JESS R. BRESSI (Bar. No. 110264)
jess.bressi@dentons.com
JAE K. PARK (Bar No. 234474)
jae.park@dentons.com
SEAN T. LOBB (Bar No. 324213)
sean.lobb@dentons.com
DENTONS US LLP
601 S. Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Telephone:     (213) 623-9300
Facsimile:      (213) 623-9924

Attorneys for Defendants
**960 N LA BREA, LLC, 1UP FITNESS GROUP
NORTH AMERICA, L.P., 703 MCKINNEY, LLC,
JOHN REED FITNESS LA, LLC, 799 VAN
NESS, LLC, and RSG GROUP NORTH
AMERICA**

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERRANTE KOBERLING CONSTRUCTION, INC., a California corporation, and FERRANTE KOBERLING CONSTRUCTION TX, INC., a Texas corporation; <br><br> Plaintiffs, <br><br> v. <br><br> 960 N LA BREA, LLC, a Delaware limited liability company; 1UP FITNESS GROUP NORTH AMERICA, L.P., a Delaware limited partnership; 703 MCKINNEY, LLC, a Delaware limited liability company; JOHN REED FITNESS LA, LLC, a Delaware limited liability company; 799 VAN NESS, LLC, a Delaware limited liability company; RSG GROUP NORTH AMERICA, a Delaware limited partnership; and DOES 1 through 100, inclusive, <br><br> Defendants. | CASE NO. 20-cv-10301 <br><br> **DEFENDANTS' NOTICE OF REMOVAL OF CIVIL ACTION TO THE UNITED STATES DISTRICT COURT UNDER 28 U.S.C. §§ 1332, 1441 AND 1446** |

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

**TO THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Defendants 960 N. La Brea, LLC, 1UP Fitness Group North America, L.P. (now known as RSG Group North America LP), 703 McKinney, LLC, John Reed Fitness LA, LLC, 799 Van Ness, LLC, and RSG Group North America LP (improperly named as RSG Group North America) (collectively "Defendants"), contemporaneously with the filing of this Notice of Removal, remove the below-referenced action from the Superior Court of the State of California for the County of Los Angeles to the United States District Court for the Central District of California.

The removal is based on 28 U.S.C. §§ 1332(d) and 1441(b) and specifically on the following grounds:

### PLEADINGS, PROCESS, AND ORDERS

1. On August 21, 2020, plaintiffs Ferrante Koberling Construction, Inc. and Ferrante Koberling Construction TX, Inc. (collectively "Plaintiffs") filed a complaint against Defendants. On October 13, 2020, Plaintiffs filed a first amended complaint against Defendants.

2. Under 28 U.S.C. § 1446(a), a true and correct copy of Plaintiffs' First Amended Complaint ("FAC") and all process and pleadings filed in the state court action are attached collectively as **Exhibit A.**

3. Plaintiffs' FAC asserts fourteen causes of action for: breach of contract, foreclosure of mechanic's lien, statutory prompt payment penalties, unjust enrichment, promissory estoppel, negligent misrepresentation, reformation-unilateral mistake, and reformation-mutual mistake. Plaintiffs' FAC seeks: over $8 million in damages plus interest, a decree from the Court, an execution for any deficiency against 960 N. La Brea and 1UP Fitness (now known as RSG Group North America LP), that the claim in the real property at issue and work of

DEFENDANTS' NOTICE OF REMOVAL

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

improvements at the 960 N. La Brea project be adjudged subordinate and subject to the lien of Plaintiffs, that Defendants be estopped from "denying their promise" to allow Ferrante Koberling Construction TX, Inc. ("FK TX") to complete the work on the 703 McKinney project and 960 N. La Brea project in exchange for the waiver of termination fees, reformation of the 703 McKinney contract, attorney fees, and costs. FAC, at 17-18.

4.      Plaintiffs allegations arise from four construction contracts and a termination agreement. *Id.*, ¶¶ 14-34. Plaintiffs allege that Defendants breached each of the four contracts, as well as the termination agreement. *Id.*, ¶¶ 35-38, 57-60, 70-81. Plaintiffs further allege that: Ferrante Koberling Construction, Inc. ("FK") recorded a valid Mechanic's Lien on the 960 N. La Brea project; Defendants have been unjustly enriched; Defendants failed to timely pay FK's progress payments; Plaintiffs made a unilateral or mutual mistake; and Defendants misrepresented that that they would not terminate FK from the 960 N. La Brea project and the 703 McKinney project. *Id.*, ¶¶ 39-56, 61-69, 85-102.

5.      Defendants have not yet been served with the Summons and FAC.

6.      On November 9 2020, Defendants filed an answer to the FAC in the Superior Court of the State of California for the County of Los Angeles, a copy of which is attached as **Exhibit B.**

## TIMELINESS OF REMOVAL

7.      Under 28 U.S.C. Section 1446(b), this Notice of Removal is timely filed as Defendants have filed it within 30 days of the date of service. Defendants have not yet been served.

## VENUE IS PROPER

8.      Venue is proper under 28 U.S.C. § 1441(a) because the United States District Court, Central District of California, embraces the county and court in which Plaintiffs filed this action, the Superior Court for the State of California, County of Los Angeles.

DEFENDANTS' NOTICE OF REMOVAL

US_Active\115901388\V-1

## JURISDICTION

9.     "[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending."  28 U.S.C. § 1441(a). This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, as Plaintiffs state that they seeks damage in excess of $75,000.00, exclusive of interest and costs, and there is diversity between Plaintiffs and Defendants.  28 U.S.C. §§ 1332(a), 1441.

10.     Accordingly, this case is properly removed under 28 U.S.C. §§ 1332 and 1441.

### B.     Diversity of Citizenship

11.     For diversity purposes, "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business."  28 U.S.C. § 1332(c)(1).

12.     For diversity purposes, the citizenship of a limited liability company or limited partnership is determined by examining the citizenship of all of its partners or members—not the location of the entity itself.  *See Lincoln Property Co. v. Roche*, 546 U.S. 81, 84 n.1 (2005).

13.     As alleged in the FAC, FK is and was, at the time of the filing of the FAC and the filing of this removal, a corporation and a licensed contractor in the state of California.  FAC, ¶ 1.  Therefore, FK is a California citizen for diversity purposes.

14.     As alleged in the FAC, FK TX is and was, at the time of the filing of the FAC and the filing of this removal, a corporation established in the state of Texas.  *Id.*, ¶ 2.  Therefore, FK TX is a Texas citizen for diversity purposes.

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

DEFENDANTS' NOTICE OF REMOVAL

US_Active\115901388\V-1

15.     Defendant 960 N. La Brea, LLC ("La Brea") is and was at all times herein mentioned a limited liability company organized and existing under the laws of the state of Delaware.  Its members are citizens of Germany and Delaware.  RSG Group North America LP ("RSG NA") is the 100% direct owner of La Brea.  RSG NA is owned 99% by RS Beteiligungs GmbH (a German company) and 1% by RS USA Management LLC (a Delaware entity).  RS USA Management LLC is 100% owned by RS Beteiligungs GmbH (a German company).  Therefore, La Brea is a citizen of Germany and Delaware for diversity purposes.

16.     Defendant 1UP Fitness Group North America LP ("1UP") is and was at all times herein mentioned a limited partnership organized and existing under the laws of the state of Delaware.  Its members are citizens of Germany and Delaware.  Per an amendment to the certificate of limited partnership in April 2019, 1UP changed its name to RSG Group North America LP.  Thus, 1UP is the same entity as RSG NA.  RSG NA is owned 99% by RS Beteiligungs GmbH (a German company) and 1% by RS USA Management LLC (a Delaware entity).  RS USA Management LLC is 100% owned by RS Beteiligungs GmbH (a German company).  Therefore, 1UP, now known as RSG NA was a citizen of Germany and Delaware for diversity purposes.

17.     Defendant 703 McKinney, LLC ("McKinney") is and was at all times herein mentioned a limited liability company organized and existing under the laws of the state of Delaware.  Its members are citizens of Germany and Delaware.  RSG NA is the 100% direct owner of McKinney.  RSG NA is owned 99% by RS Beteiligungs GmbH (a German company) and 1% by RS USA Management LLC (a Delaware entity).  RS USA Management LLC is 100% owned by RS Beteiligungs GmbH (a German company).  Therefore, McKinney is a citizen of Germany and Delaware for diversity purposes.

18.     Defendant John Reed Fitness LA, LLC ("John Reed") is and was at all times herein mentioned a limited liability company organized and existing under

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA  90017
(213) 623-9300

DEFENDANTS' NOTICE OF REMOVAL

US_Active\115901388\V-1

the laws of the state of Delaware.  Its members are citizens of Germany and Delaware.  RSG NA is the 100% direct owner of John Reed.  RSG NA is owned 99% by RS Beteiligungs GmbH (a German company) and 1% by RS USA Management LLC (a Delaware entity).  RS USA Management LLC is 100% owned by RS Beteiligungs GmbH (a German company).  Therefore, John Reed is a citizen of Germany and Delaware for diversity purposes.

19.    Defendant 799 Van Ness, LLC ("Van Ness") is and was at all times herein mentioned a limited liability company organized and existing under the laws of the state of Delaware.  Its members are citizens of Germany and Delaware.  RSG NA is the 100% direct owner of Van Ness.  RSG NA is owned 99% by RS Beteiligungs GmbH (a German company) and 1% by RS USA Management LLC (a Delaware entity).  RS USA Management LLC is 100% owned by RS Beteiligungs GmbH (a German company).  Therefore, Van Ness is a citizen of Germany and Delaware for diversity purposes.

20.    As described in paragraph 16 above, Defendant RSG Group North America LP is the same entity/defendant as 1UP, by virtue of a name change amendment filed by 1UP in April 2019.

21.    Doe defendants are disregarded when determining diversity jurisdiction for removal.  28 U.S.C. § 1441(b)(1).

22.    As Plaintiffs are California and Texas citizens, and Defendants are Germany and Delaware citizens, the parties are diverse.

**C.    Amount in Controversy**

23.    To meet the 28 U.S.C. § 1332(a) amount-in-controversy threshold, the plaintiff must allege damages in excess of $75,000 at the time of removal.

24.    Plaintiff seeks $8,000,620.25 in damages, plus 10% in interest, as well as attorney fees and costs.  FAC, at 17-18.

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

DEFENDANTS' NOTICE OF REMOVAL

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA  90017
(213) 623-9300

25.     Accordingly, the amount in controversy, exclusive of interest and costs, well exceeds the $75,000 jurisdictional minimum for federal diversity jurisdiction.

## NOTICE TO PLAINTIFFS AND SUPERIOR COURT

26.     Contemporaneously with the filing of this Notice of Removal in the United States District Court for the Central District of California, and under 28 U.S.C. § 1446(d), written notice of this filing and any attendant supplementary papers required by this Court will be given to Plaintiffs, and a copy of the Notice of Removal will be filed with the Clerk of the Court for the Superior Court of the State of California for the County of Los Angeles.

27.     Defendants, by filing this Notice of Removal, do not waive any defenses or objections available to it under the law.  Defendants reserve the right to amend or supplement this Notice of Removal.

WHEREFORE, Defendants request that the above-captioned action pending in the Superior Court of the State of California for the County of Los Angeles, Case No. 20STCV32020, be removed to this Court.

Dated:  November 10, 2020

Respectfully submitted,
DENTONS US LLP

By: */s/ Sean Lobb*
Sean T. Lobb

Attorney for Defendants
**960 N LA BREA, LLC, 1UP FITNESS GROUP NORTH AMERICA, L.P., 703 MCKINNEY, LLC, JOHN REED FITNESS LA, LLC, 799 VAN NESS, LLC,  and RSG GROUP NORTH AMERICA**

DEFENDANTS' NOTICE OF REMOVAL

US_Active\115901388\V-1

# EXHIBIT A

**EXHIBIT A**

EXHIBIT A - 000007

Electronically FILED by Superior Court of California, County of Los Angeles on 08/21/2020 06:29 PM Sherri R. Carter, Executive Officer/Clerk of Court, by N. Alvarez,Deputy Clerk
Case 2:20-cv-10301-JFW-GJS   Document 1-1   Filed 11/10/20   Page 9 of 184   Page ID #:9
Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Jon Takasugi

1 | Mark A. Feldman, State Bar No. 152476
Andrew A. Monge, State Bar No. 329466
2 | FELDMAN & ASSOCIATES, INC.
11030 Santa Monica Blvd., Suite 109
3 | Los Angeles, California 90025
Telephone:     (310) 312-5401
4 | Fax:             (310) 312-5409
mfeldman@feldmanandassoc.com
5 | amonge@feldmanandassoc.com

6 | Attorneys for Plaintiff,
FERRANTE KOBERLING CONSTRUCTION, INC.
7 | and FERRANTE KOBERLING CONSTRUCTION TX, INC.

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **LOS ANGELES COUNTY-STANLEY MOSK COURTHOUSE-UNLIMITED**

10

11

| | |
|---|---|
| 12 FERRANTE KOBERLING<br>CONSTRUCTION, INC., a California<br>13 corporation, and FERRANTE KOBERLING<br>CONSTRUCTION TX, INC., a Texas<br>14 corporation; | ) CASE NO.  20STCV32020<br>)<br>) Assigned to:<br>) Department: |
| 15                 Plaintiff,<br>16 | ) **FERRANTE KOBERLING<br>CONSTRUCTION, INC.'S,<br>COMPLAINT FOR:** |
| 17 v. | ) 1.   **BREACH OF CONTRACT;**<br>) 2.   **STATUTORY PROMPT;<br>        PAYMENT PENALTIES;** |
| 18 960 N LA BREA, LLC, a Delaware limited<br>19 liability company; 1UP FITNESS GROUP<br>NORTH AMERICA, L.P., a Delaware limited<br>20 partnership; 703 MCKINNEY, LLC, a<br>Delaware limited liability company; JOHN<br>21 REED FITNESS LA, LLC, a Delaware limited<br>liability company; 799 VAN NESS, LLC, a<br>22 Delaware limited liability company; RSG<br>GROUP NORTH AMERICA, a Delaware<br>23 limited partnership; SEBASTIAN SCHOEPE,<br>an individual; and DOES 1 through 100,<br>24 inclusive, | ) 3.   **UNJUST ENRICHMENT;**<br>) 4.   **BREACH OF CONTRACT;**<br>) 5.   **STATUTORY PROMPT<br>        PAYMENT PENALTIES;**<br>) 6.   **UNJUST ENRICHMENT;**<br>) 7.   **BREACH OF CONTRACT;**<br>) 8.   **BREACH OF CONTRACT;**<br>) 9.   **BREACH OF CONTRACT; and**<br>) 10.  **PROMISSORY ESTOPPEL;**<br>) 11.  **NEGLIGENT<br>        MISREPRESENTATION**<br>) 12.  **REFORMATION-UNILATERAL<br>        MISTAKE** |
| 25                 Defendants. | ) 13.  **REFORMATION-MUTUAL<br>        MISTAKE** |
| 26 | |

27

28

EXHIBIT A - 000008

Plaintiff FERRANTE KOBERLING CONSTRUCTION, INC., hereby alleges the following:

<u>COMMON ALLEGATIONS</u>

1.  Plaintiff FERRANTE KOBERLING CONSTRUCTION, INC. ("Ferrante") is now, and at all times relevant has been, a corporation and a licensed contractor in the state of California.

2.  Plaintiff FERRANTE KOBERLING CONSTRUCTION TX, INC. ("Ferrante TX") is now, and at all times relevant has been, a corporation established in the state of Texas.

3.  Plaintiffs are informed and believe and on the basis of such information and belief allege that Defendant, 960 N. LA BREA, LLC ("960 La Brea"), is now, and at all times relevant has been, an Delaware limited liability company operating in the state of California located at 925 N. La Brea Ave, 4th floor, Los Angeles, California 90038. This is the company's nerve center.

4.  Plaintiffs are informed and believe and on the basis of such information and belief allege that Defendant, John Reed Fitness LA, LLC, ("John Reed Fitness"), is now, and at all times relevant has been, a limited liability company in the state of California located at 925 N. La Brea Ave, 4th floor, Los Angeles, California 90038. This is the company's nerve center.

5.  Plaintiffs are informed and believe and on the basis of such information and belief allege that Defendant, 703 McKinney, LLC, ("703 McKinney"), is now, and at all times relevant has been, a Delaware limited liability company which has operated in the state of California and has its mailing address listed as 925 N. La Brea Ave, 4th floor, Los Angeles, California 90038. This is the company's nerve center.

6.  Plaintiffs are informed and believe and on the basis of such information and belief allege that Defendant, 799 Van Ness, LLC, ("799 Van Ness"), is now, and at all times relevant has been, a Delaware limited liability company operating in the state of California located at 925 N. La Brea Ave, 4th floor, Los Angeles, California 90038. This is the company's nerve center.

7.  Plaintiffs are informed and believe and on the basis of such information and belief allege that Defendant, 1UP Fitness Grout North America, LP, ("1UP Fitness"), is now, and at all times relevant has been, a Delaware limited liability company operating in the state of California, and is located at 925 N. La Brea Ave, 4th floor, Los Angeles, California 90038. This is the company's nerve center.

EXHIBIT A - 000009

8.      Plaintiffs are informed and believe and on the basis of such information and belief allege that Defendant, RSG Group North America, LP, ("RSG Group"), is now, and at all times relevant herein has been, a limited liability company in the state of California located at 925 N. La Brea Ave, 4th floor, Los Angeles, California 90038. This is the company's nerve center. RSG Group operates as 1UP Fitness according to its Foreign Limited Partnership Amendment to Application for Registration that was filed with the California Secretary of State.

9.      John Reed Fitness, 703 McKinney, 799 Van Ness, 1Up Fitness, and RSG Group, all do business from an office in or around Los Angeles, through which they contract for construction, real estate, and development, of various works of improvement, including the works of improvement referenced in this Complaint. Its local office at 925 N. La Brea, and the vicinity, is where each of the Defendant entities conduct their business and from which each entity entered into various agreements with the Defendant for the construction of the projects referenced in this Complaint. Plaintiff is aware of at least 4 different large-scale real estate and construction projects that Defendants are, or were engaged in throughout the City, for the last 4 years.

10.      Each of the above Defendants are registered with the California Secretary of State and indicate they transact business in California.

11.      Sebastian Schoepe is an individual residing in the state of California. Sebastian Schoepe is the true owner and operator of 960 N. La Brea, 1Up Fitness, 703 McKinney, Reed Fitness, 799 Van Ness, and RSG Group.

12.      Plaintiffs are unaware of the true names and capacities, whether individual, corporate, associate or otherwise, of Defendants, DOES 1 through 100, inclusive, and therefore sue said Defendants by such fictitious names. Plaintiffs will seek leave of Court to amend this Complaint to show the true names and capacities of such Defendants when the same have been ascertained. Plaintiffs are informed and believe and thereupon allege that each of the fictitiously named Defendants are responsible to the Plaintiffs for the injuries suffered and alleged herein, or are subject to the jurisdiction of the Court as a necessary party for the relief herein requested.

13.      Plaintiffs are informed and believe and therefore allege that each of the Defendants is now, and was at all times mentioned herein, the agent, principal, partner, joint venture, or alter ego of

1   the remaining Defendants, and that all of the acts and conduct alleged herein were performed within

2   the course and scope and in furtherance of such agency partnership, joint venture or alter ego

3   relationship.

4        The 799 Van Ness Contract

5        14.    On or about November 1, 2018, Ferrante entered into a written contract (the "799 Van

6   Ness Contract") with 799 Van Ness and 1UP Fitness for work at 799 Van Ness Avenue, San

7   Francisco, California 94102 (the "799 Van Ness Property"). The 799 Van Ness Contract was for an

8   approximately 45,000 square foot commercial retail space. The scope of work included, among other

9   things, placement of concrete footings, wood framing, and erection of the retail structure for a fitness

10  club, offices, and restaurants on a "cost plus" basis. A true and correct copy of the 799 Van Ness

11  Contract is attached as **Exhibit "A,"** and by this reference is incorporated here as if set forth in full.

12       15.    The 799 Van Ness Contract was performed in the City of San Francisco but entered into

13  in Los Angeles. Ferrante provided labor, materials, and equipment at the Property pursuant to the terms

14  of the 799 Van Ness Contract.

15       The John Reed Fitness Contract

16       16.    On or about July 12, 2019, Ferrante entered into a written contract (the "John Reed

17  Contract") with John Reed Fitness for work at 150 West 12th Street, Los Angeles, CA 90015 (the

18  "John Reed Property"). The John Reed Contract was for the construction of a commercial space. The

19  scope of work included, among other things, placement of concrete footings, wood framing, and

20  erection of the structure for a fitness club and offices. A true and correct copy of the John Reed

21  Contract is attached as **Exhibit "B,"** and by this reference is incorporated as if set forth in full.

22       17.    The John Reed Contract was performed in the of City Los Angeles. Ferrante provided

23  labor, materials, and equipment at the Property pursuant to the John Reed Contract.

24       The 960 N. La Brea Contract

25       18.    On or about July 2, 2018, Ferrante entered into a written contract (the "960 N. La Brea

26  Contract") with 960 N. La Brea and 1UP Fitness for work at 960 N. La Brea Avenue, Los Angeles, CA

27  90038 (the "960 N. La Brea Property"). The 960 N. La Brea Contract was for the construction of a

28  commercial space. The scope of work included, among other things, placement of concrete footings,

EXHIBIT A - 000011

1  wood framing, and erection of the structure for a fitness club, offices, and a restaurant. A true and

2  correct copy of the 960 N. La Brea Contract is attached as **Exhibit "C,"** and by this reference is

3  incorporated as if set forth in full.

4      19.      The 960 N. La Brea Contract was performed in the City of Los Angeles. Ferrante

5  provided labor, materials, and equipment at the Property pursuant to the 960 N. La Brea Contract.

6      20.      Ferrante submitted payment applications for labor, equipment, and materials it provided

7  in connection with work at the 960 N. La Brea Property. Under the 960 N. La Brea Contract, payment

8  was due within fifteen (15) days after the receipt of a payment application.

9      21.      960 N. La Brea issued multiple Change Orders to the 960 N. La Brea Contract which

10  substantially increased the cost of the project.

11      22.      Ferrante has sought and demanded payments from 960 N. La Brea. Despite such

12  demands, 960 N. La Brea has failed and refused to pay Ferrante the remaining balance due for the 960

13  N. La Brea Contract.

14  703 McKinney Contract

15      23.      Also, on or about January 15, 2019, Ferrante TX entered into a written contract (the

16  "703 McKinney Contract") with 703 McKinney and 1Up Fitness for work at 703 McKinney Avenue in

17  Dallas, Texas 75202 (the "703 McKinney Property"). The 703 McKinney Contract was for the

18  construction of a commercial space. The scope of work included, among other things, placement of

19  concrete footings, wood framing, and erection of the structure for a fitness club and offices. A true and

20  correct copy of the 703 McKinney Contract is attached as **Exhibit "D,"** and by this reference is

21  incorporated as if set forth in full.

22      24.      The 703 McKinney Contract was entered into in Los Angeles, CA, and performed in the

23  City of Dallas, Texas. Ferrante TX provided labor, materials, and equipment at the 703 McKinney

24  Property pursuant to the 703 McKinney Contract.

25      25.      Ferrante TX submitted payment applications for labor, equipment, and materials it

26  provided in connection with work at the 703 McKinney Property. Under the 703 McKinney Contract,

27  payment was due within fifteen (15) days after the receipt of a payment application.

28      26.      Ferrante TX issued multiple Change Orders to the 703 McKinney Contract which

EXHIBIT A - 000012

1  substantially increased the cost of the project. Many change orders were signed by all required parties

2  of the 703 McKinney Contract.

3      27.    Ferrante TX has sought and demanded payment. Despite such demands, 703 McKinney

4  has failed and refused to pay Ferrante the remaining balance due for the 703 McKinney Contract.

5      28.    The 703 McKinney Contract erroneously contained the name "Ferrante Koberling

6  Construction, Inc." when it "Ferrante Koberling Construction TX, Inc." should have been the entity

7  listed on the document. The parties knew that Ferrante and Ferrante TX were different entities and that

8  Ferrante TX is the company that performs construction work in the state of Texas.

9      Termination Agreement

10     29.    Defendant Sebastian Schoepe ("Schoepe") is the true owner and operator of the various

11  entities described in this complaint. Sebastian Schoepe signed the 960 N. La Brea Contract, the 703

12  McKinney Contract, the 799 Van Ness Contract, and the John Reed Contract. Sebastian Schoepe is

13  involved in the operation of all the defendants. Sebastian Schoepe engaged in conduct meant to deprive

14  Ferrante of the full benefit of the contracts it had entered into.

15     30.    After Ferrante had performed substantial work at both the 799 Van Ness Property and

16  the John Reed Property, Sebastian Schoepe stated that he wanted to terminate Ferrante's 799 Van Ness

17  Contract and John Reed Contract so that Ferrante could focus its "uninterrupted attention" on the 960

18  N. La Brea Property, and the 703 McKinney Property. **Exhibit "E" page 6.** Ferrante signed an

19  agreement to terminate (the "Termination Agreement") the 799 Van Ness Contract and John Reed

20  Contract with the understanding that Sebastian Schoepe would not terminate the 960 N. La Brea

21  Contract and the 703 McKinney Contract on behalf of any of the Defendants. The Termination

22  Agreement is attached as **Exhibit E**.

23     31.    Defendants and Sebastian Schoepe agreed that the termination of the 799 Van Ness

24  Contract and the John Reed Contract would not establish any precedent for the remaining projects, and

25  that the termination could not be used "as a basis to request or justify the same or similar treatment or

26  termination of the" 960 N. La Brea Property or 703 McKinney Property.

27     32.    Sebastian Schoepe was negotiating with Ferrante and Ferrante TX on behalf of multiple

28  Defendants simultaneously. Sebastian Schoepe made representations on behalf of the Defendants

during the course of the negotiations to entice Ferrante to enter into the Termination Agreement. Schoepe signed all of the contracts at issue in these projects on behalf of the various defendants. John Oropallo signed the agreement on behalf of Ferrante.

33.     The Defendants, John Reed Fitness, 799 Van Ness, 1UP Fitness, RSG Group, and DOES 1 through 100, inclusive, violated the Termination Agreement that Schoepe drafted for the Defendants and asked Ferrante to sign. The Termination Agreement applied to the 799 Van Ness Contract and John Reed Contract. Due to the breach of the Termination Agreement, Ferrante now seeks $350,000 as the termination fee for the 799 Van Ness Contract, and $150,000 as the termination fee for the John Reed Contract.

34.     The Termination Agreement was signed on March 20, 2020. Despite having told Ferrante that Defendants would not terminate Ferrante's 960 N. La Brea Contract or Ferrante TX's 703 McKinney Contract, less than a month later, on April 13, 2020, Ferrante received two letters terminating the 960 N. La Brea Contract and the 703 McKinney Contract. The letters were signed on behalf of 960 N. La Brea, 703 McKinney, and the RSG Group.

## FIRST CAUSE OF ACTION

(For Breach of 960 N. La Brea Contract against Defendants 960 N. La Brea, 1UP Fitness, and Does 1 through 100, inclusive)

35.     Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as though fully set forth herein.

36.     Ferrante has fully performed and executed all terms, provisions, and conditions of the 960 N. La Brea Contract to be performed by it, except to the extent said performance was prevented or excused by 960 N. La Brea's conduct, 1UP Fitness' conduct or other conduct and circumstances not attributable to Ferrante.

37.     Defendants breached the 960 N. La Brea Contract by, among other things, failing to pay the sum of $4,999,639.71 for materials, equipment, and labor, that Ferrante provided to 960 N. La Brea and 1UP Fitness at the 960 N. La Brea Property, and failing to pay the termination fee of $350,000.

38.     Under the 960 N. La Brea Contract, invoices that remain unpaid after fifteen days accrue interest of 10% per annum on the outstanding balance.   In addition, the 960 N. La Brea

Contract provides for the recovery of reasonable attorney's fees, expert fees, and court costs incurred to collect payment after a termination for convenience. As a direct and proximate result of the above-described breaches of the 960 N. La Brea Contract, Ferrante has sustained damages, the exact nature and extent of which are presently unknown to Ferrante, but which Ferrante is informed and believes, and thereupon alleges, exceed $4,999,639.71. Ferrante will seek leave of Court to amend this Complaint when the exact amount of such damages has been ascertained.

## SECOND CAUSE OF ACTION

(Prompt Payment Penalties against Defendants 960 N. La Brea, 1UP Fitness, and DOES 1 through 100, inclusive)

39.  Plaintiffs refer to all preceding paragraphs and incorporate by reference the same paragraphs as though fully set forth below.

40.  Ferrante is informed and believes, and thereon alleges that Defendants 960 N. La Brea, 1UP Fitness, and DOES 1-100 were required to make progress payments to Ferrante for materials, labor, and services provided by Ferrante under the 960 N. La Brea Contract.

41.  Under the Civil Code and the terms of the 960 N. La Brea Contract, 960 N. La Brea, 1UP Fitness, and DOES 1-100 were required to make timely progress Payments.

42.  Defendants failed to timely pay Ferrante's progress payments in violation of the 960 N. La Brea Contract and *California Civil Code* Section 8800.   Consequently, Ferrante is entitled to prompt payment penalties of 2% per month, and reasonable attorney's fees and costs.

## THIRD CAUSE OF ACTION

(Unjust Enrichment Against 960 N. La Brea, 1UP Fitness and DOES 1 through 100, inclusive)

43.  Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as though fully set forth herein.

44.  By virtue of their conduct, 960 N. La Brea and 1UP Fitness were unjustly enriched by receiving at least $4,999,639.71 in value from work, labor, and material, that were furnished, installed, and performed by Ferrante, and Defendants have not paid Ferrante for any of it. Defendants have unjustly retained the benefits of that work, labor, and material.

45.  Ferrante conferred a substantial benefit upon 960 N. La Brea and 1UP Fitness which the

EXHIBIT A - 000015

1   Defendants received (and would not have received but for Ferrante's work at the project).

2       46.    Ferrante did not receive any benefit in return for its work and instead Ferrante incurred

3   $4,999,639.71 in actual costs. Ferrante continued to perform work for 960 N. La Brea and 1UP Fitness

4   while awaiting payments which were never received.

5       47.    960 N. La Brea and 1UP Fitness engaged in unjust, illegal, and wrongful conduct in that

6   960 N. La Brea and 1UP Fitness continued to receive the benefits conferred on them by Ferrante when

7   960 N. La Brea and 1UP Fitness accepted the benefits of the work but did not intend on paying

8   Ferrante for that work.

9   **FOURTH CAUSE OF ACTION**

10   (For Breach of 703 McKinney Contract against Defendants 703 McKinney, 1UP Fitness, and

11   Does 1 through 100, inclusive)

12       48.    Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as

13   though fully set forth herein.

14       49.    Ferrante TX has fully performed and executed all terms, provisions, and conditions of

15   the 703 McKinney Contract to be performed by it, except to the extent said performance was prevented

16   or excused by 703 McKinney's conduct, 1UP Fitness' conduct or other conduct and circumstances not

17   attributable to Ferrante TX.

18       50.    Defendants breached the 703 McKinney Contract by, among other things, failing to pay

19   the sum of $2,500,980.54 for materials, equipment and labor Ferrante TX provided to 703 McKinney

20   and 1UP Fitness at the 703 McKinney Property, including the termination for convenience fee of

21   $350,000.

22       51.    Under the 703 McKinney Contract, invoices that remain unpaid after fifteen days

23   accrue interest of 10% per annum on the outstanding balance.   In addition, the 703 McKinney

24   Contract provides for the recovery of reasonable attorney's fees, expert fees, and court costs incurred

25   to collect payment after a termination for convenience. As a direct and proximate result of the above-

26   described breaches of the 703 McKinney Contract, Ferrante TX has sustained damages, the exact

27   nature and extent of which are presently unknown to Ferrante TX, but which Ferrante TX is informed

28   and believes, and thereupon alleges, exceed $2,500,980.54. Ferrante TX will seek leave of Court to

9

COMPLAINT

EXHIBIT A - 000016

1   amend this Complaint when the exact amount of such damages has been ascertained.

2   <center>**FIFTH CAUSE OF ACTION**</center>

3   <center>(Prompt Payment Penalties against Defendants 703 McKinney, 1UP Fitness, and DOES 1</center>

4   <center>through 100, inclusive)</center>

5   52.    Plaintiffs refer to all preceding paragraphs and incorporate by reference the same

6   paragraphs as though fully set forth below.

7   53.    Ferrante TX is informed and believes, and thereon alleges that Defendants 703

8   McKinney, 1UP Fitness, and DOES 1-100 were required to make progress payments to Ferrante TX

9   for materials, labor, and services provided by Ferrante TX under the 703 McKinney Contract.

10   54.    Under the terms of the 703 McKinney Contract and the Civil Code, 703 McKinney,

11   1UP Fitness and DOES 1-100 were required to make timely progress Payments.

12   55.    Defendants failed to timely pay Ferrante TX's progress payments in violation of the 703

13   McKinney Contract and *California Civil Code* Section 8800.   Consequently, Ferrante TX is entitled to

14   prompt payment penalties of 2% per month, and reasonable attorney's fees and costs.

15   <center>**SIXTH CAUSE OF ACTION**</center>

16   <center>(Unjust Enrichment against 703 McKinney, 1UP Fitness, and DOES 1 through 100, inclusive)</center>

17   56.    Plaintiffs refer to all preceding paragraphs and incorporate by reference the same

18   paragraphs as though fully set forth below.

19   57.    By virtue of their conduct, 703 McKinney and 1UP Fitness were unjustly enriched by

20   receiving at least $2,500,980.54 in value from work, labor, and material, that were furnished, installed,

21   and performed by Ferrante TX, and Defendants have not paid Ferrante TX for any of it. Defendants

22   have unjustly retained the benefits of that work, labor, and material.

23   58.    Ferrante TX conferred a substantial benefit upon 703 McKinney and 1UP Fitness which

24   the Defendants received (and would not have received but for Ferrante's work at the project).

25   59.    Ferrante TX did not receive any benefit in return for its work and instead Ferrante TX

26   incurred $2,500,980.54 in actual costs. Ferrante TX continued to perform work for 703 McKinney and

27   1UP Fitness while awaiting payments which were never received.

28   60.    703 McKinney and 1UP Fitness engaged in unjust, illegal, and wrongful conduct in that

<center>10</center>
<center>COMPLAINT</center>

703 McKinney and 1UP Fitness continued to receive the benefits conferred on them by Ferrante TX when 703 McKinney and 1UP Fitness accepted the benefits of the work but did not intend on paying Ferrante TX for that work.

## SEVENTH CAUSE OF ACTION

(Breach of John Reed Contract against John Reed Fitness, and DOES 1 through 100, inclusive)

61.     Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as though fully set forth herein.

62.     Ferrante has fully performed and executed all terms, provisions, and conditions of the John Reed Contract to be performed by it, except to the extent said performance was prevented or excused by John Reed Fitness' conduct, or other conduct and circumstances not attributable to Ferrante.

63.     Defendants breached the John Reed Contract by, among other things, failing to pay the termination for convenience fee of $150,000.

64.     Under the John Reed Contract, invoices that remain unpaid after fifteen days accrue interest of 10% per annum on the outstanding balance.   In addition, the John Reed Contract provides for the recovery of reasonable attorney's fees, expert fees, and court costs incurred to collect payment after a termination for convenience. As a direct and proximate result of the above-described breaches of the John Reed Contract, Ferrante has sustained damages, the exact nature and extent of which are presently unknown to Ferrante, but which Ferrante is informed and believes, and thereupon alleges, exceed $150,000. Ferrante will seek leave of Court to amend this Complaint when the exact amount of such damages has been ascertained.

## EIGHTH CAUSE OF ACTION

(Breach of the 799 Van Ness Contract against 799 Van Ness, 1UP Fitness, RSG Group, and DOES 1 through 100, inclusive)

65.     Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as though fully set forth herein.

66.     Ferrante has fully performed and executed all terms, provisions, and conditions of the 799 Van Ness Contract to be performed by it, except to the extent said performance was prevented or

EXHIBIT A - 000018

1 | excused by 799 Van Ness' conduct, 1UP Fitness' conduct, or other conduct and circumstances not
2 | attributable to Ferrante.

3 | 67. Defendants breached the 799 Van Ness Contract by, among other things, failing to pay
4 | the termination for convenience fee of $350,000.

5 | 68. Under the 799 Van Ness Contract, invoices that remain unpaid after fifteen days accrue
6 | interest of 10% per annum on the outstanding balance. In addition, the 799 Van Ness Contract
7 | provides for the recovery of reasonable attorney's fees, expert fees, and court costs incurred to collect
8 | payment after a termination for convenience. As a direct and proximate result of the above-described
9 | breaches of the John Reed Contract, Ferrante has sustained damages, the exact nature and extent of
10 | which are presently unknown to Ferrante, but which Ferrante is informed and believes, and thereupon
11 | alleges, exceed $350,000. Ferrante will seek leave of Court to amend this Complaint when the exact
12 | amount of such damages has been ascertained.

### NINTH CAUSE OF ACTION

(Breach of Termination Agreement against 799 Van Ness, John Reed Fitness, 1UP Fitness, RSG
Group, and DOES 1 through 100, inclusive)

16 | 69. Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as
17 | though fully set forth herein.

18 | 70. Ferrante has fully performed and executed all terms, provisions, and conditions of the
19 | contract to be performed by it, except to the extent said performance was prevented or excused by 799
20 | Van Ness' conduct, John Reed Fitness' conduct, 1UP Fitness' conduct, or other conduct and
21 | circumstances not attributable to Ferrante.

22 | 71. Defendants breached the contract by, among other things, failing to allow Ferrante TX
23 | to complete work it was prepared to do at the 703 McKinney Property and Ferrante to complete work it
24 | was prepared to do at the 960 N. La Brea Property, and not paying Ferrante's termination fees.
25 | Defendants were required to perform their obligations under the Termination Agreement in good faith.
26 | In entering into a promise to not terminate Ferrante or Ferrante TX, and subsequently terminating
27 | Ferrante and Ferrante TX within a matter of weeks, Defendants acted in bad faith and with disregard
28 | for their obligations under the Termination Agreement.

72.     As a direct and proximate result of the above-described breaches of the contract, Ferrante has sustained damages, the exact nature and extent of which are presently unknown to Ferrante, but which Ferrante is informed and believes, and thereupon alleges, exceed $500,000. Ferrante will seek leave of Court to amend this Complaint when the exact amount of such damages has been ascertained.

**TENTH CAUSE OF ACTION**

(Promissory Estoppel Against John Reed Fitness, 799 Van Ness, 1UP Fitness, RSG Group, and DOES 1 through 100, inclusive)

73.     Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as though fully set forth herein.

74.     The Defendants made a clear and unambiguous promise that they would not terminate Ferrante from the 960 N. La Brea Property and Ferrante TX from the 703 McKinney Property if Ferrante did not pursue the termination fees it was entitled to under the 799 Van Ness Contract and John Reed Contract. Ferrante's reliance on this promise was reasonable and foreseeable. Defendants knew that Ferrante was agreeing to waive the termination fees so that it could continue its work on the 960 N. La Brea Property and the 703 McKinney Property. Ferrante actually did rely upon this promise when it signed the Termination Agreement.

75.     The promise to not terminate Ferrante has been breached as Ferrante was ultimately terminated for convenience at the 960 N. La Brea Property and the 703 McKinney Property. Ferrante relied upon the statements from the Defendants to its detriment. Unjust enrichment between the parties will result if the Defendants are able to deny the existence of this promise. Injustice can only be avoided through enforcement of the promise.

**ELEVENTH CAUSE OF ACTION**

(Negligent Misrepresentation Against Sebastian Schoepe, John Reed Fitness, 799 Van Ness, 1UP Fitness, RSG Group, and DOES 1 through 100, inclusive)

76.     Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as though fully set forth herein.

77.     The Defendants made a clear and unambiguous statement (or misrepresentation) that

13

COMPLAINT

they would not terminate Ferrante from the 960 N. La Brea Property and Ferrante TX from the 703 McKinney Property if Ferrante did not pursue the termination fees it was entitled to under the 799 Van Ness Contract and John Reed Contract.

78.     During the week of March 15, 2020, Sebastian Schoepe discussed the various project with Plaintiffs in Los Angeles. Schoepe told John Oropallo that Defendants had no intention of terminating Plaintiffs at either the 960 N. La Brea Property or the 703 McKinney Property. Schoepe said he would not terminate them if Plaintiffs agreed to waive certain rights at the other properties. Schoepe stated that he wanted the 703 McKinney Property and the 960 N. La Brea Property to be completed quickly and for the focus of the teams to be on those two projects. He then presented Plaintiffs with the Termination Agreement that Schoepe drafted.

79.     However, the Defendants knew these statements to be untrue or made them with no reasonable grounds to believe the statements were true. Ferrante was terminated from the 960 N. La Brea Property and Ferrante TX was terminated from the 703 McKinney Property less than a month after the misrepresentations were made.

80.     The Defendants intended for Ferrante to rely on their misrepresentations so that Ferrante would agree to waive its termination fees pursuant to the 799 Van Ness Contract and John Reed Contract.

81.     The Ferrante's reliance on this misrepresentation was reasonable and foreseeable because Plaintiffs wanted to continue work the 799 Van Ness Project and John Reed Project but wanted compensation for the other two ongoing projects. Plaintiffs planned to continue work at the terminated projects but for the promise by Defendants to not terminate Plaintiffs at 703 McKinney or 960 N. La Brea. The Defendants knew that Ferrante was agreeing to waive the termination fees so that work could continue at the 960 N. La Brea Property and the 703 McKinney Property.

82.     Ferrante actually did rely upon this promise when it signed the Termination Agreement. Ferrante has suffered damages in an amount no less than $500,000, due Ferrante's reliance on the Defendants' misrepresentation. The Defendants' never made any statement to Ferrante indicating that their statements were false.

EXHIBIT A - 000021

**TWELFTH CAUSE OF ACTION**

(Reformation - Unilateral Mistake Against 703 McKinney, 1UP Fitness, RSG Group,

and DOES 1 through 100, inclusive)

83.     Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as though fully set forth herein.

84.     Ferrante TX alleges that it made a mistake in the formation of the 703 McKinney Contract. The entity listed is "Ferrante Koberling Construction, Inc." but "Ferrante Koberling Construction TX, Inc." is the proper party to the contract.

85.     The mistake is material to the 703 McKinney Contract because it incorrectly identifies the entity performing under the contract.

86.     There was a unilateral mistake by Ferrante TX in that Ferrante TX did not notice it was executing a contract with "Ferrante Koberling Construction, Inc." on the document.

87.     Based on the obvious mistake in the execution of the 703 McKinney Contract, Ferrante TX requests that this Court order the reformation of the 703 McKinney Contract to reflect the true intention of the parties so that the correct entity is named in the 703 McKinney Contract.

**THIRTEENTH CAUSE OF ACTION**

(Reformation - Mutual Mistake Against 703 McKinney, 1UP Fitness, RSG Group,

and DOES 1 through 100, inclusive)

88.     Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as though fully set forth herein.

89.     Ferrante TX alleges that a mistake was made in the formation of the 703 McKinney Contract. The entity listed is "Ferrante Koberling Construction, Inc." when "Ferrante Koberling Construction TX, Inc." is the proper party to the contract.

90.     Ferrante TX and the Defendants did not realize that the wrong entity had been erroneously named.

91.     The mistake is material to the 703 McKinney Contract because it incorrectly identifies the entity performing under the contract.

92.     There was a mutual mistake between both Ferrante TX and the Defendants, in that all

1    the parties thought the correct entity name was on the 703 McKinney Contract.

2         93.    Based on the obvious mistake in the execution of the 703 McKinney Contract, Ferrante

3    TX requests that this Court order the reformation of the 703 McKinney Contract to reflect the true

4    intention of the parties so that the correct entity is named in the 703 McKinney Contract.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against the Defendants as follows:

1.    For the sum of $4,999,639.71, together with interest thereon at the rate of ten percent (10%) per annum;

2.    For the sum of $2,500,980.54, together with interest thereon at the rate of ten percent (10%) per annum;

3.    For the sum of $350,000, together with interest thereon at the rate of ten percent (10%) per annum;

4.    For the sum of $150,000, together with interest thereon at the rate of ten percent (10%) per annum;

5.    That the Defendants be estopped from denying their promise to allow Ferrante TX to complete its work on the 703 McKinney Property and to allow Ferrate to complete its work on the 960 N. La Brea Property in exchange for the waiver of termination fees;

6.    Reformation of the 703 McKinney Contract;

7.    For attorney's fees and costs of suit; and

8.    For such other and further relief as the Court may deem just and proper.

DATED:    August 21, 2020          FELDMAN & ASSOCIATES, INC.


By:    _____
       Mark A. Feldman
       Andrew A. Monge
       Attorneys for Plaintiff
       FERRANTE KOBERLING CONSTRUCTION,
       INC., and FERRANTE KOBERLING
       CONSTRUCTION TX, INC.

EXHIBIT A - 000023

# EXHIBIT "A"

EXHIBIT A - 000024



# COST PLUS AGREEMENT BETWEEN OWNER AND CONTRACTOR

| | |
|---|---|
| Owner: 799 Van Ness, LLC | Contractor: Ferrante Koberling Construction, Inc. |
| Address: 925 N La Brea Ave, 4th Floor | 4700 W. Jefferson Blvd. #103 |
| City, State, Zip: Los Angeles, CA 90038 | Los Angeles, CA 90016 |
| Contact: Sebastian Schoepe | Tax ID No: 46-3955278 |
| Phone: (424)387-5709 | CA License No. 988562 |
| E-mail: schoepe@1upfitness.com | Contact: Michael Ferrante |
| Tax ID No: | Phone: (323) 933-3203 |
| | Email: mferrante@ferrantekoberling.com |
| Project: 799 Van Ness | Architect: Gruen Architects |
| Project Address: 799 Van Ness Ave | Address: 6330 S Vicente Blvd #200 |
| City, State, Zip: San Francisco, CA 94102 | City, State, Zip: Los Angeles, CA 90048 |

This Agreement Between Owner and Contractor is dated November 1st, 2018 and is between FERRANTE KOBERLING CONSTRUCTION, INC., a California corporation ("**Contractor**"), 799 VAN NESS, LLC, a Delaware limited liability corporation ("**960 N La Brea**"), and 1UP FITNESS GROUP NORTH AMERICA LP, a Delaware limited partnership, and affiliated companies ("**1UP Fitness,**" and together with **960 N La Brea**, and affiliated companies are the "**Owner**")

## Recitals

A.  Owner is leasing and building out approximately 45,000 SF of commercial space ("**Commercial Work**") as a Fitness Club, Office and Restaurant in the building located at 799 Van Ness, San Fransisco, CA 94102 ("**Project**").

B.  Contractor is experienced, qualified, and staffed to perform this Commercial Work.

C.  Owner and Contractor have reached an agreement for Contractor to perform the Commercial Work and desire to set forth their respective rights, responsibilities, terms, conditions, and compensation to be paid to Contractor.

Owner and Contractor therefore agree as follows:

1.0     **Contract Documents.** The Contract Documents consist of the following: (i) this agreement; (ii) written modifications to this agreement signed by both parties; and (iii) those documents listed under section 19.0. The Contract Documents are complementary and cumulative and what is called for by one shall be as binding as if called for by all. In case of conflicts between the drawings and specifications, the specifications will govern. In case of omissions, errors, or inconsistency among the Contract Documents, the Contractor shall immediately submit the matter to Owner for clarification. Owner's clarifications are final and binding, subject to an equitable adjustment in the compensation, the Contractor's time for performance, or both, or to dispute mitigation and resolution.

2.0     **The Relationship Between the Parties.** The parties hereby agree to proceed on the basis of mutual trust, good faith, and fair dealing. Each party shall perform its obligations with integrity and shall avoid any conflicts of interest.

3.0     **Work.** Contractor shall perform the Work in a workmanlike and expeditious manner consistent with the Contract Documents. Contractor shall provide all labor, materials, equipment, and services necessary to complete the Work in accord with the Contract Documents and Exhibits C and K, "Estimated Budget" and "Schedule of the Work," respectively.

4.0     **Compensation, Cost Plus Fee.** Owner shall compensate Contractor for Work performed as follows:

4.1     The Cost of the Work as set forth in section 7.0, plus 6 percent for overhead and 7 percent for profit (the overhead and profit markups constitute the "**Fee**"). The Fee will be paid in proportion to the Work performed.

EXHIBIT A - 000025



4.2     The Estimated Budget to complete the Work is $10,000,000.00 as set forth in Exhibit C. The Estimated Budget is not a guaranteed maximum price for the Cost of the Work or Fee. If Contractor becomes aware that the Estimated Budget will be exceeded, Contractor must promptly notify Owner in writing before performing the Work in excess of the Estimated Budget. This notice may include the Contractor's estimate of the additional costs necessary to complete the Work. The Contractor may stop work and is under no obligation to proceed with the Work in excess of the Estimated Budget until Owner authorizes Contractor in writing to proceed. Contractor is not liable for any delay in receiving this authorization.

5.0     **Owner Responsibilities.** Owner shall provide any information and services at Owner's expense and when required for the successful and expeditious completion of the Work.

5.1     As a condition to Contractor starting the Work, Owner shall provide Contractor with reasonable evidence of sufficient and available funds to satisfy all of Owner's obligations under this agreement. In the case of Project financing, such evidence must include the name and address of any construction lender and a copy of the loan commitment and loan disbursement agreement between Owner and Owner's lenders relating to the provision and disbursement of funds to Owner for its obligations under this agreement, except information deemed proprietary or confidential by Owner or Owner's lenders. During performance of the Work, Owner shall notify Contractor in writing Contractor of any material change in Project financing.

5.2     Owner shall provide Contractor with information describing the physical characteristics of the Project, including surveys, site evaluations, legal descriptions, data, or drawings depicting existing conditions, subsurface, and environmental studies, reports, investigations, tests, inspections, and other reports dealing with environmental matters, hazardous material and other existing conditions, including structural, mechanical, and chemical tests required by the Contract Documents or by law.

5.3     Owner shall provide Contractor with any other information or services requested by Contractor that Contractor claims is relevant to its performance of the Work and under Owner's control.

5.4     Within 7 days of this agreement being signed by the parties, Owner shall provide Contractor with the information necessary to give notice of or enforce mechanics' lien rights. This information must include Owner's interest in the real property on which the Project is located and the record legal title, and the name and address of the record fee owner if not the Owner. In this agreement, "**days**" means calendar days unless otherwise noted.

5.5     Owner shall secure and pay for all permits, approvals, easements, assessments, and fees required in connection with the Work.

5.6     Owner shall designate an Owner's authorized representative ("**OAR**") to provide approvals and directives necessary for the day-to-day administration of this agreement, the Work, and the Project. Owner shall designate the limits of any authority delegated to the OAR with respect to the following: executing any contract, contract modification, or other form of binding agreement; obligating the Owner in any manner to the payment of money; rendering any final decision on any contract matter, claim or dispute, terminating, suspending, or otherwise interfering with the Contractor's performance, directing any changes in the Contract Documents or in the Contractor's performance that is inconsistent with the Contract Documents. Owner and OAR shall be prohibited from communicating in any manner with Contractor's subcontractors. All communications from Owner and OAR regarding the Project must be with Contractor's designated representative.

5.7     Owner shall provide Contractor with complete and unfettered access to the site and area(s) of the Work.

5.8     Owner shall timely make payments to Contractor in accordance with this agreement.

5.9     Unless otherwise noted on the drawings and specifications, Owner shall be prohibited from performing work at the Project using its own forces or separate contractors without the Contractor's prior written consent.

5.10     Owner shall pay for all copies of the drawings and specifications as necessary for the Contractor to prosecute the Work. If the reproduction costs are paid by Contractor, Owner must reimburse Contractor the actual amount paid plus 10%.

5.11     Unless otherwise provided in the Contract Documents, Owner shall pay for all fees related to utilities and other facilities and services necessary for the Project, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work. In addition, unless otherwise provided in the Contract Documents, Owner shall

Version 1.0 — 28 June 2018

EXHIBIT A - 000026



be responsible for all necessary upgrades to any existing building systems and utilities. "**Utilities**" includes electric, gas, water, sewer and waste, storm drain, Internet, TV, and phone.

     5.12    **Joint and Several.** The obligations and liabilities of the Owner under this agreement are joint and several.

    6.0    **Contractor Responsibilities.**

     6.1    Contractor shall supervise and coordinate the Work, including the construction means, methods, techniques, sequences, and procedures utilized, unless the Owner or Contract Documents provide other specific instructions.

     6.2    **Subcontractors.** Contractor and all subcontractors shall at all times during the Work be duly licensed by the CSLB (or by the jurisdiction where the Work will be performed). In this agreement, "**subcontractors**" means any person or entity who has a contract with or is engaged by Contractor, or with any other subcontractor, at any tier. To the extent practicable, Contractor shall enter into written subcontracts where compensation is based on a lump-sum price. The lump-sum price is subject to approval by Owner. As a condition to Contractor entering any subcontract, Owner must indicate its approval of the lump-sum price (and any other important terms and conditions) by signing the "Subcontract Approval Form" in the form attached as Exhibit L.

     6.3    Except for permits that are the Owner's responsibility, Contractor shall apply for and obtain all necessary building permits pertaining to the Work. Owner shall immediately reimburse Contractor for any permit fees paid for or advanced by Contractor at actual cost plus 10%.

     6.4    Contractor has investigated the site, the visible conditions affecting the site and the Work, and the Contract Documents.

     6.5    Contractor shall comply with all applicable codes, laws, ordinances, and regulations affecting its performance and the Work. Contractor will be liable to Owner for all loss, cost, or expense, attributable to any acts or omissions by Contractor, its employees, subcontractors, suppliers, and agents in failing to comply with laws, including fines, penalties, or corrective measures. Contractor shall pay all applicable taxes for the Work provided by Contractor. The estimated Cost of the Work and Fee will be equitably adjusted for laws, taxes, duties, and tariffs that impact cost or time that are enacted after the date of this agreement or after bids are received or negotiations concluded.

     6.6    Contractor shall provide and maintain competent personnel to supervise and direct the Work and shall enforce strict discipline and good order among those carrying out the Work. Contractor shall prohibit the use of alcoholic beverages, drugs and other dangerous substances, and the playing of radios, music, or other broadcasting devices at the site that constitute a danger to life, health, or property. Contractor shall prohibit the wearing of any work clothes and attire displaying offensive logos, insignia, graphics, words, phrases, or symbols.

     6.7    Contractor shall take precautions to properly protect and preserve (i) the materials, supplies, and equipment to be incorporated into the Work and (ii) the Work itself from damage until the Work is accepted by Owner. If the Owner causes damage to the Work, the Owner shall promptly remedy that damage at its sole expense.

     6.8    Contractor shall maintain and supervise all safety precautions and programs, and shall comply with all applicable laws, ordinances, and regulations of any federal, state or local authorities, including OSHA and Cal/OSHA, for the safety of persons or property. Contractor shall conduct routine inspections of equipment and site conditions as necessary to ensure compliance with its safety programs and standards. At all times during working hours at the site, Contractor shall require and ensure the use of personal protective equipment by all workers on the site.

     6.9    Contractor shall be responsible for the proper delivery, handling, application, storage, removal, and disposal of all materials and substances brought to the site by Contractor in accordance with the Contract Documents and used or consumed in the performance of the Work.

     6.10    A "**Hazardous Material**" is any substance or material identified now or in the future as hazardous under any federal, state, or local law or regulation, or any other substance or material which may be considered hazardous or otherwise subject to statutory or regulatory requirement governing handling, disposal, or clean-up. Contractor shall not start or continue work until any Hazardous Material discovered at the site has been removed, or rendered or determined to be harmless by Owner as certified by an independent testing laboratory and approved by the appropriate

Version 1.0 – 28 June 2018

EXHIBIT A - 000027



government agency. If Contractor incurs additional costs or is delayed due to the presence or remediation of Hazardous Material, Contractor shall be entitled to an equitable adjustment.

6.11     **Submittals.** Contractor shall submit to Owner for review and approval all shop drawings, samples, product data, and similar submittals required by the Contract Documents. Submittals may be submitted in electronic form. Contractor shall be responsible to Owner for the accuracy and conformity of its submittals to the Contract Documents. Contractor shall prepare and deliver its submittals to Owner in a manner consistent with the Contractor's schedule and in such time and sequence so as not to delay the performance of the Work or the work of Owner and others retained by Owner. Contractor shall identify in writing for each submittal all changes, deviations, or substitutions from the requirements of the Contract Documents. Owner's approval of a submittal does not authorize deviations, substitutions, or changes in the requirements of the Contract Documents unless Owner specifically authorizes such deviation, substitution, or change. Owner shall review and approve submittals with promptness to avoid causing delay. Contractor shall perform all Work in accordance with approved submittals. Owner's approval does not relieve Contractor from responsibility for defective work resulting from errors or omissions of any kind on the approved shop drawings. In this agreement, "**defective work**" means work found to be not in conformance with the Contract Documents.

6.12     Contractor shall perform cutting, fitting, and patching necessary to coordinate the various parts of the Work and to prepare its Work for the work of Owner or others retained by Owner.

6.13     Contractor shall regularly remove debris and waste materials at the site resulting from the Work. Contractor shall minimize and confine dust and debris resulting from construction activities. At the completion of the Work, Contractor shall remove from the site all construction equipment, tools, surplus materials, waste materials, and debris.

6.14     **Differing Site Conditions.** The Contractor shall promptly, and before the conditions are disturbed, give written notice to Owner of: (i) subsurface or latent physical conditions at the site which differ materially from those indicated in the Contract Documents; or (ii) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract Documents. The Owner shall investigate the conditions promptly after receiving notice. If the conditions do materially differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the Work, an equitable adjustment will be made and this agreement modified in writing accordingly.

7.0     **Cost of the Work.** Owner shall pay Contractor for the Cost of the Work as defined in this section and the Fee stipulated in section 4.0. The Cost of the Work includes:

7.1     **Key Personnel.** Amounts paid by Contractor to those employees (excluding craft labor) identified in Exhibit E and at the stated billable hourly rates. Those hourly rates include the base hourly wage, payroll taxes, employee benefits, and workers' compensation insurance but not profit (fee), general administrative, and overhead costs.

7.2     **Contractor's Craft Labor.** Wages actually paid for Contractor's craft labor directly employed by Contractor in performing the Work;

7.3     **Employee Taxes and Burdens.** Cost of all employee benefits and taxes including but not limited to workers' compensation, unemployment compensation, social security, health, welfare, retirement, and other fringe benefits as required by law, labor agreements, or paid under Contractor's personnel policy, insofar as such costs are paid to employees of Contractor as part of the Cost of the Work;

7.4     **Subcontractor and Vendor Costs.** Costs paid by Contractor to its subcontractors and vendors for Work performed pursuant to subcontracts and purchase orders.

7.5     **Materials and Equipment.** Cost of all materials, supplies, and equipment incorporated in the Work, including costs of inspection and testing (if not provided by Owner), transportation, storage, and handling;

7.6     **Materials and Equipment Consumed at the Site.** Cost, including transportation and maintenance, of all materials, supplies, equipment, temporary facilities, and hand tools not owned by the workers that are used or consumed in the performance of the Work, less salvage value or residual value; and cost less salvage value on such items used, but not consumed, that remain the Contractor's property;

Version 1.0 — 28 June 2018

EXHIBIT A - 000028



7.7     **Rental Charges.** Actual rental charges of all necessary machinery and equipment, exclusive of hand tools owned by workers, used at the site, whether rented from Contractor or others, including installation, repair and replacement, dismantling, removal, maintenance, transportation, and delivery costs;

7.8     **Insurance and Bonds Premiums.** Cost of the premiums for all insurance and surety bonds which Contractor is required to procure or deems necessary, and approved by Owner, including any additional premium incurred as a result of any increase in the Cost of the Work;

7.9     **Sales and Use Taxes.** Sales, use, gross receipts, or other taxes, tariffs, or duties related to the Work for which Contractor is liable;

7.10    **Permits and Fees.** Permits, fees, licenses, tests, and royalties, except if paid by Owner;

7.11    **Course of Construction Repairs.** Actual and reasonable costs paid by Contractor in repairing minor damage to trade Work caused as a normal by-product during the course of construction and not attributable to the fault of Contractor, any subcontractor or vendor or not covered by insurance;

7.12    **Site Office.** Costs associated with establishing, equipping, operating, maintaining, and demobilizing the field office;

7.13    **Utilities.** Water, power, and fuel costs necessary for the Work;

7.14    **Clean-up and Disposal.** Cost of cleaning up, removing, and legally disposing all non-hazardous substances, debris, and waste materials;

7.15    **Emergencies.** Costs to respond to an emergency affecting the safety of persons and property, provided the cost is not the result of any act or omission of Contractor, subcontractor, vendor, or any party for whom any of them are responsible or liable at law or under the Contract Documents;

7.16    **Site Security.** Costs for site security services required for protection of the Work;

7.17    **Reproduction and Graphics.** Costs for blueprinting and reproduction of the plans and specifications, and for required postage, express mail, and long-distance costs in the performance of the Work;

7.18    **Legal.** Legal, mediation, and arbitration fees and costs reasonably and properly resulting from Contractor's performance of the Work, except those arising from disputes between the parties; and

7.19    **Miscellaneous.** Costs directly incurred in performing the Work or in connection with the Project that are not included in the Fee and that are reasonably inferable from the Contract Documents.

7.20    **Discounts.** All discounts for prompt payment shall accrue to Owner to the extent such payments are made directly by Owner. To the extent payments are made with funds of Contractor, all cash discounts accrue to Contractor. All trade discounts, rebates, and refunds, and all returns from sale of surplus materials and equipment (if any), shall be credited to the Cost of the Work.

7.21    **Contractor's Account Records.** Records of the Contractor's costs and expenditures must be maintained on the basis of generally accepted accounting practices and be available for inspection by the Owner or the Owner's designated agent at mutually convenient times for a period of 2 years after final payment.

8.0     **Payments.**

8.1     **Schedule of Values.** Per Exhibit K pending drawings within TBD working days after the parties sign this agreement, Contractor shall submit to Owner for approval an initial schedule of values allocating budgeted values among all categories or portions of the Work. The schedule of values must be prepared in such form and supported by data to substantiate its accuracy as Owner may reasonably require and must be based on the latest cost information available to Contractor. The Estimated Budget must be broken down is sufficient detail to facilitate continued evaluation of the Contractor's payment applications. The schedule of values must include separate line items for materials and equipment purchased or fabricated and stored either on-site or off-site and for the Fee. The Owner-accepted schedule of values must be used as the basis for the Contractor's applications for payments and revised for any modifications mutually agreed upon by the parties.

Version 1.0 — 28 June 2018

EXHIBIT A - 000029



8.2 **Progress Payments.** Contractor shall submit to Owner or another person or entity designated by Owner bi-weekly payment applications no later than the 15th and last day of the month. The payment application consists of the Cost of the Work performed up to the date stated in the payment application, along with a proportionate share of the Fee. Payment applications must include materials and equipment not yet incorporated into the Work but delivered to and suitably stored onsite or offsite, including applicable insurance, storage, and costs incurred transporting the materials to an offsite storage facility. Approval of payment for materials stored off-site is conditioned on the Contractor submitting bills of sale and applicable insurance or such other procedures satisfactory to Owner to establish Owner's title to such materials, or otherwise to protect Owner's interest, including transportation to the site.

8.3 **Adjustment of Contractor's Payment Application.** Owner may adjust or reject a payment application or nullify a previously approved payment application, in whole or in part, as may reasonably be necessary to protect Owner from loss or damage based on the circumstances listed below, but only to the extent that Contractor is responsible. As a condition to this right, the Owner must give written notice to Contractor no later than 7 days after receipt of a payment application specifying the reasons for the disapproval or nullification. When the reasons for disapproving or nullifying an application for payment are removed, Owner shall immediately pay the amounts previously withheld.

a. Contractor's repeated failure to perform the Work as required by the Contract Documents;

b. loss or damage for which Owner may be liable arising out of or relating to this agreement and caused by Contractor to Owner or to others retained by Owner to whom Owner may be liable;

c. Contractor's failure to properly pay subcontractors or suppliers in connection with the Work following receipt of such payment from Owner, for that portion of the Work or for supplies, provided that Owner is making payments to Contractor in accordance with this agreement;

d. rejected or defective work not corrected in a timely fashion; and

e. reasonable evidence of delay in performance of the Work such that the Work will not be completed by the Final Completion Date.

8.4 **Substantiation of Costs.** Contractor shall support its payment applications with relevant documentation to allow Owner to verify the costs incurred and expended by Contractor. The documentation may include time sheets, receipts, and invoices.

8.5 **Lien Releases.** With each payment application, Contractor shall submit properly executed waivers and releases from subcontractors, suppliers and vendors, and those persons or entities who have served a preliminary notice on Owner or Contractor.

8.6 **Retainage.** Each payment application will reflect 5% retainage of the amounts to be paid, except that no retainage applies to (i) the Fee, (ii) premiums paid by Contractor for insurance and bonds (if bonds are required), or (iii) amounts approved for payment to Contractor for the Cost of the Work (exclusive of amounts to be paid to subcontractors). All retainage must be paid as part of the final payment to Contractor. If, at any time after 50% of the Work has been completed, the Contractor is making satisfactory progress, 5% retainage will no longer be withheld and progress payments will be made in full.

8.7 **Prompt Payment.** The Owner shall make all progress payments to Contractor within 15 days after Owner receives a proper payment application.

8.8 **Delayed Payment.** If for any reason not the fault of Contractor, Contractor does not receive a progress payment from Owner within 5 days after the time that payment is due, Contractor, upon giving 10 days' written notice to Owner, and without prejudice to and in addition to any other legal remedies, may stop Work until payment of the full amount owing to Contractor has been received, including interest for late payment.

8.9 **Late Payment.** Payments due but unpaid will bear interest from the date payment is due at the rate of 10 percent per annum.

8.10 **Substantial Completion Payment.** When in the Contractor's judgment substantial completion of the Work or a designated portion has been achieved, Contractor shall notify Owner and establish the substantial completion date. In this agreement, "**substantial completion**" means that stage when the Work (or designated portion of the

Version 1.0 — 28 June 2018

EXHIBIT A - 000030



Work) is sufficiently complete in accordance with the Contract Documents so that Owner may occupy or utilize the Project, or a designated portion, for its intended use. A certificate of occupancy is not a prerequisite for substantial completion if the certificate of occupancy cannot be obtained due to factors beyond Contractor's control. Payment by Owner upon substantial completion will be in consideration of Contractor's agreement to complete all final punch list Items. Owner may retain no more than 150% of the costs estimated by Owner and Contractor necessary to complete any punch list Items. Thereafter, Owner shall pay to the Contractor the amounts retained for the punch list items to the extent that each item is completed by Contractor and accepted by Owner.

8.11     **Final Payment.** When in the Contractor's judgment final completion has been achieved, Contractor shall submit a final payment application. In this agreement, "**final completion**" means that stage when the Owner determines that the Work has been properly completed in accordance with the Contract Documents, including completion of punch list items and the submittal to Owner of all closeout documentation required by the Contract Documents. Owner shall make final payment to Contractor within 15 days after Contractor has submitted a complete and accurate payment application and has submitted to Owner all closeout documentation required by the Contract Documents. In this agreement, "**final payment**" means the payment to Contractor of all amounts due and remaining to be paid to Contractor under the Contract Documents, including any retainage. Final payment will not relieve the Contractor of any warranty obligations required under the Contract Documents.

8.12     **Waiver of Claims.** Claims not reserved by Owner in writing with the making of final payment are waived except for claims relating to liens or similar encumbrances, warranties, and latent defects. Claims not reserved by Contractor in writing in accepting final payment are waived.

9.0     **Schedule, Delays and Liquidated Damages.**

9.1     Contractor shall promptly start the Work on November 1st, 2018 ("**Commencement Date**") and complete all Work in accordance with the Contract Documents no later than TBD, pending final drawings ("**Final Completion Date**").

9.2     **Time is of the Essence.** Time is of the essence for both parties with regard to the obligations of this agreement and Contract Documents.

9.3     Contractor shall achieve substantial completion of the Work in TBD working days from the Commencement Date and achieve final completion within TBD after the date of substantial completion. Both deadlines are subject to adjustments as provided for in the Contract Documents.

9.4     **Schedule.** Before submitting its first payment application for payment, Contractor shall submit to Owner a schedule showing the dates on which Contractor plans to begin and complete various parts of the Work, including dates on which information and approvals are required from Owner. Unless otherwise agreed, the schedule must (i) provide a graphic representation of all activities and events and (ii) identify dates that are critical to ensure timely completion of the Work. Contractor shall update the schedule monthly, or as mutually agreed by the parties.

9.5     **Delays and Time Extensions.** If Contractor is delayed by any cause beyond the Contractor's control, the Contractor will be entitled to a time extension. These causes include but are not limited to the following: (a) acts or omissions of Owner, the Owner's agents, consultants, designers, and the architect-engineer; (b) changes in the Work or the sequencing of the Work ordered by Owner, or arising from the Owner's decisions that impact the time of performance; (c) encountering Hazardous Materials, or concealed or unknown conditions; (d) transportation delays not reasonably foreseeable; (e) labor disputes; (f) fire; (g) terrorism; (h) adverse governmental actions; (i) acts of God; (j) adverse weather conditions not reasonably anticipated; (k) utility disruptions or outages; (l) long lead times; (m) material and equipment damaged during transportation and delivery to the Project; (n) unexcused delays in payment. If delays to the Work are encountered, Contractor shall provide prompt written notice to Owner of the cause after Contractor first recognizes the delay. The parties shall take reasonable steps to mitigate the effect of such delays. In addition, If Contractor incurs additional costs as a result of a delay caused by the circumstances noted above, Contractor will be entitled to an equitable adjustment in compensation.

10.0     **Changes.** Without invalidating or breaching this agreement, Owner may order changes within the general scope of the Work. Such changes will be binding on Contractor only if in writing, and Contractor has no obligation to proceed

Version 1.0 — 28 June 2018

EXHIBIT A - 000031



or perform any changed work until such writing is received. The cost of changed work will be computed based on the Cost of the Work (as defined in section 7.0, above) plus markups computed as follows:

a.   6% for overhead and 7% for profit of the Cost of the Work performed by Contractor using its own forces;

**11.0    Warranty.** Contractor warrants that all materials and equipment will be new unless otherwise specified, of good quality, in conformance with the Contract Documents, and free from defective workmanship and materials for one year after the date of substantial completion. Contractor further warrants that the Work will be free from material defects not intrinsic in the design or materials required in the Contract Documents. This warranty does not include remedies for defects or damages caused by normal wear and tear during normal usage, use for a purpose for which the Work or Project was not intended, improper or insufficient maintenance, modifications performed by Owner or others retained by Owner, or abuse. If during the one-year warranty period any portion of the Work is found to be defective work, Owner shall promptly notify Contractor in writing. Unless Owner provides written acceptance of the condition, Contractor shall promptly correct the defective work at its own cost and time.

**12.0    Indemnity.**

**12.1**    To the fullest extent permitted by law, Contractor shall indemnify, defend, and hold harmless Owner, Owner's officers, directors, members, agents, and employees (but not the Owner's architect-engineer) ("**Owner Indemnitees**") from all third-party claims for bodily injury and property damage, other than to the Work itself and other property insured under section 13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of the Work but only to the extent caused by the negligent or intentional wrongful acts or omissions of Contractor, subcontractors, suppliers, or anyone employed directly or indirectly by any of them or by anyone for whose acts any of them may be liable. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of an Owner Indemnitee. Contractor will be entitled to reimbursement of any defense costs paid above Contractor's percentage of liability for the underlying claim.

**12.2**    To the fullest extent permitted by law, Owner shall indemnify, defend, and hold harmless Contractor, its officers, directors, or members, agents, and employees ("**Contractor Indemnitees**") from all third-party claims for bodily injury and property damage, other than property insured under section13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of work by Owner, Owner's architect-engineer, or others retained by Owner, but only to the extent caused by the negligent or intentionally wrongful acts or omissions of Owner, Owner's architect-engineer, or others retained by Owner. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of a Contractor Indemnitee. Owner will be entitled to reimbursement of any defense costs paid above Owner's percentage of liability for the underlying claim.

**12.3**    These indemnification obligations will not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable under workers' compensation acts, disability benefit acts, or other insurance.

**13.0    Insurance.**

**13.1    Contractor's Insurance.** Before starting Work, Contractor shall procure and maintain in force all insurance set forth in Exhibit F. Commercial General Liability Insurance may be obtained under a single policy for the full limits required or by a combination of underlying policies with the balance provided by an excess or umbrella policy. The insurance policies must contain a provision that coverages under the policies will not be cancelled or expire until at least 30 days' written notice has been given to Owner and must include either a liability endorsement covering this agreement or an endorsement making the Owner an additional insured under the policies. Certificates of insurance showing such coverages to be in force must be filed with the Owner prior to commencement of the Work.

**13.2    Owner's Insurance.** Owner shall purchase and maintain its own liability insurance, and at the Owner's option, may purchase and maintain such additional insurance to protect the Owner against claims losses, or damages that may arise from the Project. Owner shall name Contractor as an additional insured in any insurance policy obtained by the Owner for the Project.

**13.3    Waivers of Subrogation.** The Owner and Contractor hereby waive all rights against each other and against the Owner's architect-engineer, and other consultants, subcontractors, suppliers, agents and employees of the other for damages during construction covered by any property insurance as set forth in the Contract Documents.

Version 1.0 — 28 June 2018

EXHIBIT A - 000032



14.0 **Limited Mutual Waiver of Consequential Damages.** Except for losses covered by insurance required by the Contract Documents, the parties waive all claims against each other for any consequential damages that may arise out of or relate to this agreement. The provisions of this section apply to the termination of this agreement and survive such termination.

14.1 Owner waives damages for loss of use of the Project, any rental expenses incurred, loss of income, profit, or financing related to the Project, loss of business, loss of financing, loss of profits not related to this Project, loss of reputation, and insolvency.

14.2 Contractor waives damages for loss of business, loss of financing, loss of profits not related to this Project, loss of bonding capacity, loss of reputation, and insolvency.

15.0 **Dispute Resolution.**

15.1 **Executive Discussions.** As a condition to and before resorting to mediation and binding arbitration, the parties must attempt in good faith to resolve any dispute promptly by negotiation between executives who have settlement authority.

15.2 If the dispute remains unresolved after executive discussions, the parties shall proceed to mediation using JAMS, or another provider as they may otherwise mutually agree, and shall conclude such mediation within 45 calendar days of the matter being first discussed. The parties will equally share the costs of the mediation.

15.3 If the dispute remains unresolved after mediation, the dispute must proceed to binding arbitration under JAMS (or other provider as the parties may mutually agree), per its Engineering and Construction Arbitration Rules & Procedures, or if the parties agree otherwise, to the Engineering and Construction Arbitration Rules & Procedures for Expedited Arbitration. Either party may initiate arbitration with respect to the matters submitted by filing a written demand for arbitration. The Project location shall serve as the venue. The arbitration award will be final. Judgment on the award may be entered in any court having jurisdiction. This paragraph does not preclude nor otherwise limit the parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

15.4 Neither party may commence arbitration if the claim or cause of action would be barred by the applicable statute of limitations had the claim or cause of action been filed in a state or federal court. Receipt of a demand for arbitration by the person or entity administering the arbitration will constitute the commencement of legal proceedings for the purposes of determining whether a claim or cause of action is barred by the applicable statute of limitations. If, however, a state or federal court exercising jurisdiction over a timely filed claim or cause of action orders that the claim or cause of action be submitted to arbitration, the arbitration proceeding will be deemed commenced as of the date the court action was filed, provided that the party asserting the claim or cause of action files its demand for arbitration with the person or entity administering the arbitration within 30 days after the entry of such order.

15.5 **Attorney Fees.** In any litigation or arbitration arising out of or related to this agreement, the prevailing party must be awarded costs and legal fees reasonably incurred.

16.0 **Suspension and Termination.**

16.1 **Termination by Contractor.** Upon 7 days' written notice to Owner, Contractor may terminate this agreement if the Work has been stopped for a continuous 30-day period through no fault of Contractor for any of the following reasons: (i) under court order or order of other governmental authorities having jurisdiction; or (ii) as a result of the declaration of a national emergency or other governmental act during which, through no act or fault of Contractor, materials are not available. In addition, upon 7 days' written notice to Owner, Contractor may terminate this agreement if Owner does any of the following: (i) fails to furnish reasonable evidence that sufficient funds are available and committed for the entire cost of the Project; (ii) fails to pay Contractor in accordance with this agreement and Contractor has stopped Work in compliance with this agreement; or (iii) otherwise materially breaches this agreement. Upon termination by Contractor, Contractor will be entitled to recover from Owner payment for all Work executed and for any proven loss, cost, or expense in connection with the Work, including all demobilization costs plus a proportionate share of the Fee.

16.2 **Suspension by Owner.** The Owner may order the Contractor in writing to suspend all or any part of the Work for the Owner's convenience or for stoppage beyond the control of the Owner or Contractor. If the

Version 1.0 — 28 June 2018

EXHIBIT A - 000033



performance of all or any part of the Work is suspended, the Contractor will be entitled to an equitable adjustment, and this agreement will be modified in writing accordingly.

16.3     **Termination for Owner's Convenience.** The Owner on 21 days' written notice may terminate this agreement, in whole or in part, when it is in the Owner's interest. If this agreement is terminated, the Owner shall pay the Contractor: (i) for the Work performed to date, including a proportionate share of the Fee; (ii) for all demobilization costs and costs incurred resulting from termination; including remaining subcontractor invoices (iii) reasonable attorneys' fees and costs related to termination; and (d) a termination fee of $350,000.00

16.4     **Notice to Cure and Default Termination.** (a) If Contractor persistently fails to supply enough qualified workers, proper materials, or equipment to maintain the approved schedule, or persistently fails to make payment to its workers, subcontractors, or suppliers when such payment is due, or willfully disregards law or orders of any public authority having jurisdiction, or is otherwise guilty of a material breach of a provision of this agreement, Contractor may be deemed in default. If Contractor fails to commence and to continue satisfactory correction of such default with diligence and promptness within 10 days after written notification by Owner to cure, then Owner, without prejudice to any other rights or remedies, may either: (i) take reasonable steps it deems necessary to correct the deficiencies and charge the cost to Contractor, who will be liable for such payments; or (ii) terminate this agreement by written notice absent appropriate corrective action. Owner shall make reasonable efforts to mitigate damages arising from Contractor default and shall promptly invoice Contractor for all amounts due.

(b) After receipt of a termination notice, and except as directed by the Owner, the Contractor shall: (i) stop work as specified in the notice and demobilize the site; (ii) place no further subcontracts or orders, except as necessary to complete the continued portion of the Work; (iii) terminate all subcontracts to the extent they relate to the work terminated; (iv) assign to the Owner, as directed by Owner, all right, title, and interest of the Contractor under the subcontracts terminated; (v) complete performance of the Work not terminated; and (vi) take action necessary to protect and preserve the Work.

(c) After termination, the Contractor shall submit promptly a final termination settlement proposal to the Owner. If the Contractor fails to submit the proposal, the Owner may determine, on the basis of information available, the amount, if any, due the Contractor because of the termination and shall pay the amount determined.

(d) Subject to paragraph (c) of this clause, the Contractor and Owner may agree on the whole or any part of the amount to be paid (including an allowance for Fee) because of the termination. This agreement will be amended, and the Contractor paid the agreed amount. If the Contractor and Owner fail to agree in whole or in part on the amount to be paid because of the termination, the parties agree to submit the matter to mediation, and if not resolved in mediation, the matter will be submitted for binding arbitration per section 15.0.

(e) If, after termination of the Contractor for default, it is determined by a court of competent jurisdiction or arbitrator that the Contractor was not in default, or that the delay was excusable, the rights, obligations, and remedies of the parties will be the same as if the termination had been issued for the Owner's convenience.

16.5     **Obligations Arising Before Termination.** Even after termination, the provisions of this agreement will apply to any Work performed, payments made, events occurring, costs charged or incurred, or obligations arising before the termination date.

17.0     **Miscellaneous.**

17.1     **Entire Agreement.** This agreement represents the entire agreement between Owner and Contractor and supersedes any prior written or oral agreements, understandings, and representations made or dated before the date of this agreement. This agreement may be amended only by a written amendment signed by the parties.

17.2     **Joint Drafting.** The parties hereby agree that this agreement was jointly drafted and that each had the opportunity to negotiate terms and to obtain assistance of counsel in reviewing terms prior to execution. This agreement will be construed in a neutral manner and neither against nor in favor of either party.

17.3     **No Third-Party Beneficiary.** This agreement and the obligations of the parties are intended for the sole benefit of the parties and do not create any rights in any other person or entity whatsoever, except the Owner and Contractor.

Version 1.0 — 28 June 2018

EXHIBIT A - 000034



17.4 **Governing Law.** This agreement is governed by California law, or if outside California where the Project is located.

17.5 **Severability.** If any provision in this agreement is determined to be invalid, unenforceable or void, the remainder of the agreement will be fully binding with the same force and effect as though the invalid, unenforceable or void provision had been omitted.

17.6 **Photographs and Marketing.** Contractor may (a) make or issue any public announcement or statement with respect to the Work or the Project, (b) supply to the press or other news media any information, photographs, or data related to the Work or the Project, or (c) use images of the Work and Project in any Contractor materials, including without limitation, advertisements, websites, calendars, brochures or presentations with written approval from Owner; except that Contractor shall be prohibited from using Owner's name, trademark, or logo without Owner's prior written consent.

17.7 **Written Testimonial.** If the Work and Contractor's performance is satisfactory to the Owner, Owner agrees to provide Contractor with a written positive endorsement or testimonial that Contractor may use in its advertising, marketing, and promotional materials.

17.8 **Signage.** Contractor may erect signage at the site indicating its role on the Project and may maintain such signage until Final Acceptance or for a longer period as mutually agreed by the parties.

18.0 **List of Contract Documents.** The Contract Documents in existence at the time of the parties signing this agreement are as follows:

18.1 Exhibit A, Index of Plans and Specifications furnished by Owner.

18.2 Exhibit B, List of Exclusions and Assumptions and Qualifications.

18.3 Exhibit C, Estimated Budget.

18.4 Exhibit D, Schedule of the Work.

18.5 Exhibit E, List of Contractor Personnel and Hourly Rates.

18.6 Exhibit F, Contractor's Insurance.

18.7 Exhibit G, Sample Insurance Certificate.

18.8 Exhibit H, Form, Change Order.

18.9 Exhibit J, Form, Application and Certificate for Payment.

18.10 Exhibit K, Form, Schedule of Values.

18.11 Exhibit L, Form, Subcontractor Approval

*Signatures Follow on Next Page*

Version 1.0 — 28 June 2018

EXHIBIT A - 000035



The parties are signing this agreement on the date stated in the introductory clause.

FERRANTE KOBERLING CONSTRUCTION, INC.

Signed: *Michael Ferrante*

Print Name: __Michael Ferrante__

Title: __PRESIDENT & CEO__

OWNER'S FORMAL NAME IN UPPER CASE

Signed: *Sebastian Schoepe*

Print Name: SEBASTIAN SCHOEPE

Title: PRESIDENT

OWNER'S FORMAL NAME IN UPPER CASE

Signed: _____

Print Name: _____

Title: _____

Version 1.0 — 28 June 2018

EXHIBIT A - 000036

# EXHIBIT "B"

EXHIBIT A - 000037



# COST PLUS AGREEMENT BETWEEN OWNER AND CONTRACTOR

| | |
|---|---|
| Owner: John Reed Fitness LA, LLC | Contractor: Ferrante Koberling Construction, Inc. |
| Address: 925 N La Brea Ave, 4th Floor | 4700 W. Jefferson Blvd. #103 |
| City, State, Zip: Los Angeles, CA 90038 | Los Angeles, CA  90016 |
| Contact: Sebastian Schoepe | Tax ID No: 46-3955278 |
| Phone: (424)387-5709 | CA License No. 988562 |
| E-mail: schoepe@1upfitness.com | Contact: Michael Ferrante |
| Tax ID No: | Phone: (323) 933-3203 |
| | Email: mferrante@ferrantekoberling.com |
| | |
| Project: John Reed | Architect: Gruen Architects |
| Project Address: 150 W. 12th Street | Address: 6330 S Vicente Blvd #200 |
| City, State, Zip: Los Angeles, CA 90015 | City, State, Zip: Los Angeles, CA 90048 |

This Agreement Between Owner and Contractor is dated July 12, 2019 and is between FERRANTE KOBERLING CONSTRUCTION, INC., a California corporation ("**Contractor**"), JOHN REED FITNESS LA, LLC, a Delaware limited liability corporation ("**John Reed**"), and RSG GROUP NORTH AMERICA LP, a Delaware limited partnership, and affiliated companies  ("**1UP Fitness**," and together with **John Reed**, and affiliated companies are the "**Owner**")

## Recitals

A.  Owner is leasing and building out approximately 30,000 SF of commercial space ("**Commercial Work**") as a Fitness Club and Office in the building located at 150 W. 12th Street, Los Angeles, CA 90015 ("**Project**").

B.  Contractor is experienced, qualified, and staffed to perform this Commercial Work.

C.  Owner and Contractor have reached an agreement for Contractor to perform the Commercial Work and desire to set forth their respective rights, responsibilities, terms, conditions, and compensation to be paid to Contractor.

Owner and Contractor therefore agree as follows:

1.0    **Contract Documents.** The Contract Documents consist of the following: (i) this agreement; (ii) written modifications to this agreement signed by both parties; and (iii) those documents listed under section 19.0. The Contract Documents are complementary and cumulative and what is called for by one shall be as binding as if called for by all. In case of conflicts between the drawings and specifications, the specifications will govern. In case of omissions, errors, or inconsistency among the Contract Documents, the Contractor shall immediately submit the matter to Owner for clarification. Owner's clarifications are final and binding, subject to an equitable adjustment in the compensation, the Contractor's time for performance, or both, or to dispute mitigation and resolution.

2.0    **The Relationship Between the Parties.** The parties hereby agree to proceed on the basis of mutual trust, good faith, and fair dealing. Each party shall perform its obligations with integrity and shall avoid any conflicts of interest.

3.0    **Work.** Contractor shall perform the Work in a workmanlike and expeditious manner consistent with the Contract Documents. Contractor shall provide all labor, materials, equipment, and services necessary to complete the Work in accord with the Contract Documents and Exhibits C and K, "Estimated Budget" and "Schedule of the Work," respectively.

4.0    **Compensation, Cost Plus Fee.** Owner shall compensate Contractor for Work performed as follows:

EXHIBIT A - 000038



4.1     The Cost of the Work as set forth in section 7.0, plus 6 percent for overhead and 7 percent for profit (the overhead and profit markups constitute the "**Fee**"). The Fee will be paid in proportion to the Work performed.

4.2     The Estimated Budget to complete the Work is $3,000,000.00 as set forth in Exhibit C. The Estimated Budget is not a guaranteed maximum price for the Cost of the Work or Fee. If Contractor becomes aware that the Estimated Budget will be exceeded, Contractor must promptly notify Owner in writing before performing the Work in excess of the Estimated Budget. This notice may include the Contractor's estimate of the additional costs necessary to complete the Work. The Contractor may stop work and is under no obligation to proceed with the Work in excess of the Estimated Budget until Owner authorizes Contractor in writing to proceed. Contractor is not liable for any delay in receiving this authorization.

5.0     **Owner Responsibilities.** Owner shall provide any information and services at Owner's expense and when required for the successful and expeditious completion of the Work.

5.1     As a condition to Contractor starting the Work, Owner shall provide Contractor with reasonable evidence of sufficient and available funds to satisfy all of Owner's obligations under this agreement. In the case of Project financing, such evidence must include the name and address of any construction lender and a copy of the loan commitment and loan disbursement agreement between Owner and Owner's lenders relating to the provision and disbursement of funds to Owner for its obligations under this agreement, except information deemed proprietary or confidential by Owner or Owner's lenders. During performance of the Work, Owner shall notify Contractor in writing Contractor of any material change in Project financing.

5.2     Owner shall provide Contractor with information describing the physical characteristics of the Project, including surveys, site evaluations, legal descriptions, data, or drawings depicting existing conditions, subsurface, and environmental studies, reports, investigations, tests, inspections, and other reports dealing with environmental matters, hazardous material and other existing conditions, including structural, mechanical, and chemical tests required by the Contract Documents or by law.

5.3     Owner shall provide Contractor with any other information or services requested by Contractor that Contractor claims is relevant to its performance of the Work and under Owner's control.

5.4     Within 7 days of this agreement being signed by the parties, Owner shall provide Contractor with the information necessary to give notice of or enforce mechanics' lien rights. This information must include Owner's interest in the real property on which the Project is located and the record legal title, and the name and address of the record fee owner if not the Owner. In this agreement, "**days**" means calendar days unless otherwise noted.

5.5     Owner shall secure and pay for all permits, approvals, easements, assessments, and fees required in connection with the Work.

5.6     Owner shall designate an Owner's authorized representative ("**OAR**") to provide approvals and directives necessary for the day-to-day administration of this agreement, the Work, and the Project. Owner shall designate the limits of any authority delegated to the OAR with respect to the following: executing any contract, contract modification, or other form of binding agreement; obligating the Owner in any manner to the payment of money; rendering any final decision on any contract matter, claim or dispute, terminating, suspending, or otherwise interfering with the Contractor's performance, directing any changes in the Contract Documents or in the Contractor's performance that is inconsistent with the Contract Documents. Owner and OAR shall be prohibited from communicating in any manner with Contractor's subcontractors. All communications from Owner and OAR regarding the Project must be with Contractor's designated representative.

5.7     Owner shall provide Contractor with complete and unfettered access to the site and area(s) of the Work.

5.8     Owner shall timely make payments to Contractor in accordance with this agreement.

5.9     Unless otherwise noted on the drawings and specifications, Owner shall be prohibited from performing work at the Project using its own forces or separate contractors without the Contractor's prior written consent.

Version 1.0 — 28 June 2018

EXHIBIT A - 000039



5.10    Owner shall pay for all copies of the drawings and specifications as necessary for the Contractor to prosecute the Work. If the reproduction costs are paid by Contractor, Owner must reimburse Contractor the actual amount paid plus 10%.

5.11    Unless otherwise provided in the Contract Documents, Owner shall pay for all fees related to utilities and other facilities and services necessary for the Project, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work. In addition, unless otherwise provided in the Contract Documents, Owner shall be responsible for all necessary upgrades to any existing building systems and utilities. "**Utilities**" includes electric, gas, water, sewer and waste, storm drain, Internet, TV, and phone.

5.12    **Joint and Several.** The obligations and liabilities of the Owner under this agreement are joint and several.

6.0    **Contractor Responsibilities.**

6.1    Contractor shall supervise and coordinate the Work, including the construction means, methods, techniques, sequences, and procedures utilized, unless the Owner or Contract Documents provide other specific instructions.

6.2    **Subcontractors.** Contractor and all subcontractors shall at all times during the Work be duly licensed by the CSLB (or by the jurisdiction where the Work will be performed). In this agreement, "**subcontractors**" means any person or entity who has a contract with or is engaged by Contractor, or with any other subcontractor, at any tier. To the extent practicable, Contractor shall enter into written subcontracts where compensation is based on a lump-sum price. The lump-sum price is subject to approval by Owner. As a condition to Contractor entering any subcontract, Owner must indicate its approval of the lump-sum price (and any other important terms and conditions) by signing the "Subcontract Approval Form" in the form attached as Exhibit L.

6.3    Except for permits that are the Owner's responsibility, Contractor shall apply for and obtain all necessary building permits pertaining to the Work. Owner shall immediately reimburse Contractor for any permit fees paid for or advanced by Contractor at actual cost plus 10%.

6.4    Contractor has investigated the site, the visible conditions affecting the site and the Work, and the Contract Documents.

6.5    Contractor shall comply with all applicable codes, laws, ordinances, and regulations affecting its performance and the Work. Contractor will be liable to Owner for all loss, cost, or expense, attributable to any acts or omissions by Contractor, its employees, subcontractors, suppliers, and agents in failing to comply with laws, including fines, penalties, or corrective measures. Contractor shall pay all applicable taxes for the Work provided by Contractor. The estimated Cost of the Work and Fee will be equitably adjusted for laws, taxes, duties, and tariffs that impact cost or time that are enacted after the date of this agreement or after bids are received or negotiations concluded.

6.6    Contractor shall provide and maintain competent personnel to supervise and direct the Work and shall enforce strict discipline and good order among those carrying out the Work. Contractor shall prohibit the use of alcoholic beverages, drugs and other dangerous substances, and the playing of radios, music, or other broadcasting devices at the site that constitute a danger to life, health, or property. Contractor shall prohibit the wearing of any work clothes and attire displaying offensive logos, insignia, graphics, words, phrases, or symbols.

6.7    Contractor shall take precautions to properly protect and preserve (i) the materials, supplies, and equipment to be incorporated into the Work and (ii) the Work itself from damage until the Work is accepted by Owner. If the Owner causes damage to the Work, the Owner shall promptly remedy that damage at its sole expense.

6.8    Contractor shall maintain and supervise all safety precautions and programs, and shall comply with all applicable laws, ordinances, and regulations of any federal, state or local authorities, including OSHA and Cal/OSHA, for the safety of persons or property. Contractor shall conduct routine inspections of equipment and site conditions as necessary to ensure compliance with its safety programs and standards. At all times during working hours at the site, Contractor shall require and ensure the use of personal protective equipment by all workers on the site.

EXHIBIT A - 000040



6.9     Contractor shall be responsible for the proper delivery, handling, application, storage, removal, and disposal of all materials and substances brought to the site by Contractor in accordance with the Contract Documents and used or consumed in the performance of the Work.

6.10    A "**Hazardous Material**" is any substance or material identified now or in the future as hazardous under any federal, state, or local law or regulation, or any other substance or material which may be considered hazardous or otherwise subject to statutory or regulatory requirement governing handling, disposal, or clean-up. Contractor shall not start or continue work until any Hazardous Material discovered at the site has been removed, or rendered or determined to be harmless by Owner as certified by an independent testing laboratory and approved by the appropriate government agency. If Contractor incurs additional costs or is delayed due to the presence or remediation of Hazardous Material, Contractor shall be entitled to an equitable adjustment.

6.11    **Submittals.** Contractor shall submit to Owner for review and approval all shop drawings, samples, product data, and similar submittals required by the Contract Documents. Submittals may be submitted in electronic form. Contractor will be responsible to Owner for the accuracy and conformity of its submittals to the Contract Documents. Contractor shall prepare and deliver its submittals to Owner in a manner consistent with the Contractor's schedule and in such time and sequence so as not to delay the performance of the Work or the work of Owner and others retained by Owner. Contractor shall identify in writing for each submittal all changes, deviations, or substitutions from the requirements of the Contract Documents. Owner's approval of a submittal does not authorize deviations, substitutions, or changes in the requirements of the Contract Documents unless Owner specifically authorizes such deviation, substitution, or change. Owner shall review and approve submittals with promptness to avoid causing delay. Contractor shall perform all Work in accordance with approved submittals. Owner's approval does not relieve Contractor from responsibility for defective work resulting from errors or omissions of any kind on the approved shop drawings. In this agreement, "**defective work**" means work found to be not in conformance with the Contract Documents.

6.12    Contractor shall perform cutting, fitting, and patching necessary to coordinate the various parts of the Work and to prepare its Work for the work of Owner or others retained by Owner.

6.13    Contractor shall regularly remove debris and waste materials at the site resulting from the Work. Contractor shall minimize and confine dust and debris resulting from construction activities. At the completion of the Work, Contractor shall remove from the site all construction equipment, tools, surplus materials, waste materials, and debris.

6.14    **Differing Site Conditions.** The Contractor shall promptly, and before the conditions are disturbed, give written notice to Owner of: (i) subsurface or latent physical conditions at the site which differ materially from those indicated in the Contract Documents; or (ii) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract Documents. The Owner shall investigate the conditions promptly after receiving notice. If the conditions do materially differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the Work, an equitable adjustment will be made and this agreement modified in writing accordingly.

7.0     **Cost of the Work.** Owner shall pay Contractor for the Cost of the Work as defined in this section and the Fee stipulated in section 4.0. The Cost of the Work includes:

7.1     **Key Personnel.** Amounts paid by Contractor to those employees (excluding craft labor) identified in Exhibit E and at the stated billable hourly rates. Those hourly rates include the base hourly wage, payroll taxes, employee benefits, and workers' compensation insurance but not profit (fee), general administrative, and overhead costs.

7.2     **Contractor's Craft Labor.** Wages actually paid for Contractor's craft labor directly employed by Contractor in performing the Work;

7.3     **Employee Taxes and Burdens.** Cost of all employee benefits and taxes including but not limited to workers' compensation, unemployment compensation, social security, health, welfare, retirement, and other fringe benefits as required by law, labor agreements, or paid under Contractor's personnel policy, insofar as such costs are paid to employees of Contractor as part of the Cost of the Work;

7.4     **Subcontractor and Vendor Costs.** Costs paid by Contractor to its subcontractors and vendors for Work performed pursuant to subcontracts and purchase orders.

Page 4 of 13

EXHIBIT A - 000041



7.5     **Materials and Equipment.** Cost of all materials, supplies, and equipment incorporated in the Work, including costs of inspection and testing (if not provided by Owner), transportation, storage, and handling;

7.6     **Materials and Equipment Consumed at the Site.** Cost, including transportation and maintenance, of all materials, supplies, equipment, temporary facilities, and hand tools not owned by the workers that are used or consumed in the performance of the Work, less salvage value or residual value; and cost less salvage value on such items used, but not consumed, that remain the Contractor's property;

7.7     **Rental Charges.** Actual rental charges of all necessary machinery and equipment, exclusive of hand tools owned by workers, used at the site, whether rented from Contractor or others, including installation, repair and replacement, dismantling, removal, maintenance, transportation, and delivery costs;

7.8     **Insurance and Bonds Premiums.** Cost of the premiums for all insurance and surety bonds which Contractor is required to procure or deems necessary, and approved by Owner, including any additional premium incurred as a result of any increase in the Cost of the Work;

7.9     **Sales and Use Taxes.** Sales, use, gross receipts, or other taxes, tariffs, or duties related to the Work for which Contractor is liable;

7.10    **Permits and Fees.** Permits, fees, licenses, tests, and royalties, except if paid by Owner;

7.11    **Course of Construction Repairs.** Actual and reasonable costs paid by Contractor in repairing minor damage to trade Work caused as a normal by-product during the course of construction and not attributable to the fault of Contractor, any subcontractor or vendor or not covered by insurance;

7.12    **Site Office.** Costs associated with establishing, equipping, operating, maintaining, and demobilizing the field office;

7.13    **Utilities.** Water, power, and fuel costs necessary for the Work;

7.14    **Clean-up and Disposal.** Cost of cleaning up, removing, and legally disposing all non-hazardous substances, debris, and waste materials;

7.15    **Emergencies.** Costs to respond to an emergency affecting the safety of persons and property, provided the cost is not the result of any act or omission of Contractor, subcontractor, vendor, or any party for whom any of them are responsible or liable at law or under the Contract Documents;

7.16    **Site Security.** Costs for site security services required for protection of the Work;

7.17    **Reproduction and Graphics.** Costs for blueprinting and reproduction of the plans and specifications, and for required postage, express mail, and long-distance costs in the performance of the Work;

7.18    **Legal.** Legal, mediation, and arbitration fees and costs reasonably and properly resulting from Contractor's performance of the Work, except those arising from disputes between the parties; and

7.19    **Miscellaneous.** Costs directly incurred in performing the Work or in connection with the Project that are not included in the Fee and that are reasonably inferable from the Contract Documents.

7.20    **Discounts.** All discounts for prompt payment shall accrue to Owner to the extent such payments are made directly by Owner. To the extent payments are made with funds of Contractor, all cash discounts accrue to Contractor. All trade discounts, rebates, and refunds, and all returns from sale of surplus materials and equipment (if any), shall be credited to the Cost of the Work.

7.21    **Contractor's Account Records.** Records of the Contractor's costs and expenditures must be maintained on the basis of generally accepted accounting practices and be available for inspection by the Owner or the Owner's designated agent at mutually convenient times for a period of 2 years after final payment.

8.0     **Payments.**

8.1     **Schedule of Values.** Per Exhibit K pending drawings within TBD working days after the parties sign this agreement, Contractor shall submit to Owner for approval an initial schedule of values allocating budgeted

Version 1.0 — 28 June 2018



values among all categories or portions of the Work. The schedule of values must be prepared in such form and supported by data to substantiate its accuracy as Owner may reasonably require and must be based on the latest cost information available to Contractor. The Estimated Budget must be broken down is sufficient detail to facilitate continued evaluation of the Contractor's payment applications. The schedule of values must include separate line items for materials and equipment purchased or fabricated and stored either on-site or off-site and for the Fee. The Owner-accepted schedule of values must be used as the basis for the Contractor's applications for payments and revised for any modifications mutually agreed upon by the parties.

8.2     **Progress Payments.** Contractor shall submit to Owner or another person or entity designated by Owner bi-weekly payment applications no later than the 15th and last day of the month. The payment application consists of the Cost of the Work performed up to the date stated in the payment application, along with a proportionate share of the Fee. Payment applications must include materials and equipment not yet incorporated into the Work but delivered to and suitably stored onsite or offsite, including applicable insurance, storage, and costs incurred transporting the materials to an offsite storage facility. Approval of payment for materials stored off-site is conditioned on the Contractor submitting bills of sale and applicable insurance or such other procedures satisfactory to Owner to establish Owner's title to such materials, or otherwise to protect Owner's interest, including transportation to the site.

8.3     **Adjustment of Contractor's Payment Application.** Owner may adjust or reject a payment application or nullify a previously approved payment application, in whole or in part, as may reasonably be necessary to protect Owner from loss or damage based on the circumstances listed below, but only to the extent that Contractor is responsible. As a condition to this right, the Owner must give written notice to Contractor no later than 7 days after receipt of a payment application specifying the reasons for the disapproval or nullification. When the reasons for disapproving or nullifying an application for payment are removed, Owner shall immediately pay the amounts previously withheld.

a.  Contractor's repeated failure to perform the Work as required by the Contract Documents;

b.  loss or damage for which Owner may be liable arising out of or relating to this agreement and caused by Contractor to Owner or to others retained by Owner to whom Owner may be liable;

c.  Contractor's failure to properly pay subcontractors or suppliers in connection with the Work following receipt of such payment from Owner, for that portion of the Work or for supplies, provided that Owner is making payments to Contractor in accordance with this agreement;

d.  rejected or defective work not corrected in a timely fashion; and

e.  reasonable evidence of delay in performance of the Work such that the Work will not be completed by the Final Completion Date.

8.4     **Substantiation of Costs.** Contractor shall support its payment applications with relevant documentation to allow Owner to verify the costs incurred and expended by Contractor. The documentation may include time sheets, receipts, and invoices.

8.5     **Lien Releases.** With each payment application, Contractor shall submit properly executed waivers and releases from subcontractors, suppliers and vendors, and those persons or entities who have served a preliminary notice on Owner or Contractor.

8.6     **Retainage.** Each payment application will reflect 5% retainage of the amounts to be paid, except that no retainage applies to (i) the Fee, (ii) premiums paid by Contractor for insurance and bonds (if bonds are required), or (iii) amounts approved for payment to Contractor for the Cost of the Work (exclusive of amounts to be paid to subcontractors). All retainage must be paid as part of the final payment to Contractor. If, at any time after 50% of the Work has been completed, the Contractor is making satisfactory progress, 5% retainage will no longer be withheld and progress payments will be made in full.

8.7     **Prompt Payment.** The Owner shall make all progress payments to Contractor within 15 days after Owner receives a proper payment application.

8.8     **Delayed Payment.** If for any reason not the fault of Contractor, Contractor does not receive a progress payment from Owner within 5 days after the time that payment is due, Contractor, upon giving 10 days' written

Version 1.0 — 28 June 2018

EXHIBIT A - 000043



notice to Owner, and without prejudice to and in addition to any other legal remedies, may stop Work until payment of the full amount owing to Contractor has been received, including interest for late payment.

8.9     **Late Payment.** Payments due but unpaid will bear interest from the date payment is due at the rate of 10 percent per annum.

8.10     **Substantial Completion Payment.** When in the Contractor's judgment substantial completion of the Work or a designated portion has been achieved, Contractor shall notify Owner and establish the substantial completion date. In this agreement, "**substantial completion**" means that stage when the Work (or designated portion of the Work) is sufficiently complete in accordance with the Contract Documents so that Owner may occupy or utilize the Project, or a designated portion, for its intended use. A certificate of occupancy is not a prerequisite for substantial completion if the certificate of occupancy cannot be obtained due to factors beyond Contractor's control. Payment by Owner upon substantial completion will be in consideration of Contractor's agreement to complete all final punch list Items. Owner may retain no more than 150% of the costs estimated by Owner and Contractor necessary to complete any punch list Items. Thereafter, Owner shall pay to the Contractor the amounts retained for the punch list items to the extent that each item is completed by Contractor and accepted by Owner.

8.11     **Final Payment.** When in the Contractor's judgment final completion has been achieved, Contractor shall submit a final payment application. In this agreement, "**final completion**" means that stage when the Owner determines that the Work has been properly completed in accordance with the Contract Documents, including completion of punch list items and the submittal to Owner of all closeout documentation required by the Contract Documents. Owner shall make final payment to Contractor within 15 days after Contractor has submitted a complete and accurate payment application and has submitted to Owner all closeout documentation required by the Contract Documents. In this agreement, "**final payment**" means the payment to Contractor of all amounts due and remaining to be paid to Contractor under the Contract Documents, including any retainage. Final payment will not relieve the Contractor of any warranty obligations required under the Contract Documents.

8.12     **Waiver of Claims.** Claims not reserved by Owner in writing with the making of final payment are waived except for claims relating to liens or similar encumbrances, warranties, and latent defects. Claims not reserved by Contractor in writing in accepting final payment are waived.

9.0     **Schedule, Delays and Liquidated Damages.**

9.1     Contractor shall promptly start the Work on June 2019 ("**Commencement Date**") and complete all Work in accordance with the Contract Documents no later than December 2020, pending final drawings ("**Final Completion Date**").

9.2     **Time is of the Essence.** Time is of the essence for both parties with regard to the obligations of this agreement and Contract Documents.

9.3     Contractor shall achieve substantial completion of the Work in TBD working days from the Commencement Date and achieve final completion within TBD after the date of substantial completion. Both deadlines are subject to adjustments as provided for in the Contract Documents.

9.4     **Schedule.** Before submitting its first payment application for payment, Contractor shall submit to Owner a schedule showing the dates on which Contractor plans to begin and complete various parts of the Work, including dates on which information and approvals are required from Owner. Unless otherwise agreed, the schedule must (i) provide a graphic representation of all activities and events and (ii) identify dates that are critical to ensure timely completion of the Work. Contractor shall update the schedule monthly, or as mutually agreed by the parties.

9.5     **Delays and Time Extensions.** If Contractor is delayed by any cause beyond the Contractor's control, the Contractor will be entitled to a time extension. These causes include but are not limited to the following: (a) acts or omissions of Owner, the Owner's agents, consultants, designers, and the architect-engineer; (b) changes in the Work or the sequencing of the Work ordered by Owner, or arising from the Owner's decisions that impact the time of performance; (c) encountering Hazardous Materials, or concealed or unknown conditions; (d) transportation delays not reasonably foreseeable; (e) labor disputes; (f) fire; (g) terrorism; (h) adverse governmental actions; (i) acts of God; (j) adverse weather conditions not reasonably anticipated; (k) utility disruptions or outages; (l) long lead times; (m) material and equipment damaged during transportation and delivery to the Project; (n) unexcused delays in payment. If

EXHIBIT A - 000044



delays to the Work are encountered, Contractor shall provide prompt written notice to Owner of the cause after Contractor first recognizes the delay. The parties shall take reasonable steps to mitigate the effect of such delays. In addition, If Contractor incurs additional costs as a result of a delay caused by the circumstances noted above, Contractor will be entitled to an equitable adjustment in compensation.

10.0    **Changes.** Without invalidating or breaching this agreement, Owner may order changes within the general scope of the Work. Such changes will be binding on Contractor only if in writing, and Contractor has no obligation to proceed or perform any changed work until such writing is received. The cost of changed work will be computed based on the Cost of the Work (as defined in section 7.0, above) plus markups computed as follows:

a.  6% for overhead and 7% for profit of the Cost of the Work performed by Contractor using its own forces;

11.0    **Warranty.** Contractor warrants that all materials and equipment will be new unless otherwise specified, of good quality, in conformance with the Contract Documents, and free from defective workmanship and materials for one year after the date of substantial completion. Contractor further warrants that the Work will be free from material defects not intrinsic in the design or materials required in the Contract Documents. This warranty does not include remedies for defects or damages caused by normal wear and tear during normal usage, use for a purpose for which the Work or Project was not intended, improper or insufficient maintenance, modifications performed by Owner or others retained by Owner, or abuse. If during the one-year warranty period any portion of the Work is found to be defective work, Owner shall promptly notify Contractor in writing. Unless Owner provides written acceptance of the condition, Contractor shall promptly correct the defective work at its own cost and time.

12.0    **Indemnity.**

12.1    To the fullest extent permitted by law, Contractor shall indemnify, defend, and hold harmless Owner, Owner's officers, directors, members, agents, and employees (but not the Owner's architect-engineer) ("**Owner Indemnitees**") from all third-party claims for bodily injury and property damage, other than to the Work itself and other property insured under section 13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of the Work but only to the extent caused by the negligent or intentional wrongful acts or omissions of Contractor, subcontractors, suppliers, or anyone employed directly or indirectly by any of them or by anyone for whose acts any of them may be liable. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of an Owner Indemnitee. Contractor will be entitled to reimbursement of any defense costs paid above Contractor's percentage of liability for the underlying claim.

12.2    To the fullest extent permitted by law, Owner shall indemnify, defend, and hold harmless Contractor, its officers, directors, or members, agents, and employees ("**Contractor Indemnitees**") from all third-party claims for bodily injury and property damage, other than property insured under section 13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of work by Owner, Owner's architect-engineer, or others retained by Owner, but only to the extent caused by the negligent or intentionally wrongful acts or omissions of Owner, Owner's architect-engineer, or others retained by Owner. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of a Contractor Indemnitee. Owner will be entitled to reimbursement of any defense costs paid above Owner's percentage of liability for the underlying claim.

12.3    These indemnification obligations will not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable under workers' compensation acts, disability benefit acts, or other insurance.

13.0    **Insurance.**

13.1    **Contractor's Insurance.** Before starting Work, Contractor shall procure and maintain in force all insurance set forth in Exhibit F. Commercial General Liability Insurance may be obtained under a single policy for the full limits required or by a combination of underlying policies with the balance provided by an excess or umbrella policy. The insurance policies must contain a provision that coverages under the policies will not be cancelled or expire until at least 30 days' written notice has been given to Owner and must include either a liability endorsement covering this agreement or an endorsement making the Owner an additional insured under the policies. Certificates of insurance showing such coverages to be in force must be filed with the Owner prior to commencement of the Work.

Version 1.0 — 28 June 2018

EXHIBIT A - 000045



13.2     **Owner's Insurance.** Owner shall purchase and maintain its own liability insurance, and at the Owner's option, may purchase and maintain such additional insurance to protect the Owner against claims losses, or damages that may arise from the Project. Owner shall name Contractor as an additional insured in any insurance policy obtained by the Owner for the Project.

13.3     **Waivers of Subrogation.** The Owner and Contractor hereby waive all rights against each other and against the Owner's architect-engineer, and other consultants, subcontractors, suppliers, agents and employees of the other for damages during construction covered by any property insurance as set forth in the Contract Documents.

14.0     **Limited Mutual Waiver of Consequential Damages.** Except for losses covered by insurance required by the Contract Documents, the parties waive all claims against each other for any consequential damages that may arise out of or relate to this agreement. The provisions of this section apply to the termination of this agreement and survive such termination.

14.1     Owner waives damages for loss of use of the Project, any rental expenses incurred, loss of income, profit, or financing related to the Project, loss of business, loss of financing, loss of profits not related to this Project, loss of reputation, and insolvency.

14.2     Contractor waives damages for loss of business, loss of financing, loss of profits not related to this Project, loss of bonding capacity, loss of reputation, and insolvency.

15.0     **Dispute Resolution.**

15.1     **Executive Discussions.** As a condition to and before resorting to mediation and binding arbitration, the parties must attempt in good faith to resolve any dispute promptly by negotiation between executives who have settlement authority.

15.2     If the dispute remains unresolved after executive discussions, the parties shall proceed to mediation using JAMS, or another provider as they may otherwise mutually agree, and shall conclude such mediation within 45 calendar days of the matter being first discussed. The parties will equally share the costs of the mediation.

15.3     If the dispute remains unresolved after mediation, the dispute must proceed to binding arbitration under JAMS (or other provider as the parties may mutually agree), per its Engineering and Construction Arbitration Rules & Procedures, or if the parties agree otherwise, to the Engineering and Construction Arbitration Rules & Procedures for Expedited Arbitration. Either party may initiate arbitration with respect to the matters submitted by filing a written demand for arbitration. The Project location shall serve as the venue. The arbitration award will be final. Judgment on the award may be entered in any court having jurisdiction. This paragraph does not preclude nor otherwise limit the parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

15.4     Neither party may commence arbitration if the claim or cause of action would be barred by the applicable statute of limitations had the claim or cause of action been filed in a state or federal court. Receipt of a demand for arbitration by the person or entity administering the arbitration will constitute the commencement of legal proceedings for the purposes of determining whether a claim or cause of action is barred by the applicable statute of limitations. If, however, a state or federal court exercising jurisdiction over a timely filed claim or cause of action orders that the claim or cause of action be submitted to arbitration, the arbitration proceeding will be deemed commenced as of the date the court action was filed, provided that the party asserting the claim or cause of action files its demand for arbitration with the person or entity administering the arbitration within 30 days after the entry of such order.

15.5     **Attorney Fees.** In any litigation or arbitration arising out of or related to this agreement, the prevailing party must be awarded costs and legal fees reasonably incurred.

16.0     **Suspension and Termination.**

16.1     **Termination by Contractor.** Upon 7 days' written notice to Owner, Contractor may terminate this agreement if the Work has been stopped for a continuous 30-day period through no fault of Contractor for any of the following reasons: (i) under court order or order of other governmental authorities having jurisdiction; or (ii) as a result of the declaration of a national emergency or other governmental act during which, through no act or fault of Contractor, materials are not available. In addition, upon 7 days' written notice to Owner, Contractor may terminate this agreement if Owner does any of the following: (i) fails to furnish reasonable evidence that sufficient funds are available

EXHIBIT A - 000046



and committed for the entire cost of the Project; (ii) fails to pay Contractor in accordance with this agreement and Contractor has stopped Work in compliance with this agreement; or (iii) otherwise materially breaches this agreement. Upon termination by Contractor, Contractor will be entitled to recover from Owner payment for all Work executed and for any proven loss, cost, or expense in connection with the Work, including all demobilization costs plus a proportionate share of the Fee.

16.2     **Suspension by Owner.** The Owner may order the Contractor in writing to suspend all or any part of the Work for the Owner's convenience or for stoppage beyond the control of the Owner or Contractor. If the performance of all or any part of the Work is suspended, the Contractor will be entitled to an equitable adjustment, and this agreement will be modified in writing accordingly.

16.3     **Termination for Owner's Convenience.** The Owner on 21 days' written notice may terminate this agreement, in whole or in part, when it is in the Owner's interest. If this agreement is terminated, the Owner shall pay the Contractor: (i) for the Work performed to date, including a proportionate share of the Fee; (ii) for all demobilization costs and costs incurred resulting from termination; including remaining subcontractor invoices (iii) reasonable attorneys' fees and costs related to termination; and (d) a termination fee of $150,000.00

16.4     **Notice to Cure and Default Termination.** (a) If Contractor persistently fails to supply enough qualified workers, proper materials, or equipment to maintain the approved schedule, or persistently fails to make payment to its workers, subcontractors, or suppliers when such payment is due, or willfully disregards law or orders of any public authority having jurisdiction, or is otherwise guilty of a material breach of a provision of this agreement, Contractor may be deemed in default. If Contractor fails to commence and to continue satisfactory correction of such default with diligence and promptness within 10 days after written notification by Owner to cure, then Owner, without prejudice to any other rights or remedies, may either: (i) take reasonable steps it deems necessary to correct the deficiencies and charge the cost to Contractor, who will be liable for such payments; or (ii) terminate this agreement by written notice absent appropriate corrective action. Owner shall make reasonable efforts to mitigate damages arising from Contractor default and shall promptly invoice Contractor for all amounts due.

(b) After receipt of a termination notice, and except as directed by the Owner, the Contractor shall: (i) stop work as specified in the notice and demobilize the site; (ii) place no further subcontracts or orders, except as necessary to complete the continued portion of the Work; (iii) terminate all subcontracts to the extent they relate to the work terminated; (iv) assign to the Owner, as directed by Owner, all right, title, and interest of the Contractor under the subcontracts terminated; (v) complete performance of the Work not terminated; and (vi) take action necessary to protect and preserve the Work.

(c) After termination, the Contractor shall submit promptly a final termination settlement proposal to the Owner. If the Contractor fails to submit the proposal, the Owner may determine, on the basis of information available, the amount, if any, due the Contractor because of the termination and shall pay the amount determined.

(d) Subject to paragraph (c) of this clause, the Contractor and Owner may agree on the whole or any part of the amount to be paid (including an allowance for Fee) because of the termination. This agreement will be amended, and the Contractor paid the agreed amount. If the Contractor and Owner fail to agree in whole or in part on the amount to be paid because of the termination, the parties agree to submit the matter to mediation, and if not resolved in mediation, the matter will be submitted for binding arbitration per section 15.0.

(e) If, after termination of the Contractor for default, it is determined by a court of competent jurisdiction or arbitrator that the Contractor was not in default, or that the delay was excusable, the rights, obligations, and remedies of the parties will be the same as if the termination had been issued for the Owner's convenience.

16.5     **Obligations Arising Before Termination.** Even after termination, the provisions of this agreement will apply to any Work performed, payments made, events occurring, costs charged or incurred, or obligations arising before the termination date.

17.0     **Miscellaneous.**

17.1     **Entire Agreement.** This agreement represents the entire agreement between Owner and Contractor and supersedes any prior written or oral agreements, understandings, and representations made or dated before the date of this agreement. This agreement may be amended only by a written amendment signed by the parties.

Page 10 of 13

EXHIBIT A - 000047



17.2    **Joint Drafting.** The parties hereby agree that this agreement was jointly drafted and that each had the opportunity to negotiate terms and to obtain assistance of counsel in reviewing terms prior to execution. This agreement will be construed in a neutral manner and neither against nor in favor of either party.

17.3    **No Third-Party Beneficiary.** This agreement and the obligations of the parties are intended for the sole benefit of the parties and do not create any rights in any other person or entity whatsoever, except the Owner and Contractor.

17.4    **Governing Law.** This agreement is governed by California law, or if outside California where the Project is located.

17.5    **Severability.** If any provision in this agreement is determined to be invalid, unenforceable or void, the remainder of the agreement will be fully binding with the same force and effect as though the invalid, unenforceable or void provision had been omitted.

17.6    **Photographs and Marketing.** Contractor may (a) make or issue any public announcement or statement with respect to the Work or the Project, (b) supply to the press or other news media any information, photographs, or data related to the Work or the Project, or (c) use images of the Work and Project in any Contractor materials, including without limitation, advertisements, websites, calendars, brochures or presentations with written approval from Owner; except that Contractor shall be prohibited from using Owner's name, trademark, or logo without Owner's prior written consent.

17.7    **Written Testimonial.** If the Work and Contractor's performance is satisfactory to the Owner, Owner agrees to provide Contractor with a written positive endorsement or testimonial that Contractor may use in its advertising, marketing, and promotional materials.

17.8    **Signage.** Contractor may erect signage at the site indicating its role on the Project and may maintain such signage until Final Acceptance or for a longer period as mutually agreed by the parties.

18.0    **List of Contract Documents.** The Contract Documents in existence at the time of the parties signing this agreement are as follows:

18.1    Exhibit A, Index of Plans and Specifications furnished by Owner.

18.2    Exhibit B, List of Exclusions and Assumptions and Qualifications.

18.3    Exhibit C, Estimated Budget.

18.4    Exhibit D, Schedule of the Work.

18.5    Exhibit E, List of Contractor Personnel and Hourly Rates.

18.6    Exhibit F, Contractor's Insurance.

18.7    Exhibit G, Sample Insurance Certificate.

18.8    Exhibit H, Form, Change Order.

18.9    Exhibit J, Form, Application and Certificate for Payment.

18.10   Exhibit K, Form, Schedule of Values.

18.11   Exhibit L, Form, Subcontractor Approval.

*Signatures Follow on Next Page*

Version 1.0 — 28 June 2018

EXHIBIT A - 000048



The parties are signing this agreement on the date stated in the introductory clause.

FERRANTE KOBERLING CONSTRUCTION, INC.

Signed: *Michael Ferrante*

Print Name:  Michael Ferrante

Title:  President and CEO

JOHN REED FITNESS LA, LLC

Signed:

Print Name: Sebastian Schoepe

Title:  President

OWNER'S FORMAL NAME IN UPPER CASE

Signed: _____

Print Name: _____

Title: _____

Version 1.0 — 28 June 2018

EXHIBIT A - 000049



EXHIBIT A - 000050

# EXHIBIT "C"

EXHIBIT A - 000051



## COST PLUS AGREEMENT BETWEEN OWNER AND CONTRACTOR

| | |
|---|---|
| Owner: 960 N La Brea, LLC | Contractor: Ferrante Koberling Construction, Inc. |
| Address: 925 N La Brea Ave, 4th Floor | 4700 W. Jefferson Blvd. #103 |
| City, State, Zip: 925 N La Brea Ave, 4ᵗʰ Floor | Los Angeles, CA  90016 |
| Contact: Sebastian Schoepe | Tax ID No: 46-3955278 |
| Phone: (424) 387-5709 | CA License No. 988562 |
| E-mail: schoepe@1upfitness.com | Contact: Michael Ferrante |
| Tax ID No: | Phone: (323) 933-3203 |
| | Email: mferrante@ferrantekoberling.com |
| Project: 960 N La Brea | Architect: Gruen Architects |
| Project Address: 960 N La Brea Ave | Address: 6330 S Vicente Blvd #200 |
| City, State, Zip: Los Angeles, CA 90038 | City, State, Zip: Los Angeles, CA 90048 |

This Agreement Between Owner and Contractor is dated July 2ⁿᵈ, 2018 and is between FERRANTE KOBERLING CONSTRUCTION, INC., a California corporation ("**Contractor**"), 960 N LA BREA, LLC, a Delaware limited liability corporation ("**960 N La Brea**"), and 1UP FITNESS GROUP NORTH AMERICA LP, a Delaware limited partnership, and affiliated companies  ("**1UP Fitness,**" and together with **960 N La Brea**, and affiliated companies are the "**Owner**")

### Recitals

A.  Owner is leasing and building out approximately 66,250 SF of commercial space ("**Commercial Work**") as a Fitness Club, Office and Restaurant in the building located at 960 N. La Brea Ave., Los Angeles, CA 90016 ("**Project**").

B.  Contractor is experienced, qualified, and staffed to perform this Commercial Work.

C.  Owner and Contractor have reached an agreement for Contractor to perform the Commercial Work and desire to set forth their respective rights, responsibilities, terms, conditions, and compensation to be paid to Contractor.

Owner and Contractor therefore agree as follows:

1.0      **Contract Documents.** The Contract Documents consist of the following: (i) this agreement; (ii) written modifications to this agreement signed by both parties; and (iii) those documents listed under section 19.0. The Contract Documents are complementary and cumulative and what is called for by one shall be as binding as if called for by all. In case of conflicts between the drawings and specifications, the specifications will govern. In case of omissions, errors, or inconsistency among the Contract Documents, the Contractor shall immediately submit the matter to Owner for clarification. Owner's clarifications are final and binding, subject to an equitable adjustment in the compensation, the Contractor's time for performance, or both, or to dispute mitigation and resolution.

2.0      **The Relationship Between the Parties.** The parties hereby agree to proceed on the basis of mutual trust, good faith, and fair dealing. Each party shall perform its obligations with integrity and shall avoid any conflicts of interest.

3.0      **Work.** Contractor shall perform the Work in a workmanlike and expeditious manner consistent with the Contract Documents. Contractor shall provide all labor, materials, equipment, and services necessary to complete the Work in accord with the Contract Documents and Exhibits C and K, "Estimated Budget" and "Schedule of the Work," respectively.

4.0      **Compensation, Cost Plus Fee.** Owner shall compensate Contractor for Work performed as follows:

4.1      The Cost of the Work as set forth in section 7.0, plus 6 percent for overhead and 7 percent for profit (the overhead and profit markups constitute the "**Fee**"). The Fee will be paid in proportion to the Work performed.

EXHIBIT A - 000052



4.2     The Estimated Budget to complete the Work is $12,000,000.00 as set forth in Exhibit C. The Estimated Budget is not a guaranteed maximum price for the Cost of the Work or Fee. If Contractor becomes aware that the Estimated Budget will be exceeded, Contractor must promptly notify Owner in writing before performing the Work in excess of the Estimated Budget. This notice may include the Contractor's estimate of the additional costs necessary to complete the Work. The Contractor may stop work and is under no obligation to proceed with the Work in excess of the Estimated Budget until Owner authorizes Contractor in writing to proceed. Contractor is not liable for any delay in receiving this authorization.

5.0     **Owner Responsibilities.** Owner shall provide any information and services at Owner's expense and when required for the successful and expeditious completion of the Work.

5.1     As a condition to Contractor starting the Work, Owner shall provide Contractor with reasonable evidence of sufficient and available funds to satisfy all of Owner's obligations under this agreement. In the case of Project financing, such evidence must include the name and address of any construction lender and a copy of the loan commitment and loan disbursement agreement between Owner and Owner's lenders relating to the provision and disbursement of funds to Owner for its obligations under this agreement, except information deemed proprietary or confidential by Owner or Owner's lenders. During performance of the Work, Owner shall notify Contractor in writing Contractor of any material change in Project financing.

5.2     Owner shall provide Contractor with information describing the physical characteristics of the Project, including surveys, site evaluations, legal descriptions, data, or drawings depicting existing conditions, subsurface, and environmental studies, reports, investigations, tests, inspections, and other reports dealing with environmental matters, hazardous material and other existing conditions, including structural, mechanical, and chemical tests required by the Contract Documents or by law.

5.3     Owner shall provide Contractor with any other information or services requested by Contractor that Contractor claims is relevant to its performance of the Work and under Owner's control.

5.4     Within 7 days of this agreement being signed by the parties, Owner shall provide Contractor with the information necessary to give notice of or enforce mechanics' lien rights. This information must include Owner's interest in the real property on which the Project is located and the record legal title, and the name and address of the record fee owner if not the Owner. In this agreement, "**days**" means calendar days unless otherwise noted.

5.5     Owner shall secure and pay for all permits, approvals, easements, assessments, and fees required in connection with the Work.

5.6     Owner shall designate an Owner's authorized representative ("**OAR**") to provide approvals and directives necessary for the day-to-day administration of this agreement, the Work, and the Project. Owner shall designate the limits of any authority delegated to the OAR with respect to the following: executing any contract, contract modification, or other form of binding agreement; obligating the Owner in any manner to the payment of money; rendering any final decision on any contract matter, claim or dispute, terminating, suspending, or otherwise interfering with the Contractor's performance, directing any changes in the Contract Documents or in the Contractor's performance that is inconsistent with the Contract Documents. Owner and OAR shall be prohibited from communicating in any manner with Contractor's subcontractors. All communications from Owner and OAR regarding the Project must be with Contractor's designated representative.

5.7     Owner shall provide Contractor with complete and unfettered access to the site and area(s) of the Work.

5.8     Owner shall timely make payments to Contractor in accordance with this agreement.

5.9     Unless otherwise noted on the drawings and specifications, Owner shall be prohibited from performing work at the Project using its own forces or separate contractors without the Contractor's prior written consent.

5.10     Owner shall pay for all copies of the drawings and specifications as necessary for the Contractor to prosecute the Work. If the reproduction costs are paid by Contractor, Owner must reimburse Contractor the actual amount paid plus 10%.

5.11     Unless otherwise provided in the Contract Documents, Owner shall pay for all fees related to utilities and other facilities and services necessary for the Project, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work. In addition, unless otherwise provided in the Contract Documents, Owner shall

EXHIBIT A - 000053



be responsible for all necessary upgrades to any existing building systems and utilities. "**Utilities**" includes electric, gas, water, sewer and waste, storm drain, Internet, TV, and phone.

5.12 **Joint and Several.** The obligations and liabilities of the Owner under this agreement are joint and several.

6.0 **Contractor Responsibilities.**

6.1 Contractor shall supervise and coordinate the Work, including the construction means, methods, techniques, sequences, and procedures utilized, unless the Owner or Contract Documents provide other specific instructions.

6.2 **Subcontractors.** Contractor and all subcontractors shall at all times during the Work be duly licensed by the CSLB (or by the jurisdiction where the Work will be performed). In this agreement, "**subcontractors**" means any person or entity who has a contract with or is engaged by Contractor, or with any other subcontractor, at any tier. To the extent practicable, Contractor shall enter into written subcontracts where compensation is based on a lump-sum price. The lump-sum price is subject to approval by Owner. As a condition to Contractor entering any subcontract, Owner must indicate its approval of the lump-sum price (and any other important terms and conditions) by signing the "Subcontract Approval Form" in the form attached as Exhibit L.

6.3 Except for permits that are the Owner's responsibility, Contractor shall apply for and obtain all necessary building permits pertaining to the Work. Owner shall immediately reimburse Contractor for any permit fees paid for or advanced by Contractor at actual cost plus 10%.

6.4 Contractor has investigated the site, the visible conditions affecting the site and the Work, and the Contract Documents.

6.5 Contractor shall comply with all applicable codes, laws, ordinances, and regulations affecting its performance and the Work. Contractor will be liable to Owner for all loss, cost, or expense, attributable to any acts or omissions by Contractor, its employees, subcontractors, suppliers, and agents in failing to comply with laws, including fines, penalties, or corrective measures. Contractor shall pay all applicable taxes for the Work provided by Contractor. The estimated Cost of the Work and Fee will be equitably adjusted for laws, taxes, duties, and tariffs that impact cost or time that are enacted after the date of this agreement or after bids are received or negotiations concluded.

6.6 Contractor shall provide and maintain competent personnel to supervise and direct the Work and shall enforce strict discipline and good order among those carrying out the Work. Contractor shall prohibit the use of alcoholic beverages, drugs and other dangerous substances, and the playing of radios, music, or other broadcasting devices at the site that constitute a danger to life, health, or property. Contractor shall prohibit the wearing of any work clothes and attire displaying offensive logos, insignia, graphics, words, phrases, or symbols.

6.7 Contractor shall take precautions to properly protect and preserve (I) the materials, supplies, and equipment to be incorporated into the Work and (ii) the Work itself from damage until the Work is accepted by Owner. If the Owner causes damage to the Work, the Owner shall promptly remedy that damage at its sole expense.

6.8 Contractor shall maintain and supervise all safety precautions and programs, and shall comply with all applicable laws, ordinances, and regulations of any federal, state or local authorities, including OSHA and Cal/OSHA, for the safety of persons or property. Contractor shall conduct routine inspections of equipment and site conditions as necessary to ensure compliance with its safety programs and standards. At all times during working hours at the site, Contractor shall require and ensure the use of personal protective equipment by all workers on the site.

6.9 Contractor shall be responsible for the proper delivery, handling, application, storage, removal, and disposal of all materials and substances brought to the site by Contractor in accordance with the Contract Documents and used or consumed in the performance of the Work.

6.10 A "**Hazardous Material**" is any substance or material identified now or in the future as hazardous under any federal, state, or local law or regulation, or any other substance or material which may be considered hazardous or otherwise subject to statutory or regulatory requirement governing handling, disposal, or clean-up. Contractor shall not start or continue work until any Hazardous Material discovered at the site has been removed, or rendered or determined to be harmless by Owner as certified by an independent testing laboratory and approved by the appropriate

Page **3** of **13**

EXHIBIT A - 000054



government agency. If Contractor incurs additional costs or is delayed due to the presence or remediation of Hazardous Material, Contractor shall be entitled to an equitable adjustment.

6.11 **Submittals.** Contractor shall submit to Owner for review and approval all shop drawings, samples, product data, and similar submittals required by the Contract Documents. Submittals may be submitted in electronic form. Contractor will be responsible to Owner for the accuracy and conformity of its submittals to the Contract Documents. Contractor shall prepare and deliver its submittals to Owner in a manner consistent with the Contractor's schedule and in such time and sequence so as not to delay the performance of the Work or the work of Owner and others retained by Owner. Contractor shall identify in writing for each submittal all changes, deviations, or substitutions from the requirements of the Contract Documents. Owner's approval of a submittal does not authorize deviations, substitutions, or changes in the requirements of the Contract Documents unless Owner specifically authorizes such deviation, substitution, or change. Owner shall review and approve submittals with promptness to avoid causing delay. Contractor shall perform all Work in accordance with approved submittals. Owner's approval does not relieve Contractor from responsibility for defective work resulting from errors or omissions of any kind on the approved shop drawings. In this agreement, "**defective work**" means work found to be not in conformance with the Contract Documents.

6.12 Contractor shall perform cutting, fitting, and patching necessary to coordinate the various parts of the Work and to prepare its Work for the work of Owner or others retained by Owner.

6.13 Contractor shall regularly remove debris and waste materials at the site resulting from the Work. Contractor shall minimize and confine dust and debris resulting from construction activities. At the completion of the Work, Contractor shall remove from the site all construction equipment, tools, surplus materials, waste materials, and debris.

6.14 **Differing Site Conditions.** The Contractor shall promptly, and before the conditions are disturbed, give written notice to Owner of: (i) subsurface or latent physical conditions at the site which differ materially from those indicated in the Contract Documents; or (ii) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract Documents. The Owner shall investigate the conditions promptly after receiving notice. If the conditions do materially differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the Work, an equitable adjustment will be made and this agreement modified in writing accordingly.

7.0 **Cost of the Work.** Owner shall pay Contractor for the Cost of the Work as defined in this section and the Fee stipulated in section 4.0. The Cost of the Work includes:

7.1 **Key Personnel.** Amounts paid by Contractor to those employees (excluding craft labor) identified in Exhibit E and at the stated billable hourly rates. Those hourly rates include the base hourly wage, payroll taxes, employee benefits, and workers' compensation insurance but not profit (fee), general administrative, and overhead costs.

7.2 **Contractor's Craft Labor.** Wages actually paid for Contractor's craft labor directly employed by Contractor in performing the Work;

7.3 **Employee Taxes and Burdens.** Cost of all employee benefits and taxes including but not limited to workers' compensation, unemployment compensation, social security, health, welfare, retirement, and other fringe benefits as required by law, labor agreements, or paid under Contractor's personnel policy, insofar as such costs are paid to employees of Contractor as part of the Cost of the Work;

7.4 **Subcontractor and Vendor Costs.** Costs paid by Contractor to its subcontractors and vendors for Work performed pursuant to subcontracts and purchase orders.

7.5 **Materials and Equipment.** Cost of all materials, supplies, and equipment incorporated in the Work, including costs of inspection and testing (if not provided by Owner), transportation, storage, and handling;

7.6 **Materials and Equipment Consumed at the Site.** Cost, including transportation and maintenance, of all materials, supplies, equipment, temporary facilities, and hand tools not owned by the workers that are used or consumed in the performance of the Work, less salvage value or residual value; and cost less salvage value on such items used, but not consumed, that remain the Contractor's property;

Version 1.0 — 28 June 2018

EXHIBIT A - 000055



7.7     **Rental Charges.** Actual rental charges of all necessary machinery and equipment, exclusive of hand tools owned by workers, used at the site, whether rented from Contractor or others, including installation, repair and replacement, dismantling, removal, maintenance, transportation, and delivery costs;

7.8     **Insurance and Bonds Premiums.** Cost of the premiums for all insurance and surety bonds which Contractor is required to procure or deems necessary, and approved by Owner, including any additional premium incurred as a result of any increase in the Cost of the Work;

7.9     **Sales and Use Taxes.** Sales, use, gross receipts, or other taxes, tariffs, or duties related to the Work for which Contractor is liable;

7.10    **Permits and Fees.** Permits, fees, licenses, tests, and royalties, except if paid by Owner;

7.11    **Course of Construction Repairs.** Actual and reasonable costs paid by Contractor in repairing minor damage to trade Work caused as a normal by-product during the course of construction and not attributable to the fault of Contractor, any subcontractor or vendor or not covered by insurance;

7.12    **Site Office.** Costs associated with establishing, equipping, operating, maintaining, and demobilizing the field office;

7.13    **Utilities.** Water, power, and fuel costs necessary for the Work;

7.14    **Clean-up and Disposal.** Cost of cleaning up, removing, and legally disposing all non-hazardous substances, debris, and waste materials;

7.15    **Emergencies.** Costs to respond to an emergency affecting the safety of persons and property, provided the cost is not the result of any act or omission of Contractor, subcontractor, vendor, or any party for whom any of them are responsible or liable at law or under the Contract Documents;

7.16    **Site Security.** Costs for site security services required for protection of the Work;

7.17    **Reproduction and Graphics.** Costs for blueprinting and reproduction of the plans and specifications, and for required postage, express mail, and long-distance costs in the performance of the Work;

7.18    **Legal.** Legal, mediation, and arbitration fees and costs reasonably and properly resulting from Contractor's performance of the Work, except those arising from disputes between the parties; and

7.19    **Miscellaneous.** Costs directly incurred in performing the Work or in connection with the Project that are not included in the Fee and that are reasonably inferable from the Contract Documents.

7.20    **Discounts.** All discounts for prompt payment shall accrue to Owner to the extent such payments are made directly by Owner. To the extent payments are made with funds of Contractor, all cash discounts accrue to Contractor. All trade discounts, rebates, and refunds, and all returns from sale of surplus materials and equipment (if any), shall be credited to the Cost of the Work.

7.21    **Contractor's Account Records.** Records of the Contractor's costs and expenditures must be maintained on the basis of generally accepted accounting practices and be available for inspection by the Owner or the Owner's designated agent at mutually convenient times for a period of 2 years after final payment.

8.0     **Payments.**

8.1     **Schedule of Values.** Per Exhibit K pending drawings within TBD working days after the parties sign this agreement, Contractor shall submit to Owner for approval an initial schedule of values allocating budgeted values among all categories or portions of the Work. The schedule of values must be prepared in such form and supported by data to substantiate its accuracy as Owner may reasonably require and must be based on the latest cost information available to Contractor. The Estimated Budget must be broken down is sufficient detail to facilitate continued evaluation of the Contractor's payment applications. The schedule of values must include separate line items for materials and equipment purchased or fabricated and stored either on-site or off-site and for the Fee. The Owner-accepted schedule of values must be used as the basis for the Contractor's applications for payments and revised for any modifications mutually agreed upon by the parties.

Version 1.0 — 28 June 2018

EXHIBIT A - 000056



8.2     **Progress Payments.** Contractor shall submit to Owner or another person or entity designated by Owner bi-weekly payment applications no later than the 15th and last day of the month. The payment application consists of the Cost of the Work performed up to the date stated in the payment application, along with a proportionate share of the Fee. Payment applications must include materials and equipment not yet incorporated into the Work but delivered to and suitably stored onsite or offsite, including applicable insurance, storage, and costs incurred transporting the materials to an offsite storage facility. Approval of payment for materials stored off-site is conditioned on the Contractor submitting bills of sale and applicable insurance or such other procedures satisfactory to Owner to establish Owner's title to such materials, or otherwise to protect Owner's interest, including transportation to the site.

8.3     **Adjustment of Contractor's Payment Application.** Owner may adjust or reject a payment application or nullify a previously approved payment application, in whole or in part, as may reasonably be necessary to protect Owner from loss or damage based on the circumstances listed below, but only to the extent that Contractor is responsible. As a condition to this right, the Owner must give written notice to Contractor no later than 7 days after receipt of a payment application specifying the reasons for the disapproval or nullification. When the reasons for disapproving or nullifying an application for payment are removed, Owner shall immediately pay the amounts previously withheld.

a.  Contractor's repeated failure to perform the Work as required by the Contract Documents;

b.  loss or damage for which Owner may be liable arising out of or relating to this agreement and caused by Contractor to Owner or to others retained by Owner to whom Owner may be liable;

c.  Contractor's failure to properly pay subcontractors or suppliers in connection with the Work following receipt of such payment from Owner, for that portion of the Work or for supplies, provided that Owner is making payments to Contractor in accordance with this agreement;

d.  rejected or defective work not corrected in a timely fashion; and

e.  reasonable evidence of delay in performance of the Work such that the Work will not be completed by the Final Completion Date.

8.4     **Substantiation of Costs.** Contractor shall support its payment applications with relevant documentation to allow Owner to verify the costs incurred and expended by Contractor. The documentation may include time sheets, receipts, and invoices.

8.5     **Lien Releases.** With each payment application, Contractor shall submit properly executed waivers and releases from subcontractors, suppliers and vendors, and those persons or entities who have served a preliminary notice on Owner or Contractor.

8.6     **Retainage.** Each payment application will reflect 5% retainage of the amounts to be paid, except that no retainage applies to (i) the Fee, (ii) premiums paid by Contractor for insurance and bonds (if bonds are required), or (iii) amounts approved for payment to Contractor for the Cost of the Work (exclusive of amounts to be paid to subcontractors). All retainage must be paid as part of the final payment to Contractor. If, at any time after 50% of the Work has been completed, the Contractor is making satisfactory progress, 5% retainage will no longer be withheld and progress payments will be made in full.

8.7     **Prompt Payment.** The Owner shall make all progress payments to Contractor within 15 days after Owner receives a proper payment application.

8.8     **Delayed Payment.** If for any reason not the fault of Contractor, Contractor does not receive a progress payment from Owner within 5 days after the time that payment is due, Contractor, upon giving 10 days' written notice to Owner, and without prejudice to and in addition to any other legal remedies, may stop Work until payment of the full amount owing to Contractor has been received, including interest for late payment.

8.9     **Late Payment.** Payments due but unpaid will bear interest from the date payment is due at the rate of 10 percent per annum.

8.10    **Substantial Completion Payment.** When in the Contractor's judgment substantial completion of the Work or a designated portion has been achieved, Contractor shall notify Owner and establish the substantial completion date. In this agreement, "**substantial completion**" means that stage when the Work (or designated portion of the

EXHIBIT A - 000057



Work) is sufficiently complete in accordance with the Contract Documents so that Owner may occupy or utilize the Project, or a designated portion, for its intended use. A certificate of occupancy is not a prerequisite for substantial completion if the certificate of occupancy cannot be obtained due to factors beyond Contractor's control. Payment by Owner upon substantial completion will be in consideration of Contractor's agreement to complete all final punch list Items. Owner may retain no more than 150% of the costs estimated by Owner and Contractor necessary to complete any punch list Items. Thereafter, Owner shall pay to the Contractor the amounts retained for the punch list items to the extent that each item is completed by Contractor and accepted by Owner.

8.11    **Final Payment.** When in the Contractor's judgment final completion has been achieved, Contractor shall submit a final payment application. In this agreement, "**final completion**" means that stage when the Owner determines that the Work has been properly completed in accordance with the Contract Documents, including completion of punch list items and the submittal to Owner of all closeout documentation required by the Contract Documents. Owner shall make final payment to Contractor within 15 days after Contractor has submitted a complete and accurate payment application and has submitted to Owner all closeout documentation required by the Contract Documents. In this agreement, "**final payment**" means the payment to Contractor of all amounts due and remaining to be paid to Contractor under the Contract Documents, including any retainage. Final payment will not relieve the Contractor of any warranty obligations required under the Contract Documents.

8.12    **Waiver of Claims.** Claims not reserved by Owner in writing with the making of final payment are waived except for claims relating to liens or similar encumbrances, warranties, and latent defects. Claims not reserved by Contractor in writing in accepting final payment are waived.

9.0    **Schedule, Delays and Liquidated Damages.**

9.1    Contractor shall promptly start the Work on July 1st, 2018 ("**Commencement Date**") and complete all Work in accordance with the Contract Documents no later than TBD, pending final drawings ("**Final Completion Date**").

9.2    **Time is of the Essence.** Time is of the essence for both parties with regard to the obligations of this agreement and Contract Documents.

9.3    Contractor shall achieve substantial completion of the Work in TBD working days from the Commencement Date and achieve final completion within TBD after the date of substantial completion. Both deadlines are subject to adjustments as provided for in the Contract Documents.

9.4    **Schedule.** Before submitting its first payment application for payment, Contractor shall submit to Owner a schedule showing the dates on which Contractor plans to begin and complete various parts of the Work, including dates on which information and approvals are required from Owner. Unless otherwise agreed, the schedule must (i) provide a graphic representation of all activities and events and (ii) identify dates that are critical to ensure timely completion of the Work. Contractor shall update the schedule monthly, or as mutually agreed by the parties.

9.5    **Delays and Time Extensions.** If Contractor is delayed by any cause beyond the Contractor's control, the Contractor will be entitled to a time extension. These causes include but are not limited to the following: (a) acts or omissions of Owner, the Owner's agents, consultants, designers, and the architect-engineer; (b) changes in the Work or the sequencing of the Work ordered by Owner, or arising from the Owner's decisions that impact the time of performance; (c) encountering Hazardous Materials, or concealed or unknown conditions; (d) transportation delays not reasonably foreseeable; (e) labor disputes; (f) fire; (g) terrorism; (h) adverse governmental actions; (i) acts of God; (j) adverse weather conditions not reasonably anticipated; (k) utility disruptions or outages; (l) long lead times; (m) material and equipment damaged during transportation and delivery to the Project; (n) unexcused delays in payment. If delays to the Work are encountered, Contractor shall provide prompt written notice to Owner of the cause after Contractor first recognizes the delay. The parties shall take reasonable steps to mitigate the effect of such delays. In addition, If Contractor incurs additional costs as a result of a delay caused by the circumstances noted above, Contractor will be entitled to an equitable adjustment in compensation.

10.0    **Changes.** Without invalidating or breaching this agreement, Owner may order changes within the general scope of the Work. Such changes will be binding on Contractor only if in writing, and Contractor has no obligation to proceed

Version 1.0 — 28 June 2018

EXHIBIT A - 000058



or perform any changed work until such writing is received. The cost of changed work will be computed based on the Cost of the Work (as defined in section 7.0, above) plus markups computed as follows:

a.   6% for overhead and 7% for profit of the Cost of the Work performed by Contractor using its own forces;

11.0     **Warranty.** Contractor warrants that all materials and equipment will be new unless otherwise specified, of good quality, in conformance with the Contract Documents, and free from defective workmanship and materials for one year after the date of substantial completion. Contractor further warrants that the Work will be free from material defects not intrinsic in the design or materials required in the Contract Documents. This warranty does not include remedies for defects or damages caused by normal wear and tear during normal usage, use for a purpose for which the Work or Project was not intended, improper or insufficient maintenance, modifications performed by Owner or others retained by Owner, or abuse. If during the one-year warranty period any portion of the Work is found to be defective work, Owner shall promptly notify Contractor in writing. Unless Owner provides written acceptance of the condition, Contractor shall promptly correct the defective work at its own cost and time.

12.0     **Indemnity.**

12.1     To the fullest extent permitted by law, Contractor shall indemnify, defend, and hold harmless Owner, Owner's officers, directors, members, agents, and employees (but not the Owner's architect-engineer) ("**Owner Indemnitees**") from all third-party claims for bodily injury and property damage, other than to the Work itself and other property insured under section 13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of the Work but only to the extent caused by the negligent or intentional wrongful acts or omissions of Contractor, subcontractors, suppliers, or anyone employed directly or indirectly by any of them or by anyone for whose acts any of them may be liable. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of an Owner Indemnitee. Contractor will be entitled to reimbursement of any defense costs paid above Contractor's percentage of liability for the underlying claim.

12.2     To the fullest extent permitted by law, Owner shall indemnify, defend, and hold harmless Contractor, its officers, directors, or members, agents, and employees ("**Contractor Indemnitees**") from all third-party claims for bodily injury and property damage, other than property insured under section 13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of work by Owner, Owner's architect-engineer, or others retained by Owner, but only to the extent caused by the negligent or intentionally wrongful acts or omissions of Owner, Owner's architect-engineer, or others retained by Owner. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of a Contractor Indemnitee. Owner will be entitled to reimbursement of any defense costs paid above Owner's percentage of liability for the underlying claim.

12.3     These indemnification obligations will not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable under workers' compensation acts, disability benefit acts, or other insurance.

13.0     **Insurance.**

13.1     **Contractor's Insurance.** Before starting Work, Contractor shall procure and maintain in force all insurance set forth in Exhibit F. Commercial General Liability Insurance may be obtained under a single policy for the full limits required or by a combination of underlying policies with the balance provided by an excess or umbrella policy. The insurance policies must contain a provision that coverages under the policies will not be cancelled or expire until at least 30 days' written notice has been given to Owner and must include either a liability endorsement covering this agreement or an endorsement making the Owner an additional insured under the policies. Certificates of insurance showing such coverages to be in force must be filed with the Owner prior to commencement of the Work.

13.2     **Owner's Insurance.** Owner shall purchase and maintain its own liability insurance, and at the Owner's option, may purchase and maintain such additional insurance to protect the Owner against claims losses, or damages that may arise from the Project. Owner shall name Contractor as an additional insured in any insurance policy obtained by the Owner for the Project.

13.3     **Waivers of Subrogation.** The Owner and Contractor hereby waive all rights against each other and against the Owner's architect-engineer, and other consultants, subcontractors, suppliers, agents and employees of the other for damages during construction covered by any property insurance as set forth in the Contract Documents.

Version 1.0 — 28 June 2018

EXHIBIT A - 000059



14.0     **Limited Mutual Waiver of Consequential Damages.** Except for losses covered by insurance required by the Contract Documents, the parties waive all claims against each other for any consequential damages that may arise out of or relate to this agreement. The provisions of this section apply to the termination of this agreement and survive such termination.

14.1     Owner waives damages for loss of use of the Project, any rental expenses incurred, loss of income, profit, or financing related to the Project, loss of business, loss of financing, loss of profits not related to this Project, loss of reputation, and insolvency.

14.2     Contractor waives damages for loss of business, loss of financing, loss of profits not related to this Project, loss of bonding capacity, loss of reputation, and insolvency.

15.0     **Dispute Resolution.**

15.1     **Executive Discussions.** As a condition to and before resorting to mediation and binding arbitration, the parties must attempt in good faith to resolve any dispute promptly by negotiation between executives who have settlement authority.

15.2     If the dispute remains unresolved after executive discussions, the parties shall proceed to mediation using JAMS, or another provider as they may otherwise mutually agree, and shall conclude such mediation within 45 calendar days of the matter being first discussed. The parties will equally share the costs of the mediation.

15.3     If the dispute remains unresolved after mediation, the dispute must proceed to binding arbitration under JAMS (or other provider as the parties may mutually agree), per its Engineering and Construction Arbitration Rules & Procedures, or if the parties agree otherwise, to the Engineering and Construction Arbitration Rules & Procedures for Expedited Arbitration. Either party may initiate arbitration with respect to the matters submitted by filing a written demand for arbitration. The Project location shall serve as the venue. The arbitration award will be final. Judgment on the award may be entered in any court having jurisdiction. This paragraph does not preclude nor otherwise limit the parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

15.4     Neither party may commence arbitration if the claim or cause of action would be barred by the applicable statute of limitations had the claim or cause of action been filed in a state or federal court. Receipt of a demand for arbitration by the person or entity administering the arbitration will constitute the commencement of legal proceedings for the purposes of determining whether a claim or cause of action is barred by the applicable statute of limitations. If, however, a state or federal court exercising jurisdiction over a timely filed claim or cause of action orders that the claim or cause of action be submitted to arbitration, the arbitration proceeding will be deemed commenced as of the date the court action was filed, provided that the party asserting the claim or cause of action files its demand for arbitration with the person or entity administering the arbitration within 30 days after the entry of such order.

15.5     **Attorney Fees.** In any litigation or arbitration arising out of or related to this agreement, the prevailing party must be awarded costs and legal fees reasonably incurred.

16.0     **Suspension and Termination.**

16.1     **Termination by Contractor.** Upon 7 days' written notice to Owner, Contractor may terminate this agreement if the Work has been stopped for a continuous 30-day period through no fault of Contractor for any of the following reasons: (i) under court order or order of other governmental authorities having jurisdiction; or (ii) as a result of the declaration of a national emergency or other governmental act during which, through no act or fault of Contractor, materials are not available. In addition, upon 7 days' written notice to Owner, Contractor may terminate this agreement if Owner does any of the following: (i) fails to furnish reasonable evidence that sufficient funds are available and committed for the entire cost of the Project; (ii) fails to pay Contractor in accordance with this agreement and Contractor has stopped Work in compliance with this agreement; or (iii) otherwise materially breaches this agreement. Upon termination by Contractor, Contractor will be entitled to recover from Owner payment for all Work executed and for any proven loss, cost, or expense in connection with the Work, including all demobilization costs plus a proportionate share of the Fee.

16.2     **Suspension by Owner.** The Owner may order the Contractor in writing to suspend all or any part of the Work for the Owner's convenience or for stoppage beyond the control of the Owner or Contractor. If the

Version 1.0 — 28 June 2018

EXHIBIT A - 000060



performance of all or any part of the Work is suspended, the Contractor will be entitled to an equitable adjustment, and this agreement will be modified in writing accordingly.

16.3    **Termination for Owner's Convenience.** The Owner on 21 days' written notice may terminate this agreement, in whole or in part, when it is in the Owner's interest. If this agreement is terminated, the Owner shall pay the Contractor: (i) for the Work performed to date, including a proportionate share of the Fee; (ii) for all demobilization costs and costs incurred resulting from termination; including remaining subcontractor invoices  (iii) reasonable attorneys' fees and costs related to termination; and (d) a termination fee of $350,000.00

16.4    **Notice to Cure and Default Termination.** (a) If Contractor persistently fails to supply enough qualified workers, proper materials, or equipment to maintain the approved schedule, or persistently fails to make payment to its workers, subcontractors, or suppliers when such payment is due, or willfully disregards law or orders of any public authority having jurisdiction, or is otherwise guilty of a material breach of a provision of this agreement, Contractor may be deemed in default. If Contractor fails to commence and to continue satisfactory correction of such default with diligence and promptness within 10 days after written notification by Owner to cure, then Owner, without prejudice to any other rights or remedies, may either: (i) take reasonable steps it deems necessary to correct the deficiencies and charge the cost to Contractor, who will be liable for such payments; or (ii) terminate this agreement by written notice absent appropriate corrective action. Owner shall make reasonable efforts to mitigate damages arising from Contractor default and shall promptly invoice Contractor for all amounts due.

(b) After receipt of a termination notice, and except as directed by the Owner, the Contractor shall: (i) stop work as specified in the notice and demobilize the site; (ii) place no further subcontracts or orders, except as necessary to complete the continued portion of the Work; (iii) terminate all subcontracts to the extent they relate to the work terminated; (iv) assign to the Owner, as directed by Owner, all right, title, and interest of the Contractor under the subcontracts terminated; (v) complete performance of the Work not terminated; and (vi) take action necessary to protect and preserve the Work.

(c) After termination, the Contractor shall submit promptly a final termination settlement proposal to the Owner. If the Contractor fails to submit the proposal, the Owner may determine, on the basis of information available, the amount, if any, due the Contractor because of the termination and shall pay the amount determined.

(d) Subject to paragraph (c) of this clause, the Contractor and Owner may agree on the whole or any part of the amount to be paid (including an allowance for Fee) because of the termination. This agreement will be amended, and the Contractor paid the agreed amount. If the Contractor and Owner fail to agree in whole or in part on the amount to be paid because of the termination, the parties agree to submit the matter to mediation, and if not resolved in mediation, the matter will be submitted for binding arbitration per section 15.0.

(e) If, after termination of the Contractor for default, it is determined by a court of competent jurisdiction or arbitrator that the Contractor was not in default, or that the delay was excusable, the rights, obligations, and remedies of the parties will be the same as if the termination had been issued for the Owner's convenience.

16.5    **Obligations Arising Before Termination.** Even after termination, the provisions of this agreement will apply to any Work performed, payments made, events occurring, costs charged or incurred, or obligations arising before the termination date.

17.0    **Miscellaneous.**

17.1    **Entire Agreement.**  This agreement represents the entire agreement between Owner and Contractor and supersedes any prior written or oral agreements, understandings, and representations made or dated before the date of this agreement. This agreement may be amended only by a written amendment signed by the parties.

17.2    **Joint Drafting.** The parties hereby agree that this agreement was jointly drafted and that each had the opportunity to negotiate terms and to obtain assistance of counsel in reviewing terms prior to execution. This agreement will be construed in a neutral manner and neither against nor in favor of either party.

17.3    **No Third-Party Beneficiary.** This agreement and the obligations of the parties are intended for the sole benefit of the parties and do not create any rights in any other person or entity whatsoever, except the Owner and Contractor.

Version 1.0 — 28 June 2018

EXHIBIT A - 000061



17.4    **Governing Law.** This agreement is governed by California law, or if outside California where the Project is located.

17.5    **Severability.** If any provision in this agreement is determined to be invalid, unenforceable or void, the remainder of the agreement will be fully binding with the same force and effect as though the invalid, unenforceable or void provision had been omitted.

17.6    **Photographs and Marketing.** Contractor may (a) make or issue any public announcement or statement with respect to the Work or the Project, (b) supply to the press or other news media any information, photographs, or data related to the Work or the Project, or (c) use images of the Work and Project in any Contractor materials, including without limitation, advertisements, websites, calendars, brochures or presentations with written approval from Owner; except that Contractor shall be prohibited from using Owner's name, trademark, or logo without Owner's prior written consent.

17.7    **Written Testimonial.** If the Work and Contractor's performance is satisfactory to the Owner, Owner agrees to provide Contractor with a written positive endorsement or testimonial that Contractor may use in its advertising, marketing, and promotional materials.

17.8    **Signage.** Contractor may erect signage at the site indicating its role on the Project and may maintain such signage until Final Acceptance or for a longer period as mutually agreed by the parties.

18.0    **List of Contract Documents.** The Contract Documents in existence at the time of the parties signing this agreement are as follows:

18.1    Exhibit A, Index of Plans and Specifications furnished by Owner.

18.2    Exhibit B, List of Exclusions and Assumptions and Qualifications.

18.3    Exhibit C, Estimated Budget.

18.4    Exhibit D, Schedule of the Work.

18.5    Exhibit E, List of Contractor Personnel and Hourly Rates.

18.6    Exhibit F, Contractor's Insurance.

18.7    Exhibit G, Sample Insurance Certificate.

18.8    Exhibit H, Form, Change Order.

18.9    Exhibit J, Form, Application and Certificate for Payment.

18.10    Exhibit K, Form, Schedule of Values.

18.11    Exhibit L, Form, Subcontractor Approval

*Signatures Follow on Next Page*

Version 1.0 — 28 June 2018

EXHIBIT A - 000062



The parties are signing this agreement on the date stated in the introductory clause.

FERRANTE KOBERLING CONSTRUCTION, INC.

Signed: _Michael Ferrante_

Print Name: __Michael Ferrante__

Title: __PRESIDENT & CEO__

OWNER'S FORMAL NAME IN UPPER CASE

Signed: _Sebastian Schoepe_

Print Name: SEBASTIAN SCHOEPE

Title: PRESIDENT

OWNER'S FORMAL NAME IN UPPER CASE

Signed: _____

Print Name: _____

Title: _____

Version 1.0 — 28 June 2018

EXHIBIT A - 000063

# EXHIBIT "D"

EXHIBIT A - 000064



## COST PLUS AGREEMENT BETWEEN OWNER AND CONTRACTOR

| | |
|---|---|
| Owner: 703 McKinney, LLC | Contractor: Ferrante Koberling Construction, Inc. |
| Address: 925 N La Brea Ave, 4th Floor | 4700 W. Jefferson Blvd. #103 |
| City, State, Zip: Los Angeles, CA 90038 | Los Angeles, CA  90016 |
| Contact: Sebastian Schoepe | Tax ID No: 46-3955278 |
| Phone: (424)387-5709 | CA License No. 988562 |
| E-mail: schoepe@1upfitness.com | Contact: Michael Ferrante |
| Tax ID No: | Phone: (323) 933-3203 |
| | Email: mferrante@ferrantekoberling.com |
| | |
| Project: 703 McKinney | Architect: Gruen Architects |
| Project Address: 703 McKinney Ave | Address: 6330 S Vicente Blvd #200 |
| City, State, Zip: Dallas, TX 75202 | City, State, Zip: Los Angeles, CA 90048 |

This Agreement Between Owner and Contractor is dated January 15th, 2019 and is between FERRANTE KOBERLING CONSTRUCTION, INC., a California corporation ("**Contractor**"), 703 MCKINNEY, LLC, a Delaware limited liability corporation ("**960 N La Brea**"), and 1UP FITNESS GROUP NORTH AMERICA LP, a Delaware limited partnership, and affiliated companies ("**1UP Fitness**," and together with **960 N La Brea**, and affiliated companies are the "**Owner**")

### Recitals

A.  Owner is leasing and building out approximately 149,065 SF of commercial space ("**Commercial Work**") as a Fitness Club, Office and Restaurant in the building located at 703 McKinney Ave, Dallas, TX 75202 ("**Project**").

B.  Contractor is experienced, qualified, and staffed to perform this Commercial Work.

C.  Owner and Contractor have reached an agreement for Contractor to perform the Commercial Work and desire to set forth their respective rights, responsibilities, terms, conditions, and compensation to be paid to Contractor.

Owner and Contractor therefore agree as follows:

1.0     **Contract Documents.** The Contract Documents consist of the following: (i) this agreement; (ii) written modifications to this agreement signed by both parties; and (iii) those documents listed under section 19.0. The Contract Documents are complementary and cumulative and what is called for by one shall be as binding as if called for by all. In case of conflicts between the drawings and specifications, the specifications will govern. In case of omissions, errors, or inconsistency among the Contract Documents, the Contractor shall immediately submit the matter to Owner for clarification. Owner's clarifications are final and binding, subject to an equitable adjustment in the compensation, the Contractor's time for performance, or both, or to dispute mitigation and resolution.

2.0     **The Relationship Between the Parties.** The parties hereby agree to proceed on the basis of mutual trust, good faith, and fair dealing. Each party shall perform its obligations with integrity and shall avoid any conflicts of interest.

3.0     **Work.** Contractor shall perform the Work in a workmanlike and expeditious manner consistent with the Contract Documents. Contractor shall provide all labor, materials, equipment, and services necessary to complete the Work in accord with the Contract Documents and Exhibits C and K, "Estimated Budget" and "Schedule of the Work," respectively.

4.0     **Compensation, Cost Plus Fee.** Owner shall compensate Contractor for Work performed as follows:

4.1     The Cost of the Work as set forth in section 7.0, plus 6 percent for overhead and 7 percent for profit (the overhead and profit markups constitute the "**Fee**"). The Fee will be paid in proportion to the Work performed.

EXHIBIT A - 000065



4.2    The Estimated Budget to complete the Work is $12,000,000.00 as set forth in Exhibit C. The Estimated Budget is not a guaranteed maximum price for the Cost of the Work or Fee. If Contractor becomes aware that the Estimated Budget will be exceeded, Contractor must promptly notify Owner in writing before performing the Work in excess of the Estimated Budget. This notice may include the Contractor's estimate of the additional costs necessary to complete the Work. The Contractor may stop work and is under no obligation to proceed with the Work in excess of the Estimated Budget until Owner authorizes Contractor in writing to proceed. Contractor is not liable for any delay in receiving this authorization.

5.0    **Owner Responsibilities.** Owner shall provide any information and services at Owner's expense and when required for the successful and expeditious completion of the Work.

5.1    As a condition to Contractor starting the Work, Owner shall provide Contractor with reasonable evidence of sufficient and available funds to satisfy all of Owner's obligations under this agreement. In the case of Project financing, such evidence must include the name and address of any construction lender and a copy of the loan commitment and loan disbursement agreement between Owner and Owner's lenders relating to the provision and disbursement of funds to Owner for its obligations under this agreement, except information deemed proprietary or confidential by Owner or Owner's lenders. During performance of the Work, Owner shall notify Contractor in writing Contractor of any material change in Project financing.

5.2    Owner shall provide Contractor with information describing the physical characteristics of the Project, including surveys, site evaluations, legal descriptions, data, or drawings depicting existing conditions, subsurface, and environmental studies, reports, investigations, tests, inspections, and other reports dealing with environmental matters, hazardous material and other existing conditions, including structural, mechanical, and chemical tests required by the Contract Documents or by law.

5.3    Owner shall provide Contractor with any other information or services requested by Contractor that Contractor claims is relevant to its performance of the Work and under Owner's control.

5.4    Within 7 days of this agreement being signed by the parties, Owner shall provide Contractor with the information necessary to give notice of or enforce mechanics' lien rights. This information must include Owner's interest in the real property on which the Project is located and the record legal title, and the name and address of the record fee owner if not the Owner. In this agreement, "**days**" means calendar days unless otherwise noted.

5.5    Owner shall secure and pay for all permits, approvals, easements, assessments, and fees required in connection with the Work.

5.6    Owner shall designate an Owner's authorized representative ("**OAR**") to provide approvals and directives necessary for the day-to-day administration of this agreement, the Work, and the Project. Owner shall designate the limits of any authority delegated to the OAR with respect to the following: executing any contract, contract modification, or other form of binding agreement; obligating the Owner in any manner to the payment of money; rendering any final decision on any contract matter, claim or dispute, terminating, suspending, or otherwise interfering with the Contractor's performance, directing any changes in the Contract Documents or in the Contractor's performance that is inconsistent with the Contract Documents. Owner and OAR shall be prohibited from communicating in any manner with Contractor's subcontractors. All communications from Owner and OAR regarding the Project must be with Contractor's designated representative.

5.7    Owner shall provide Contractor with complete and unfettered access to the site and area(s) of the Work.

5.8    Owner shall timely make payments to Contractor in accordance with this agreement.

5.9    Unless otherwise noted on the drawings and specifications, Owner shall be prohibited from performing work at the Project using its own forces or separate contractors without the Contractor's prior written consent.

5.10    Owner shall pay for all copies of the drawings and specifications as necessary for the Contractor to prosecute the Work. If the reproduction costs are paid by Contractor, Owner must reimburse Contractor the actual amount paid plus 10%.

5.11    Unless otherwise provided in the Contract Documents, Owner shall pay for all fees related to utilities and other facilities and services necessary for the Project, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work. In addition, unless otherwise provided in the Contract Documents, Owner shall

EXHIBIT A - 000066



be responsible for all necessary upgrades to any existing building systems and utilities. "**Utilities**" includes electric, gas, water, sewer and waste, storm drain, Internet, TV, and phone.

    5.12  **Joint and Several.** The obligations and liabilities of the Owner under this agreement are joint and several.

   6.0  **Contractor Responsibilities.**

    6.1  Contractor shall supervise and coordinate the Work, including the construction means, methods, techniques, sequences, and procedures utilized, unless the Owner or Contract Documents provide other specific instructions.

    6.2  **Subcontractors.** Contractor and all subcontractors shall at all times during the Work be duly licensed by the CSLB (or by the jurisdiction where the Work will be performed). In this agreement, "**subcontractors**" means any person or entity who has a contract with or is engaged by Contractor, or with any other subcontractor, at any tier. To the extent practicable, Contractor shall enter into written subcontracts where compensation is based on a lump-sum price. The lump-sum price is subject to approval by Owner. As a condition to Contractor entering any subcontract, Owner must indicate its approval of the lump-sum price (and any other important terms and conditions) by signing the "Subcontract Approval Form" in the form attached as Exhibit L.

    6.3  Except for permits that are the Owner's responsibility, Contractor shall apply for and obtain all necessary building permits pertaining to the Work. Owner shall immediately reimburse Contractor for any permit fees paid for or advanced by Contractor at actual cost plus 10%.

    6.4  Contractor has investigated the site, the visible conditions affecting the site and the Work, and the Contract Documents.

    6.5  Contractor shall comply with all applicable codes, laws, ordinances, and regulations affecting its performance and the Work. Contractor will be liable to Owner for all loss, cost, or expense, attributable to any acts or omissions by Contractor, its employees, subcontractors, suppliers, and agents in failing to comply with laws, including fines, penalties, or corrective measures. Contractor shall pay all applicable taxes for the Work provided by Contractor. The estimated Cost of the Work and Fee will be equitably adjusted for laws, taxes, duties, and tariffs that impact cost or time that are enacted after the date of this agreement or after bids are received or negotiations concluded.

    6.6  Contractor shall provide and maintain competent personnel to supervise and direct the Work and shall enforce strict discipline and good order among those carrying out the Work. Contractor shall prohibit the use of alcoholic beverages, drugs and other dangerous substances, and the playing of radios, music, or other broadcasting devices at the site that constitute a danger to life, health, or property. Contractor shall prohibit the wearing of any work clothes and attire displaying offensive logos, insignia, graphics, words, phrases, or symbols.

    6.7  Contractor shall take precautions to properly protect and preserve (i) the materials, supplies, and equipment to be incorporated into the Work and (ii) the Work itself from damage until the Work is accepted by Owner. If the Owner causes damage to the Work, the Owner shall promptly remedy that damage at its sole expense.

    6.8  Contractor shall maintain and supervise all safety precautions and programs, and shall comply with all applicable laws, ordinances, and regulations of any federal, state or local authorities, including OSHA and Cal/OSHA, for the safety of persons or property. Contractor shall conduct routine inspections of equipment and site conditions as necessary to ensure compliance with its safety programs and standards. At all times during working hours at the site, Contractor shall require and ensure the use of personal protective equipment by all workers on the site.

    6.9  Contractor shall be responsible for the proper delivery, handling, application, storage, removal, and disposal of all materials and substances brought to the site by Contractor in accordance with the Contract Documents and used or consumed in the performance of the Work.

    6.10  A "**Hazardous Material**" is any substance or material identified now or in the future as hazardous under any federal, state, or local law or regulation, or any other substance or material which may be considered hazardous or otherwise subject to statutory or regulatory requirement governing handling, disposal, or clean-up. Contractor shall not start or continue work until any Hazardous Material discovered at the site has been removed, or rendered or determined to be harmless by Owner as certified by an independent testing laboratory and approved by the appropriate

Version 1.0 — 28 June 2018

EXHIBIT A - 000067



government agency. If Contractor incurs additional costs or is delayed due to the presence or remediation of Hazardous Material, Contractor shall be entitled to an equitable adjustment.

6.11 **Submittals.** Contractor shall submit to Owner for review and approval all shop drawings, samples, product data, and similar submittals required by the Contract Documents. Submittals may be submitted in electronic form. Contractor shall be responsible to Owner for the accuracy and conformity of its submittals to the Contract Documents. Contractor shall prepare and deliver its submittals to Owner in a manner consistent with the Contractor's schedule and in such time and sequence so as not to delay the performance of the Work or the work of Owner and others retained by Owner. Contractor shall identify in writing for each submittal all changes, deviations, or substitutions from the requirements of the Contract Documents. Owner's approval of a submittal does not authorize deviations, substitutions, or changes in the requirements of the Contract Documents unless Owner specifically authorizes such deviation, substitution, or change. Owner shall review and approve submittals with promptness to avoid causing delay. Contractor shall perform all Work in accordance with approved submittals. Owner's approval does not relieve Contractor from responsibility for defective work resulting from errors or omissions of any kind on the approved shop drawings. In this agreement, "**defective work**" means work found to be not in conformance with the Contract Documents.

6.12 Contractor shall perform cutting, fitting, and patching necessary to coordinate the various parts of the Work and to prepare its Work for the work of Owner or others retained by Owner.

6.13 Contractor shall regularly remove debris and waste materials at the site resulting from the Work. Contractor shall minimize and confine dust and debris resulting from construction activities. At the completion of the Work, Contractor shall remove from the site all construction equipment, tools, surplus materials, waste materials, and debris.

6.14 **Differing Site Conditions.** The Contractor shall promptly, and before the conditions are disturbed, give written notice to Owner of: (i) subsurface or latent physical conditions at the site which differ materially from those indicated in the Contract Documents; or (ii) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract Documents. The Owner shall investigate the conditions promptly after receiving notice. If the conditions do materially differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the Work, an equitable adjustment will be made and this agreement modified in writing accordingly.

7.0 **Cost of the Work.** Owner shall pay Contractor for the Cost of the Work as defined in this section and the Fee stipulated in section 4.0. The Cost of the Work includes:

7.1 **Key Personnel.** Amounts paid by Contractor to those employees (excluding craft labor) identified in Exhibit E and at the stated billable hourly rates. Those hourly rates include the base hourly wage, payroll taxes, employee benefits, and workers' compensation insurance but not profit (fee), general administrative, and overhead costs.

7.2 **Contractor's Craft Labor.** Wages actually paid for Contractor's craft labor directly employed by Contractor in performing the Work;

7.3 **Employee Taxes and Burdens.** Cost of all employee benefits and taxes including but not limited to workers' compensation, unemployment compensation, social security, health, welfare, retirement, and other fringe benefits as required by law, labor agreements, or paid under Contractor's personnel policy, insofar as such costs are paid to employees of Contractor as part of the Cost of the Work;

7.4 **Subcontractor and Vendor Costs.** Costs paid by Contractor to its subcontractors and vendors for Work performed pursuant to subcontracts and purchase orders.

7.5 **Materials and Equipment.** Cost of all materials, supplies, and equipment incorporated in the Work, including costs of inspection and testing (if not provided by Owner), transportation, storage, and handling;

7.6 **Materials and Equipment Consumed at the Site.** Cost, including transportation and maintenance, of all materials, supplies, equipment, temporary facilities, and hand tools not owned by the workers that are used or consumed in the performance of the Work, less salvage value or residual value; and cost less salvage value on such items used, but not consumed, that remain the Contractor's property;

Version 1.0 — 28 June 2018

EXHIBIT A - 000068



7.7     **Rental Charges.** Actual rental charges of all necessary machinery and equipment, exclusive of hand tools owned by workers, used at the site, whether rented from Contractor or others, including installation, repair and replacement, dismantling, removal, maintenance, transportation, and delivery costs;

7.8     **Insurance and Bonds Premiums.** Cost of the premiums for all insurance and surety bonds which Contractor is required to procure or deems necessary, and approved by Owner, including any additional premium incurred as a result of any increase in the Cost of the Work;

7.9     **Sales and Use Taxes.** Sales, use, gross receipts, or other taxes, tariffs, or duties related to the Work for which Contractor is liable;

7.10    **Permits and Fees.** Permits, fees, licenses, tests, and royalties, except if paid by Owner;

7.11    **Course of Construction Repairs.** Actual and reasonable costs paid by Contractor in repairing minor damage to trade Work caused as a normal by-product during the course of construction and not attributable to the fault of Contractor, any subcontractor or vendor or not covered by insurance;

7.12    **Site Office.** Costs associated with establishing, equipping, operating, maintaining, and demobilizing the field office;

7.13    **Utilities.** Water, power, and fuel costs necessary for the Work;

7.14    **Clean-up and Disposal.** Cost of cleaning up, removing, and legally disposing all non-hazardous substances, debris, and waste materials;

7.15    **Emergencies.** Costs to respond to an emergency affecting the safety of persons and property, provided the cost is not the result of any act or omission of Contractor, subcontractor, vendor, or any party for whom any of them are responsible or liable at law or under the Contract Documents;

7.16    **Site Security.** Costs for site security services required for protection of the Work;

7.17    **Reproduction and Graphics.** Costs for blueprinting and reproduction of the plans and specifications, and for required postage, express mail, and long-distance costs in the performance of the Work;

7.18    **Legal.** Legal, mediation, and arbitration fees and costs reasonably and properly resulting from Contractor's performance of the Work, except those arising from disputes between the parties; and

7.19    **Miscellaneous.** Costs directly incurred in performing the Work or in connection with the Project that are not included in the Fee and that are reasonably inferable from the Contract Documents.

7.20    **Discounts.** All discounts for prompt payment shall accrue to Owner to the extent such payments are made directly by Owner. To the extent payments are made with funds of Contractor, all cash discounts accrue to Contractor. All trade discounts, rebates, and refunds, and all returns from sale of surplus materials and equipment (if any), shall be credited to the Cost of the Work.

7.21    **Contractor's Account Records.** Records of the Contractor's costs and expenditures must be maintained on the basis of generally accepted accounting practices and be available for inspection by the Owner or the Owner's designated agent at mutually convenient times for a period of 2 years after final payment.

8.0     **Payments.**

8.1     **Schedule of Values.** Per Exhibit K pending drawings within TBD working days after the parties sign this agreement, Contractor shall submit to Owner for approval an initial schedule of values allocating budgeted values among all categories or portions of the Work. The schedule of values must be prepared in such form and supported by data to substantiate its accuracy as Owner may reasonably require and must be based on the latest cost information available to Contractor. The Estimated Budget must be broken down is sufficient detail to facilitate continued evaluation of the Contractor's payment applications. The schedule of values must include separate line items for materials and equipment purchased or fabricated and stored either on-site or off-site and for the Fee. The Owner-accepted schedule of values must be used as the basis for the Contractor's applications for payments and revised for any modifications mutually agreed upon by the parties.

Version 1.0 — 28 June 2018

EXHIBIT A - 000069



8.2      **Progress Payments.** Contractor shall submit to Owner or another person or entity designated by Owner bi-weekly payment applications no later than the 15th and last day of the month. The payment application consists of the Cost of the Work performed up to the date stated in the payment application, along with a proportionate share of the Fee. Payment applications must include materials and equipment not yet incorporated into the Work but delivered to and suitably stored onsite or offsite, including applicable insurance, storage, and costs incurred transporting the materials to an offsite storage facility. Approval of payment for materials stored off-site is conditioned on the Contractor submitting bills of sale and applicable insurance or such other procedures satisfactory to Owner to establish Owner's title to such materials, or otherwise to protect Owner's interest, including transportation to the site.

8.3      **Adjustment of Contractor's Payment Application.** Owner may adjust or reject a payment application or nullify a previously approved payment application, in whole or in part, as may reasonably be necessary to protect Owner from loss or damage based on the circumstances listed below, but only to the extent that Contractor is responsible. As a condition to this right, the Owner must give written notice to Contractor no later than 7 days after receipt of a payment application specifying the reasons for the disapproval or nullification. When the reasons for disapproving or nullifying an application for payment are removed, Owner shall immediately pay the amounts previously withheld.

a.   Contractor's repeated failure to perform the Work as required by the Contract Documents;

b.   loss or damage for which Owner may be liable arising out of or relating to this agreement and caused by Contractor to Owner or to others retained by Owner to whom Owner may be liable;

c.   Contractor's failure to properly pay subcontractors or suppliers in connection with the Work following receipt of such payment from Owner, for that portion of the Work or for supplies, provided that Owner is making payments to Contractor in accordance with this agreement;

d.   rejected or defective work not corrected in a timely fashion; and

e.   reasonable evidence of delay in performance of the Work such that the Work will not be completed by the Final Completion Date.

8.4      **Substantiation of Costs.** Contractor shall support its payment applications with relevant documentation to allow Owner to verify the costs incurred and expended by Contractor. The documentation may include time sheets, receipts, and invoices.

8.5      **Lien Releases.** With each payment application, Contractor shall submit properly executed waivers and releases from subcontractors, suppliers and vendors, and those persons or entities who have served a preliminary notice on Owner or Contractor.

8.6      **Retainage.** Each payment application will reflect 5% retainage of the amounts to be paid, except that no retainage applies to (i) the Fee, (ii) premiums paid by Contractor for insurance and bonds (if bonds are required), or (iii) amounts approved for payment to Contractor for the Cost of the Work (exclusive of amounts to be paid to subcontractors). All retainage must be paid as part of the final payment to Contractor. If, at any time after 50% of the Work has been completed, the Contractor is making satisfactory progress, 5% retainage will no longer be withheld and progress payments will be made in full.

8.7      **Prompt Payment.** The Owner shall make all progress payments to Contractor within 15 days after Owner receives a proper payment application.

8.8      **Delayed Payment.** If for any reason not the fault of Contractor, Contractor does not receive a progress payment from Owner within 5 days after the time that payment is due, Contractor, upon giving 10 days' written notice to Owner, and without prejudice to and in addition to any other legal remedies, may stop Work until payment of the full amount owing to Contractor has been received, including interest for late payment.

8.9      **Late Payment.** Payments due but unpaid will bear interest from the date payment is due at the rate of 10 percent per annum.

8.10     **Substantial Completion Payment.** When in the Contractor's judgment substantial completion of the Work or a designated portion has been achieved, Contractor shall notify Owner and establish the substantial completion date. In this agreement, "**substantial completion**" means that stage when the Work (or designated portion of the

Version 1.0 — 28 June 2018

EXHIBIT A - 000070



Work) is sufficiently complete in accordance with the Contract Documents so that Owner may occupy or utilize the Project, or a designated portion, for its intended use. A certificate of occupancy is not a prerequisite for substantial completion if the certificate of occupancy cannot be obtained due to factors beyond Contractor's control. Payment by Owner upon substantial completion will be in consideration of Contractor's agreement to complete all final punch list Items. Owner may retain no more than 150% of the costs estimated by Owner and Contractor necessary to complete any punch list Items. Thereafter, Owner shall pay to the Contractor the amounts retained for the punch list items to the extent that each item is completed by Contractor and accepted by Owner.

8.11 **Final Payment.** When in the Contractor's judgment final completion has been achieved, Contractor shall submit a final payment application. In this agreement, "**final completion**" means that stage when the Owner determines that the Work has been properly completed in accordance with the Contract Documents, including completion of punch list items and the submittal to Owner of all closeout documentation required by the Contract Documents. Owner shall make final payment to Contractor within 15 days after Contractor has submitted a complete and accurate payment application and has submitted to Owner all closeout documentation required by the Contract Documents. In this agreement, "**final payment**" means the payment to Contractor of all amounts due and remaining to be paid to Contractor under the Contract Documents, including any retainage. Final payment will not relieve the Contractor of any warranty obligations required under the Contract Documents.

8.12 **Waiver of Claims.** Claims not reserved by Owner in writing with the making of final payment are waived except for claims relating to liens or similar encumbrances, warranties, and latent defects. Claims not reserved by Contractor in writing in accepting final payment are waived.

9.0 **Schedule, Delays and Liquidated Damages.**

9.1 Contractor shall promptly start the Work on January 15th, 2019 ("**Commencement Date**") and complete all Work in accordance with the Contract Documents no later than TBD, pending final drawings ("**Final Completion Date**").

9.2 **Time is of the Essence.** Time is of the essence for both parties with regard to the obligations of this agreement and Contract Documents.

9.3 Contractor shall achieve substantial completion of the Work in TBD working days from the Commencement Date and achieve final completion within TBD after the date of substantial completion. Both deadlines are subject to adjustments as provided for in the Contract Documents.

9.4 **Schedule.** Before submitting its first payment application for payment, Contractor shall submit to Owner a schedule showing the dates on which Contractor plans to begin and complete various parts of the Work, including dates on which information and approvals are required from Owner. Unless otherwise agreed, the schedule must (i) provide a graphic representation of all activities and events and (ii) identify dates that are critical to ensure timely completion of the Work. Contractor shall update the schedule monthly, or as mutually agreed by the parties.

9.5 **Delays and Time Extensions.** If Contractor is delayed by any cause beyond the Contractor's control, the Contractor will be entitled to a time extension. These causes include but are not limited to the following: (a) acts or omissions of Owner, the Owner's agents, consultants, designers, and the architect-engineer; (b) changes in the Work or the sequencing of the Work ordered by Owner, or arising from the Owner's decisions that impact the time of performance; (c) encountering Hazardous Materials, or concealed or unknown conditions; (d) transportation delays not reasonably foreseeable; (e) labor disputes; (f) fire; (g) terrorism; (h) adverse governmental actions; (i) acts of God; (j) adverse weather conditions not reasonably anticipated; (k) utility disruptions or outages; (l) long lead times; (m) material and equipment damaged during transportation and delivery to the Project; (n) unexcused delays in payment. If delays to the Work are encountered, Contractor shall provide prompt written notice to Owner of the cause after Contractor first recognizes the delay. The parties shall take reasonable steps to mitigate the effect of such delays. In addition, If Contractor incurs additional costs as a result of a delay caused by the circumstances noted above, Contractor will be entitled to an equitable adjustment in compensation.

10.0 **Changes.** Without invalidating or breaching this agreement, Owner may order changes within the general scope of the Work. Such changes will be binding on Contractor only if in writing, and Contractor has no obligation to proceed

Version 1.0 — 28 June 2018



or perform any changed work until such writing is received. The cost of changed work will be computed based on the Cost of the Work (as defined in section 7.0, above) plus markups computed as follows:

a.   6% for overhead and 7% for profit of the Cost of the Work performed by Contractor using its own forces;

**11.0     Warranty.** Contractor warrants that all materials and equipment will be new unless otherwise specified, of good quality, in conformance with the Contract Documents, and free from defective workmanship and materials for one year after the date of substantial completion. Contractor further warrants that the Work will be free from material defects not intrinsic in the design or materials required in the Contract Documents. This warranty does not include remedies for defects or damages caused by normal wear and tear during normal usage, use for a purpose for which the Work or Project was not intended, improper or insufficient maintenance, modifications performed by Owner or others retained by Owner, or abuse. If during the one-year warranty period any portion of the Work is found to be defective work, Owner shall promptly notify Contractor in writing. Unless Owner provides written acceptance of the condition, Contractor shall promptly correct the defective work at its own cost and time.

**12.0     Indemnity.**

**12.1** To the fullest extent permitted by law, Contractor shall indemnify, defend, and hold harmless Owner, Owner's officers, directors, members, agents, and employees (but not the Owner's architect-engineer) ("**Owner Indemnitees**") from all third-party claims for bodily injury and property damage, other than to the Work itself and other property insured under section 13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of the Work but only to the extent caused by the negligent or intentional wrongful acts or omissions of Contractor, subcontractors, suppliers, or anyone employed directly or indirectly by any of them or by anyone for whose acts any of them may be liable. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of an Owner Indemnitee. Contractor will be entitled to reimbursement of any defense costs paid above Contractor's percentage of liability for the underlying claim.

**12.2** To the fullest extent permitted by law, Owner shall indemnify, defend, and hold harmless Contractor, its officers, directors, or members, agents, and employees ("**Contractor Indemnitees**") from all third-party claims for bodily injury and property damage, other than property insured under section 13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of work by Owner, Owner's architect-engineer, or others retained by Owner, but only to the extent caused by the negligent or intentionally wrongful acts or omissions of Owner, Owner's architect-engineer, or others retained by Owner. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of a Contractor Indemnitee. Owner will be entitled to reimbursement of any defense costs paid above Owner's percentage of liability for the underlying claim.

**12.3** These indemnification obligations will not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable under workers' compensation acts, disability benefit acts, or other insurance.

**13.0     Insurance.**

**13.1     Contractor's Insurance.** Before starting Work, Contractor shall procure and maintain in force all insurance set forth in Exhibit F. Commercial General Liability Insurance may be obtained under a single policy for the full limits required or by a combination of underlying policies with the balance provided by an excess or umbrella policy. The insurance policies must contain a provision that coverages under the policies will not be cancelled or expire until at least 30 days' written notice has been given to Owner and must include either a liability endorsement covering this agreement or an endorsement making the Owner an additional insured under the policies. Certificates of insurance showing such coverages to be in force must be filed with the Owner prior to commencement of the Work.

**13.2     Owner's Insurance.** Owner shall purchase and maintain its own liability insurance, and at the Owner's option, may purchase and maintain such additional insurance to protect the Owner against claims losses, or damages that may arise from the Project. Owner shall name Contractor as an additional insured in any insurance policy obtained by the Owner for the Project.

**13.3     Waivers of Subrogation.** The Owner and Contractor hereby waive all rights against each other and against the Owner's architect-engineer, and other consultants, subcontractors, suppliers, agents and employees of the other for damages during construction covered by any property insurance as set forth in the Contract Documents.

Version 1.0 — 28 June 2018

EXHIBIT A - 000072



14.0     **Limited Mutual Waiver of Consequential Damages.** Except for losses covered by insurance required by the Contract Documents, the parties waive all claims against each other for any consequential damages that may arise out of or relate to this agreement. The provisions of this section apply to the termination of this agreement and survive such termination.

14.1     Owner waives damages for loss of use of the Project, any rental expenses incurred, loss of income, profit, or financing related to the Project, loss of business, loss of financing, loss of profits not related to this Project, loss of reputation, and insolvency.

14.2     Contractor waives damages for loss of business, loss of financing, loss of profits not related to this Project, loss of bonding capacity, loss of reputation, and insolvency.

15.0     **Dispute Resolution.**

15.1     **Executive Discussions.** As a condition to and before resorting to mediation and binding arbitration, the parties must attempt in good faith to resolve any dispute promptly by negotiation between executives who have settlement authority.

15.2     If the dispute remains unresolved after executive discussions, the parties shall proceed to mediation using JAMS, or another provider as they may otherwise mutually agree, and shall conclude such mediation within 45 calendar days of the matter being first discussed. The parties will equally share the costs of the mediation.

15.3     If the dispute remains unresolved after mediation, the dispute must proceed to binding arbitration under JAMS (or other provider as the parties may mutually agree), per its Engineering and Construction Arbitration Rules & Procedures, or if the parties agree otherwise, to the Engineering and Construction Arbitration Rules & Procedures for Expedited Arbitration. Either party may initiate arbitration with respect to the matters submitted by filing a written demand for arbitration. The Project location shall serve as the venue. The arbitration award will be final. Judgment on the award may be entered in any court having jurisdiction. This paragraph does not preclude nor otherwise limit the parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

15.4     Neither party may commence arbitration if the claim or cause of action would be barred by the applicable statute of limitations had the claim or cause of action been filed in a state or federal court. Receipt of a demand for arbitration by the person or entity administering the arbitration will constitute the commencement of legal proceedings for the purposes of determining whether a claim or cause of action is barred by the applicable statute of limitations. If, however, a state or federal court exercising jurisdiction over a timely filed claim or cause of action orders that the claim or cause of action be submitted to arbitration, the arbitration proceeding will be deemed commenced as of the date the court action was filed, provided that the party asserting the claim or cause of action files its demand for arbitration with the person or entity administering the arbitration within 30 days after the entry of such order.

15.5     **Attorney Fees.** In any litigation or arbitration arising out of or related to this agreement, the prevailing party must be awarded costs and legal fees reasonably incurred.

16.0     **Suspension and Termination.**

16.1     **Termination by Contractor.** Upon 7 days' written notice to Owner, Contractor may terminate this agreement if the Work has been stopped for a continuous 30-day period through no fault of Contractor for any of the following reasons: (i) under court order or order of other governmental authorities having jurisdiction; or (ii) as a result of the declaration of a national emergency or other governmental act during which, through no act or fault of Contractor, materials are not available. In addition, upon 7 days' written notice to Owner, Contractor may terminate this agreement if Owner does any of the following: (i) fails to furnish reasonable evidence that sufficient funds are available and committed for the entire cost of the Project; (ii) fails to pay Contractor in accordance with this agreement and Contractor has stopped Work in compliance with this agreement; or (iii) otherwise materially breaches this agreement. Upon termination by Contractor, Contractor will be entitled to recover from Owner payment for all Work executed and for any proven loss, cost, or expense in connection with the Work, including all demobilization costs plus a proportionate share of the Fee.

16.2     **Suspension by Owner.** The Owner may order the Contractor in writing to suspend all or any part of the Work for the Owner's convenience or for stoppage beyond the control of the Owner or Contractor. If the

Version 1.0 — 28 June 2018

EXHIBIT A - 000073



performance of all or any part of the Work is suspended, the Contractor will be entitled to an equitable adjustment, and this agreement will be modified in writing accordingly.

16.3    **Termination for Owner's Convenience.** The Owner on 21 days' written notice may terminate this agreement, in whole or in part, when it is in the Owner's interest. If this agreement is terminated, the Owner shall pay the Contractor: (i) for the Work performed to date, including a proportionate share of the Fee; (ii) for all demobilization costs and costs incurred resulting from termination; including remaining subcontractor invoices (iii) reasonable attorneys' fees and costs related to termination; and (d) a termination fee of $350,000.00

16.4    **Notice to Cure and Default Termination.** (a) If Contractor persistently fails to supply enough qualified workers, proper materials, or equipment to maintain the approved schedule, or persistently fails to make payment to its workers, subcontractors, or suppliers when such payment is due, or willfully disregards law or orders of any public authority having jurisdiction, or is otherwise guilty of a material breach of a provision of this agreement, Contractor may be deemed in default. If Contractor fails to commence and to continue satisfactory correction of such default with diligence and promptness within 10 days after written notification by Owner to cure, then Owner, without prejudice to any other rights or remedies, may either: (i) take reasonable steps it deems necessary to correct the deficiencies and charge the cost to Contractor, who will be liable for such payments; or (ii) terminate this agreement by written notice absent appropriate corrective action. Owner shall make reasonable efforts to mitigate damages arising from Contractor default and shall promptly invoice Contractor for all amounts due.

(b) After receipt of a termination notice, and except as directed by the Owner, the Contractor shall: (i) stop work as specified in the notice and demobilize the site; (ii) place no further subcontracts or orders, except as necessary to complete the continued portion of the Work; (iii) terminate all subcontracts to the extent they relate to the work terminated; (iv) assign to the Owner, as directed by Owner, all right, title, and interest of the Contractor under the subcontracts terminated; (v) complete performance of the Work not terminated; and (vi) take action necessary to protect and preserve the Work.

(c) After termination, the Contractor shall submit promptly a final termination settlement proposal to the Owner. If the Contractor fails to submit the proposal, the Owner may determine, on the basis of information available, the amount, if any, due the Contractor because of the termination and shall pay the amount determined.

(d) Subject to paragraph (c) of this clause, the Contractor and Owner may agree on the whole or any part of the amount to be paid (including an allowance for Fee) because of the termination. This agreement will be amended, and the Contractor paid the agreed amount. If the Contractor and Owner fail to agree in whole or in part on the amount to be paid because of the termination, the parties agree to submit the matter to mediation, and if not resolved in mediation, the matter will be submitted for binding arbitration per section 15.0.

(e) If, after termination of the Contractor for default, it is determined by a court of competent jurisdiction or arbitrator that the Contractor was not in default, or that the delay was excusable, the rights, obligations, and remedies of the parties will be the same as if the termination had been issued for the Owner's convenience.

16.5    **Obligations Arising Before Termination.** Even after termination, the provisions of this agreement will apply to any Work performed, payments made, events occurring, costs charged or incurred, or obligations arising before the termination date.

17.0    **Miscellaneous.**

17.1    **Entire Agreement.**  This agreement represents the entire agreement between Owner and Contractor and supersedes any prior written or oral agreements, understandings, and representations made or dated before the date of this agreement. This agreement may be amended only by a written amendment signed by the parties.

17.2    **Joint Drafting.** The parties hereby agree that this agreement was jointly drafted and that each had the opportunity to negotiate terms and to obtain assistance of counsel in reviewing terms prior to execution. This agreement will be construed in a neutral manner and neither against nor in favor of either party.

17.3    **No Third-Party Beneficiary.** This agreement and the obligations of the parties are intended for the sole benefit of the parties and do not create any rights in any other person or entity whatsoever, except the Owner and Contractor.

Version 1.0 — 28 June 2018

EXHIBIT A - 000074



17.4    **Governing Law.** This agreement is governed by California law, or if outside California where the Project is located.

17.5    **Severability.** If any provision in this agreement is determined to be invalid, unenforceable or void, the remainder of the agreement will be fully binding with the same force and effect as though the invalid, unenforceable or void provision had been omitted.

17.6    **Photographs and Marketing.** Contractor may (a) make or issue any public announcement or statement with respect to the Work or the Project, (b) supply to the press or other news media any information, photographs, or data related to the Work or the Project, or (c) use images of the Work and Project in any Contractor materials, including without limitation, advertisements, websites, calendars, brochures or presentations with written approval from Owner; except that Contractor shall be prohibited from using Owner's name, trademark, or logo with Owner's prior written consent.

17.7    **Written Testimonial.** If the Work and Contractor's performance is satisfactory to the Owner, Owner agrees to provide Contractor with a written positive endorsement or testimonial that Contractor may use in its advertising, marketing, and promotional materials.

17.8    **Signage.** Contractor may erect signage at the site indicating its role on the Project and may maintain such signage until Final Acceptance or for a longer period as mutually agreed by the parties.

18.0    **List of Contract Documents.** The Contract Documents in existence at the time of the parties signing this agreement are as follows:

18.1    Exhibit A, Index of Plans and Specifications furnished by Owner.

18.2    Exhibit B, List of Exclusions and Assumptions and Qualifications.

18.3    Exhibit C, Estimated Budget.

18.4    Exhibit D, Schedule of the Work.

18.5    Exhibit E, List of Contractor Personnel and Hourly Rates.

18.6    Exhibit F, Contractor's Insurance.

18.7    Exhibit G, Sample Insurance Certificate.

18.8    Exhibit H, Form, Change Order.

18.9    Exhibit J, Form, Application and Certificate for Payment.

18.10    Exhibit K, Form, Schedule of Values.

18.11    Exhibit L, Form, Subcontractor Approval

*Signatures Follow on Next Page*

Version 1.0 — 28 June 2018

EXHIBIT A - 000075



The parties are signing this agreement on the date stated in the introductory clause.

FERRANTE KOBERLING CONSTRUCTION, INC.

Signed: *Michael Ferrante*

Print Name: __Michael Ferrante__

Title: __PRESIDENT & CEO__

OWNER'S FORMAL NAME IN UPPER CASE

Signed: *Sebastian Schoepe*

Print Name: __SEBASTIAN SCHOEPE__

Title: __PRESIDENT__

OWNER'S FORMAL NAME IN UPPER CASE

Signed: _____

Print Name: _____

Title: _____

Version 1.0 — 28 June 2018

EXHIBIT A - 000076

# EXHIBIT "E"

EXHIBIT A - 000077

**JOHN REED FITNESS LA, LLC,**
a Delaware limited liability company

**799 VAN NESS, LLC,**
a Delaware limited liability company

7000 Romaine Street, Suite 201
Los Angeles, CA 90038

March 20, 2020

FERRANTE KOBERLING CONSTRUCTION INC. ,
a California corporation
4700 W. Jefferson Blvd. #103
Los Angeles, CA 90016
Attention: Mr. Michael Ferrante

Re:     Cost Plus Agreement Between Owner and Contractor (the "**SF Contract**") Regarding 799
Van Ness, San Francisco (the "**San Francisco Project**) and Cost Plus Agreement Between
Owner and Contractor (the "**DTLA Contract**") Regarding 150 S. 12th Street, Los Angeles,
California (the "**DTLA Project**").

Dear Michael:

This letter confirms our discussion and agreement regarding the San Francisco Project and the DTLA
Project and the further agreement among 799 Van Ness, LLC ("**799 Van Ness**"), John Reed Fitness LA,
LLC ("**John Reed Fitness**") and Ferrante Koberling Construction, Inc. ("**Ferrante**").  For the purpose of
this letter, the SF Contract and the DTLA Contract shall be referred to herein collectively as the
"**Contracts**".

1.   Termination of Contracts.  The Contracts have been terminated per section 16 of each of the
Contracts provided that 799 Van Ness and John Reed Fitness make the payments in Sections 2 and
3, below, respectively.

2.   Transition Issues San Francisco Project.  To create an orderly transition for the San Francisco
Project, 799 Van Ness and Ferrante agree as follows:

(i)      799 Van Ness shall pay all outstanding subcontractor/consultant invoices
regarding the San Francisco Project, in the amount of $276,064.92.

(ii)     799 Van Ness shall pay all outstanding Ferrante general conditions and
Ferrante's earned Fee through February 29, 2020, in the amount of $163,961.91.

(iii)    799 Van Ness shall pay Ferrante expenses incurred during the proposed
"transition period" until March 31, 2020, in the amount of $38,764.20.

(iv)     Ferrante shall reasonably facilitate 799 Van Ness during the "transition
period" in regard to existing subcontracts, in particular the swimming pool, skylight, metal

and wood framing as well as the structural steel subcontractor. It is understood that it remains in each subcontractor's sole discretion to accept or decline the change in general contractor. However, Ferrante shall use commercially reasonable efforts to support 799 Van Ness in the process of handing over/adapting the existing subcontracts. Ferrante's obligation to assist 799 Van Ness automatically terminates at 11:59 PM on March 31, 2020.

        (v)      Ferrante shall deliver all statutory waivers and releases (that have not been delivered to date) from Ferrante and all subcontractors for any payments made by 799 Van Ness.

        (vi)     Ferrante shall deliver to 799 Van Ness the original permits and plans issued and stamped by the City of San Francisco.

        (vii)    Ferrante's delivery of the statutory waivers and releases and original permits and plans set forth in items (v) and (vi), above, is conditioned on the simultaneous payment by 799 Van Ness of all sums due under items (i)–(iv), above. Ferrante and 799 Van Ness agree that the simultaneous exchange described in this paragraph (vii) will occur no later than March 27, 2020 or on such later date as Ferrante and 799 Van Ness mutually agree.

      3.     <u>Transition Issues for the DTLA Project</u>. John Reed Fitness shall pay all costs and expenses for work and services ("**Transition Expenses**") performed by Ferrante in regard to the preparation of the DTLA Project, in the amount of $30,150.00. John Reed Fitness shall make payment for the Transition Expenses no later than March 27, 2020 or on such later date as Ferrante and John Reed Fitness mutually agree; simultaneously with such payment, Ferrante shall deliver a statutory waiver and release upon final payment with respect to the DTLA Project.

      4.     <u>Additional Issues Regarding Contracts, SF Project and DTLA Project</u>. 799 Van Ness, John Reed and Ferrante agree as follows:

        (i)      Immediately upon payments by 799 Van Ness and John Reed Fitness under Section 2 and 3, above, and Ferrante's satisfaction of all its obligations under this letter, 799 Van Ness and John Reed Fitness shall deliver to Ferrante a signed copy of the letter agreement attached as Exhibit "A".

        (ii)     Although 1Up Fitness Group North America LP and affiliated companies (collectively, "**1Up Fitness**") are identified in the SF Contract under the definition of "Owner", in reality the only "Owner" under the SF Contract is 799 Van Ness; and therefore 1Up Fitness never had any rights or obligations under the SF Contract.

        (iii)    Although RSG Group North America LP and affiliated companies (collectively, "**RSG**") are identified in the DTLA Contract under the definition of "Owner", in reality the only "Owner" under the DTLA Contract is John Reed Fitness; and therefore, RSG never had any rights or obligations under the DTLA Contract.

        (iv)    There shall be no termination fees due under the Contracts.

        (v)      Except as provided herein, 799 Van Ness and affiliated companies, John Reed Fitness and affiliated companies, and Ferrante shall have no further responsibility or liability under the Contracts. However, notwithstanding anything otherwise stated in this letter, Ferrante remains

legally responsible under the Contracts and otherwise for all work performed at, on, or for the SF Project and the DTLA Project.

(vi)      If Owner fails to make payment of all sums noted above in sections 2 and 3, this letter agreement will automatically terminate and be rescinded immediately without further notice or action by Ferrante, and the parties will be restored to their same positions (and under the same terms as existed in the Contracts) prior to this letter agreement.

The parties (including their respective affiliated companies) agree (i) that this letter agreement does not establish any precedent respecting the La Brea Project and Dallas Project contracts and (ii) that both parties are prohibited from using or relying on this letter agreement as a basis to request or justify the same or similar treatment or termination of the La Brea Project and the Dallas Project contracts.

If this letter accurately reflects your understanding, please sign below to signify your agreement to the terms of this letter.

Sincerely,


SEBASTIAN SCHOEPE
President

ACCEPTED:

Ferrante Koberling Construction, Inc.

By: *Michael A Ferrante*          03.20.2020
      Michael Ferrante
      President & CEO

EXHIBIT A - 000081

EXHIBIT "A"

**LETTER AGREEMENT**

EXHIBIT A - 000082

**JOHN REED FITNESS LA, LLC,**
a Delaware limited liability company

**799 VAN NESS, LLC,**
a Delaware limited liability company

7000 Romaine Street, Suite 201
Los Angeles, CA  90038

March 20, 2020

**FERRANTE KOBERLING CONSTRUCTION INC. ,**
a California corporation
4700 W. Jefferson Blvd. #103
Los Angeles, CA  90016

Re:     Cost Plus Agreements Between Owner and Contractor Regarding 799 Van Ness, San
Francisco (the "**San Francisco Project**") and 150 S. 12th Street, Los Angeles, California
(the "**DTLA Project**").

Dear Michael:

This letter confirms our discussions and agreement regarding the San Francisco Project and the DTLA Project.

As you know, the other projects that you are working on, the La Brea Project and the Dallas Project, are at critical stages; and we are under great pressure to complete construction on those projects as quickly as possible.  Therefore, to allow you to focus your uninterrupted attention on the La Brea Project and the Dallas Project, the contracts for the San Francisco Project and the DTLA Project have been terminated each termination conditioned on 799 Van Ness and John Reed Fitness each fully satisfying their respective obligations set forth in the letter to which this Exhibit A is attached.

We look forward to continuing to work with you on the La Brea Project and the Dallas Project so that those can be completed as soon as possible.

Sincerely,

SEBASTIAN SCHOEPE
President

ACCEPTED:

Ferrante Koberling Construction, Inc.

By: *Michael A Ferrante*
Michael Ferrante
President & CEO

Mark A. Feldman, State Bar No. 152476
Andrew A. Monge, State Bar No. 329466
FELDMAN & ASSOCIATES, INC.
11030 Santa Monica Blvd., Suite 109
Los Angeles, California 90025
Telephone:    (310) 312-5401
Fax:          (310) 312-5409
mfeldman@feldmanandassoc.com
amonge@feldmanandassoc.com

Attorneys for Plaintiff,
FERRANTE KOBERLING CONSTRUCTION, INC.
and FERRANTE KOBERLING CONSTRUCTION TX, INC.

FILED
Superior Court of California
County of Los Angeles

10/13/2020

Sherri R. Carter, Executive Officer / Clerk of Court

By: _____ A. Flores _____ Deputy

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## LOS ANGELES COUNTY-STANLEY MOSK COURTHOUSE-UNLIMITED

| | |
|---|---|
| FERRANTE KOBERLING CONSTRUCTION, INC., a California corporation, and FERRANTE KOBERLING CONSTRUCTION TX, INC., a Texas corporation;<br><br>          Plaintiff,<br><br>v.<br><br>960 N. LA BREA, LLC, a Delaware limited liability company; 1UP FITNESS GROUP NORTH AMERICA, L.P., a Delaware limited partnership; 703 MCKINNEY, LLC, a Delaware limited liability company; JOHN REED FITNESS LA, LLC, a Delaware limited liability company; 799 VAN NESS, LLC, a Delaware limited liability company; RSG GROUP NORTH AMERICA, a Delaware limited partnership; and DOES 1 through 100, inclusive,<br><br>          Defendants. | CASE NO. 20STCV32020<br><br>Assigned to: Jon R. Takasugi<br>Department: 17<br><br>**FERRANTE KOBERLING CONSTRUCTION, INC.'S, FIRST AMENDED COMPLAINT FOR:**<br><br>1.  **BREACH OF CONTRACT;**<br>2.  **FORECLOSURE OF MECHANIC'S LIEN**<br>3.  **STATUTORY PROMPT PAYMENT PENALTIES;**<br>4.  **UNJUST ENRICHMENT;**<br>5.  **BREACH OF CONTRACT;**<br>6.  **STATUTORY PROMPT PAYMENT PENALTIES;**<br>7.  **UNJUST ENRICHMENT;**<br>8.  **BREACH OF CONTRACT;**<br>9.  **BREACH OF CONTRACT;**<br>10. **BREACH OF CONTRACT; and**<br>11. **PROMISSORY ESTOPPEL;**<br>12. **NEGLIGENT MISREPRESENTATION**<br>13. **REFORMATION-UNILATERAL MISTAKE**<br>14. **REFORMATION-MUTUAL MISTAKE**<br><br>Action Filed: August 21, 2020<br>Trial Date: None Set |

Electronically Received 10/13/2020 10:26 AM

EXHIBIT A - 000084

Plaintiff FERRANTE KOBERLING CONSTRUCTION, INC., hereby alleges the following:

<u>COMMON ALLEGATIONS</u>

1.      Plaintiff FERRANTE KOBERLING CONSTRUCTION, INC. ("Ferrante") is now, and at all times relevant has been, a corporation and a licensed contractor in the state of California.

2.      Plaintiff FERRANTE KOBERLING CONSTRUCTION TX, INC. ("Ferrante TX") is now, and at all times relevant has been, a corporation established in the state of Texas.

3.      Plaintiffs are informed and believe and on the basis of such information and belief allege that Defendant, 960 N. LA BREA, LLC ("960 La Brea"), is now, and at all times relevant has been, an Delaware limited liability company operating in the state of California located at 925 N. La Brea Ave, 4th floor, Los Angeles, California 90038. This is the company's nerve center.

4.      Plaintiffs are informed and believe and on the basis of such information and belief allege that Defendant, John Reed Fitness LA, LLC, ("John Reed Fitness"), is now, and at all times relevant has been, a limited liability company in the state of California located at 925 N. La Brea Ave, 4th floor, Los Angeles, California 90038. This is the company's nerve center.

5.       Plaintiffs are informed and believe and on the basis of such information and belief allege that Defendant, 703 McKinney, LLC, ("703 McKinney"), is now, and at all times relevant has been, a Delaware limited liability company which has operated in the state of California and has its mailing address listed as 925 N. La Brea Ave, 4th floor, Los Angeles, California 90038. This is the company's nerve center.

6.      Plaintiffs are informed and believe and on the basis of such information and belief allege that Defendant, 799 Van Ness, LLC, ("799 Van Ness"), is now, and at all times relevant has been, a Delaware limited liability company operating in the state of California located at 925 N. La Brea Ave, 4th floor, Los Angeles, California 90038. This is the company's nerve center.

7.      Plaintiffs are informed and believe and on the basis of such information and belief allege that Defendant, 1UP Fitness Grout North America, LP, ("1UP Fitness"), is now, and at all times relevant has been, a Delaware limited liability company operating in the state of California, and is located at 925 N. La Brea Ave, 4th floor, Los Angeles, California 90038. This is the company's nerve center.

2

FIRST AMENDED COMPLAINT

8.     Plaintiffs are informed and believe and on the basis of such information and belief allege that Defendant, RSG Group North America, LP, ("RSG Group"), is now, and at all times relevant herein has been, a limited liability company in the state of California located at 925 N. La Brea Ave, 4th floor, Los Angeles, California 90038. This is the company's nerve center. RSG Group operates as 1UP Fitness according to its Foreign Limited Partnership Amendment to Application for Registration that was filed with the California Secretary of State.

9.     John Reed Fitness, 703 McKinney, 799 Van Ness, 1Up Fitness, and RSG Group, all do business from an office in or around Los Angeles, through which they contract for construction, real estate, and development, of various works of improvement, including the works of improvement referenced in this Complaint. Its local office at 925 N. La Brea, and the vicinity, is where each of the Defendant entities conduct their business and from which each entity entered into various agreements with the Defendant for the construction of the projects referenced in this Complaint. Plaintiff is aware of at least 4 different large-scale real estate and construction projects that Defendants are, or were engaged in throughout the City, for the last 4 years.

10.    Each of the above Defendants are registered with the California Secretary of State and indicate they transact business in California.

11.    Sebastian Schoepe is an individual residing in the state of California. Sebastian Schoepe is the true owner and operator of 960 N. La Brea, 1Up Fitness, 703 McKinney, Reed Fitness, 799 Van Ness, and RSG Group.

12.    Plaintiffs are unaware of the true names and capacities, whether individual, corporate, associate or otherwise, of Defendants, DOES 1 through 100, inclusive, and therefore sue said Defendants by such fictitious names. Plaintiffs will seek leave of Court to amend this Complaint to show the true names and capacities of such Defendants when the same have been ascertained. Plaintiffs are informed and believe and thereupon allege that each of the fictitiously named Defendants are responsible to the Plaintiffs for the injuries suffered and alleged herein, or are subject to the jurisdiction of the Court as a necessary party for the relief herein requested.

13.    Plaintiffs are informed and believe and therefore allege that each of the Defendants is now, and was at all times mentioned herein, the agent, principal, partner, joint venture, or alter ego of

EXHIBIT A - 000086

1   the remaining Defendants, and that all of the acts and conduct alleged herein were performed within

2   the course and scope and in furtherance of such agency partnership, joint venture or alter ego

3   relationship.

4       The 799 Van Ness Contract

5       14.    On or about November 1, 2018, Ferrante entered into a written contract (the "799 Van

6   Ness Contract") with 799 Van Ness and 1UP Fitness for work at 799 Van Ness Avenue, San

7   Francisco, California 94102 (the "799 Van Ness Property"). The 799 Van Ness Contract was for an

8   approximately 45,000 square foot commercial retail space. The scope of work included, among other

9   things, placement of concrete footings, wood framing, and erection of the retail structure for a fitness

10  club, offices, and restaurants on a "cost plus" basis. A true and correct copy of the 799 Van Ness

11  Contract is attached as **Exhibit "A,"** and by this reference is incorporated here as if set forth in full.

12      15.    The 799 Van Ness Contract was performed in the City of San Francisco but entered into

13  in Los Angeles. Ferrante provided labor, materials, and equipment at the Property pursuant to the terms

14  of the 799 Van Ness Contract.

15      The John Reed Fitness Contract

16      16.    On or about July 12, 2019, Ferrante entered into a written contract (the "John Reed

17  Contract") with John Reed Fitness for work at 150 West 12th Street, Los Angeles, CA 90015 (the

18  "John Reed Property"). The John Reed Contract was for the construction of a commercial space. The

19  scope of work included, among other things, placement of concrete footings, wood framing, and

20  erection of the structure for a fitness club and offices. A true and correct copy of the John Reed

21  Contract is attached as **Exhibit "B,"** and by this reference is incorporated as if set forth in full.

22      17.    The John Reed Contract was performed in the of City Los Angeles. Ferrante provided

23  labor, materials, and equipment at the Property pursuant to the John Reed Contract.

24      The 960 N. La Brea Contract

25      18.    On or about July 2, 2018, Ferrante entered into a written contract (the "960 N. La Brea

26  Contract") with 960 N. La Brea and 1UP Fitness for work at 960 N. La Brea Avenue, Los Angeles, CA

27  90038 (the "960 N. La Brea Property"). The 960 N. La Brea Contract was for the construction of a

28  commercial space. The scope of work included, among other things, placement of concrete footings,

wood framing, and erection of the structure for a fitness club, offices, and a restaurant. A true and correct copy of the 960 N. La Brea Contract is attached as **Exhibit "C**," and by this reference is incorporated as if set forth in full.

19.     The 960 N. La Brea Contract was performed in the City of Los Angeles. Ferrante provided labor, materials, and equipment at the Property pursuant to the 960 N. La Brea Contract.

20.     Ferrante submitted payment applications for labor, equipment, and materials it provided in connection with work at the 960 N. La Brea Property. Under the 960 N. La Brea Contract, payment was due within fifteen (15) days after the receipt of a payment application.

21.     960 N. La Brea issued multiple Change Orders to the 960 N. La Brea Contract which substantially increased the cost of the project.

22.     Ferrante has sought and demanded payments from 960 N. La Brea. Despite such demands, 960 N. La Brea has failed and refused to pay Ferrante the remaining balance due for the 960 N. La Brea Contract.

703 McKinney Contract

23.     Also, on or about January 15, 2019, Ferrante TX entered into a written contract (the "703 McKinney Contract") with 703 McKinney and 1Up Fitness for work at 703 McKinney Avenue in Dallas, Texas 75202 (the "703 McKinney Property"). The 703 McKinney Contract was for the construction of a commercial space. The scope of work included, among other things, placement of concrete footings, wood framing, and erection of the structure for a fitness club and offices. A true and correct copy of the 703 McKinney Contract is attached as **Exhibit "D**," and by this reference is incorporated as if set forth in full.

24.     The 703 McKinney Contract was entered into in Los Angeles, CA, and performed in the City of Dallas, Texas. Ferrante TX provided labor, materials, and equipment at the 703 McKinney Property pursuant to the 703 McKinney Contract.

25.     Ferrante TX submitted payment applications for labor, equipment, and materials it provided in connection with work at the 703 McKinney Property. Under the 703 McKinney Contract, payment was due within fifteen (15) days after the receipt of a payment application.

26.     Ferrante TX issued multiple Change Orders to the 703 McKinney Contract which

1   substantially increased the cost of the project. Many change orders were signed by all required parties

2   of the 703 McKinney Contract.

3       27.    Ferrante TX has sought and demanded payment. Despite such demands, 703 McKinney

4   has failed and refused to pay Ferrante the remaining balance due for the 703 McKinney Contract.

5       28.    The 703 McKinney Contract erroneously contained the name "Ferrante Koberling

6   Construction, Inc." when it "Ferrante Koberling Construction TX, Inc." should have been the entity

7   listed on the document. The parties knew that Ferrante and Ferrante TX were different entities and that

8   Ferrante TX is the company that performs construction work in the state of Texas.

9       Termination Agreement

10      29.    Sebastian Schoepe ("Schoepe") signed the 960 N. La Brea Contract, the 703 McKinney

11   Contract, the 799 Van Ness Contract, and the John Reed Contract. Sebastian Schoepe is involved in

12   the operation of all the defendants. Sebastian Schoepe and Defendants engaged in conduct meant to

13   deprive Ferrante of the full benefit of the contracts it had entered into.

14      30.    After Ferrante had performed substantial work at both the 799 Van Ness Property and

15   the John Reed Property, Sebastian Schoepe, on Defendants' behalf, stated that he wanted to terminate

16   Ferrante's 799 Van Ness Contract and John Reed Contract so that Ferrante could focus its

17   "uninterrupted attention" on the 960 N. La Brea Property, and the 703 McKinney Property. **Exhibit**

18   **"E" page 6.** Ferrante signed an agreement to terminate (the "Termination Agreement") the 799 Van

19   Ness Contract and John Reed Contract with the understanding that Sebastian Schoepe would not

20   terminate the 960 N. La Brea Contract and the 703 McKinney Contract on behalf of any of the

21   Defendants. The Termination Agreement is attached as **Exhibit E**.

22      31.    Defendants and Sebastian Schoepe agreed that the termination of the 799 Van Ness

23   Contract and the John Reed Contract would not establish any precedent for the remaining projects, and

24   that the termination could not be used "as a basis to request or justify the same or similar treatment or

25   termination of the" 960 N. La Brea Property or 703 McKinney Property.

26      32.    Sebastian Schoepe was negotiating with Ferrante and Ferrante TX on behalf of multiple

27   Defendants simultaneously. Sebastian Schoepe made representations on behalf of the Defendants

28   during the course of the negotiations to entice Ferrante to enter into the Termination Agreement.

EXHIBIT A - 000089

1   Schoepe signed all of the contracts at issue in these projects on behalf of the various defendants. John

2   Oropallo signed the agreement on behalf of Ferrante.

3       33.    The Defendants, John Reed Fitness, 799 Van Ness, 1UP Fitness, RSG Group,

4   and DOES 1 through 100, inclusive, violated the Termination Agreement that Schoepe drafted for the

5   Defendants and asked Ferrante to sign. The Termination Agreement applied to the 799 Van Ness

6   Contract and John Reed Contract. Due to the breach of the Termination Agreement, Ferrante now

7   seeks $350,000 as the termination fee for the 799 Van Ness Contract, and $150,000 as the termination

8   fee for the John Reed Contract.

9       34.    The Termination Agreement was signed on March 20, 2020. Despite having told

10   Ferrante that Defendants would not terminate Ferrante's 960 N. La Brea Contract or Ferrante TX's 703

11   McKinney Contract, less than a month later, on April 13, 2020, Ferrante received two letters

12   terminating the 960 N. La Brea Contract and the 703 McKinney Contract. The letters were signed on

13   behalf of 960 N. La Brea, 703 McKinney, and the RSG Group.

14   **FIRST CAUSE OF ACTION**

15   (For Breach of 960 N. La Brea Contract against Defendants 960 N. La Brea, 1UP Fitness, and

16   Does 1 through 100, inclusive)

17       35.    Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as

18   though fully set forth herein.

19       36.    Ferrante has fully performed and executed all terms, provisions, and conditions of the

20   960 N. La Brea Contract to be performed by it, except to the extent said performance was prevented or

21   excused by 960 N. La Brea's conduct, 1UP Fitness' conduct or other conduct and circumstances not

22   attributable to Ferrante.

23       37.    Defendants breached the 960 N. La Brea Contract by, among other things, failing to pay

24   the sum of $4,999,639.71 for materials, equipment, and labor, that Ferrante provided to 960 N. La Brea

25   and 1UP Fitness at the 960 N. La Brea Property, and failing to pay the termination fee of $350,000.

26       38.    Under the 960 N. La Brea Contract, invoices that remain unpaid after fifteen days

27   accrue interest of 10% per annum on the outstanding balance.   In addition, the 960 N. La Brea

28   Contract provides for the recovery of reasonable attorney's fees, expert fees, and court costs incurred

to collect payment after a termination for convenience. As a direct and proximate result of the above-described breaches of the 960 N. La Brea Contract, Ferrante has sustained damages, the exact nature and extent of which are presently unknown to Ferrante, but which Ferrante is informed and believes, and thereupon alleges, exceed $4,999,639.71. Ferrante will seek leave of Court to amend this Complaint when the exact amount of such damages has been ascertained.

## SECOND CAUSE OF ACTION

(For Foreclosure of Mechanic's Lien against Defendants 960 N. La Brea, 1UP Fitness, and Does 1 through 100, inclusive)

39.     Plaintiffs refer to all preceding paragraphs and incorporate by reference the same paragraphs as though fully set forth below.

40.     The 960 N. La Brea Property described in this Complaint is located in the City of Los Angeles, County of Los Angeles, State of California.

41.     Defendants 960 N. La Brea, 1UP Fitness, and Does 1 through 100, inclusive, are now, and at all times mentioned in this Complaint, the owner, lessor, and/or lessee of the 960 N. La Brea Property.

42.     Ferrante was at all times mentioned in this Complaint engaged in a work of improvement at the 960 N. La Brea Property.

43.     On or about September 23, 2020, after Ferrante had substantially completed its work at the 960 N. La Brea Property, Ferrante recorded a verified Mechanic's Lien in the office of the county recorder of Los Angeles. Ferrante served the reputed owner (960 N. La Brea) with a copy of the Mechanic's Lien.

44.     The Mechanic's Lien was recorded within the time prescribed by *California Civil Code* Section 8412. A true and correct copy of that Mechanic's Lien is attached hereto as **Exhibit "F."**

45.     At the request of 960 N. La Brea, Plaintiff furnished labor, materials, and equipment at the 960 N. La Brea Property in connection with the work of improvement. The reasonable and agreed value of the services and labor furnished and consumed in the work of improvement is no less than $4,999,639.71.

46.     Plaintiff demanded payment of $4,999,639.71, but 960 N. La Brea has failed and

8

EXHIBIT A - 000091

1  refused to pay the outstanding balance of $4,999,639.71 and the whole amount remains owed to

2  Ferrante.

3       47.    Defendants 960 N. La Brea and DOES 1 through 100, inclusive, claim to have some

4  right, title or interest in and to said premises, buildings, and structures at the 960 N. La Brea Property

5  as owner, lessee, judgement creditor, beneficiary of trust deeds or otherwise. Said claims are subject to

6  and subordinate to the claim Ferrante sues on in this Complaint.

7  **THIRD CAUSE OF ACTION**

8  (Prompt Payment Penalties against Defendants 960 N. La Brea, 1UP Fitness, and DOES 1

9  through 100, inclusive)

10       48.    Plaintiffs refer to all preceding paragraphs and incorporate by reference the same

11  paragraphs as though fully set forth below.

12       49.    Ferrante is informed and believes, and thereon alleges that Defendants 960 N. La Brea,

13  1UP Fitness, and DOES 1-100 were required to make progress payments to Ferrante for materials,

14  labor, and services provided by Ferrante under the 960 N. La Brea Contract.

15       50.    Under the Civil Code and the terms of the 960 N. La Brea Contract, 960 N. La Brea,

16  1UP Fitness, and DOES 1-100 were required to make timely progress Payments.

17       51.    Defendants failed to timely pay Ferrante's progress payments in violation of the 960 N.

18  La Brea Contract and *California Civil Code* Section 8800.   Consequently, Ferrante is entitled to

19  prompt payment penalties of 2% per month, and reasonable attorney's fees and costs.

20  **FOURTH CAUSE OF ACTION**

21  (Unjust Enrichment Against 960 N. La Brea, 1UP Fitness and DOES 1 through 100, inclusive)

22       52.    Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as

23  though fully set forth herein.

24       53.    By virtue of their conduct, 960 N. La Brea and 1UP Fitness were unjustly enriched by

25  receiving at least $4,999,639.71 in value from work, labor, and material, that were furnished, installed,

26  and performed by Ferrante, and Defendants have not paid Ferrante for any of it. Defendants have

27  unjustly retained the benefits of that work, labor, and material.

28       54.    Ferrante conferred a substantial benefit upon 960 N. La Brea and 1UP Fitness which the

EXHIBIT A - 000092

1    Defendants received (and would not have received but for Ferrante's work at the project).

2         55.    Ferrante did not receive any benefit in return for its work and instead Ferrante incurred

3    $4,999,639.71 in actual costs. Ferrante continued to perform work for 960 N. La Brea and 1UP Fitness

4    while awaiting payments which were never received.

5         56.    960 N. La Brea and 1UP Fitness engaged in unjust, illegal, and wrongful conduct in that

6    960 N. La Brea and 1UP Fitness continued to receive the benefits conferred on them by Ferrante when

7    960 N. La Brea and 1UP Fitness accepted the benefits of the work but did not intend on paying

8    Ferrante for that work.

9                          **FIFTH CAUSE OF ACTION**

10        (For Breach of 703 McKinney Contract against Defendants 703 McKinney, 1UP Fitness, and

11                          Does 1 through 100, inclusive)

12        57.    Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as

13    though fully set forth herein.

14        58.    Ferrante TX has fully performed and executed all terms, provisions, and conditions of

15    the 703 McKinney Contract to be performed by it, except to the extent said performance was prevented

16    or excused by 703 McKinney's conduct, 1UP Fitness' conduct or other conduct and circumstances not

17    attributable to Ferrante TX.

18        59.    Defendants breached the 703 McKinney Contract by, among other things, failing to pay

19    the sum of $2,500,980.54 for materials, equipment and labor Ferrante TX provided to 703 McKinney

20    and 1UP Fitness at the 703 McKinney Property, including the termination for convenience fee of

21    $350,000.

22        60.    Under the 703 McKinney Contract, invoices that remain unpaid after fifteen days

23    accrue interest of 10% per annum on the outstanding balance.   In addition, the 703 McKinney

24    Contract provides for the recovery of reasonable attorney's fees, expert fees, and court costs incurred

25    to collect payment after a termination for convenience. As a direct and proximate result of the above-

26    described breaches of the 703 McKinney Contract, Ferrante TX has sustained damages, the exact

27    nature and extent of which are presently unknown to Ferrante TX, but which Ferrante TX is informed

28    and believes, and thereupon alleges, exceed $2,500,980.54. Ferrante TX will seek leave of Court to

FIRST AMENDED COMPLAINT

EXHIBIT A - 000093

amend this Complaint when the exact amount of such damages has been ascertained.

## SIXTH CAUSE OF ACTION

(Prompt Payment Penalties against Defendants 703 McKinney, 1UP Fitness, and DOES 1 through 100, inclusive)

61.     Plaintiffs refer to all preceding paragraphs and incorporate by reference the same paragraphs as though fully set forth below.

62.     Ferrante TX is informed and believes, and thereon alleges that Defendants 703 McKinney, 1UP Fitness, and DOES 1-100 were required to make progress payments to Ferrante TX for materials, labor, and services provided by Ferrante TX under the 703 McKinney Contract.

63.     Under the terms of the 703 McKinney Contract and the Civil Code, 703 McKinney, 1UP Fitness and DOES 1-100 were required to make timely progress Payments.

64.     Defendants failed to timely pay Ferrante TX's progress payments in violation of the 703 McKinney Contract and *California Civil Code* Section 8800.   Consequently, Ferrante TX is entitled to prompt payment penalties of 2% per month, and reasonable attorney's fees and costs.

## SEVENTH CAUSE OF ACTION

(Unjust Enrichment against 703 McKinney, 1UP Fitness, and DOES 1 through 100, inclusive)

65.     Plaintiffs refer to all preceding paragraphs and incorporate by reference the same paragraphs as though fully set forth below.

66.     By virtue of their conduct, 703 McKinney and 1UP Fitness were unjustly enriched by receiving at least $2,500,980.54 in value from work, labor, and material, that were furnished, installed, and performed by Ferrante TX, and Defendants have not paid Ferrante TX for any of it. Defendants have unjustly retained the benefits of that work, labor, and material.

67.     Ferrante TX conferred a substantial benefit upon 703 McKinney and 1UP Fitness which the Defendants received (and would not have received but for Ferrante's work at the project).

68.     Ferrante TX did not receive any benefit in return for its work and instead Ferrante TX incurred $2,500,980.54 in actual costs. Ferrante TX continued to perform work for 703 McKinney and 1UP Fitness while awaiting payments which were never received.

69.     703 McKinney and 1UP Fitness engaged in unjust, illegal, and wrongful conduct in that

EXHIBIT A - 000094

703 McKinney and 1UP Fitness continued to receive the benefits conferred on them by Ferrante TX when 703 McKinney and 1UP Fitness accepted the benefits of the work but did not intend on paying Ferrante TX for that work.

**EIGHTH CAUSE OF ACTION**

(Breach of John Reed Contract against John Reed Fitness, and DOES 1 through 100, inclusive)

70.     Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as though fully set forth herein.

71.     Ferrante has fully performed and executed all terms, provisions, and conditions of the John Reed Contract to be performed by it, except to the extent said performance was prevented or excused by John Reed Fitness' conduct, or other conduct and circumstances not attributable to Ferrante.

72.     Defendants breached the John Reed Contract by, among other things, failing to pay the termination for convenience fee of $150,000.

73.     Under the John Reed Contract, invoices that remain unpaid after fifteen days accrue interest of 10% per annum on the outstanding balance.   In addition, the John Reed Contract provides for the recovery of reasonable attorney's fees, expert fees, and court costs incurred to collect payment after a termination for convenience. As a direct and proximate result of the above-described breaches of the John Reed Contract, Ferrante has sustained damages, the exact nature and extent of which are presently unknown to Ferrante, but which Ferrante is informed and believes, and thereupon alleges, exceed $150,000. Ferrante will seek leave of Court to amend this Complaint when the exact amount of such damages has been ascertained.

**NINTH CAUSE OF ACTION**

(Breach of the 799 Van Ness Contract against 799 Van Ness, 1UP Fitness, RSG Group,
and DOES 1 through 100, inclusive)

74.     Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as though fully set forth herein.

75.     Ferrante has fully performed and executed all terms, provisions, and conditions of the 799 Van Ness Contract to be performed by it, except to the extent said performance was prevented or

12

FIRST AMENDED COMPLAINT

1   excused by 799 Van Ness' conduct, 1UP Fitness' conduct, or other conduct and circumstances not

2   attributable to Ferrante.

3         76.    Defendants breached the 799 Van Ness Contract by, among other things, failing to pay

4   the termination for convenience fee of $350,000.

5         77.    Under the 799 Van Ness Contract, invoices that remain unpaid after fifteen days accrue

6   interest of 10% per annum on the outstanding balance.   In addition, the 799 Van Ness Contract

7   provides for the recovery of reasonable attorney's fees, expert fees, and court costs incurred to collect

8   payment after a termination for convenience. As a direct and proximate result of the above-described

9   breaches of the John Reed Contract, Ferrante has sustained damages, the exact nature and extent of

10   which are presently unknown to Ferrante, but which Ferrante is informed and believes, and thereupon

11   alleges, exceed $350,000. Ferrante will seek leave of Court to amend this Complaint when the exact

12   amount of such damages has been ascertained.

13   **TENTH CAUSE OF ACTION**

14   (Breach of Termination Agreement against 799 Van Ness, John Reed Fitness, 1UP Fitness, RSG

15   Group, and DOES 1 through 100, inclusive)

16         78.    Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as

17   though fully set forth herein.

18         79.    Ferrante has fully performed and executed all terms, provisions, and conditions of the

19   contract to be performed by it, except to the extent said performance was prevented or excused by 799

20   Van Ness' conduct, John Reed Fitness' conduct, 1UP Fitness' conduct, or other conduct and

21   circumstances not attributable to Ferrante.

22         80.    Defendants breached the contract by, among other things, failing to allow Ferrante TX

23   to complete work it was prepared to do at the 703 McKinney Property and Ferrante to complete work it

24   was prepared to do at the 960 N. La Brea Property, and not paying Ferrante's termination fees.

25   Defendants were required to perform their obligations under the Termination Agreement in good faith.

26   In entering into a promise to not terminate Ferrante or Ferrante TX, and subsequently terminating

27   Ferrante and Ferrante TX within a matter of weeks, Defendants acted in bad faith and with disregard

28   for their obligations under the Termination Agreement.

13

FIRST AMENDED COMPLAINT

81.     As a direct and proximate result of the above-described breaches of the contract, Ferrante has sustained damages, the exact nature and extent of which are presently unknown to Ferrante, but which Ferrante is informed and believes, and thereupon alleges, exceed $500,000. Ferrante will seek leave of Court to amend this Complaint when the exact amount of such damages has been ascertained.

## ELEVENTH CAUSE OF ACTION

(Promissory Estoppel Against John Reed Fitness, 799 Van Ness, 1UP Fitness, RSG Group, and DOES 1 through 100, inclusive)

82.     Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as though fully set forth herein.

83.     The Defendants made a clear and unambiguous promise that they would not terminate Ferrante from the 960 N. La Brea Property and Ferrante TX from the 703 McKinney Property if Ferrante did not pursue the termination fees it was entitled to under the 799 Van Ness Contract and John Reed Contract. Ferrante's reliance on this promise was reasonable and foreseeable. Defendants knew that Ferrante was agreeing to waive the termination fees so that it could continue its work on the 960 N. La Brea Property and the 703 McKinney Property. Ferrante actually did rely upon this promise when it signed the Termination Agreement.

84.     The promise to not terminate Ferrante has been breached as Ferrante was ultimately terminated for convenience at the 960 N. La Brea Property and the 703 McKinney Property. Ferrante relied upon the statements from the Defendants to its detriment. Unjust enrichment between the parties will result if the Defendants are able to deny the existence of this promise. Injustice can only be avoided through enforcement of the promise.

## TWELFTH CAUSE OF ACTION

(Negligent Misrepresentation Against, John Reed Fitness, 799 Van Ness, 1UP Fitness, RSG Group, and DOES 1 through 100, inclusive)

85.     Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as though fully set forth herein.

86.     The Defendants made a clear and unambiguous statement (or misrepresentation) that

14

EXHIBIT A - 000097

they would not terminate Ferrante from the 960 N. La Brea Property and Ferrante TX from the 703 McKinney Property if Ferrante did not pursue the termination fees it was entitled to under the 799 Van Ness Contract and John Reed Contract.

87.     During the week of March 15, 2020, Sebastian Schoepe discussed the various project with Plaintiffs in Los Angeles. Schoepe told John Oropallo that Defendants had no intention of terminating Plaintiffs at either the 960 N. La Brea Property or the 703 McKinney Property. Schoepe said he would not terminate them if Plaintiffs agreed to waive certain rights at the other properties. Schoepe stated that he wanted the 703 McKinney Property and the 960 N. La Brea Property to be completed quickly and for the focus of the teams to be on those two projects. He then presented Plaintiffs with the Termination Agreement that Schoepe drafted.

88.     However, the Defendants knew these statements to be untrue or made them with no reasonable grounds to believe the statements were true. Ferrante was terminated from the 960 N. La Brea Property and Ferrante TX was terminated from the 703 McKinney Property less than a month after the misrepresentations were made.

89.     The Defendants intended for Ferrante to rely on their misrepresentations so that Ferrante would agree to waive its termination fees pursuant to the 799 Van Ness Contract and John Reed Contract.

90.     The Ferrante's reliance on this misrepresentation was reasonable and foreseeable because Plaintiffs wanted to continue work the 799 Van Ness Project and John Reed Project but wanted compensation for the other two ongoing projects. Plaintiffs planned to continue work at the terminated projects but for the promise by Defendants to not terminate Plaintiffs at 703 McKinney or 960 N. La Brea. The Defendants knew that Ferrante was agreeing to waive the termination fees so that work could continue at the 960 N. La Brea Property and the 703 McKinney Property.

91.     Ferrante actually did rely upon this promise when it signed the Termination Agreement. Ferrante has suffered damages in an amount no less than $500,000, due Ferrante's reliance on the Defendants' misrepresentation. The Defendants' never made any statement to Ferrante indicating that their statements were false.

EXHIBIT A - 000098

**THIRTEENTH CAUSE OF ACTION**

(Reformation - Unilateral Mistake Against 703 McKinney, 1UP Fitness, RSG Group, and DOES 1 through 100, inclusive)

92.     Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as though fully set forth herein.

93.     Ferrante TX alleges that it made a mistake in the formation of the 703 McKinney Contract. The entity listed is "Ferrante Koberling Construction, Inc." but "Ferrante Koberling Construction TX, Inc." is the proper party to the contract.

94.     The mistake is material to the 703 McKinney Contract because it incorrectly identifies the entity performing under the contract.

95.     There was a unilateral mistake by Ferrante TX in that Ferrante TX did not notice it was executing a contract with "Ferrante Koberling Construction, Inc." on the document.

96.     Based on the obvious mistake in the execution of the 703 McKinney Contract, Ferrante TX requests that this Court order the reformation of the 703 McKinney Contract to reflect the true intention of the parties so that the correct entity is named in the 703 McKinney Contract.

**FOURTEENTH CAUSE OF ACTION**

(Reformation - Mutual Mistake Against 703 McKinney, 1UP Fitness, RSG Group, and DOES 1 through 100, inclusive)

97.     Plaintiffs refer to all preceding paragraphs and by this reference incorporate the same as though fully set forth herein.

98.     Ferrante TX alleges that a mistake was made in the formation of the 703 McKinney Contract. The entity listed is "Ferrante Koberling Construction, Inc." when "Ferrante Koberling Construction TX, Inc." is the proper party to the contract.

99.     Ferrante TX and the Defendants did not realize that the wrong entity had been erroneously named.

100.     The mistake is material to the 703 McKinney Contract because it incorrectly identifies the entity performing under the contract.

101.     There was a mutual mistake between both Ferrante TX and the Defendants, in that all

16

EXHIBIT A - 000099

1    the parties thought the correct entity name was on the 703 McKinney Contract.

2          102.   Based on the obvious mistake in the execution of the 703 McKinney Contract, Ferrante

3    TX requests that this Court order the reformation of the 703 McKinney Contract to reflect the true

4    intention of the parties so that the correct entity is named in the 703 McKinney Contract.

5                              **PRAYER FOR RELIEF**

6          WHEREFORE, Plaintiffs pray for judgment against the Defendants as follows:

7      1.   For the sum of $4,999,639.71, together with interest thereon at the rate of ten percent

8            (10%) per annum;

9      2.   For the sum of $2,500,980.54, together with interest thereon at the rate of ten percent

10           (10%) per annum;

11     3.   For the sum of $350,000, together with interest thereon at the rate of ten percent

12           (10%) per annum;

13     4.   For the sum of $150,000, together with interest thereon at the rate of ten percent

14           (10%) per annum;

15     5.   That it be decreed that Plaintiff has a lien upon the real property and work of

16           improvement described as the 960 N. La Brea Property and owned by Defendants,

17           for the sum of, at least, $4,999,639.71, together with interest thereon at the rate of ten

18           percent (10%) per annum from the date the lien was recorded;

19     6.   That said real property and work of improvement be sold under decree of this Court

20           and the proceeds applied to the payment of the sum of, at least, $4,999,639.71

21           together with interest at the rate of ten percent (10%) per annum from the date the

22           lien was recorded;

23     7.   That Plaintiff have execution for any deficiency against Defendants 960 N. La Brea

24           and 1 UP Fitness;

25     8.   That all of the right, title, interest and claim in and to said real property and work of

26           improvements of the Defendants at 960 N. La Brea be adjudged subordinate and

27           subject to the lien of Plaintiff herein;

28     9.   That the Defendants be estopped from denying their promise to allow Ferrante TX to

17

EXHIBIT A - 000100

complete its work on the 703 McKinney Property and to allow Ferrate to complete its work on the 960 N. La Brea Property in exchange for the waiver of termination fees;

10.     Reformation of the 703 McKinney Contract;

11.     For attorney's fees and costs of suit; and

12.     For such other and further relief as the Court may deem just and proper.


DATED:     October 12, 2020                    FELDMAN & ASSOCIATES, INC.


                                               By: _____
                                                   Mark A. Feldman
                                                   Andrew A. Monge
                                                   Attorneys for Plaintiff
                                                   FERRANTE KOBERLING CONSTRUCTION,
                                                   INC., and FERRANTE KOBERLING
                                                   CONSTRUCTION TX, INC.

FIRST AMENDED COMPLAINT

EXHIBIT A - 000101

# EXHIBIT "A"



## COST PLUS AGREEMENT BETWEEN OWNER AND CONTRACTOR

| | |
|---|---|
| Owner: 799 Van Ness, LLC | Contractor: Ferrante Koberling Construction, Inc. |
| Address: 925 N La Brea Ave, 4th Floor | 4700 W. Jefferson Blvd. #103 |
| City, State, Zip: Los Angeles, CA 90038 | Los Angeles, CA  90016 |
| Contact: Sebastian Schoepe | Tax ID No: 46-3955278 |
| Phone: (424)387-5709 | CA License No. 988562 |
| E-mail: schoepe@1upfitness.com | Contact: Michael Ferrante |
| Tax ID No: | Phone: (323) 933-3203 |
| | Email: mferrante@ferrantekoberling.com |

| | |
|---|---|
| Project: 799 Van Ness | Architect: Gruen Architects |
| Project Address: 799 Van Ness Ave | Address: 6330 S Vicente Blvd #200 |
| City, State, Zip: San Francisco, CA 94102 | City, State, Zip: Los Angeles, CA 90048 |

This Agreement Between Owner and Contractor is dated November 1st, 2018 and is between FERRANTE KOBERLING CONSTRUCTION, INC., a California corporation ("**Contractor**"), 799 VAN NESS, LLC, a Delaware limited liability corporation ("**960 N La Brea**"), and 1UP FITNESS GROUP NORTH AMERICA LP, a Delaware limited partnership, and affiliated companies  ("**1UP Fitness**," and together with **960 N La Brea**, and affiliated companies are the "**Owner**")

## Recitals

A.  Owner is leasing and building out approximately 45,000 SF of commercial space ("**Commercial Work**") as a Fitness Club, Office and Restaurant in the building located at 799 Van Ness, San Fransisco, CA 94102 ("**Project**").

B.  Contractor is experienced, qualified, and staffed to perform this Commercial Work.

C.  Owner and Contractor have reached an agreement for Contractor to perform the Commercial Work and desire to set forth their respective rights, responsibilities, terms, conditions, and compensation to be paid to Contractor.

Owner and Contractor therefore agree as follows:

1.0     **Contract Documents.** The Contract Documents consist of the following: (i) this agreement; (ii) written modifications to this agreement signed by both parties; and (iii) those documents listed under section 19.0. The Contract Documents are complementary and cumulative and what is called for by one shall be as binding as if called for by all. In case of conflicts between the drawings and specifications, the specifications will govern. In case of omissions, errors, or inconsistency among the Contract Documents, the Contractor shall immediately submit the matter to Owner for clarification. Owner's clarifications are final and binding, subject to an equitable adjustment in the compensation, the Contractor's time for performance, or both, or to dispute mitigation and resolution.

2.0     **The Relationship Between the Parties.** The parties hereby agree to proceed on the basis of mutual trust, good faith, and fair dealing. Each party shall perform its obligations with integrity and shall avoid any conflicts of interest.

3.0     **Work.** Contractor shall perform the Work in a workmanlike and expeditious manner consistent with the Contract Documents. Contractor shall provide all labor, materials, equipment, and services necessary to complete the Work in accord with the Contract Documents and Exhibits C and K, "Estimated Budget" and "Schedule of the Work," respectively.

4.0     **Compensation, Cost Plus Fee.** Owner shall compensate Contractor for Work performed as follows:

4.1     The Cost of the Work as set forth in section 7.0, plus 6 percent for overhead and 7 percent for profit (the overhead and profit markups constitute the "**Fee**"). The Fee will be paid in proportion to the Work performed.

Version 1.0 – 28 June 2018

EXHIBIT A - 000103



4.2     The Estimated Budget to complete the Work is $10,000,000.00 as set forth in Exhibit C. The Estimated Budget is not a guaranteed maximum price for the Cost of the Work or Fee. If Contractor becomes aware that the Estimated Budget will be exceeded, Contractor must promptly notify Owner in writing before performing the Work in excess of the Estimated Budget. This notice may include the Contractor's estimate of the additional costs necessary to complete the Work. The Contractor may stop work and is under no obligation to proceed with the Work in excess of the Estimated Budget until Owner authorizes Contractor in writing to proceed. Contractor is not liable for any delay in receiving this authorization.

5.0     **Owner Responsibilities.** Owner shall provide any information and services at Owner's expense and when required for the successful and expeditious completion of the Work.

5.1     As a condition to Contractor starting the Work, Owner shall provide Contractor with reasonable evidence of sufficient and available funds to satisfy all of Owner's obligations under this agreement. In the case of Project financing, such evidence must include the name and address of any construction lender and a copy of the loan commitment and loan disbursement agreement between Owner and Owner's lenders relating to the provision and disbursement of funds to Owner for its obligations under this agreement, except information deemed proprietary or confidential by Owner or Owner's lenders. During performance of the Work, Owner shall notify Contractor in writing Contractor of any material change in Project financing.

5.2     Owner shall provide Contractor with information describing the physical characteristics of the Project, including surveys, site evaluations, legal descriptions, data, or drawings depicting existing conditions, subsurface, and environmental studies, reports, investigations, tests, inspections, and other reports dealing with environmental matters, hazardous material and other existing conditions, including structural, mechanical, and chemical tests required by the Contract Documents or by law.

5.3     Owner shall provide Contractor with any other information or services requested by Contractor that Contractor claims is relevant to its performance of the Work and under Owner's control.

5.4     Within 7 days of this agreement being signed by the parties, Owner shall provide Contractor with the information necessary to give notice of or enforce mechanics' lien rights. This information must include Owner's interest in the real property on which the Project is located and the record legal title, and the name and address of the record fee owner if not the Owner. In this agreement, "**days**" means calendar days unless otherwise noted.

5.5     Owner shall secure and pay for all permits, approvals, easements, assessments, and fees required in connection with the Work.

5.6     Owner shall designate an Owner's authorized representative ("**OAR**") to provide approvals and directives necessary for the day-to-day administration of this agreement, the Work, and the Project. Owner shall designate the limits of any authority delegated to the OAR with respect to the following: executing any contract, contract modification, or other form of binding agreement; obligating the Owner in any manner to the payment of money; rendering any final decision on any contract matter, claim or dispute, terminating, suspending, or otherwise interfering with the Contractor's performance, directing any changes in the Contract Documents or in the Contractor's performance that is inconsistent with the Contract Documents. Owner and OAR shall be prohibited from communicating in any manner with Contractor's subcontractors. All communications from Owner and OAR regarding the Project must be with Contractor's designated representative.

5.7     Owner shall provide Contractor with complete and unfettered access to the site and area(s) of the Work.

5.8     Owner shall timely make payments to Contractor in accordance with this agreement.

5.9     Unless otherwise noted on the drawings and specifications, Owner shall be prohibited from performing work at the Project using its own forces or separate contractors without the Contractor's prior written consent.

5.10    Owner shall pay for all copies of the drawings and specifications as necessary for the Contractor to prosecute the Work. If the reproduction costs are paid by Contractor, Owner must reimburse Contractor the actual amount paid plus 10%.

5.11    Unless otherwise provided in the Contract Documents, Owner shall pay for all fees related to utilities and other facilities and services necessary for the Project, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work. In addition, unless otherwise provided in the Contract Documents, Owner shall

EXHIBIT A - 000104



be responsible for all necessary upgrades to any existing building systems and utilities. "**Utilities**" includes electric, gas, water, sewer and waste, storm drain, Internet, TV, and phone.

      5.12    **Joint and Several.** The obligations and liabilities of the Owner under this agreement are joint and several.

    6.0    **Contractor Responsibilities.**

      6.1    Contractor shall supervise and coordinate the Work, including the construction means, methods, techniques, sequences, and procedures utilized, unless the Owner or Contract Documents provide other specific instructions.

      6.2    **Subcontractors.** Contractor and all subcontractors shall at all times during the Work be duly licensed by the CSLB (or by the jurisdiction where the Work will be performed). In this agreement, "**subcontractors**" means any person or entity who has a contract with or is engaged by Contractor, or with any other subcontractor, at any tier. To the extent practicable, Contractor shall enter into written subcontracts where compensation is based on a lump-sum price. The lump-sum price is subject to approval by Owner. As a condition to Contractor entering any subcontract, Owner must indicate its approval of the lump-sum price (and any other important terms and conditions) by signing the "Subcontract Approval Form" in the form attached as Exhibit L.

      6.3    Except for permits that are the Owner's responsibility, Contractor shall apply for and obtain all necessary building permits pertaining to the Work. Owner shall immediately reimburse Contractor for any permit fees paid for or advanced by Contractor at actual cost plus 10%.

      6.4    Contractor has investigated the site, the visible conditions affecting the site and the Work, and the Contract Documents.

      6.5    Contractor shall comply with all applicable codes, laws, ordinances, and regulations affecting its performance and the Work. Contractor will be liable to Owner for all loss, cost, or expense, attributable to any acts or omissions by Contractor, its employees, subcontractors, suppliers, and agents in failing to comply with laws, including fines, penalties, or corrective measures. Contractor shall pay all applicable taxes for the Work provided by Contractor. The estimated Cost of the Work and Fee will be equitably adjusted for laws, taxes, duties, and tariffs that impact cost or time that are enacted after the date of this agreement or after bids are received or negotiations concluded.

      6.6    Contractor shall provide and maintain competent personnel to supervise and direct the Work and shall enforce strict discipline and good order among those carrying out the Work. Contractor shall prohibit the use of alcoholic beverages, drugs and other dangerous substances, and the playing of radios, music, or other broadcasting devices at the site that constitute a danger to life, health, or property. Contractor shall prohibit the wearing of any work clothes and attire displaying offensive logos, insignia, graphics, words, phrases, or symbols.

      6.7    Contractor shall take precautions to properly protect and preserve (i) the materials, supplies, and equipment to be incorporated into the Work and (ii) the Work itself from damage until the Work is accepted by Owner. If the Owner causes damage to the Work, the Owner shall promptly remedy that damage at its sole expense.

      6.8    Contractor shall maintain and supervise all safety precautions and programs, and shall comply with all applicable laws, ordinances, and regulations of any federal, state or local authorities, including OSHA and Cal/OSHA, for the safety of persons or property. Contractor shall conduct routine inspections of equipment and site conditions as necessary to ensure compliance with its safety programs and standards. At all times during working hours at the site, Contractor shall require and ensure the use of personal protective equipment by all workers on the site.

      6.9    Contractor shall be responsible for the proper delivery, handling, application, storage, removal, and disposal of all materials and substances brought to the site by Contractor in accordance with the Contract Documents and used or consumed in the performance of the Work.

      6.10    A "**Hazardous Material**" is any substance or material identified now or in the future as hazardous under any federal, state, or local law or regulation, or any other substance or material which may be considered hazardous or otherwise subject to statutory or regulatory requirement governing handling, disposal, or clean-up. Contractor shall not start or continue work until any Hazardous Material discovered at the site has been removed, or rendered or determined to be harmless by Owner as certified by an independent testing laboratory and approved by the appropriate

EXHIBIT A - 000105



government agency. If Contractor incurs additional costs or is delayed due to the presence or remediation of Hazardous Material, Contractor shall be entitled to an equitable adjustment.

      6.11    **Submittals.** Contractor shall submit to Owner for review and approval all shop drawings, samples, product data, and similar submittals required by the Contract Documents. Submittals may be submitted in electronic form. Contractor will be responsible to Owner for the accuracy and conformity of its submittals to the Contract Documents. Contractor shall prepare and deliver its submittals to Owner in a manner consistent with the Contractor's schedule and in such time and sequence so as not to delay the performance of the Work or the work of Owner and others retained by Owner. Contractor shall identify in writing for each submittal all changes, deviations, or substitutions from the requirements of the Contract Documents. Owner's approval of a submittal does not authorize deviations, substitutions, or changes in the requirements of the Contract Documents unless Owner specifically authorizes such deviation, substitution, or change. Owner shall review and approve submittals with promptness to avoid causing delay. Contractor shall perform all Work in accordance with approved submittals. Owner's approval does not relieve Contractor from responsibility for defective work resulting from errors or omissions of any kind on the approved shop drawings. In this agreement, "**defective work**" means work found to be not in conformance with the Contract Documents.

      6.12    Contractor shall perform cutting, fitting, and patching necessary to coordinate the various parts of the Work and to prepare its Work for the work of Owner or others retained by Owner.

      6.13    Contractor shall regularly remove debris and waste materials at the site resulting from the Work. Contractor shall minimize and confine dust and debris resulting from construction activities. At the completion of the Work, Contractor shall remove from the site all construction equipment, tools, surplus materials, waste materials, and debris.

      6.14    **Differing Site Conditions.** The Contractor shall promptly, and before the conditions are disturbed, give written notice to Owner of: (i) subsurface or latent physical conditions at the site which differ materially from those indicated in the Contract Documents; or (ii) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract Documents. The Owner shall investigate the conditions promptly after receiving notice. If the conditions do materially differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the Work, an equitable adjustment will be made and this agreement modified in writing accordingly.

    7.0    **Cost of the Work.** Owner shall pay Contractor for the Cost of the Work as defined in this section and the Fee stipulated in section 4.0. The Cost of the Work includes:

      7.1    **Key Personnel.** Amounts paid by Contractor to those employees (excluding craft labor) identified in Exhibit E and at the stated billable hourly rates. Those hourly rates include the base hourly wage, payroll taxes, employee benefits, and workers' compensation insurance but not profit (fee), general administrative, and overhead costs.

      7.2    **Contractor's Craft Labor.** Wages actually paid for Contractor's craft labor directly employed by Contractor in performing the Work;

      7.3    **Employee Taxes and Burdens.** Cost of all employee benefits and taxes including but not limited to workers' compensation, unemployment compensation, social security, health, welfare, retirement, and other fringe benefits as required by law, labor agreements, or paid under Contractor's personnel policy, insofar as such costs are paid to employees of Contractor as part of the Cost of the Work;

      7.4    **Subcontractor and Vendor Costs.** Costs paid by Contractor to its subcontractors and vendors for Work performed pursuant to subcontracts and purchase orders.

      7.5    **Materials and Equipment.** Cost of all materials, supplies, and equipment incorporated in the Work, including costs of inspection and testing (if not provided by Owner), transportation, storage, and handling;

      7.6    **Materials and Equipment Consumed at the Site.** Cost, including transportation and maintenance, of all materials, supplies, equipment, temporary facilities, and hand tools not owned by the workers that are used or consumed in the performance of the Work, less salvage value or residual value; and cost less salvage value on such items used, but not consumed, that remain the Contractor's property;

Version 1.0 — 28 June 2018

EXHIBIT A - 000106



7.7     **Rental Charges.** Actual rental charges of all necessary machinery and equipment, exclusive of hand tools owned by workers, used at the site, whether rented from Contractor or others, including installation, repair and replacement, dismantling, removal, maintenance, transportation, and delivery costs;

7.8     **Insurance and Bonds Premiums.** Cost of the premiums for all insurance and surety bonds which Contractor is required to procure or deems necessary, and approved by Owner, including any additional premium incurred as a result of any increase in the Cost of the Work;

7.9     **Sales and Use Taxes.** Sales, use, gross receipts, or other taxes, tariffs, or duties related to the Work for which Contractor is liable;

7.10    **Permits and Fees.** Permits, fees, licenses, tests, and royalties, except if paid by Owner;

7.11    **Course of Construction Repairs.** Actual and reasonable costs paid by Contractor in repairing minor damage to trade Work caused as a normal by-product during the course of construction and not attributable to the fault of Contractor, any subcontractor or vendor or not covered by insurance;

7.12    **Site Office.** Costs associated with establishing, equipping, operating, maintaining, and demobilizing the field office;

7.13    **Utilities.** Water, power, and fuel costs necessary for the Work;

7.14    **Clean-up and Disposal.** Cost of cleaning up, removing, and legally disposing all non-hazardous substances, debris, and waste materials;

7.15    **Emergencies.** Costs to respond to an emergency affecting the safety of persons and property, provided the cost is not the result of any act or omission of Contractor, subcontractor, vendor, or any party for whom any of them are responsible or liable at law or under the Contract Documents;

7.16    **Site Security.** Costs for site security services required for protection of the Work;

7.17    **Reproduction and Graphics.** Costs for blueprinting and reproduction of the plans and specifications, and for required postage, express mail, and long-distance costs in the performance of the Work;

7.18    **Legal.** Legal, mediation, and arbitration fees and costs reasonably and properly resulting from Contractor's performance of the Work, except those arising from disputes between the parties; and

7.19    **Miscellaneous.** Costs directly incurred in performing the Work or in connection with the Project that are not included in the Fee and that are reasonably inferable from the Contract Documents.

7.20    **Discounts.** All discounts for prompt payment shall accrue to Owner to the extent such payments are made directly by Owner. To the extent payments are made with funds of Contractor, all cash discounts accrue to Contractor. All trade discounts, rebates, and refunds, and all returns from sale of surplus materials and equipment (if any), shall be credited to the Cost of the Work.

7.21    **Contractor's Account Records.** Records of the Contractor's costs and expenditures must be maintained on the basis of generally accepted accounting practices and be available for inspection by the Owner or the Owner's designated agent at mutually convenient times for a period of 2 years after final payment.

8.0     **Payments.**

8.1     **Schedule of Values.** Per Exhibit K pending drawings within TBD working days after the parties sign this agreement, Contractor shall submit to Owner for approval an initial schedule of values allocating budgeted values among all categories or portions of the Work. The schedule of values must be prepared in such form and supported by data to substantiate its accuracy as Owner may reasonably require and must be based on the latest cost information available to Contractor. The Estimated Budget must be broken down is sufficient detail to facilitate continued evaluation of the Contractor's payment applications. The schedule of values must include separate line items for materials and equipment purchased or fabricated and stored either on-site or off-site and for the Fee. The Owner-accepted schedule of values must be used as the basis for the Contractor's applications for payments and revised for any modifications mutually agreed upon by the parties.

Version 1.0 — 28 June 2018

EXHIBIT A - 000107



8.2     **Progress Payments.** Contractor shall submit to Owner or another person or entity designated by Owner bi-weekly payment applications no later than the 15th and last day of the month. The payment application consists of the Cost of the Work performed up to the date stated in the payment application, along with a proportionate share of the Fee. Payment applications must include materials and equipment not yet incorporated into the Work but delivered to and suitably stored onsite or offsite, including applicable insurance, storage, and costs incurred transporting the materials to an offsite storage facility. Approval of payment for materials stored off-site is conditioned on the Contractor submitting bills of sale and applicable insurance or such other procedures satisfactory to Owner to establish Owner's title to such materials, or otherwise to protect Owner's interest, including transportation to the site.

8.3     **Adjustment of Contractor's Payment Application.** Owner may adjust or reject a payment application or nullify a previously approved payment application, in whole or in part, as may reasonably be necessary to protect Owner from loss or damage based on the circumstances listed below, but only to the extent that Contractor is responsible. As a condition to this right, the Owner must give written notice to Contractor no later than 7 days after receipt of a payment application specifying the reasons for the disapproval or nullification. When the reasons for disapproving or nullifying an application for payment are removed, Owner shall immediately pay the amounts previously withheld.

a.  Contractor's repeated failure to perform the Work as required by the Contract Documents;

b.  loss or damage for which Owner may be liable arising out of or relating to this agreement and caused by Contractor to Owner or to others retained by Owner to whom Owner may be liable;

c.  Contractor's failure to properly pay subcontractors or suppliers in connection with the Work following receipt of such payment from Owner, for that portion of the Work or for supplies, provided that Owner is making payments to Contractor in accordance with this agreement;

d.  rejected or defective work not corrected in a timely fashion; and

e.  reasonable evidence of delay in performance of the Work such that the Work will not be completed by the Final Completion Date.

8.4     **Substantiation of Costs.** Contractor shall support its payment applications with relevant documentation to allow Owner to verify the costs incurred and expended by Contractor. The documentation may include time sheets, receipts, and invoices.

8.5     **Lien Releases.** With each payment application, Contractor shall submit properly executed waivers and releases from subcontractors, suppliers and vendors, and those persons or entities who have served a preliminary notice on Owner or Contractor.

8.6     **Retainage.** Each payment application will reflect 5% retainage of the amounts to be paid, except that no retainage applies to (i) the Fee, (ii) premiums paid by Contractor for insurance and bonds (if bonds are required), or (iii) amounts approved for payment to Contractor for the Cost of the Work (exclusive of amounts to be paid to subcontractors). All retainage must be paid as part of the final payment to Contractor. If, at any time after 50% of the Work has been completed, the Contractor is making satisfactory progress, 5% retainage will no longer be withheld and progress payments will be made in full.

8.7     **Prompt Payment.** The Owner shall make all progress payments to Contractor within 15 days after Owner receives a proper payment application.

8.8     **Delayed Payment.** If for any reason not the fault of Contractor, Contractor does not receive a progress payment from Owner within 5 days after the time that payment is due, Contractor, upon giving 10 days' written notice to Owner, and without prejudice to and in addition to any other legal remedies, may stop Work until payment of the full amount owing to Contractor has been received, including interest for late payment.

8.9     **Late Payment.** Payments due but unpaid will bear interest from the date payment is due at the rate of 10 percent per annum.

8.10    **Substantial Completion Payment.** When in the Contractor's judgment substantial completion of the Work or a designated portion has been achieved, Contractor shall notify Owner and establish the substantial completion date. In this agreement, "**substantial completion**" means that stage when the Work (or designated portion of the

Version 1.0 — 28 June 2018

EXHIBIT A - 000108



Work) is sufficiently complete in accordance with the Contract Documents so that Owner may occupy or utilize the Project, or a designated portion, for its intended use. A certificate of occupancy is not a prerequisite for substantial completion if the certificate of occupancy cannot be obtained due to factors beyond Contractor's control. Payment by Owner upon substantial completion will be in consideration of Contractor's agreement to complete all final punch list Items. Owner may retain no more than 150% of the costs estimated by Owner and Contractor necessary to complete any punch list Items. Thereafter, Owner shall pay to the Contractor the amounts retained for the punch list items to the extent that each item is completed by Contractor and accepted by Owner.

8.11    **Final Payment.** When in the Contractor's judgment final completion has been achieved, Contractor shall submit a final payment application. In this agreement, "**final completion**" means that stage when the Owner determines that the Work has been properly completed in accordance with the Contract Documents, including completion of punch list items and the submittal to Owner of all closeout documentation required by the Contract Documents. Owner shall make final payment to Contractor within 15 days after Contractor has submitted a complete and accurate payment application and has submitted to Owner all closeout documentation required by the Contract Documents. In this agreement, "**final payment**" means the payment to Contractor of all amounts due and remaining to be paid to Contractor under the Contract Documents, including any retainage. Final payment will not relieve the Contractor of any warranty obligations required under the Contract Documents.

8.12    **Waiver of Claims.** Claims not reserved by Owner in writing with the making of final payment are waived except for claims relating to liens or similar encumbrances, warranties, and latent defects. Claims not reserved by Contractor in writing in accepting final payment are waived.

9.0    **Schedule, Delays and Liquidated Damages.**

9.1    Contractor shall promptly start the Work on November 1st, 2018 ("**Commencement Date**") and complete all Work in accordance with the Contract Documents no later than TBD, pending final drawings ("**Final Completion Date**").

9.2    **Time is of the Essence.** Time is of the essence for both parties with regard to the obligations of this agreement and Contract Documents.

9.3    Contractor shall achieve substantial completion of the Work in TBD working days from the Commencement Date and achieve final completion within TBD after the date of substantial completion. Both deadlines are subject to adjustments as provided for in the Contract Documents.

9.4    **Schedule.** Before submitting its first payment application for payment, Contractor shall submit to Owner a schedule showing the dates on which Contractor plans to begin and complete various parts of the Work, including dates on which information and approvals are required from Owner. Unless otherwise agreed, the schedule must (i) provide a graphic representation of all activities and events and (ii) identify dates that are critical to ensure timely completion of the Work. Contractor shall update the schedule monthly, or as mutually agreed by the parties.

9.5    **Delays and Time Extensions.** If Contractor is delayed by any cause beyond the Contractor's control, the Contractor will be entitled to a time extension. These causes include but are not limited to the following: (a) acts or omissions of Owner, the Owner's agents, consultants, designers, and the architect-engineer; (b) changes in the Work or the sequencing of the Work ordered by Owner, or arising from the Owner's decisions that impact the time of performance; (c) encountering Hazardous Materials, or concealed or unknown conditions; (d) transportation delays not reasonably foreseeable; (e) labor disputes; (f) fire; (g) terrorism; (h) adverse governmental actions; (i) acts of God; (j) adverse weather conditions not reasonably anticipated; (k) utility disruptions or outages; (l) long lead times; (m) material and equipment damaged during transportation and delivery to the Project; (n) unexcused delays in payment. If delays to the Work are encountered, Contractor shall provide prompt written notice to Owner of the cause after Contractor first recognizes the delay. The parties shall take reasonable steps to mitigate the effect of such delays. In addition, If Contractor incurs additional costs as a result of a delay caused by the circumstances noted above, Contractor will be entitled to an equitable adjustment in compensation.

10.0    **Changes.** Without invalidating or breaching this agreement, Owner may order changes within the general scope of the Work. Such changes will be binding on Contractor only if in writing, and Contractor has no obligation to proceed

Version 1.0 — 28 June 2018

EXHIBIT A - 000109



or perform any changed work until such writing is received. The cost of changed work will be computed based on the Cost of the Work (as defined in section 7.0, above) plus markups computed as follows:

a.   6% for overhead and 7% for profit of the Cost of the Work performed by Contractor using its own forces;

**11.0    Warranty.** Contractor warrants that all materials and equipment will be new unless otherwise specified, of good quality, in conformance with the Contract Documents, and free from defective workmanship and materials for one year after the date of substantial completion. Contractor further warrants that the Work will be free from material defects not intrinsic in the design or materials required in the Contract Documents. This warranty does not include remedies for defects or damages caused by normal wear and tear during normal usage, use for a purpose for which the Work or Project was not intended, improper or insufficient maintenance, modifications performed by Owner or others retained by Owner, or abuse. If during the one-year warranty period any portion of the Work is found to be defective work, Owner shall promptly notify Contractor in writing. Unless Owner provides written acceptance of the condition, Contractor shall promptly correct the defective work at its own cost and time.

**12.0    Indemnity.**

**12.1**    To the fullest extent permitted by law, Contractor shall indemnify, defend, and hold harmless Owner, Owner's officers, directors, members, agents, and employees (but not the Owner's architect-engineer) ("**Owner Indemnitees**") from all third-party claims for bodily injury and property damage, other than to the Work itself and other property insured under section 13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of the Work but only to the extent caused by the negligent or intentional wrongful acts or omissions of Contractor, subcontractors, suppliers, or anyone employed directly or indirectly by any of them or by anyone for whose acts any of them may be liable. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of an Owner Indemnitee. Contractor will be entitled to reimbursement of any defense costs paid above Contractor's percentage of liability for the underlying claim.

**12.2**    To the fullest extent permitted by law, Owner shall indemnify, defend, and hold harmless Contractor, its officers, directors, or members, agents, and employees ("**Contractor Indemnitees**") from all third-party claims for bodily injury and property damage, other than property insured under section 13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of work by Owner, Owner's architect-engineer, or others retained by Owner, but only to the extent caused by the negligent or intentionally wrongful acts or omissions of Owner, Owner's architect-engineer, or others retained by Owner. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of a Contractor Indemnitee. Owner will be entitled to reimbursement of any defense costs paid above Owner's percentage of liability for the underlying claim.

**12.3**    These indemnification obligations will not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable under workers' compensation acts, disability benefit acts, or other insurance.

**13.0    Insurance.**

**13.1    Contractor's Insurance.** Before starting Work, Contractor shall procure and maintain in force all insurance set forth in Exhibit F. Commercial General Liability Insurance may be obtained under a single policy for the full limits required or by a combination of underlying policies with the balance provided by an excess or umbrella policy. The insurance policies must contain a provision that coverages under the policies will not be cancelled or expire until at least 30 days' written notice has been given to Owner and must include either a liability endorsement covering this agreement or an endorsement making the Owner an additional insured under the policies. Certificates of insurance showing such coverages to be in force must be filed with the Owner prior to commencement of the Work.

**13.2    Owner's Insurance.** Owner shall purchase and maintain its own liability insurance, and at the Owner's option, may purchase and maintain such additional insurance to protect the Owner against claims losses, or damages that may arise from the Project. Owner shall name Contractor as an additional insured in any insurance policy obtained by the Owner for the Project.

**13.3    Waivers of Subrogation.** The Owner and Contractor hereby waive all rights against each other and against the Owner's architect-engineer, and other consultants, subcontractors, suppliers, agents and employees of the other for damages during construction covered by any property insurance as set forth in the Contract Documents.

Version 1.0 — 28 June 2018

EXHIBIT A - 000110



14.0 **Limited Mutual Waiver of Consequential Damages.** Except for losses covered by insurance required by the Contract Documents, the parties waive all claims against each other for any consequential damages that may arise out of or relate to this agreement. The provisions of this section apply to the termination of this agreement and survive such termination.

14.1 Owner waives damages for loss of use of the Project, any rental expenses incurred, loss of income, profit, or financing related to the Project, loss of business, loss of financing, loss of profits not related to this Project, loss of reputation, and insolvency.

14.2 Contractor waives damages for loss of business, loss of financing, loss of profits not related to this Project, loss of bonding capacity, loss of reputation, and insolvency.

15.0 **Dispute Resolution.**

15.1 **Executive Discussions.** As a condition to and before resorting to mediation and binding arbitration, the parties must attempt in good faith to resolve any dispute promptly by negotiation between executives who have settlement authority.

15.2 If the dispute remains unresolved after executive discussions, the parties shall proceed to mediation using JAMS, or another provider as they may otherwise mutually agree, and shall conclude such mediation within 45 calendar days of the matter being first discussed. The parties will equally share the costs of the mediation.

15.3 If the dispute remains unresolved after mediation, the dispute must proceed to binding arbitration under JAMS (or other provider as the parties may mutually agree), per its Engineering and Construction Arbitration Rules & Procedures, or if the parties agree otherwise, to the Engineering and Construction Arbitration Rules & Procedures for Expedited Arbitration. Either party may initiate arbitration with respect to the matters submitted by filing a written demand for arbitration. The Project location shall serve as the venue. The arbitration award will be final. Judgment on the award may be entered in any court having jurisdiction. This paragraph does not preclude nor otherwise limit the parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

15.4 Neither party may commence arbitration if the claim or cause of action would be barred by the applicable statute of limitations had the claim or cause of action been filed in a state or federal court. Receipt of a demand for arbitration by the person or entity administering the arbitration will constitute the commencement of legal proceedings for the purposes of determining whether a claim or cause of action is barred by the applicable statute of limitations. If, however, a state or federal court exercising jurisdiction over a timely filed claim or cause of action orders that the claim or cause of action be submitted to arbitration, the arbitration proceeding will be deemed commenced as of the date the court action was filed, provided that the party asserting the claim or cause of action files its demand for arbitration with the person or entity administering the arbitration within 30 days after the entry of such order.

15.5 **Attorney Fees.** In any litigation or arbitration arising out of or related to this agreement, the prevailing party must be awarded costs and legal fees reasonably incurred.

16.0 **Suspension and Termination.**

16.1 **Termination by Contractor.** Upon 7 days' written notice to Owner, Contractor may terminate this agreement if the Work has been stopped for a continuous 30-day period through no fault of Contractor for any of the following reasons: (i) under court order or order of other governmental authorities having jurisdiction; or (ii) as a result of the declaration of a national emergency or other governmental act during which, through no act or fault of Contractor, materials are not available. In addition, upon 7 days' written notice to Owner, Contractor may terminate this agreement if Owner does any of the following: (i) fails to furnish reasonable evidence that sufficient funds are available and committed for the entire cost of the Project; (ii) fails to pay Contractor in accordance with this agreement and Contractor has stopped Work in compliance with this agreement; or (iii) otherwise materially breaches this agreement. Upon termination by Contractor, Contractor will be entitled to recover from Owner payment for all Work executed and for any proven loss, cost, or expense in connection with the Work, including all demobilization costs plus a proportionate share of the Fee.

16.2 **Suspension by Owner.** The Owner may order the Contractor in writing to suspend all or any part of the Work for the Owner's convenience or for stoppage beyond the control of the Owner or Contractor. If the

Version 1.0 — 28 June 2018

EXHIBIT A - 000111



performance of all or any part of the Work is suspended, the Contractor will be entitled to an equitable adjustment, and this agreement will be modified in writing accordingly.

16.3    **Termination for Owner's Convenience.** The Owner on 21 days' written notice may terminate this agreement, in whole or in part, when it is in the Owner's interest. If this agreement is terminated, the Owner shall pay the Contractor: (i) for the Work performed to date, including a proportionate share of the Fee; (ii) for all demobilization costs and costs incurred resulting from termination; including remaining subcontractor invoices (iii) reasonable attorneys' fees and costs related to termination; and (d) a termination fee of $350,000.00

16.4    **Notice to Cure and Default Termination.** (a) If Contractor persistently fails to supply enough qualified workers, proper materials, or equipment to maintain the approved schedule, or persistently fails to make payment to its workers, subcontractors, or suppliers when such payment is due, or willfully disregards law or orders of any public authority having jurisdiction, or is otherwise guilty of a material breach of a provision of this agreement, Contractor may be deemed in default. If Contractor fails to commence and to continue satisfactory correction of such default with diligence and promptness within 10 days after written notification by Owner to cure, then Owner, without prejudice to any other rights or remedies, may either: (i) take reasonable steps it deems necessary to correct the deficiencies and charge the cost to Contractor, who will be liable for such payments; or (ii) terminate this agreement by written notice absent appropriate corrective action. Owner shall make reasonable efforts to mitigate damages arising from Contractor default and shall promptly invoice Contractor for all amounts due.

(b) After receipt of a termination notice, and except as directed by the Owner, the Contractor shall: (i) stop work as specified in the notice and demobilize the site; (ii) place no further subcontracts or orders, except as necessary to complete the continued portion of the Work; (iii) terminate all subcontracts to the extent they relate to the work terminated; (iv) assign to the Owner, as directed by Owner, all right, title, and interest of the Contractor under the subcontracts terminated; (v) complete performance of the Work not terminated; and (vi) take action necessary to protect and preserve the Work.

(c) After termination, the Contractor shall submit promptly a final termination settlement proposal to the Owner. If the Contractor fails to submit the proposal, the Owner may determine, on the basis of information available, the amount, if any, due the Contractor because of the termination and shall pay the amount determined.

(d) Subject to paragraph (c) of this clause, the Contractor and Owner may agree on the whole or any part of the amount to be paid (including an allowance for Fee) because of the termination. This agreement will be amended, and the Contractor paid the agreed amount. If the Contractor and Owner fail to agree in whole or in part on the amount to be paid because of the termination, the parties agree to submit the matter to mediation, and if not resolved in mediation, the matter will be submitted for binding arbitration per section 15.0.

(e) If, after termination of the Contractor for default, it is determined by a court of competent jurisdiction or arbitrator that the Contractor was not in default, or that the delay was excusable, the rights, obligations, and remedies of the parties will be the same as if the termination had been issued for the Owner's convenience.

16.5    **Obligations Arising Before Termination.** Even after termination, the provisions of this agreement will apply to any Work performed, payments made, events occurring, costs charged or incurred, or obligations arising before the termination date.

17.0    **Miscellaneous.**

17.1    **Entire Agreement.**  This agreement represents the entire agreement between Owner and Contractor and supersedes any prior written or oral agreements, understandings, and representations made or dated before the date of this agreement. This agreement may be amended only by a written amendment signed by the parties.

17.2    **Joint Drafting.** The parties hereby agree that this agreement was jointly drafted and that each had the opportunity to negotiate terms and to obtain assistance of counsel in reviewing terms prior to execution. This agreement will be construed in a neutral manner and neither against nor in favor of either party.

17.3    **No Third-Party Beneficiary**. This agreement and the obligations of the parties are intended for the sole benefit of the parties and do not create any rights in any other person or entity whatsoever, except the Owner and Contractor.

Version 1.0 — 28 June 2018

EXHIBIT A - 000112



17.4 **Governing Law.** This agreement is governed by California law, or if outside California where the Project is located.

17.5 **Severability.** If any provision in this agreement is determined to be invalid, unenforceable or void, the remainder of the agreement will be fully binding with the same force and effect as though the invalid, unenforceable or void provision had been omitted.

17.6 **Photographs and Marketing.** Contractor may (a) make or issue any public announcement or statement with respect to the Work or the Project, (b) supply to the press or other news media any information, photographs, or data related to the Work or the Project, or (c) use images of the Work and Project in any Contractor materials, including without limitation, advertisements, websites, calendars, brochures or presentations with written approval from Owner; except that Contractor shall be prohibited from using Owner's name, trademark, or logo without Owner's prior written consent.

17.7 **Written Testimonial.** If the Work and Contractor's performance is satisfactory to the Owner, Owner agrees to provide Contractor with a written positive endorsement or testimonial that Contractor may use in its advertising, marketing, and promotional materials.

17.8 **Signage.** Contractor may erect signage at the site indicating its role on the Project and may maintain such signage until Final Acceptance or for a longer period as mutually agreed by the parties.

18.0 **List of Contract Documents.** The Contract Documents in existence at the time of the parties signing this agreement are as follows:

18.1 Exhibit A, Index of Plans and Specifications furnished by Owner.

18.2 Exhibit B, List of Exclusions and Assumptions and Qualifications.

18.3 Exhibit C, Estimated Budget.

18.4 Exhibit D, Schedule of the Work.

18.5 Exhibit E, List of Contractor Personnel and Hourly Rates.

18.6 Exhibit F, Contractor's Insurance.

18.7 Exhibit G, Sample Insurance Certificate.

18.8 Exhibit H, Form, Change Order.

18.9 Exhibit J, Form, Application and Certificate for Payment.

18.10 Exhibit K, Form, Schedule of Values.

18.11 Exhibit L, Form, Subcontractor Approval

*Signatures Follow on Next Page*

Version 1.0 — 28 June 2018

EXHIBIT A - 000113



The parties are signing this agreement on the date stated in the introductory clause.

FERRANTE KOBERLING CONSTRUCTION, INC.

Signed: *Michael Ferrante*

Print Name: __Michael Ferrante__

Title: __PRESIDENT & CEO__

OWNER'S FORMAL NAME IN UPPER CASE

Signed: *Sebastian Schoepe*

Print Name: SEBASTIAN SCHOEPE

Title: PRESIDENT

OWNER'S FORMAL NAME IN UPPER CASE

Signed: _____

Print Name: _____

Title: _____

Version 1.0 — 28 June 2018

EXHIBIT A - 000114

# EXHIBIT "B"



## COST PLUS AGREEMENT BETWEEN OWNER AND CONTRACTOR

| | |
|---|---|
| Owner: John Reed Fitness LA, LLC | Contractor: Ferrante Koberling Construction, Inc. |
| Address: 925 N La Brea Ave, 4th Floor | 4700 W. Jefferson Blvd. #103 |
| City, State, Zip: Los Angeles, CA 90038 | Los Angeles, CA  90016 |
| Contact: Sebastian Schoepe | Tax ID No: 46-3955278 |
| Phone: (424)387-5709 | CA License No. 988562 |
| E-mail: schoepe@1upfitness.com | Contact: Michael Ferrante |
| Tax ID No: | Phone: (323) 933-3203 |
| | Email: mferrante@ferrantekoberling.com |
| | |
| Project: John Reed | Architect: Gruen Architects |
| Project Address: 150 W. 12th Street | Address: 6330 S Vicente Blvd #200 |
| City, State, Zip: Los Angeles, CA 90015 | City, State, Zip: Los Angeles, CA 90048 |

This Agreement Between Owner and Contractor is dated July 12, 2019 and is between FERRANTE KOBERLING CONSTRUCTION, INC., a California corporation ("**Contractor**"), JOHN REED FITNESS LA, LLC, a Delaware limited liability corporation ("**John Reed**"), and RSG GROUP NORTH AMERICA LP, a Delaware limited partnership, and affiliated companies  ("**1UP Fitness**," and together with **John Reed**, and affiliated companies are the "**Owner**")

### Recitals

A.   Owner is leasing and building out approximately 30,000 SF of commercial space ("**Commercial Work**") as a Fitness Club and Office in the building located at 150 W. 12th Street, Los Angeles, CA 90015 ("**Project**").

B.   Contractor is experienced, qualified, and staffed to perform this Commercial Work.

C.   Owner and Contractor have reached an agreement for Contractor to perform the Commercial Work and desire to set forth their respective rights, responsibilities, terms, conditions, and compensation to be paid to Contractor.

Owner and Contractor therefore agree as follows:

1.0      **Contract Documents.** The Contract Documents consist of the following: (i) this agreement; (ii) written modifications to this agreement signed by both parties; and (iii) those documents listed under section 19.0. The Contract Documents are complementary and cumulative and what is called for by one shall be as binding as if called for by all. In case of conflicts between the drawings and specifications, the specifications will govern. In case of omissions, errors, or inconsistency among the Contract Documents, the Contractor shall immediately submit the matter to Owner for clarification. Owner's clarifications are final and binding, subject to an equitable adjustment in the compensation, the Contractor's time for performance, or both, or to dispute mitigation and resolution.

2.0      **The Relationship Between the Parties.** The parties hereby agree to proceed on the basis of mutual trust, good faith, and fair dealing. Each party shall perform its obligations with integrity and shall avoid any conflicts of interest.

3.0      **Work.** Contractor shall perform the Work in a workmanlike and expeditious manner consistent with the Contract Documents. Contractor shall provide all labor, materials, equipment, and services necessary to complete the Work in accord with the Contract Documents and Exhibits C and K, "Estimated Budget" and "Schedule of the Work," respectively.

4.0      **Compensation, Cost Plus Fee.** Owner shall compensate Contractor for Work performed as follows:

EXHIBIT A - 000116



4.1     The Cost of the Work as set forth in section 7.0, plus 6 percent for overhead and 7 percent for profit (the overhead and profit markups constitute the "**Fee**"). The Fee will be paid in proportion to the Work performed.

4.2     The Estimated Budget to complete the Work is $3,000,000.00 as set forth in Exhibit C. The Estimated Budget is not a guaranteed maximum price for the Cost of the Work or Fee. If Contractor becomes aware that the Estimated Budget will be exceeded, Contractor must promptly notify Owner in writing before performing the Work in excess of the Estimated Budget. This notice may include the Contractor's estimate of the additional costs necessary to complete the Work. The Contractor may stop work and is under no obligation to proceed with the Work in excess of the Estimated Budget until Owner authorizes Contractor in writing to proceed. Contractor is not liable for any delay in receiving this authorization.

5.0     **Owner Responsibilities.** Owner shall provide any information and services at Owner's expense and when required for the successful and expeditious completion of the Work.

5.1     As a condition to Contractor starting the Work, Owner shall provide Contractor with reasonable evidence of sufficient and available funds to satisfy all of Owner's obligations under this agreement. In the case of Project financing, such evidence must include the name and address of any construction lender and a copy of the loan commitment and loan disbursement agreement between Owner and Owner's lenders relating to the provision and disbursement of funds to Owner for its obligations under this agreement, except information deemed proprietary or confidential by Owner or Owner's lenders. During performance of the Work, Owner shall notify Contractor in writing Contractor of any material change in Project financing.

5.2     Owner shall provide Contractor with information describing the physical characteristics of the Project, including surveys, site evaluations, legal descriptions, data, or drawings depicting existing conditions, subsurface, and environmental studies, reports, investigations, tests, inspections, and other reports dealing with environmental matters, hazardous material and other existing conditions, including structural, mechanical, and chemical tests required by the Contract Documents or by law.

5.3     Owner shall provide Contractor with any other information or services requested by Contractor that Contractor claims is relevant to its performance of the Work and under Owner's control.

5.4     Within 7 days of this agreement being signed by the parties, Owner shall provide Contractor with the information necessary to give notice of or enforce mechanics' lien rights. This information must include Owner's interest in the real property on which the Project is located and the record legal title, and the name and address of the record fee owner if not the Owner. In this agreement, "**days**" means calendar days unless otherwise noted.

5.5     Owner shall secure and pay for all permits, approvals, easements, assessments, and fees required in connection with the Work.

5.6     Owner shall designate an Owner's authorized representative ("**OAR**") to provide approvals and directives necessary for the day-to-day administration of this agreement, the Work, and the Project. Owner shall designate the limits of any authority delegated to the OAR with respect to the following: executing any contract, contract modification, or other form of binding agreement; obligating the Owner in any manner to the payment of money; rendering any final decision on any contract matter, claim or dispute, terminating, suspending, or otherwise interfering with the Contractor's performance, directing any changes in the Contract Documents or in the Contractor's performance that is inconsistent with the Contract Documents. Owner and OAR shall be prohibited from communicating in any manner with Contractor's subcontractors. All communications from Owner and OAR regarding the Project must be with Contractor's designated representative.

5.7     Owner shall provide Contractor with complete and unfettered access to the site and area(s) of the Work.

5.8     Owner shall timely make payments to Contractor in accordance with this agreement.

5.9     Unless otherwise noted on the drawings and specifications, Owner shall be prohibited from performing work at the Project using its own forces or separate contractors without the Contractor's prior written consent.

Version 1.0 — 28 June 2018

EXHIBIT A - 000117



5.10     Owner shall pay for all copies of the drawings and specifications as necessary for the Contractor to prosecute the Work. If the reproduction costs are paid by Contractor, Owner must reimburse Contractor the actual amount paid plus 10%.

5.11     Unless otherwise provided in the Contract Documents, Owner shall pay for all fees related to utilities and other facilities and services necessary for the Project, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work. In addition, unless otherwise provided in the Contract Documents, Owner shall be responsible for all necessary upgrades to any existing building systems and utilities. "**Utilities**" includes electric, gas, water, sewer and waste, storm drain, Internet, TV, and phone.

5.12     **Joint and Several.** The obligations and liabilities of the Owner under this agreement are joint and several.

6.0     **Contractor Responsibilities.**

6.1     Contractor shall supervise and coordinate the Work, including the construction means, methods, techniques, sequences, and procedures utilized, unless the Owner or Contract Documents provide other specific instructions.

6.2     **Subcontractors.** Contractor and all subcontractors shall at all times during the Work be duly licensed by the CSLB (or by the jurisdiction where the Work will be performed). In this agreement, "**subcontractors**" means any person or entity who has a contract with or is engaged by Contractor, or with any other subcontractor, at any tier. To the extent practicable, Contractor shall enter into written subcontracts where compensation is based on a lump-sum price. The lump-sum price is subject to approval by Owner. As a condition to Contractor entering any subcontract, Owner must indicate its approval of the lump-sum price (and any other important terms and conditions) by signing the "Subcontract Approval Form" in the form attached as Exhibit L.

6.3     Except for permits that are the Owner's responsibility, Contractor shall apply for and obtain all necessary building permits pertaining to the Work. Owner shall immediately reimburse Contractor for any permit fees paid for or advanced by Contractor at actual cost plus 10%.

6.4     Contractor has investigated the site, the visible conditions affecting the site and the Work, and the Contract Documents.

6.5     Contractor shall comply with all applicable codes, laws, ordinances, and regulations affecting its performance and the Work. Contractor will be liable to Owner for all loss, cost, or expense, attributable to any acts or omissions by Contractor, its employees, subcontractors, suppliers, and agents in failing to comply with laws, including fines, penalties, or corrective measures. Contractor shall pay all applicable taxes for the Work provided by Contractor. The estimated Cost of the Work and Fee will be equitably adjusted for laws, taxes, duties, and tariffs that impact cost or time that are enacted after the date of this agreement or after bids are received or negotiations concluded.

6.6     Contractor shall provide and maintain competent personnel to supervise and direct the Work and shall enforce strict discipline and good order among those carrying out the Work. Contractor shall prohibit the use of alcoholic beverages, drugs and other dangerous substances, and the playing of radios, music, or other broadcasting devices at the site that constitute a danger to life, health, or property. Contractor shall prohibit the wearing of any work clothes and attire displaying offensive logos, insignia, graphics, words, phrases, or symbols.

6.7     Contractor shall take precautions to properly protect and preserve (i) the materials, supplies, and equipment to be incorporated into the Work and (ii) the Work itself from damage until the Work is accepted by Owner. If the Owner causes damage to the Work, the Owner shall promptly remedy that damage at its sole expense.

6.8     Contractor shall maintain and supervise all safety precautions and programs, and shall comply with all applicable laws, ordinances, and regulations of any federal, state or local authorities, including OSHA and Cal/OSHA, for the safety of persons or property. Contractor shall conduct routine inspections of equipment and site conditions as necessary to ensure compliance with its safety programs and standards. At all times during working hours at the site, Contractor shall require and ensure the use of personal protective equipment by all workers on the site.

Version 1.0 — 28 June 2018

EXHIBIT A - 000118



6.9     Contractor shall be responsible for the proper delivery, handling, application, storage, removal, and disposal of all materials and substances brought to the site by Contractor in accordance with the Contract Documents and used or consumed in the performance of the Work.

6.10     A "**Hazardous Material**" is any substance or material identified now or in the future as hazardous under any federal, state, or local law or regulation, or any other substance or material which may be considered hazardous or otherwise subject to statutory or regulatory requirement governing handling, disposal, or clean-up. Contractor shall not start or continue work until any Hazardous Material discovered at the site has been removed, or rendered or determined to be harmless by Owner as certified by an independent testing laboratory and approved by the appropriate government agency. If Contractor incurs additional costs or is delayed due to the presence or remediation of Hazardous Material, Contractor shall be entitled to an equitable adjustment.

6.11     **Submittals.** Contractor shall submit to Owner for review and approval all shop drawings, samples, product data, and similar submittals required by the Contract Documents. Submittals may be submitted in electronic form. Contractor will be responsible to Owner for the accuracy and conformity of its submittals to the Contract Documents. Contractor shall prepare and deliver its submittals to Owner in a manner consistent with the Contractor's schedule and in such time and sequence so as not to delay the performance of the Work or the work of Owner and others retained by Owner. Contractor shall identify in writing for each submittal all changes, deviations, or substitutions from the requirements of the Contract Documents. Owner's approval of a submittal does not authorize deviations, substitutions, or changes in the requirements of the Contract Documents unless Owner specifically authorizes such deviation, substitution, or change. Owner shall review and approve submittals with promptness to avoid causing delay. Contractor shall perform all Work in accordance with approved submittals. Owner's approval does not relieve Contractor from responsibility for defective work resulting from errors or omissions of any kind on the approved shop drawings. In this agreement, "**defective work**" means work found to be not in conformance with the Contract Documents.

6.12     Contractor shall perform cutting, fitting, and patching necessary to coordinate the various parts of the Work and to prepare its Work for the work of Owner or others retained by Owner.

6.13     Contractor shall regularly remove debris and waste materials at the site resulting from the Work. Contractor shall minimize and confine dust and debris resulting from construction activities. At the completion of the Work, Contractor shall remove from the site all construction equipment, tools, surplus materials, waste materials, and debris.

6.14     **Differing Site Conditions.** The Contractor shall promptly, and before the conditions are disturbed, give written notice to Owner of: (i) subsurface or latent physical conditions at the site which differ materially from those indicated in the Contract Documents; or (ii) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract Documents. The Owner shall investigate the conditions promptly after receiving notice. If the conditions do materially differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the Work, an equitable adjustment will be made and this agreement modified in writing accordingly.

7.0     **Cost of the Work.** Owner shall pay Contractor for the Cost of the Work as defined in this section and the Fee stipulated in section 4.0. The Cost of the Work includes:

7.1     **Key Personnel.** Amounts paid by Contractor to those employees (excluding craft labor) identified in Exhibit E and at the stated billable hourly rates. Those hourly rates include the base hourly wage, payroll taxes, employee benefits, and workers' compensation insurance but not profit (fee), general administrative, and overhead costs.

7.2     **Contractor's Craft Labor.** Wages actually paid for Contractor's craft labor directly employed by Contractor in performing the Work;

7.3     **Employee Taxes and Burdens.** Cost of all employee benefits and taxes including but not limited to workers' compensation, unemployment compensation, social security, health, welfare, retirement, and other fringe benefits as required by law, labor agreements, or paid under Contractor's personnel policy, insofar as such costs are paid to employees of Contractor as part of the Cost of the Work;

7.4     **Subcontractor and Vendor Costs.** Costs paid by Contractor to its subcontractors and vendors for Work performed pursuant to subcontracts and purchase orders.

EXHIBIT A - 000119



7.5 **Materials and Equipment.** Cost of all materials, supplies, and equipment incorporated in the Work, including costs of inspection and testing (if not provided by Owner), transportation, storage, and handling;

7.6 **Materials and Equipment Consumed at the Site.** Cost, including transportation and maintenance, of all materials, supplies, equipment, temporary facilities, and hand tools not owned by the workers that are used or consumed in the performance of the Work, less salvage value or residual value; and cost less salvage value on such items used, but not consumed, that remain the Contractor's property;

7.7 **Rental Charges.** Actual rental charges of all necessary machinery and equipment, exclusive of hand tools owned by workers, used at the site, whether rented from Contractor or others, including installation, repair and replacement, dismantling, removal, maintenance, transportation, and delivery costs;

7.8 **Insurance and Bonds Premiums.** Cost of the premiums for all insurance and surety bonds which Contractor is required to procure or deems necessary, and approved by Owner, including any additional premium incurred as a result of any increase in the Cost of the Work;

7.9 **Sales and Use Taxes.** Sales, use, gross receipts, or other taxes, tariffs, or duties related to the Work for which Contractor is liable;

7.10 **Permits and Fees.** Permits, fees, licenses, tests, and royalties, except if paid by Owner;

7.11 **Course of Construction Repairs.** Actual and reasonable costs paid by Contractor in repairing minor damage to trade Work caused as a normal by-product during the course of construction and not attributable to the fault of Contractor, any subcontractor or vendor or not covered by insurance;

7.12 **Site Office.** Costs associated with establishing, equipping, operating, maintaining, and demobilizing the field office;

7.13 **Utilities.** Water, power, and fuel costs necessary for the Work;

7.14 **Clean-up and Disposal.** Cost of cleaning up, removing, and legally disposing all non-hazardous substances, debris, and waste materials;

7.15 **Emergencies.** Costs to respond to an emergency affecting the safety of persons and property, provided the cost is not the result of any act or omission of Contractor, subcontractor, vendor, or any party for whom any of them are responsible or liable at law or under the Contract Documents;

7.16 **Site Security.** Costs for site security services required for protection of the Work;

7.17 **Reproduction and Graphics.** Costs for blueprinting and reproduction of the plans and specifications, and for required postage, express mail, and long-distance costs in the performance of the Work;

7.18 **Legal.** Legal, mediation, and arbitration fees and costs reasonably and properly resulting from Contractor's performance of the Work, except those arising from disputes between the parties; and

7.19 **Miscellaneous.** Costs directly incurred in performing the Work or in connection with the Project that are not included in the Fee and that are reasonably inferable from the Contract Documents.

7.20 **Discounts.** All discounts for prompt payment shall accrue to Owner to the extent such payments are made directly by Owner. To the extent payments are made with funds of Contractor, all cash discounts accrue to Contractor. All trade discounts, rebates, and refunds, and all returns from sale of surplus materials and equipment (if any), shall be credited to the Cost of the Work.

7.21 **Contractor's Account Records.** Records of the Contractor's costs and expenditures must be maintained on the basis of generally accepted accounting practices and be available for inspection by the Owner or the Owner's designated agent at mutually convenient times for a period of 2 years after final payment.

8.0 **Payments.**

8.1 **Schedule of Values.** Per Exhibit K pending drawings within TBD working days after the parties sign this agreement, Contractor shall submit to Owner for approval an initial schedule of values allocating budgeted

Version 1.0 — 28 June 2018

EXHIBIT A - 000120



values among all categories or portions of the Work. The schedule of values must be prepared in such form and supported by data to substantiate its accuracy as Owner may reasonably require and must be based on the latest cost information available to Contractor. The Estimated Budget must be broken down is sufficient detail to facilitate continued evaluation of the Contractor's payment applications. The schedule of values must include separate line items for materials and equipment purchased or fabricated and stored either on-site or off-site and for the Fee. The Owner-accepted schedule of values must be used as the basis for the Contractor's applications for payments and revised for any modifications mutually agreed upon by the parties.

8.2     **Progress Payments.** Contractor shall submit to Owner or another person or entity designated by Owner bi-weekly payment applications no later than the 15th and last day of the month. The payment application consists of the Cost of the Work performed up to the date stated in the payment application, along with a proportionate share of the Fee. Payment applications must include materials and equipment not yet incorporated into the Work but delivered to and suitably stored onsite or offsite, including applicable insurance, storage, and costs incurred transporting the materials to an offsite storage facility. Approval of payment for materials stored off-site is conditioned on the Contractor submitting bills of sale and applicable insurance or such other procedures satisfactory to Owner to establish Owner's title to such materials, or otherwise to protect Owner's interest, including transportation to the site.

8.3     **Adjustment of Contractor's Payment Application.** Owner may adjust or reject a payment application or nullify a previously approved payment application, in whole or in part, as may reasonably be necessary to protect Owner from loss or damage based on the circumstances listed below, but only to the extent that Contractor is responsible. As a condition to this right, the Owner must give written notice to Contractor no later than 7 days after receipt of a payment application specifying the reasons for the disapproval or nullification. When the reasons for disapproving or nullifying an application for payment are removed, Owner shall immediately pay the amounts previously withheld.

a.  Contractor's repeated failure to perform the Work as required by the Contract Documents;

b.  loss or damage for which Owner may be liable arising out of or relating to this agreement and caused by Contractor to Owner or to others retained by Owner to whom Owner may be liable;

c.  Contractor's failure to properly pay subcontractors or suppliers in connection with the Work following receipt of such payment from Owner, for that portion of the Work or for supplies, provided that Owner is making payments to Contractor in accordance with this agreement;

d.  rejected or defective work not corrected in a timely fashion; and

e.  reasonable evidence of delay in performance of the Work such that the Work will not be completed by the Final Completion Date.

8.4     **Substantiation of Costs.** Contractor shall support its payment applications with relevant documentation to allow Owner to verify the costs incurred and expended by Contractor. The documentation may include time sheets, receipts, and invoices.

8.5     **Lien Releases.** With each payment application, Contractor shall submit properly executed waivers and releases from subcontractors, suppliers and vendors, and those persons or entities who have served a preliminary notice on Owner or Contractor.

8.6     **Retainage.** Each payment application will reflect 5% retainage of the amounts to be paid, except that no retainage applies to (i) the Fee, (ii) premiums paid by Contractor for insurance and bonds (if bonds are required), or (iii) amounts approved for payment to Contractor for the Cost of the Work (exclusive of amounts to be paid to subcontractors). All retainage must be paid as part of the final payment to Contractor. If, at any time after 50% of the Work has been completed, the Contractor is making satisfactory progress, 5% retainage will no longer be withheld and progress payments will be made in full.

8.7     **Prompt Payment.** The Owner shall make all progress payments to Contractor within 15 days after Owner receives a proper payment application.

8.8     **Delayed Payment.** If for any reason not the fault of Contractor, Contractor does not receive a progress payment from Owner within 5 days after the time that payment is due, Contractor, upon giving 10 days' written

Page 6 of 13



notice to Owner, and without prejudice to and in addition to any other legal remedies, may stop Work until payment of the full amount owing to Contractor has been received, including interest for late payment.

8.9 **Late Payment.** Payments due but unpaid will bear interest from the date payment is due at the rate of 10 percent per annum.

8.10 **Substantial Completion Payment.** When in the Contractor's judgment substantial completion of the Work or a designated portion has been achieved, Contractor shall notify Owner and establish the substantial completion date. In this agreement, "**substantial completion**" means that stage when the Work (or designated portion of the Work) is sufficiently complete in accordance with the Contract Documents so that Owner may occupy or utilize the Project, or a designated portion, for its intended use. A certificate of occupancy is not a prerequisite for substantial completion if the certificate of occupancy cannot be obtained due to factors beyond Contractor's control. Payment by Owner upon substantial completion will be in consideration of Contractor's agreement to complete all final punch list Items. Owner may retain no more than 150% of the costs estimated by Owner and Contractor necessary to complete any punch list Items. Thereafter, Owner shall pay to the Contractor the amounts retained for the punch list items to the extent that each item is completed by Contractor and accepted by Owner.

8.11 **Final Payment.** When in the Contractor's judgment final completion has been achieved, Contractor shall submit a final payment application. In this agreement, "**final completion**" means that stage when the Owner determines that the Work has been properly completed in accordance with the Contract Documents, including completion of punch list items and the submittal to Owner of all closeout documentation required by the Contract Documents. Owner shall make final payment to Contractor within 15 days after Contractor has submitted a complete and accurate payment application and has submitted to Owner all closeout documentation required by the Contract Documents. In this agreement, "**final payment**" means the payment to Contractor of all amounts due and remaining to be paid to Contractor under the Contract Documents, including any retainage. Final payment will not relieve the Contractor of any warranty obligations required under the Contract Documents.

8.12 **Waiver of Claims.** Claims not reserved by Owner in writing with the making of final payment are waived except for claims relating to liens or similar encumbrances, warranties, and latent defects. Claims not reserved by Contractor in writing in accepting final payment are waived.

9.0 **Schedule, Delays and Liquidated Damages.**

9.1 Contractor shall promptly start the Work on June 2019 ("**Commencement Date**") and complete all Work in accordance with the Contract Documents no later than December 2020, pending final drawings ("**Final Completion Date**").

9.2 **Time is of the Essence.** Time is of the essence for both parties with regard to the obligations of this agreement and Contract Documents.

9.3 Contractor shall achieve substantial completion of the Work in TBD working days from the Commencement Date and achieve final completion within TBD after the date of substantial completion. Both deadlines are subject to adjustments as provided for in the Contract Documents.

9.4 **Schedule.** Before submitting its first payment application for payment, Contractor shall submit to Owner a schedule showing the dates on which Contractor plans to begin and complete various parts of the Work, including dates on which information and approvals are required from Owner. Unless otherwise agreed, the schedule must (i) provide a graphic representation of all activities and events and (ii) identify dates that are critical to ensure timely completion of the Work. Contractor shall update the schedule monthly, or as mutually agreed by the parties.

9.5 **Delays and Time Extensions.** If Contractor is delayed by any cause beyond the Contractor's control, the Contractor will be entitled to a time extension. These causes include but are not limited to the following: (a) acts or omissions of Owner, the Owner's agents, consultants, designers, and the architect-engineer; (b) changes in the Work or the sequencing of the Work ordered by Owner, or arising from the Owner's decisions that impact the time of performance; (c) encountering Hazardous Materials, or concealed or unknown conditions; (d) transportation delays not reasonably foreseeable; (e) labor disputes; (f) fire; (g) terrorism; (h) adverse governmental actions; (i) acts of God; (j) adverse weather conditions not reasonably anticipated; (k) utility disruptions or outages; (l) long lead times; (m) material and equipment damaged during transportation and delivery to the Project; (n) unexcused delays in payment. If

Version 1.0 — 28 June 2018

EXHIBIT A - 000122



delays to the Work are encountered, Contractor shall provide prompt written notice to Owner of the cause after Contractor first recognizes the delay. The parties shall take reasonable steps to mitigate the effect of such delays. In addition, If Contractor incurs additional costs as a result of a delay caused by the circumstances noted above, Contractor will be entitled to an equitable adjustment in compensation.

10.0 **Changes.** Without invalidating or breaching this agreement, Owner may order changes within the general scope of the Work. Such changes will be binding on Contractor only if in writing, and Contractor has no obligation to proceed or perform any changed work until such writing is received. The cost of changed work will be computed based on the Cost of the Work (as defined in section 7.0, above) plus markups computed as follows:

a. 6% for overhead and 7% for profit of the Cost of the Work performed by Contractor using its own forces;

11.0 **Warranty.** Contractor warrants that all materials and equipment will be new unless otherwise specified, of good quality, in conformance with the Contract Documents, and free from defective workmanship and materials for one year after the date of substantial completion. Contractor further warrants that the Work will be free from material defects not intrinsic in the design or materials required in the Contract Documents. This warranty does not include remedies for defects or damages caused by normal wear and tear during normal usage, use for a purpose for which the Work or Project was not intended, improper or insufficient maintenance, modifications performed by Owner or others retained by Owner, or abuse. If during the one-year warranty period any portion of the Work is found to be defective work, Owner shall promptly notify Contractor in writing. Unless Owner provides written acceptance of the condition, Contractor shall promptly correct the defective work at its own cost and time.

12.0 **Indemnity.**

12.1 To the fullest extent permitted by law, Contractor shall indemnify, defend, and hold harmless Owner, Owner's officers, directors, members, agents, and employees (but not the Owner's architect-engineer) ("**Owner Indemnitees**") from all third-party claims for bodily injury and property damage, other than to the Work itself and other property insured under section 13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of the Work but only to the extent caused by the negligent or intentional wrongful acts or omissions of Contractor, subcontractors, suppliers, or anyone employed directly or indirectly by any of them or by anyone for whose acts any of them may be liable. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of an Owner Indemnitee. Contractor will be entitled to reimbursement of any defense costs paid above Contractor's percentage of liability for the underlying claim.

12.2 To the fullest extent permitted by law, Owner shall indemnify, defend, and hold harmless Contractor, its officers, directors, or members, agents, and employees ("**Contractor Indemnitees**") from all third-party claims for bodily injury and property damage, other than property insured under section13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of work by Owner, Owner's architect-engineer, or others retained by Owner, but only to the extent caused by the negligent or intentionally wrongful acts or omissions of Owner, Owner's architect-engineer, or others retained by Owner. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of a Contractor Indemnitee. Owner will be entitled to reimbursement of any defense costs paid above Owner's percentage of liability for the underlying claim.

12.3 These indemnification obligations will not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable under workers' compensation acts, disability benefit acts, or other insurance.

13.0 **Insurance.**

13.1 **Contractor's Insurance.** Before starting Work, Contractor shall procure and maintain in force all insurance set forth in Exhibit F. Commercial General Liability Insurance may be obtained under a single policy for the full limits required or by a combination of underlying policies with the balance provided by an excess or umbrella policy. The insurance policies must contain a provision that coverages under the policies will not be cancelled or expire until at least 30 days' written notice has been given to Owner and must include either a liability endorsement covering this agreement or an endorsement making the Owner an additional insured under the policies. Certificates of insurance showing such coverages to be in force must be filed with the Owner prior to commencement of the Work.

Version 1.0 – 28 June 2018

EXHIBIT A - 000123



13.2     **Owner's Insurance.** Owner shall purchase and maintain its own liability insurance, and at the Owner's option, may purchase and maintain such additional insurance to protect the Owner against claims losses, or damages that may arise from the Project. Owner shall name Contractor as an additional insured in any insurance policy obtained by the Owner for the Project.

13.3     **Waivers of Subrogation.** The Owner and Contractor hereby waive all rights against each other and against the Owner's architect-engineer, and other consultants, subcontractors, suppliers, agents and employees of the other for damages during construction covered by any property insurance as set forth in the Contract Documents.

14.0     **Limited Mutual Waiver of Consequential Damages.** Except for losses covered by insurance required by the Contract Documents, the parties waive all claims against each other for any consequential damages that may arise out of or relate to this agreement. The provisions of this section apply to the termination of this agreement and survive such termination.

14.1     Owner waives damages for loss of use of the Project, any rental expenses incurred, loss of income, profit, or financing related to the Project, loss of business, loss of financing, loss of profits not related to this Project, loss of reputation, and insolvency.

14.2     Contractor waives damages for loss of business, loss of financing, loss of profits not related to this Project, loss of bonding capacity, loss of reputation, and insolvency.

15.0     **Dispute Resolution.**

15.1     **Executive Discussions.** As a condition to and before resorting to mediation and binding arbitration, the parties must attempt in good faith to resolve any dispute promptly by negotiation between executives who have settlement authority.

15.2     If the dispute remains unresolved after executive discussions, the parties shall proceed to mediation using JAMS, or another provider as they may otherwise mutually agree, and shall conclude such mediation within 45 calendar days of the matter being first discussed. The parties will equally share the costs of the mediation.

15.3     If the dispute remains unresolved after mediation, the dispute must proceed to binding arbitration under JAMS (or other provider as the parties may mutually agree), per its Engineering and Construction Arbitration Rules & Procedures, or if the parties agree otherwise, to the Engineering and Construction Arbitration Rules & Procedures for Expedited Arbitration. Either party may initiate arbitration with respect to the matters submitted by filing a written demand for arbitration. The Project location shall serve as the venue. The arbitration award will be final. Judgment on the award may be entered in any court having jurisdiction. This paragraph does not preclude nor otherwise limit the parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

15.4     Neither party may commence arbitration if the claim or cause of action would be barred by the applicable statute of limitations had the claim or cause of action been filed in a state or federal court. Receipt of a demand for arbitration by the person or entity administering the arbitration will constitute the commencement of legal proceedings for the purposes of determining whether a claim or cause of action is barred by the applicable statute of limitations. If, however, a state or federal court exercising jurisdiction over a timely filed claim or cause of action orders that the claim or cause of action be submitted to arbitration, the arbitration proceeding will be deemed commenced as of the date the court action was filed, provided that the party asserting the claim or cause of action files its demand for arbitration with the person or entity administering the arbitration within 30 days after the entry of such order.

15.5     **Attorney Fees.** In any litigation or arbitration arising out of or related to this agreement, the prevailing party must be awarded costs and legal fees reasonably incurred.

16.0     **Suspension and Termination.**

16.1     **Termination by Contractor.** Upon 7 days' written notice to Owner, Contractor may terminate this agreement if the Work has been stopped for a continuous 30-day period through no fault of Contractor for any of the following reasons: (i) under court order or order of other governmental authorities having jurisdiction; or (ii) as a result of the declaration of a national emergency or other governmental act during which, through no act or fault of Contractor, materials are not available. In addition, upon 7 days' written notice to Owner, Contractor may terminate this agreement if Owner does any of the following: (i) fails to furnish reasonable evidence that sufficient funds are available

Version 1.0 — 28 June 2018

EXHIBIT A - 000124



and committed for the entire cost of the Project; (ii) fails to pay Contractor in accordance with this agreement and Contractor has stopped Work in compliance with this agreement; or (iii) otherwise materially breaches this agreement. Upon termination by Contractor, Contractor will be entitled to recover from Owner payment for all Work executed and for any proven loss, cost, or expense in connection with the Work, including all demobilization costs plus a proportionate share of the Fee.

16.2    **Suspension by Owner.** The Owner may order the Contractor in writing to suspend all or any part of the Work for the Owner's convenience or for stoppage beyond the control of the Owner or Contractor. If the performance of all or any part of the Work is suspended, the Contractor will be entitled to an equitable adjustment, and this agreement will be modified in writing accordingly.

16.3    **Termination for Owner's Convenience.** The Owner on 21 days' written notice may terminate this agreement, in whole or in part, when it is in the Owner's interest. If this agreement is terminated, the Owner shall pay the Contractor: (i) for the Work performed to date, including a proportionate share of the Fee; (ii) for all demobilization costs and costs incurred resulting from termination; including remaining subcontractor invoices (iii) reasonable attorneys' fees and costs related to termination; and (d) a termination fee of $150,000.00

16.4    **Notice to Cure and Default Termination.** (a) If Contractor persistently fails to supply enough qualified workers, proper materials, or equipment to maintain the approved schedule, or persistently fails to make payment to its workers, subcontractors, or suppliers when such payment is due, or willfully disregards law or orders of any public authority having jurisdiction, or is otherwise guilty of a material breach of a provision of this agreement, Contractor may be deemed in default. If Contractor fails to commence and to continue satisfactory correction of such default with diligence and promptness within 10 days after written notification by Owner to cure, then Owner, without prejudice to any other rights or remedies, may either: (i) take reasonable steps it deems necessary to correct the deficiencies and charge the cost to Contractor, who will be liable for such payments; or (ii) terminate this agreement by written notice absent appropriate corrective action. Owner shall make reasonable efforts to mitigate damages arising from Contractor default and shall promptly invoice Contractor for all amounts due.

(b)  After receipt of a termination notice, and except as directed by the Owner, the Contractor shall: (i) stop work as specified in the notice and demobilize the site; (ii) place no further subcontracts or orders, except as necessary to complete the continued portion of the Work; (iii) terminate all subcontracts to the extent they relate to the work terminated; (iv) assign to the Owner, as directed by Owner, all right, title, and interest of the Contractor under the subcontracts terminated; (v) complete performance of the Work not terminated; and (vi) take action necessary to protect and preserve the Work.

(c)  After termination, the Contractor shall submit promptly a final termination settlement proposal to the Owner. If the Contractor fails to submit the proposal, the Owner may determine, on the basis of information available, the amount, if any, due the Contractor because of the termination and shall pay the amount determined.

(d)  Subject to paragraph (c) of this clause, the Contractor and Owner may agree on the whole or any part of the amount to be paid (including an allowance for Fee) because of the termination. This agreement will be amended, and the Contractor paid the agreed amount. If the Contractor and Owner fail to agree in whole or in part on the amount to be paid because of the termination, the parties agree to submit the matter to mediation, and if not resolved in mediation, the matter will be submitted for binding arbitration per section 15.0.

(e)  If, after termination of the Contractor for default, it is determined by a court of competent jurisdiction or arbitrator that the Contractor was not in default, or that the delay was excusable, the rights, obligations, and remedies of the parties will be the same as if the termination had been issued for the Owner's convenience.

16.5    **Obligations Arising Before Termination.** Even after termination, the provisions of this agreement will apply to any Work performed, payments made, events occurring, costs charged or incurred, or obligations arising before the termination date.

17.0    **Miscellaneous.**

17.1    **Entire Agreement.** This agreement represents the entire agreement between Owner and Contractor and supersedes any prior written or oral agreements, understandings, and representations made or dated before the date of this agreement. This agreement may be amended only by a written amendment signed by the parties.

Version 1.0 — 28 June 2018

EXHIBIT A - 000125



17.2 **Joint Drafting.** The parties hereby agree that this agreement was jointly drafted and that each had the opportunity to negotiate terms and to obtain assistance of counsel in reviewing terms prior to execution. This agreement will be construed in a neutral manner and neither against nor in favor of either party.

17.3 **No Third-Party Beneficiary.** This agreement and the obligations of the parties are intended for the sole benefit of the parties and do not create any rights in any other person or entity whatsoever, except the Owner and Contractor.

17.4 **Governing Law.** This agreement is governed by California law, or if outside California where the Project is located.

17.5 **Severability.** If any provision in this agreement is determined to be invalid, unenforceable or void, the remainder of the agreement will be fully binding with the same force and effect as though the invalid, unenforceable or void provision had been omitted.

17.6 **Photographs and Marketing.** Contractor may (a) make or issue any public announcement or statement with respect to the Work or the Project, (b) supply to the press or other news media any information, photographs, or data related to the Work or the Project, or (c) use images of the Work and Project in any Contractor materials, including without limitation, advertisements, websites, calendars, brochures or presentations with written approval from Owner; except that Contractor shall be prohibited from using Owner's name, trademark, or logo without Owner's prior written consent.

17.7 **Written Testimonial.** If the Work and Contractor's performance is satisfactory to the Owner, Owner agrees to provide Contractor with a written positive endorsement or testimonial that Contractor may use in its advertising, marketing, and promotional materials.

17.8 **Signage.** Contractor may erect signage at the site indicating its role on the Project and may maintain such signage until Final Acceptance or for a longer period as mutually agreed by the parties.

18.0 **List of Contract Documents.** The Contract Documents in existence at the time of the parties signing this agreement are as follows:

18.1 Exhibit A, Index of Plans and Specifications furnished by Owner.

18.2 Exhibit B, List of Exclusions and Assumptions and Qualifications.

18.3 Exhibit C, Estimated Budget.

18.4 Exhibit D, Schedule of the Work.

18.5 Exhibit E, List of Contractor Personnel and Hourly Rates.

18.6 Exhibit F, Contractor's Insurance.

18.7 Exhibit G, Sample Insurance Certificate.

18.8 Exhibit H, Form, Change Order.

18.9 Exhibit J, Form, Application and Certificate for Payment.

18.10 Exhibit K, Form, Schedule of Values.

18.11 Exhibit L, Form, Subcontractor Approval

*Signatures Follow on Next Page*

Version 1.0 — 28 June 2018

EXHIBIT A - 000126



The parties are signing this agreement on the date stated in the introductory clause.

FERRANTE KOBERLING CONSTRUCTION, INC.

Signed: *Michael Ferrante*

Print Name: Michael Ferrante

Title: President and CEO

JOHN REED FITNESS LA, LLC

Signed: ~~~~~~~

Print Name: Sebastian Schoepe

Title: President

OWNER'S FORMAL NAME IN UPPER CASE

Signed: _____

Print Name: _____

Title: _____

Version 1.0 — 28 June 2018

EXHIBIT A - 000127



EXHIBIT A - 000128

# EXHIBIT "C"



## COST PLUS AGREEMENT BETWEEN OWNER AND CONTRACTOR

| | |
|---|---|
| Owner: 960 N La Brea, LLC | Contractor: Ferrante Koberling Construction, Inc. |
| Address: 925 N La Brea Ave, 4th Floor | 4700 W. Jefferson Blvd. #103 |
| City, State, Zip: 925 N La Brea Ave, 4th Floor | Los Angeles, CA  90016 |
| Contact: Sebastian Schoepe | Tax ID No: 46-3955278 |
| Phone: (424) 387-5709 | CA License No. 988562 |
| E-mail: schoepe@1upfitness.com | Contact: Michael Ferrante |
| Tax ID No: | Phone: (323) 933-3203 |
| | Email: mferrante@ferrantekoberling.com |

| | |
|---|---|
| Project: 960 N La Brea | Architect: Gruen Architects |
| Project Address: 960 N La Brea Ave | Address: 6330 S Vicente Blvd #200 |
| City, State, Zip: Los Angeles, CA 90038 | City, State, Zip: Los Angeles, CA 90048 |

This Agreement Between Owner and Contractor is dated July 2nd, 2018 and is between FERRANTE KOBERLING CONSTRUCTION, INC., a California corporation ("**Contractor**"), 960 N LA BREA, LLC, a Delaware limited liability corporation ("**960 N La Brea**"), and 1UP FITNESS GROUP NORTH AMERICA LP, a Delaware limited partnership, and affiliated companies  ("**1UP Fitness**," and together with **960 N La Brea**, and affiliated companies are the "**Owner**")

### Recitals

A.   Owner is leasing and building out approximately 66,250 SF of commercial space ("**Commercial Work**") as a Fitness Club, Office and Restaurant in the building located at 960 N. La Brea Ave., Los Angeles, CA 90016 ("**Project**").

B.   Contractor is experienced, qualified, and staffed to perform this Commercial Work.

C.   Owner and Contractor have reached an agreement for Contractor to perform the Commercial Work and desire to set forth their respective rights, responsibilities, terms, conditions, and compensation to be paid to Contractor.

Owner and Contractor therefore agree as follows:

1.0      **Contract Documents.** The Contract Documents consist of the following: (i) this agreement; (ii) written modifications to this agreement signed by both parties; and (iii) those documents listed under section 19.0. The Contract Documents are complementary and cumulative and what is called for by one shall be as binding as if called for by all. In case of conflicts between the drawings and specifications, the specifications will govern. In case of omissions, errors, or inconsistency among the Contract Documents, the Contractor shall immediately submit the matter to Owner for clarification. Owner's clarifications are final and binding, subject to an equitable adjustment in the compensation, the Contractor's time for performance, or both, or to dispute mitigation and resolution.

2.0      **The Relationship Between the Parties.** The parties hereby agree to proceed on the basis of mutual trust, good faith, and fair dealing. Each party shall perform its obligations with integrity and shall avoid any conflicts of interest.

3.0      **Work.** Contractor shall perform the Work in a workmanlike and expeditious manner consistent with the Contract Documents. Contractor shall provide all labor, materials, equipment, and services necessary to complete the Work in accord with the Contract Documents and Exhibits C and K, "Estimated Budget" and "Schedule of the Work," respectively.

4.0      **Compensation, Cost Plus Fee.** Owner shall compensate Contractor for Work performed as follows:

4.1      The Cost of the Work as set forth in section 7.0, plus 6 percent for overhead and 7 percent for profit (the overhead and profit markups constitute the "**Fee**"). The Fee will be paid in proportion to the Work performed.

Version 1.0 — 28 June 2018

EXHIBIT A - 000130



4.2     The Estimated Budget to complete the Work is $12,000,000.00 as set forth in Exhibit C. The Estimated Budget is not a guaranteed maximum price for the Cost of the Work or Fee. If Contractor becomes aware that the Estimated Budget will be exceeded, Contractor must promptly notify Owner in writing before performing the Work in excess of the Estimated Budget. This notice may include the Contractor's estimate of the additional costs necessary to complete the Work. The Contractor may stop work and is under no obligation to proceed with the Work in excess of the Estimated Budget until Owner authorizes Contractor in writing to proceed. Contractor is not liable for any delay in receiving this authorization.

5.0     **Owner Responsibilities.** Owner shall provide any information and services at Owner's expense and when required for the successful and expeditious completion of the Work.

5.1     As a condition to Contractor starting the Work, Owner shall provide Contractor with reasonable evidence of sufficient and available funds to satisfy all of Owner's obligations under this agreement. In the case of Project financing, such evidence must include the name and address of any construction lender and a copy of the loan commitment and loan disbursement agreement between Owner and Owner's lenders relating to the provision and disbursement of funds to Owner for its obligations under this agreement, except information deemed proprietary or confidential by Owner or Owner's lenders. During performance of the Work, Owner shall notify Contractor in writing Contractor of any material change in Project financing.

5.2     Owner shall provide Contractor with information describing the physical characteristics of the Project, including surveys, site evaluations, legal descriptions, data, or drawings depicting existing conditions, subsurface, and environmental studies, reports, investigations, tests, inspections, and other reports dealing with environmental matters, hazardous material and other existing conditions, including structural, mechanical, and chemical tests required by the Contract Documents or by law.

5.3     Owner shall provide Contractor with any other information or services requested by Contractor that Contractor claims is relevant to its performance of the Work and under Owner's control.

5.4     Within 7 days of this agreement being signed by the parties, Owner shall provide Contractor with the information necessary to give notice of or enforce mechanics' lien rights. This information must include Owner's interest in the real property on which the Project is located and the record legal title, and the name and address of the record fee owner if not the Owner. In this agreement, "**days**" means calendar days unless otherwise noted.

5.5     Owner shall secure and pay for all permits, approvals, easements, assessments, and fees required in connection with the Work.

5.6     Owner shall designate an Owner's authorized representative ("**OAR**") to provide approvals and directives necessary for the day-to-day administration of this agreement, the Work, and the Project. Owner shall designate the limits of any authority delegated to the OAR with respect to the following: executing any contract, contract modification, or other form of binding agreement; obligating the Owner in any manner to the payment of money; rendering any final decision on any contract matter, claim or dispute, terminating, suspending, or otherwise interfering with the Contractor's performance, directing any changes in the Contract Documents or in the Contractor's performance that is inconsistent with the Contract Documents. Owner and OAR shall be prohibited from communicating in any manner with Contractor's subcontractors. All communications from Owner and OAR regarding the Project must be with Contractor's designated representative.

5.7     Owner shall provide Contractor with complete and unfettered access to the site and area(s) of the Work.

5.8     Owner shall timely make payments to Contractor in accordance with this agreement.

5.9     Unless otherwise noted on the drawings and specifications, Owner shall be prohibited from performing work at the Project using its own forces or separate contractors without the Contractor's prior written consent.

5.10    Owner shall pay for all copies of the drawings and specifications as necessary for the Contractor to prosecute the Work. If the reproduction costs are paid by Contractor, Owner must reimburse Contractor the actual amount paid plus 10%.

5.11    Unless otherwise provided in the Contract Documents, Owner shall pay for all fees related to utilities and other facilities and services necessary for the Project, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work. In addition, unless otherwise provided in the Contract Documents, Owner shall

EXHIBIT A - 000131



be responsible for all necessary upgrades to any existing building systems and utilities. "**Utilities**" includes electric, gas, water, sewer and waste, storm drain, Internet, TV, and phone.

     5.12    **Joint and Several.** The obligations and liabilities of the Owner under this agreement are joint and several.

    6.0    **Contractor Responsibilities.**

     6.1    Contractor shall supervise and coordinate the Work, including the construction means, methods, techniques, sequences, and procedures utilized, unless the Owner or Contract Documents provide other specific instructions.

     6.2    **Subcontractors.** Contractor and all subcontractors shall at all times during the Work be duly licensed by the CSLB (or by the jurisdiction where the Work will be performed). In this agreement, "**subcontractors**" means any person or entity who has a contract with or is engaged by Contractor, or with any other subcontractor, at any tier. To the extent practicable, Contractor shall enter into written subcontracts where compensation is based on a lump-sum price. The lump-sum price is subject to approval by Owner. As a condition to Contractor entering any subcontract, Owner must indicate its approval of the lump-sum price (and any other important terms and conditions) by signing the "Subcontract Approval Form" in the form attached as Exhibit L.

     6.3    Except for permits that are the Owner's responsibility, Contractor shall apply for and obtain all necessary building permits pertaining to the Work. Owner shall immediately reimburse Contractor for any permit fees paid for or advanced by Contractor at actual cost plus 10%.

     6.4    Contractor has investigated the site, the visible conditions affecting the site and the Work, and the Contract Documents.

     6.5    Contractor shall comply with all applicable codes, laws, ordinances, and regulations affecting its performance and the Work. Contractor will be liable to Owner for all loss, cost, or expense, attributable to any acts or omissions by Contractor, its employees, subcontractors, suppliers, and agents in failing to comply with laws, including fines, penalties, or corrective measures. Contractor shall pay all applicable taxes for the Work provided by Contractor. The estimated Cost of the Work and Fee will be equitably adjusted for laws, taxes, duties, and tariffs that impact cost or time that are enacted after the date of this agreement or after bids are received or negotiations concluded.

     6.6    Contractor shall provide and maintain competent personnel to supervise and direct the Work and shall enforce strict discipline and good order among those carrying out the Work. Contractor shall prohibit the use of alcoholic beverages, drugs and other dangerous substances, and the playing of radios, music, or other broadcasting devices at the site that constitute a danger to life, health, or property. Contractor shall prohibit the wearing of any work clothes and attire displaying offensive logos, insignia, graphics, words, phrases, or symbols.

     6.7    Contractor shall take precautions to properly protect and preserve (i) the materials, supplies, and equipment to be incorporated into the Work and (ii) the Work itself from damage until the Work is accepted by Owner. If the Owner causes damage to the Work, the Owner shall promptly remedy that damage at its sole expense.

     6.8    Contractor shall maintain and supervise all safety precautions and programs, and shall comply with all applicable laws, ordinances, and regulations of any federal, state or local authorities, including OSHA and Cal/OSHA, for the safety of persons or property. Contractor shall conduct routine inspections of equipment and site conditions as necessary to ensure compliance with its safety programs and standards. At all times during working hours at the site, Contractor shall require and ensure the use of personal protective equipment by all workers on the site.

     6.9    Contractor shall be responsible for the proper delivery, handling, application, storage, removal, and disposal of all materials and substances brought to the site by Contractor in accordance with the Contract Documents and used or consumed in the performance of the Work.

     6.10    A "**Hazardous Material**" is any substance or material identified now or in the future as hazardous under any federal, state, or local law or regulation, or any other substance or material which may be considered hazardous or otherwise subject to statutory or regulatory requirement governing handling, disposal, or clean-up. Contractor shall not start or continue work until any Hazardous Material discovered at the site has been removed, or rendered or determined to be harmless by Owner as certified by an independent testing laboratory and approved by the appropriate

Version 1.0 — 28 June 2018

EXHIBIT A - 000132



government agency. If Contractor incurs additional costs or is delayed due to the presence or remediation of Hazardous Material, Contractor shall be entitled to an equitable adjustment.

6.11    **Submittals.** Contractor shall submit to Owner for review and approval all shop drawings, samples, product data, and similar submittals required by the Contract Documents. Submittals may be submitted in electronic form. Contractor will be responsible to Owner for the accuracy and conformity of its submittals to the Contract Documents. Contractor shall prepare and deliver its submittals to Owner in a manner consistent with the Contractor's schedule and in such time and sequence so as not to delay the performance of the Work or the work of Owner and others retained by Owner. Contractor shall identify in writing for each submittal all changes, deviations, or substitutions from the requirements of the Contract Documents. Owner's approval of a submittal does not authorize deviations, substitutions, or changes in the requirements of the Contract Documents unless Owner specifically authorizes such deviation, substitution, or change. Owner shall review and approve submittals with promptness to avoid causing delay. Contractor shall perform all Work in accordance with approved submittals. Owner's approval does not relieve Contractor from responsibility for defective work resulting from errors or omissions of any kind on the approved shop drawings. In this agreement, "**defective work**" means work found to be not in conformance with the Contract Documents.

6.12    Contractor shall perform cutting, fitting, and patching necessary to coordinate the various parts of the Work and to prepare its Work for the work of Owner or others retained by Owner.

6.13    Contractor shall regularly remove debris and waste materials at the site resulting from the Work. Contractor shall minimize and confine dust and debris resulting from construction activities. At the completion of the Work, Contractor shall remove from the site all construction equipment, tools, surplus materials, waste materials, and debris.

6.14    **Differing Site Conditions.** The Contractor shall promptly, and before the conditions are disturbed, give written notice to Owner of: (i) subsurface or latent physical conditions at the site which differ materially from those indicated in the Contract Documents; or (ii) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract Documents. The Owner shall investigate the conditions promptly after receiving notice. If the conditions do materially differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the Work, an equitable adjustment will be made and this agreement modified in writing accordingly.

7.0    **Cost of the Work.** Owner shall pay Contractor for the Cost of the Work as defined in this section and the Fee stipulated in section 4.0. The Cost of the Work includes:

7.1    **Key Personnel.** Amounts paid by Contractor to those employees (excluding craft labor) identified in Exhibit E and at the stated billable hourly rates. Those hourly rates include the base hourly wage, payroll taxes, employee benefits, and workers' compensation insurance but not profit (fee), general administrative, and overhead costs.

7.2    **Contractor's Craft Labor.** Wages actually paid for Contractor's craft labor directly employed by Contractor in performing the Work;

7.3    **Employee Taxes and Burdens.** Cost of all employee benefits and taxes including but not limited to workers' compensation, unemployment compensation, social security, health, welfare, retirement, and other fringe benefits as required by law, labor agreements, or paid under Contractor's personnel policy, insofar as such costs are paid to employees of Contractor as part of the Cost of the Work;

7.4    **Subcontractor and Vendor Costs.** Costs paid by Contractor to its subcontractors and vendors for Work performed pursuant to subcontracts and purchase orders.

7.5    **Materials and Equipment.** Cost of all materials, supplies, and equipment incorporated in the Work, including costs of inspection and testing (if not provided by Owner), transportation, storage, and handling;

7.6    **Materials and Equipment Consumed at the Site.** Cost, including transportation and maintenance, of all materials, supplies, equipment, temporary facilities, and hand tools not owned by the workers that are used or consumed in the performance of the Work, less salvage value or residual value; and cost less salvage value on such items used, but not consumed, that remain the Contractor's property;

EXHIBIT A - 000133



7.7     **Rental Charges.** Actual rental charges of all necessary machinery and equipment, exclusive of hand tools owned by workers, used at the site, whether rented from Contractor or others, including installation, repair and replacement, dismantling, removal, maintenance, transportation, and delivery costs;

7.8     **Insurance and Bonds Premiums.** Cost of the premiums for all insurance and surety bonds which Contractor is required to procure or deems necessary, and approved by Owner, including any additional premium incurred as a result of any increase in the Cost of the Work;

7.9     **Sales and Use Taxes.** Sales, use, gross receipts, or other taxes, tariffs, or duties related to the Work for which Contractor is liable;

7.10    **Permits and Fees.** Permits, fees, licenses, tests, and royalties, except if paid by Owner;

7.11    **Course of Construction Repairs.** Actual and reasonable costs paid by Contractor in repairing minor damage to trade Work caused as a normal by-product during the course of construction and not attributable to the fault of Contractor, any subcontractor or vendor or not covered by insurance;

7.12    **Site Office.** Costs associated with establishing, equipping, operating, maintaining, and demobilizing the field office;

7.13    **Utilities.** Water, power, and fuel costs necessary for the Work;

7.14    **Clean-up and Disposal.** Cost of cleaning up, removing, and legally disposing all non-hazardous substances, debris, and waste materials;

7.15    **Emergencies.** Costs to respond to an emergency affecting the safety of persons and property, provided the cost is not the result of any act or omission of Contractor, subcontractor, vendor, or any party for whom any of them are responsible or liable at law or under the Contract Documents;

7.16    **Site Security.** Costs for site security services required for protection of the Work;

7.17    **Reproduction and Graphics.** Costs for blueprinting and reproduction of the plans and specifications, and for required postage, express mail, and long-distance costs in the performance of the Work;

7.18    **Legal.** Legal, mediation, and arbitration fees and costs reasonably and properly resulting from Contractor's performance of the Work, except those arising from disputes between the parties; and

7.19    **Miscellaneous.** Costs directly incurred in performing the Work or in connection with the Project that are not included in the Fee and that are reasonably inferable from the Contract Documents.

7.20    **Discounts.** All discounts for prompt payment shall accrue to Owner to the extent such payments are made directly by Owner. To the extent payments are made with funds of Contractor, all cash discounts accrue to Contractor. All trade discounts, rebates, and refunds, and all returns from sale of surplus materials and equipment (if any), shall be credited to the Cost of the Work.

7.21    **Contractor's Account Records.** Records of the Contractor's costs and expenditures must be maintained on the basis of generally accepted accounting practices and be available for inspection by the Owner or the Owner's designated agent at mutually convenient times for a period of 2 years after final payment.

8.0     **Payments.**

8.1     **Schedule of Values.** Per Exhibit K pending drawings within TBD working days after the parties sign this agreement, Contractor shall submit to Owner for approval an initial schedule of values allocating budgeted values among all categories or portions of the Work. The schedule of values must be prepared in such form and supported by data to substantiate its accuracy as Owner may reasonably require and must be based on the latest cost information available to Contractor. The Estimated Budget must be broken down is sufficient detail to facilitate continued evaluation of the Contractor's payment applications. The schedule of values must include separate line items for materials and equipment purchased or fabricated and stored either on-site or off-site and for the Fee. The Owner-accepted schedule of values must be used as the basis for the Contractor's applications for payments and revised for any modifications mutually agreed upon by the parties.

Version 1.0 — 28 June 2018

EXHIBIT A - 000134



8.2    **Progress Payments.** Contractor shall submit to Owner or another person or entity designated by Owner bi-weekly payment applications no later than the 15th and last day of the month. The payment application consists of the Cost of the Work performed up to the date stated in the payment application, along with a proportionate share of the Fee. Payment applications must include materials and equipment not yet incorporated into the Work but delivered to and suitably stored onsite or offsite, including applicable insurance, storage, and costs incurred transporting the materials to an offsite storage facility. Approval of payment for materials stored off-site is conditioned on the Contractor submitting bills of sale and applicable insurance or such other procedures satisfactory to Owner to establish Owner's title to such materials, or otherwise to protect Owner's interest, including transportation to the site.

8.3    **Adjustment of Contractor's Payment Application.** Owner may adjust or reject a payment application or nullify a previously approved payment application, in whole or in part, as may reasonably be necessary to protect Owner from loss or damage based on the circumstances listed below, but only to the extent that Contractor is responsible. As a condition to this right, the Owner must give written notice to Contractor no later than 7 days after receipt of a payment application specifying the reasons for the disapproval or nullification. When the reasons for disapproving or nullifying an application for payment are removed, Owner shall immediately pay the amounts previously withheld.

a.  Contractor's repeated failure to perform the Work as required by the Contract Documents;

b.  loss or damage for which Owner may be liable arising out of or relating to this agreement and caused by Contractor to Owner or to others retained by Owner to whom Owner may be liable;

c.  Contractor's failure to properly pay subcontractors or suppliers in connection with the Work following receipt of such payment from Owner, for that portion of the Work or for supplies, provided that Owner is making payments to Contractor in accordance with this agreement;

d.  rejected or defective work not corrected in a timely fashion; and

e.  reasonable evidence of delay in performance of the Work such that the Work will not be completed by the Final Completion Date.

8.4    **Substantiation of Costs.** Contractor shall support its payment applications with relevant documentation to allow Owner to verify the costs incurred and expended by Contractor. The documentation may include time sheets, receipts, and invoices.

8.5    **Lien Releases.** With each payment application, Contractor shall submit properly executed waivers and releases from subcontractors, suppliers and vendors, and those persons or entities who have served a preliminary notice on Owner or Contractor.

8.6    **Retainage.** Each payment application will reflect 5% retainage of the amounts to be paid, except that no retainage applies to (i) the Fee, (ii) premiums paid by Contractor for insurance and bonds (if bonds are required), or (iii) amounts approved for payment to Contractor for the Cost of the Work (exclusive of amounts to be paid to subcontractors). All retainage must be paid as part of the final payment to Contractor. If, at any time after 50% of the Work has been completed, the Contractor is making satisfactory progress, 5% retainage will no longer be withheld and progress payments will be made in full.

8.7    **Prompt Payment.** The Owner shall make all progress payments to Contractor within 15 days after Owner receives a proper payment application.

8.8    **Delayed Payment.** If for any reason not the fault of Contractor, Contractor does not receive a progress payment from Owner within 5 days after the time that payment is due, Contractor, upon giving 10 days' written notice to Owner, and without prejudice to and in addition to any other legal remedies, may stop Work until payment of the full amount owing to Contractor has been received, including interest for late payment.

8.9    **Late Payment.** Payments due but unpaid will bear interest from the date payment is due at the rate of 10 percent per annum.

8.10    **Substantial Completion Payment.** When in the Contractor's judgment substantial completion of the Work or a designated portion has been achieved, Contractor shall notify Owner and establish the substantial completion date. In this agreement, "**substantial completion**" means that stage when the Work (or designated portion of the

Version 1.0 — 28 June 2018

EXHIBIT A - 000135



Work) is sufficiently complete in accordance with the Contract Documents so that Owner may occupy or utilize the Project, or a designated portion, for its intended use. A certificate of occupancy is not a prerequisite for substantial completion if the certificate of occupancy cannot be obtained due to factors beyond Contractor's control. Payment by Owner upon substantial completion will be in consideration of Contractor's agreement to complete all final punch list Items. Owner may retain no more than 150% of the costs estimated by Owner and Contractor necessary to complete any punch list Items. Thereafter, Owner shall pay to the Contractor the amounts retained for the punch list items to the extent that each item is completed by Contractor and accepted by Owner.

8.11     **Final Payment.** When in the Contractor's judgment final completion has been achieved, Contractor shall submit a final payment application. In this agreement, "**final completion**" means that stage when the Owner determines that the Work has been properly completed in accordance with the Contract Documents, including completion of punch list items and the submittal to Owner of all closeout documentation required by the Contract Documents. Owner shall make final payment to Contractor within 15 days after Contractor has submitted a complete and accurate payment application and has submitted to Owner all closeout documentation required by the Contract Documents. In this agreement, "**final payment**" means the payment to Contractor of all amounts due and remaining to be paid to Contractor under the Contract Documents, including any retainage. Final payment will not relieve the Contractor of any warranty obligations required under the Contract Documents.

8.12     **Waiver of Claims.** Claims not reserved by Owner in writing with the making of final payment are waived except for claims relating to liens or similar encumbrances, warranties, and latent defects. Claims not reserved by Contractor in writing in accepting final payment are waived.

9.0     **Schedule, Delays and Liquidated Damages.**

9.1     Contractor shall promptly start the Work on July 1st, 2018 ("**Commencement Date**") and complete all Work in accordance with the Contract Documents no later than TBD, pending final drawings ("**Final Completion Date**").

9.2     **Time is of the Essence.** Time is of the essence for both parties with regard to the obligations of this agreement and Contract Documents.

9.3     Contractor shall achieve substantial completion of the Work in TBD working days from the Commencement Date and achieve final completion within TBD after the date of substantial completion. Both deadlines are subject to adjustments as provided for in the Contract Documents.

9.4     **Schedule.** Before submitting its first payment application for payment, Contractor shall submit to Owner a schedule showing the dates on which Contractor plans to begin and complete various parts of the Work, including dates on which information and approvals are required from Owner. Unless otherwise agreed, the schedule must (i) provide a graphic representation of all activities and events and (ii) identify dates that are critical to ensure timely completion of the Work. Contractor shall update the schedule monthly, or as mutually agreed by the parties.

9.5     **Delays and Time Extensions.** If Contractor is delayed by any cause beyond the Contractor's control, the Contractor will be entitled to a time extension. These causes include but are not limited to the following: (a) acts or omissions of Owner, the Owner's agents, consultants, designers, and the architect-engineer; (b) changes in the Work or the sequencing of the Work ordered by Owner, or arising from the Owner's decisions that impact the time of performance; (c) encountering Hazardous Materials, or concealed or unknown conditions; (d) transportation delays not reasonably foreseeable; (e) labor disputes; (f) fire; (g) terrorism; (h) adverse governmental actions; (i) acts of God; (j) adverse weather conditions not reasonably anticipated; (k) utility disruptions or outages; (l) long lead times; (m) material and equipment damaged during transportation and delivery to the Project; (n) unexcused delays in payment. If delays to the Work are encountered, Contractor shall provide prompt written notice to Owner of the cause after Contractor first recognizes the delay. The parties shall take reasonable steps to mitigate the effect of such delays. In addition, If Contractor incurs additional costs as a result of a delay caused by the circumstances noted above, Contractor will be entitled to an equitable adjustment in compensation.

10.0     **Changes.** Without invalidating or breaching this agreement, Owner may order changes within the general scope of the Work. Such changes will be binding on Contractor only if in writing, and Contractor has no obligation to proceed

Version 1.0 — 28 June 2018

EXHIBIT A - 000136



or perform any changed work until such writing is received. The cost of changed work will be computed based on the Cost of the Work (as defined in section 7.0, above) plus markups computed as follows:

a.  6% for overhead and 7% for profit of the Cost of the Work performed by Contractor using its own forces;

**11.0    Warranty.** Contractor warrants that all materials and equipment will be new unless otherwise specified, of good quality, in conformance with the Contract Documents, and free from defective workmanship and materials for one year after the date of substantial completion. Contractor further warrants that the Work will be free from material defects not intrinsic in the design or materials required in the Contract Documents. This warranty does not include remedies for defects or damages caused by normal wear and tear during normal usage, use for a purpose for which the Work or Project was not intended, improper or insufficient maintenance, modifications performed by Owner or others retained by Owner, or abuse. If during the one-year warranty period any portion of the Work is found to be defective work, Owner shall promptly notify Contractor in writing. Unless Owner provides written acceptance of the condition, Contractor shall promptly correct the defective work at its own cost and time.

**12.0    Indemnity.**

**12.1    To the fullest extent permitted by law, Contractor shall indemnify, defend, and hold harmless Owner, Owner's officers, directors, members, agents, and employees (but not the Owner's architect-engineer) ("Owner Indemnitees") from all third-party claims for bodily injury and property damage, other than to the Work itself and other property insured under section 13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of the Work but only to the extent caused by the negligent or intentional wrongful acts or omissions of Contractor, subcontractors, suppliers, or anyone employed directly or indirectly by any of them or by anyone for whose acts any of them may be liable. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of an Owner Indemnitee. Contractor will be entitled to reimbursement of any defense costs paid above Contractor's percentage of liability for the underlying claim.**

**12.2    To the fullest extent permitted by law, Owner shall indemnify, defend, and hold harmless Contractor, its officers, directors, or members, agents, and employees ("Contractor Indemnitees") from all third-party claims for bodily injury and property damage, other than property insured under section13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of work by Owner, Owner's architect-engineer, or others retained by Owner, but only to the extent caused by the negligent or intentionally wrongful acts or omissions of Owner, Owner's architect-engineer, or others retained by Owner. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of a Contractor Indemnitee. Owner will be entitled to reimbursement of any defense costs paid above Owner's percentage of liability for the underlying claim.**

12.3    These indemnification obligations will not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable under workers' compensation acts, disability benefit acts, or other insurance.

**13.0    Insurance.**

**13.1    Contractor's Insurance.** Before starting Work, Contractor shall procure and maintain in force all insurance set forth in Exhibit F. Commercial General Liability Insurance may be obtained under a single policy for the full limits required or by a combination of underlying policies with the balance provided by an excess or umbrella policy. The insurance policies must contain a provision that coverages under the policies will not be cancelled or expire until at least 30 days' written notice has been given to Owner and must include either a liability endorsement covering this agreement or an endorsement making the Owner an additional insured under the policies. Certificates of insurance showing such coverages to be in force must be filed with the Owner prior to commencement of the Work.

**13.2    Owner's Insurance.** Owner shall purchase and maintain its own liability insurance, and at the Owner's option, may purchase and maintain such additional insurance to protect the Owner against claims losses, or damages that may arise from the Project. Owner shall name Contractor as an additional insured in any insurance policy obtained by the Owner for the Project.

**13.3    Waivers of Subrogation.** The Owner and Contractor hereby waive all rights against each other and against the Owner's architect-engineer, and other consultants, subcontractors, suppliers, agents and employees of the other for damages during construction covered by any property insurance as set forth in the Contract Documents.

Version 1.0 — 28 June 2018

EXHIBIT A - 000137



14.0    **Limited Mutual Waiver of Consequential Damages.** Except for losses covered by insurance required by the Contract Documents, the parties waive all claims against each other for any consequential damages that may arise out of or relate to this agreement. The provisions of this section apply to the termination of this agreement and survive such termination.

14.1    Owner waives damages for loss of use of the Project, any rental expenses incurred, loss of income, profit, or financing related to the Project, loss of business, loss of financing, loss of profits not related to this Project, loss of reputation, and insolvency.

14.2    Contractor waives damages for loss of business, loss of financing, loss of profits not related to this Project, loss of bonding capacity, loss of reputation, and insolvency.

15.0    **Dispute Resolution.**

15.1    **Executive Discussions.** As a condition to and before resorting to mediation and binding arbitration, the parties must attempt in good faith to resolve any dispute promptly by negotiation between executives who have settlement authority.

15.2    If the dispute remains unresolved after executive discussions, the parties shall proceed to mediation using JAMS, or another provider as they may otherwise mutually agree, and shall conclude such mediation within 45 calendar days of the matter being first discussed. The parties will equally share the costs of the mediation.

15.3    If the dispute remains unresolved after mediation, the dispute must proceed to binding arbitration under JAMS (or other provider as the parties may mutually agree), per its Engineering and Construction Arbitration Rules & Procedures, or if the parties agree otherwise, to the Engineering and Construction Arbitration Rules & Procedures for Expedited Arbitration. Either party may initiate arbitration with respect to the matters submitted by filing a written demand for arbitration. The Project location shall serve as the venue. The arbitration award will be final. Judgment on the award may be entered in any court having jurisdiction. This paragraph does not preclude nor otherwise limit the parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

15.4    Neither party may commence arbitration if the claim or cause of action would be barred by the applicable statute of limitations had the claim or cause of action been filed in a state or federal court. Receipt of a demand for arbitration by the person or entity administering the arbitration will constitute the commencement of legal proceedings for the purposes of determining whether a claim or cause of action is barred by the applicable statute of limitations. If, however, a state or federal court exercising jurisdiction over a timely filed claim or cause of action orders that the claim or cause of action be submitted to arbitration, the arbitration proceeding will be deemed commenced as of the date the court action was filed, provided that the party asserting the claim or cause of action files its demand for arbitration with the person or entity administering the arbitration within 30 days after the entry of such order.

15.5    **Attorney Fees.** In any litigation or arbitration arising out of or related to this agreement, the prevailing party must be awarded costs and legal fees reasonably incurred.

16.0    **Suspension and Termination.**

16.1    **Termination by Contractor.** Upon 7 days' written notice to Owner, Contractor may terminate this agreement if the Work has been stopped for a continuous 30-day period through no fault of Contractor for any of the following reasons: (i) under court order or order of other governmental authorities having jurisdiction; or (ii) as a result of the declaration of a national emergency or other governmental act during which, through no act or fault of Contractor, materials are not available. In addition, upon 7 days' written notice to Owner, Contractor may terminate this agreement if Owner does any of the following: (i) fails to furnish reasonable evidence that sufficient funds are available and committed for the entire cost of the Project; (ii) fails to pay Contractor in accordance with this agreement and Contractor has stopped Work in compliance with this agreement; or (iii) otherwise materially breaches this agreement. Upon termination by Contractor, Contractor will be entitled to recover from Owner payment for all Work executed and for any proven loss, cost, or expense in connection with the Work, including all demobilization costs plus a proportionate share of the Fee.

16.2    **Suspension by Owner.** The Owner may order the Contractor in writing to suspend all or any part of the Work for the Owner's convenience or for stoppage beyond the control of the Owner or Contractor. If the

Version 1.0 — 28 June 2018

EXHIBIT A - 000138



performance of all or any part of the Work is suspended, the Contractor will be entitled to an equitable adjustment, and this agreement will be modified in writing accordingly.

16.3 **Termination for Owner's Convenience.** The Owner on 21 days' written notice may terminate this agreement, in whole or in part, when it is in the Owner's interest. If this agreement is terminated, the Owner shall pay the Contractor: (i) for the Work performed to date, including a proportionate share of the Fee; (ii) for all demobilization costs and costs incurred resulting from termination; including remaining subcontractor invoices (iii) reasonable attorneys' fees and costs related to termination; and (d) a termination fee of $350,000.00

16.4 **Notice to Cure and Default Termination.** (a) If Contractor persistently fails to supply enough qualified workers, proper materials, or equipment to maintain the approved schedule, or persistently fails to make payment to its workers, subcontractors, or suppliers when such payment is due, or willfully disregards law or orders of any public authority having jurisdiction, or is otherwise guilty of a material breach of a provision of this agreement, Contractor may be deemed in default. If Contractor fails to commence and to continue satisfactory correction of such default with diligence and promptness within 10 days after written notification by Owner to cure, then Owner, without prejudice to any other rights or remedies, may either: (i) take reasonable steps it deems necessary to correct the deficiencies and charge the cost to Contractor, who will be liable for such payments; or (ii) terminate this agreement by written notice absent appropriate corrective action. Owner shall make reasonable efforts to mitigate damages arising from Contractor default and shall promptly invoice Contractor for all amounts due.

(b) After receipt of a termination notice, and except as directed by the Owner, the Contractor shall: (i) stop work as specified in the notice and demobilize the site; (ii) place no further subcontracts or orders, except as necessary to complete the continued portion of the Work; (iii) terminate all subcontracts to the extent they relate to the work terminated; (iv) assign to the Owner, as directed by Owner, all right, title, and interest of the Contractor under the subcontracts terminated; (v) complete performance of the Work not terminated; and (vi) take action necessary to protect and preserve the Work.

(c) After termination, the Contractor shall submit promptly a final termination settlement proposal to the Owner. If the Contractor fails to submit the proposal, the Owner may determine, on the basis of information available, the amount, if any, due the Contractor because of the termination and shall pay the amount determined.

(d) Subject to paragraph (c) of this clause, the Contractor and Owner may agree on the whole or any part of the amount to be paid (including an allowance for Fee) because of the termination. This agreement will be amended, and the Contractor paid the agreed amount. If the Contractor and Owner fail to agree in whole or in part on the amount to be paid because of the termination, the parties agree to submit the matter to mediation, and if not resolved in mediation, the matter will be submitted for binding arbitration per section 15.0.

(e) If, after termination of the Contractor for default, it is determined by a court of competent jurisdiction or arbitrator that the Contractor was not in default, or that the delay was excusable, the rights, obligations, and remedies of the parties will be the same as if the termination had been issued for the Owner's convenience.

16.5 **Obligations Arising Before Termination.** Even after termination, the provisions of this agreement will apply to any Work performed, payments made, events occurring, costs charged or incurred, or obligations arising before the termination date.

17.0 **Miscellaneous.**

17.1 **Entire Agreement.** This agreement represents the entire agreement between Owner and Contractor and supersedes any prior written or oral agreements, understandings, and representations made or dated before the date of this agreement. This agreement may be amended only by a written amendment signed by the parties.

17.2 **Joint Drafting.** The parties hereby agree that this agreement was jointly drafted and that each had the opportunity to negotiate terms and to obtain assistance of counsel in reviewing terms prior to execution. This agreement will be construed in a neutral manner and neither against nor in favor of either party.

17.3 **No Third-Party Beneficiary.** This agreement and the obligations of the parties are intended for the sole benefit of the parties and do not create any rights in any other person or entity whatsoever, except the Owner and Contractor.

Version 1.0 — 28 June 2018

EXHIBIT A - 000139



17.4     **Governing Law.** This agreement is governed by California law, or if outside California where the Project is located.

17.5     **Severability.** If any provision in this agreement is determined to be invalid, unenforceable or void, the remainder of the agreement will be fully binding with the same force and effect as though the invalid, unenforceable or void provision had been omitted.

17.6     **Photographs and Marketing.** Contractor may (a) make or issue any public announcement or statement with respect to the Work or the Project, (b) supply to the press or other news media any information, photographs, or data related to the Work or the Project, or (c) use images of the Work and Project in any Contractor materials, including without limitation, advertisements, websites, calendars, brochures or presentations with written approval from Owner; except that Contractor shall be prohibited from using Owner's name, trademark, or logo without Owner's prior written consent.

17.7     **Written Testimonial.** If the Work and Contractor's performance is satisfactory to the Owner, Owner agrees to provide Contractor with a written positive endorsement or testimonial that Contractor may use in its advertising, marketing, and promotional materials.

17.8     **Signage.** Contractor may erect signage at the site indicating its role on the Project and may maintain such signage until Final Acceptance or for a longer period as mutually agreed by the parties.

18.0     **List of Contract Documents.** The Contract Documents in existence at the time of the parties signing this agreement are as follows:

18.1     Exhibit A, Index of Plans and Specifications furnished by Owner.

18.2     Exhibit B, List of Exclusions and Assumptions and Qualifications.

18.3     Exhibit C, Estimated Budget.

18.4     Exhibit D, Schedule of the Work.

18.5     Exhibit E, List of Contractor Personnel and Hourly Rates.

18.6     Exhibit F, Contractor's Insurance.

18.7     Exhibit G, Sample Insurance Certificate.

18.8     Exhibit H, Form, Change Order.

18.9     Exhibit J, Form, Application and Certificate for Payment.

18.10    Exhibit K, Form, Schedule of Values.

18.11    Exhibit L, Form, Subcontractor Approval

*Signatures Follow on Next Page*

Version 1.0 — 28 June 2018

EXHIBIT A - 000140



The parties are signing this agreement on the date stated in the introductory clause.

FERRANTE KOBERLING CONSTRUCTION, INC.

Signed: *Michael Ferrante*

Print Name: __Michael Ferrante__

Title: __PRESIDENT & CEO__

OWNER'S FORMAL NAME IN UPPER CASE

Signed: *Sebastian Schoepe*

Print Name: __SEBASTIAN SCHOEPE__

Title: __PRESIDENT__

OWNER'S FORMAL NAME IN UPPER CASE

Signed: _____

Print Name: _____

Title: _____

Version 1.0 — 28 June 2018

EXHIBIT A - 000141

# EXHIBIT "D"

EXHIBIT A - 000142



## COST PLUS AGREEMENT BETWEEN OWNER AND CONTRACTOR

| | |
|---|---|
| Owner: 703 McKinney, LLC | Contractor: Ferrante Koberling Construction, Inc. |
| Address: 925 N La Brea Ave, 4th Floor | 4700 W. Jefferson Blvd. #103 |
| City, State, Zip: Los Angeles, CA 90038 | Los Angeles, CA 90016 |
| Contact: Sebastian Schoepe | Tax ID No: 46-3955278 |
| Phone: (424)387-5709 | CA License No. 988562 |
| E-mail: schoepe@1upfitness.com | Contact: Michael Ferrante |
| Tax ID No: | Phone: (323) 933-3203 |
| | Email: mferrante@ferrantekoberling.com |

| | |
|---|---|
| Project: 703 McKinney | Architect: Gruen Architects |
| Project Address: 703 McKinney Ave | Address: 6330 S Vicente Blvd #200 |
| City, State, Zip: Dallas, TX 75202 | City, State, Zip: Los Angeles, CA 90048 |

This Agreement Between Owner and Contractor is dated January 15th, 2019 and is between FERRANTE KOBERLING CONSTRUCTION, INC., a California corporation ("**Contractor**"), 703 MCKINNEY, LLC, a Delaware limited liability corporation ("**960 N La Brea**"), and 1UP FITNESS GROUP NORTH AMERICA LP, a Delaware limited partnership, and affiliated companies  ("**1UP Fitness**," and together with **960 N La Brea**, and affiliated companies are the "**Owner**")

### Recitals

A.  Owner is leasing and building out approximately 149,065 SF of commercial space ("**Commercial Work**") as a Fitness Club, Office and Restaurant in the building located at 703 McKinney Ave, Dallas, TX 75202 ("**Project**").

B.  Contractor is experienced, qualified, and staffed to perform this Commercial Work.

C.  Owner and Contractor have reached an agreement for Contractor to perform the Commercial Work and desire to set forth their respective rights, responsibilities, terms, conditions, and compensation to be paid to Contractor.

Owner and Contractor therefore agree as follows:

1.0      **Contract Documents.** The Contract Documents consist of the following: (i) this agreement; (ii) written modifications to this agreement signed by both parties; and (iii) those documents listed under section 19.0. The Contract Documents are complementary and cumulative and what is called for by one shall be as binding as if called for by all. In case of conflicts between the drawings and specifications, the specifications will govern. In case of omissions, errors, or inconsistency among the Contract Documents, the Contractor shall immediately submit the matter to Owner for clarification. Owner's clarifications are final and binding, subject to an equitable adjustment in the compensation, the Contractor's time for performance, or both, or to dispute mitigation and resolution.

2.0      **The Relationship Between the Parties.** The parties hereby agree to proceed on the basis of mutual trust, good faith, and fair dealing. Each party shall perform its obligations with integrity and shall avoid any conflicts of interest.

3.0      **Work.** Contractor shall perform the Work in a workmanlike and expeditious manner consistent with the Contract Documents. Contractor shall provide all labor, materials, equipment, and services necessary to complete the Work in accord with the Contract Documents and Exhibits C and K, "Estimated Budget" and "Schedule of the Work," respectively.

4.0      **Compensation, Cost Plus Fee.** Owner shall compensate Contractor for Work performed as follows:

4.1      The Cost of the Work as set forth in section 7.0, plus 6 percent for overhead and 7 percent for profit (the overhead and profit markups constitute the "**Fee**"). The Fee will be paid in proportion to the Work performed.

EXHIBIT A - 000143



4.2     The Estimated Budget to complete the Work is $12,000,000.00 as set forth in Exhibit C. The Estimated Budget is not a guaranteed maximum price for the Cost of the Work or Fee. If Contractor becomes aware that the Estimated Budget will be exceeded, Contractor must promptly notify Owner in writing before performing the Work in excess of the Estimated Budget. This notice may include the Contractor's estimate of the additional costs necessary to complete the Work. The Contractor may stop work and is under no obligation to proceed with the Work in excess of the Estimated Budget until Owner authorizes Contractor in writing to proceed. Contractor is not liable for any delay in receiving this authorization.

5.0     **Owner Responsibilities.** Owner shall provide any information and services at Owner's expense and when required for the successful and expeditious completion of the Work.

5.1     As a condition to Contractor starting the Work, Owner shall provide Contractor with reasonable evidence of sufficient and available funds to satisfy all of Owner's obligations under this agreement. In the case of Project financing, such evidence must include the name and address of any construction lender and a copy of the loan commitment and loan disbursement agreement between Owner and Owner's lenders relating to the provision and disbursement of funds to Owner for its obligations under this agreement, except information deemed proprietary or confidential by Owner or Owner's lenders. During performance of the Work, Owner shall notify Contractor in writing Contractor of any material change in Project financing.

5.2     Owner shall provide Contractor with information describing the physical characteristics of the Project, including surveys, site evaluations, legal descriptions, data, or drawings depicting existing conditions, subsurface, and environmental studies, reports, investigations, tests, inspections, and other reports dealing with environmental matters, hazardous material and other existing conditions, including structural, mechanical, and chemical tests required by the Contract Documents or by law.

5.3     Owner shall provide Contractor with any other information or services requested by Contractor that Contractor claims is relevant to its performance of the Work and under Owner's control.

5.4     Within 7 days of this agreement being signed by the parties, Owner shall provide Contractor with the information necessary to give notice of or enforce mechanics' lien rights. This information must include Owner's interest in the real property on which the Project is located and the record legal title, and the name and address of the record fee owner if not the Owner. In this agreement, "**days**" means calendar days unless otherwise noted.

5.5     Owner shall secure and pay for all permits, approvals, easements, assessments, and fees required in connection with the Work.

5.6     Owner shall designate an Owner's authorized representative ("**OAR**") to provide approvals and directives necessary for the day-to-day administration of this agreement, the Work, and the Project. Owner shall designate the limits of any authority delegated to the OAR with respect to the following: executing any contract, contract modification, or other form of binding agreement; obligating the Owner in any manner to the payment of money; rendering any final decision on any contract matter, claim or dispute, terminating, suspending, or otherwise interfering with the Contractor's performance, directing any changes in the Contract Documents or in the Contractor's performance that is inconsistent with the Contract Documents. Owner and OAR shall be prohibited from communicating in any manner with Contractor's subcontractors. All communications from Owner and OAR regarding the Project must be with Contractor's designated representative.

5.7     Owner shall provide Contractor with complete and unfettered access to the site and area(s) of the Work.

5.8     Owner shall timely make payments to Contractor in accordance with this agreement.

5.9     Unless otherwise noted on the drawings and specifications, Owner shall be prohibited from performing work at the Project using its own forces or separate contractors without the Contractor's prior written consent.

5.10    Owner shall pay for all copies of the drawings and specifications as necessary for the Contractor to prosecute the Work. If the reproduction costs are paid by Contractor, Owner must reimburse Contractor the actual amount paid plus 10%.

5.11    Unless otherwise provided in the Contract Documents, Owner shall pay for all fees related to utilities and other facilities and services necessary for the Project, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work. In addition, unless otherwise provided in the Contract Documents, Owner shall



be responsible for all necessary upgrades to any existing building systems and utilities. "**Utilities**" includes electric, gas, water, sewer and waste, storm drain, Internet, TV, and phone.

5.12    **Joint and Several.** The obligations and liabilities of the Owner under this agreement are joint and several.

6.0    **Contractor Responsibilities.**

6.1    Contractor shall supervise and coordinate the Work, including the construction means, methods, techniques, sequences, and procedures utilized, unless the Owner or Contract Documents provide other specific instructions.

6.2    **Subcontractors.** Contractor and all subcontractors shall at all times during the Work be duly licensed by the CSLB (or by the jurisdiction where the Work will be performed). In this agreement, "**subcontractors**" means any person or entity who has a contract with or is engaged by Contractor, or with any other subcontractor, at any tier. To the extent practicable, Contractor shall enter into written subcontracts where compensation is based on a lump-sum price. The lump-sum price is subject to approval by Owner. As a condition to Contractor entering any subcontract, Owner must indicate its approval of the lump-sum price (and any other important terms and conditions) by signing the "Subcontract Approval Form" in the form attached as Exhibit L.

6.3    Except for permits that are the Owner's responsibility, Contractor shall apply for and obtain all necessary building permits pertaining to the Work. Owner shall immediately reimburse Contractor for any permit fees paid for or advanced by Contractor at actual cost plus 10%.

6.4    Contractor has investigated the site, the visible conditions affecting the site and the Work, and the Contract Documents.

6.5    Contractor shall comply with all applicable codes, laws, ordinances, and regulations affecting its performance and the Work. Contractor will be liable to Owner for all loss, cost, or expense, attributable to any acts or omissions by Contractor, its employees, subcontractors, suppliers, and agents in failing to comply with laws, including fines, penalties, or corrective measures. Contractor shall pay all applicable taxes for the Work provided by Contractor. The estimated Cost of the Work and Fee will be equitably adjusted for laws, taxes, duties, and tariffs that impact cost or time that are enacted after the date of this agreement or after bids are received or negotiations concluded.

6.6    Contractor shall provide and maintain competent personnel to supervise and direct the Work and shall enforce strict discipline and good order among those carrying out the Work. Contractor shall prohibit the use of alcoholic beverages, drugs and other dangerous substances, and the playing of radios, music, or other broadcasting devices at the site that constitute a danger to life, health, or property. Contractor shall prohibit the wearing of any work clothes and attire displaying offensive logos, insignia, graphics, words, phrases, or symbols.

6.7    Contractor shall take precautions to properly protect and preserve (i) the materials, supplies, and equipment to be incorporated into the Work and (ii) the Work itself from damage until the Work is accepted by Owner. If the Owner causes damage to the Work, the Owner shall promptly remedy that damage at its sole expense.

6.8    Contractor shall maintain and supervise all safety precautions and programs, and shall comply with all applicable laws, ordinances, and regulations of any federal, state or local authorities, including OSHA and Cal/OSHA, for the safety of persons or property. Contractor shall conduct routine inspections of equipment and site conditions as necessary to ensure compliance with its safety programs and standards. At all times during working hours at the site, Contractor shall require and ensure the use of personal protective equipment by all workers on the site.

6.9    Contractor shall be responsible for the proper delivery, handling, application, storage, removal, and disposal of all materials and substances brought to the site by Contractor in accordance with the Contract Documents and used or consumed in the performance of the Work.

6.10    A "**Hazardous Material**" is any substance or material identified now or in the future as hazardous under any federal, state, or local law or regulation, or any other substance or material which may be considered hazardous or otherwise subject to statutory or regulatory requirement governing handling, disposal, or clean-up. Contractor shall not start or continue work until any Hazardous Material discovered at the site has been removed, or rendered or determined to be harmless by Owner as certified by an independent testing laboratory and approved by the appropriate

Page **3** of 13

EXHIBIT A - 000145



government agency. If Contractor incurs additional costs or is delayed due to the presence or remediation of Hazardous Material, Contractor shall be entitled to an equitable adjustment.

6.11 **Submittals.** Contractor shall submit to Owner for review and approval all shop drawings, samples, product data, and similar submittals required by the Contract Documents. Submittals may be submitted in electronic form. Contractor will be responsible to Owner for the accuracy and conformity of its submittals to the Contract Documents. Contractor shall prepare and deliver its submittals to Owner in a manner consistent with the Contractor's schedule and in such time and sequence so as not to delay the performance of the Work or the work of Owner and others retained by Owner. Contractor shall identify in writing for each submittal all changes, deviations, or substitutions from the requirements of the Contract Documents. Owner's approval of a submittal does not authorize deviations, substitutions, or changes in the requirements of the Contract Documents unless Owner specifically authorizes such deviation, substitution, or change. Owner shall review and approve submittals with promptness to avoid causing delay. Contractor shall perform all Work in accordance with approved submittals. Owner's approval does not relieve Contractor from responsibility for defective work resulting from errors or omissions of any kind on the approved shop drawings. In this agreement, "**defective work**" means work found to be not in conformance with the Contract Documents.

6.12 Contractor shall perform cutting, fitting, and patching necessary to coordinate the various parts of the Work and to prepare its Work for the work of Owner or others retained by Owner.

6.13 Contractor shall regularly remove debris and waste materials at the site resulting from the Work. Contractor shall minimize and confine dust and debris resulting from construction activities. At the completion of the Work, Contractor shall remove from the site all construction equipment, tools, surplus materials, waste materials, and debris.

6.14 **Differing Site Conditions.** The Contractor shall promptly, and before the conditions are disturbed, give written notice to Owner of: (i) subsurface or latent physical conditions at the site which differ materially from those indicated in the Contract Documents; or (ii) unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the Contract Documents. The Owner shall investigate the conditions promptly after receiving notice. If the conditions do materially differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performing any part of the Work, an equitable adjustment will be made and this agreement modified in writing accordingly.

7.0 **Cost of the Work.** Owner shall pay Contractor for the Cost of the Work as defined in this section and the Fee stipulated in section 4.0. The Cost of the Work includes:

7.1 **Key Personnel.** Amounts paid by Contractor to those employees (excluding craft labor) identified in Exhibit E and at the stated billable hourly rates. Those hourly rates include the base hourly wage, payroll taxes, employee benefits, and workers' compensation insurance but not profit (fee), general administrative, and overhead costs.

7.2 **Contractor's Craft Labor.** Wages actually paid for Contractor's craft labor directly employed by Contractor in performing the Work;

7.3 **Employee Taxes and Burdens.** Cost of all employee benefits and taxes including but not limited to workers' compensation, unemployment compensation, social security, health, welfare, retirement, and other fringe benefits as required by law, labor agreements, or paid under Contractor's personnel policy, insofar as such costs are paid to employees of Contractor as part of the Cost of the Work;

7.4 **Subcontractor and Vendor Costs.** Costs paid by Contractor to its subcontractors and vendors for Work performed pursuant to subcontracts and purchase orders.

7.5 **Materials and Equipment.** Cost of all materials, supplies, and equipment incorporated in the Work, including costs of inspection and testing (if not provided by Owner), transportation, storage, and handling;

7.6 **Materials and Equipment Consumed at the Site.** Cost, including transportation and maintenance, of all materials, supplies, equipment, temporary facilities, and hand tools not owned by the workers that are used or consumed in the performance of the Work, less salvage value or residual value; and cost less salvage value on such items used, but not consumed, that remain the Contractor's property;

Version 1.0 — 28 June 2018

EXHIBIT A - 000146



7.7     **Rental Charges.** Actual rental charges of all necessary machinery and equipment, exclusive of hand tools owned by workers, used at the site, whether rented from Contractor or others, including installation, repair and replacement, dismantling, removal, maintenance, transportation, and delivery costs;

7.8     **Insurance and Bonds Premiums.** Cost of the premiums for all insurance and surety bonds which Contractor is required to procure or deems necessary, and approved by Owner, including any additional premium incurred as a result of any increase in the Cost of the Work;

7.9     **Sales and Use Taxes.** Sales, use, gross receipts, or other taxes, tariffs, or duties related to the Work for which Contractor is liable;

7.10    **Permits and Fees.** Permits, fees, licenses, tests, and royalties, except if paid by Owner;

7.11    **Course of Construction Repairs.** Actual and reasonable costs paid by Contractor in repairing minor damage to trade Work caused as a normal by-product during the course of construction and not attributable to the fault of Contractor, any subcontractor or vendor or not covered by insurance;

7.12    **Site Office.** Costs associated with establishing, equipping, operating, maintaining, and demobilizing the field office;

7.13    **Utilities.** Water, power, and fuel costs necessary for the Work;

7.14    **Clean-up and Disposal.** Cost of cleaning up, removing, and legally disposing all non-hazardous substances, debris, and waste materials;

7.15    **Emergencies.** Costs to respond to an emergency affecting the safety of persons and property, provided the cost is not the result of any act or omission of Contractor, subcontractor, vendor, or any party for whom any of them are responsible or liable at law or under the Contract Documents;

7.16    **Site Security.** Costs for site security services required for protection of the Work;

7.17    **Reproduction and Graphics.** Costs for blueprinting and reproduction of the plans and specifications, and for required postage, express mail, and long-distance costs in the performance of the Work;

7.18    **Legal.** Legal, mediation, and arbitration fees and costs reasonably and properly resulting from Contractor's performance of the Work, except those arising from disputes between the parties; and

7.19    **Miscellaneous.** Costs directly incurred in performing the Work or in connection with the Project that are not included in the Fee and that are reasonably inferable from the Contract Documents.

7.20    **Discounts.** All discounts for prompt payment shall accrue to Owner to the extent such payments are made directly by Owner. To the extent payments are made with funds of Contractor, all cash discounts accrue to Contractor. All trade discounts, rebates, and refunds, and all returns from sale of surplus materials and equipment (if any), shall be credited to the Cost of the Work.

7.21    **Contractor's Account Records.** Records of the Contractor's costs and expenditures must be maintained on the basis of generally accepted accounting practices and be available for inspection by the Owner or the Owner's designated agent at mutually convenient times for a period of 2 years after final payment.

8.0     **Payments.**

8.1     **Schedule of Values.** Per Exhibit K pending drawings within TBD working days after the parties sign this agreement, Contractor shall submit to Owner for approval an initial schedule of values allocating budgeted values among all categories or portions of the Work. The schedule of values must be prepared in such form and supported by data to substantiate its accuracy as Owner may reasonably require and must be based on the latest cost information available to Contractor. The Estimated Budget must be broken down is sufficient detail to facilitate continued evaluation of the Contractor's payment applications. The schedule of values must include separate line items for materials and equipment purchased or fabricated and stored either on-site or off-site and for the Fee. The Owner-accepted schedule of values must be used as the basis for the Contractor's applications for payments and revised for any modifications mutually agreed upon by the parties.

Version 1.0 — 28 June 2018

EXHIBIT A - 000147



8.2     **Progress Payments.** Contractor shall submit to Owner or another person or entity designated by Owner bi-weekly payment applications no later than the 15th and last day of the month. The payment application consists of the Cost of the Work performed up to the date stated in the payment application, along with a proportionate share of the Fee. Payment applications must include materials and equipment not yet incorporated into the Work but delivered to and suitably stored onsite or offsite, including applicable insurance, storage, and costs incurred transporting the materials to an offsite storage facility. Approval of payment for materials stored off-site is conditioned on the Contractor submitting bills of sale and applicable insurance or such other procedures satisfactory to Owner to establish Owner's title to such materials, or otherwise to protect Owner's interest, including transportation to the site.

8.3     **Adjustment of Contractor's Payment Application.** Owner may adjust or reject a payment application or nullify a previously approved payment application, in whole or in part, as may reasonably be necessary to protect Owner from loss or damage based on the circumstances listed below, but only to the extent that Contractor is responsible. As a condition to this right, the Owner must give written notice to Contractor no later than 7 days after receipt of a payment application specifying the reasons for the disapproval or nullification. When the reasons for disapproving or nullifying an application for payment are removed, Owner shall immediately pay the amounts previously withheld.

a.   Contractor's repeated failure to perform the Work as required by the Contract Documents;

b.   loss or damage for which Owner may be liable arising out of or relating to this agreement and caused by Contractor to Owner or to others retained by Owner to whom Owner may be liable;

c.   Contractor's failure to properly pay subcontractors or suppliers in connection with the Work following receipt of such payment from Owner, for that portion of the Work or for supplies, provided that Owner is making payments to Contractor in accordance with this agreement;

d.   rejected or defective work not corrected in a timely fashion; and

e.   reasonable evidence of delay in performance of the Work such that the Work will not be completed by the Final Completion Date.

8.4     **Substantiation of Costs.** Contractor shall support its payment applications with relevant documentation to allow Owner to verify the costs incurred and expended by Contractor. The documentation may include time sheets, receipts, and invoices.

8.5     **Lien Releases.** With each payment application, Contractor shall submit properly executed waivers and releases from subcontractors, suppliers and vendors, and those persons or entities who have served a preliminary notice on Owner or Contractor.

8.6     **Retainage.** Each payment application will reflect 5% retainage of the amounts to be paid, except that no retainage applies to (i) the Fee, (ii) premiums paid by Contractor for insurance and bonds (if bonds are required), or (iii) amounts approved for payment to Contractor for the Cost of the Work (exclusive of amounts to be paid to subcontractors). All retainage must be paid as part of the final payment to Contractor. If, at any time after 50% of the Work has been completed, the Contractor is making satisfactory progress, 5% retainage will no longer be withheld and progress payments will be made in full.

8.7     **Prompt Payment.** The Owner shall make all progress payments to Contractor within 15 days after Owner receives a proper payment application.

8.8     **Delayed Payment.** If for any reason not the fault of Contractor, Contractor does not receive a progress payment from Owner within 5 days after the time that payment is due, Contractor, upon giving 10 days' written notice to Owner, and without prejudice to and in addition to any other legal remedies, may stop Work until payment of the full amount owing to Contractor has been received, including interest for late payment.

8.9     **Late Payment.** Payments due but unpaid will bear interest from the date payment is due at the rate of 10 percent per annum.

8.10    **Substantial Completion Payment.** When in the Contractor's judgment substantial completion of the Work or a designated portion has been achieved, Contractor shall notify Owner and establish the substantial completion date. In this agreement, "**substantial completion**" means that stage when the Work (or designated portion of the

Version 1.0 — 28 June 2018

EXHIBIT A - 000148



Work) is sufficiently complete in accordance with the Contract Documents so that Owner may occupy or utilize the Project, or a designated portion, for its intended use. A certificate of occupancy is not a prerequisite for substantial completion if the certificate of occupancy cannot be obtained due to factors beyond Contractor's control. Payment by Owner upon substantial completion will be in consideration of Contractor's agreement to complete all final punch list Items. Owner may retain no more than 150% of the costs estimated by Owner and Contractor necessary to complete any punch list Items. Thereafter, Owner shall pay to the Contractor the amounts retained for the punch list items to the extent that each item is completed by Contractor and accepted by Owner.

8.11        **Final Payment.** When in the Contractor's judgment final completion has been achieved, Contractor shall submit a final payment application. In this agreement, "**final completion**" means that stage when the Owner determines that the Work has been properly completed in accordance with the Contract Documents, including completion of punch list items and the submittal to Owner of all closeout documentation required by the Contract Documents. Owner shall make final payment to Contractor within 15 days after Contractor has submitted a complete and accurate payment application and has submitted to Owner all closeout documentation required by the Contract Documents. In this agreement, "**final payment**" means the payment to Contractor of all amounts due and remaining to be paid to Contractor under the Contract Documents, including any retainage. Final payment will not relieve the Contractor of any warranty obligations required under the Contract Documents.

8.12        **Waiver of Claims.** Claims not reserved by Owner in writing with the making of final payment are waived except for claims relating to liens or similar encumbrances, warranties, and latent defects. Claims not reserved by Contractor in writing in accepting final payment are waived.

9.0        **Schedule, Delays and Liquidated Damages.**

9.1        Contractor shall promptly start the Work on January 15th, 2019 ("**Commencement Date**") and complete all Work in accordance with the Contract Documents no later than TBD, pending final drawings ("**Final Completion Date**").

9.2        **Time is of the Essence**. Time is of the essence for both parties with regard to the obligations of this agreement and Contract Documents.

9.3        Contractor shall achieve substantial completion of the Work in TBD working days from the Commencement Date and achieve final completion within TBD after the date of substantial completion. Both deadlines are subject to adjustments as provided for in the Contract Documents.

9.4        **Schedule.** Before submitting its first payment application for payment, Contractor shall submit to Owner a schedule showing the dates on which Contractor plans to begin and complete various parts of the Work, including dates on which information and approvals are required from Owner. Unless otherwise agreed, the schedule must (i) provide a graphic representation of all activities and events and (ii) identify dates that are critical to ensure timely completion of the Work. Contractor shall update the schedule monthly, or as mutually agreed by the parties.

9.5        **Delays and Time Extensions.** If Contractor is delayed by any cause beyond the Contractor's control, the Contractor will be entitled to a time extension. These causes include but are not limited to the following: (a) acts or omissions of Owner, the Owner's agents, consultants, designers, and the architect-engineer; (b) changes in the Work or the sequencing of the Work ordered by Owner, or arising from the Owner's decisions that impact the time of performance; (c) encountering Hazardous Materials, or concealed or unknown conditions; (d) transportation delays not reasonably foreseeable; (e) labor disputes; (f) fire; (g) terrorism; (h) adverse governmental actions; (i) acts of God; (j) adverse weather conditions not reasonably anticipated; (k) utility disruptions or outages; (l) long lead times; (m) material and equipment damaged during transportation and delivery to the Project; (n) unexcused delays in payment. If delays to the Work are encountered, Contractor shall provide prompt written notice to Owner of the cause after Contractor first recognizes the delay. The parties shall take reasonable steps to mitigate the effect of such delays. In addition, If Contractor incurs additional costs as a result of a delay caused by the circumstances noted above, Contractor will be entitled to an equitable adjustment in compensation.

10.0        **Changes.** Without invalidating or breaching this agreement, Owner may order changes within the general scope of the Work. Such changes will be binding on Contractor only if in writing, and Contractor has no obligation to proceed

Version 1.0 — 28 June 2018



or perform any changed work until such writing is received. The cost of changed work will be computed based on the Cost of the Work (as defined in section 7.0, above) plus markups computed as follows:

a.  6% for overhead and 7% for profit of the Cost of the Work performed by Contractor using its own forces;

      11.0    **Warranty.** Contractor warrants that all materials and equipment will be new unless otherwise specified, of good quality, in conformance with the Contract Documents, and free from defective workmanship and materials for one year after the date of substantial completion. Contractor further warrants that the Work will be free from material defects not intrinsic in the design or materials required in the Contract Documents. This warranty does not include remedies for defects or damages caused by normal wear and tear during normal usage, use for a purpose for which the Work or Project was not intended, improper or insufficient maintenance, modifications performed by Owner or others retained by Owner, or abuse. If during the one-year warranty period any portion of the Work is found to be defective work, Owner shall promptly notify Contractor in writing. Unless Owner provides written acceptance of the condition, Contractor shall promptly correct the defective work at its own cost and time.

      12.0    **Indemnity.**

      12.1    To the fullest extent permitted by law, Contractor shall indemnify, defend, and hold harmless Owner, Owner's officers, directors, members, agents, and employees (but not the Owner's architect-engineer) ("**Owner Indemnitees**") from all third-party claims for bodily injury and property damage, other than to the Work itself and other property insured under section 13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of the Work but only to the extent caused by the negligent or intentional wrongful acts or omissions of Contractor, subcontractors, suppliers, or anyone employed directly or indirectly by any of them or by anyone for whose acts any of them may be liable. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of an Owner Indemnitee. Contractor will be entitled to reimbursement of any defense costs paid above Contractor's percentage of liability for the underlying claim.

      12.2    To the fullest extent permitted by law, Owner shall indemnify, defend, and hold harmless Contractor, its officers, directors, or members, agents, and employees ("**Contractor Indemnitees**") from all third-party claims for bodily injury and property damage, other than property insured under section 13.0, including reasonable attorneys' fees, costs, and expenses, that may arise from the performance of work by Owner, Owner's architect-engineer, or others retained by Owner, but only to the extent caused by the negligent or intentionally wrongful acts or omissions of Owner, Owner's architect-engineer, or others retained by Owner. This indemnity and defense obligation does not apply to the extent the claims arise from the active negligence, sole negligence, or willful misconduct of a Contractor Indemnitee. Owner will be entitled to reimbursement of any defense costs paid above Owner's percentage of liability for the underlying claim.

      12.3    These indemnification obligations will not be limited in any way by any limitation on the amount or type of damages, compensation, or benefits payable under workers' compensation acts, disability benefit acts, or other insurance.

      13.0    **Insurance.**

      13.1    **Contractor's Insurance.** Before starting Work, Contractor shall procure and maintain in force all insurance set forth in Exhibit F. Commercial General Liability Insurance may be obtained under a single policy for the full limits required or by a combination of underlying policies with the balance provided by an excess or umbrella policy. The insurance policies must contain a provision that coverages under the policies will not be cancelled or expire until at least 30 days' written notice has been given to Owner and must include either a liability endorsement covering this agreement or an endorsement making the Owner an additional insured under the policies. Certificates of insurance showing such coverages to be in force must be filed with the Owner prior to commencement of the Work.

      13.2    **Owner's Insurance.** Owner shall purchase and maintain its own liability insurance, and at the Owner's option, may purchase and maintain such additional insurance to protect the Owner against claims losses, or damages that may arise from the Project. Owner shall name Contractor as an additional insured in any insurance policy obtained by the Owner for the Project.

      13.3    **Waivers of Subrogation.** The Owner and Contractor hereby waive all rights against each other and against the Owner's architect-engineer, and other consultants, subcontractors, suppliers, agents and employees of the other for damages during construction covered by any property insurance as set forth in the Contract Documents.

Version 1.0 — 28 June 2018

EXHIBIT A - 000150



14.0     **Limited Mutual Waiver of Consequential Damages.** Except for losses covered by insurance required by the Contract Documents, the parties waive all claims against each other for any consequential damages that may arise out of or relate to this agreement. The provisions of this section apply to the termination of this agreement and survive such termination.

14.1     Owner waives damages for loss of use of the Project, any rental expenses incurred, loss of income, profit, or financing related to the Project, loss of business, loss of financing, loss of profits not related to this Project, loss of reputation, and insolvency.

14.2     Contractor waives damages for loss of business, loss of financing, loss of profits not related to this Project, loss of bonding capacity, loss of reputation, and insolvency.

15.0     **Dispute Resolution.**

15.1     **Executive Discussions.** As a condition to and before resorting to mediation and binding arbitration, the parties must attempt in good faith to resolve any dispute promptly by negotiation between executives who have settlement authority.

15.2     If the dispute remains unresolved after executive discussions, the parties shall proceed to mediation using JAMS, or another provider as they may otherwise mutually agree, and shall conclude such mediation within 45 calendar days of the matter being first discussed. The parties will equally share the costs of the mediation.

15.3     If the dispute remains unresolved after mediation, the dispute must proceed to binding arbitration under JAMS (or other provider as the parties may mutually agree), per its Engineering and Construction Arbitration Rules & Procedures, or if the parties agree otherwise, to the Engineering and Construction Arbitration Rules & Procedures for Expedited Arbitration. Either party may initiate arbitration with respect to the matters submitted by filing a written demand for arbitration. The Project location shall serve as the venue. The arbitration award will be final. Judgment on the award may be entered in any court having jurisdiction. This paragraph does not preclude nor otherwise limit the parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

15.4     Neither party may commence arbitration if the claim or cause of action would be barred by the applicable statute of limitations had the claim or cause of action been filed in a state or federal court. Receipt of a demand for arbitration by the person or entity administering the arbitration will constitute the commencement of legal proceedings for the purposes of determining whether a claim or cause of action is barred by the applicable statute of limitations. If, however, a state or federal court exercising jurisdiction over a timely filed claim or cause of action orders that the claim or cause of action be submitted to arbitration, the arbitration proceeding will be deemed commenced as of the date the court action was filed, provided that the party asserting the claim or cause of action files its demand for arbitration with the person or entity administering the arbitration within 30 days after the entry of such order.

15.5     **Attorney Fees.** In any litigation or arbitration arising out of or related to this agreement, the prevailing party must be awarded costs and legal fees reasonably incurred.

16.0     **Suspension and Termination.**

16.1     **Termination by Contractor.** Upon 7 days' written notice to Owner, Contractor may terminate this agreement if the Work has been stopped for a continuous 30-day period through no fault of Contractor for any of the following reasons: (i) under court order or order of other governmental authorities having jurisdiction; or (ii) as a result of the declaration of a national emergency or other governmental act during which, through no act or fault of Contractor, materials are not available. In addition, upon 7 days' written notice to Owner, Contractor may terminate this agreement if Owner does any of the following: (i) fails to furnish reasonable evidence that sufficient funds are available and committed for the entire cost of the Project; (ii) fails to pay Contractor in accordance with this agreement and Contractor has stopped Work in compliance with this agreement; or (iii) otherwise materially breaches this agreement. Upon termination by Contractor, Contractor will be entitled to recover from Owner payment for all Work executed and for any proven loss, cost, or expense in connection with the Work, including all demobilization costs plus a proportionate share of the Fee.

16.2     **Suspension by Owner.** The Owner may order the Contractor in writing to suspend all or any part of the Work for the Owner's convenience or for stoppage beyond the control of the Owner or Contractor. If the

EXHIBIT A - 000151



performance of all or any part of the Work is suspended, the Contractor will be entitled to an equitable adjustment, and this agreement will be modified in writing accordingly.

    16.3  **Termination for Owner's Convenience.** The Owner on 21 days' written notice may terminate this agreement, in whole or in part, when it is in the Owner's interest. If this agreement is terminated, the Owner shall pay the Contractor: (i) for the Work performed to date, including a proportionate share of the Fee; (ii) for all demobilization costs and costs incurred resulting from termination; including remaining subcontractor invoices (iii) reasonable attorneys' fees and costs related to termination; and (d) a termination fee of $350,000.00

    16.4  **Notice to Cure and Default Termination.** (a) If Contractor persistently fails to supply enough qualified workers, proper materials, or equipment to maintain the approved schedule, or persistently fails to make payment to its workers, subcontractors, or suppliers when such payment is due, or willfully disregards law or orders of any public authority having jurisdiction, or is otherwise guilty of a material breach of a provision of this agreement, Contractor may be deemed in default. If Contractor fails to commence and to continue satisfactory correction of such default with diligence and promptness within 10 days after written notification by Owner to cure, then Owner, without prejudice to any other rights or remedies, may either: (i) take reasonable steps it deems necessary to correct the deficiencies and charge the cost to Contractor, who will be liable for such payments; or (ii) terminate this agreement by written notice absent appropriate corrective action. Owner shall make reasonable efforts to mitigate damages arising from Contractor default and shall promptly invoice Contractor for all amounts due.

(b) After receipt of a termination notice, and except as directed by the Owner, the Contractor shall: (i) stop work as specified in the notice and demobilize the site; (ii) place no further subcontracts or orders, except as necessary to complete the continued portion of the Work; (iii) terminate all subcontracts to the extent they relate to the work terminated; (iv) assign to the Owner, as directed by Owner, all right, title, and interest of the Contractor under the subcontracts terminated; (v) complete performance of the Work not terminated; and (vi) take action necessary to protect and preserve the Work.

(c) After termination, the Contractor shall submit promptly a final termination settlement proposal to the Owner. If the Contractor fails to submit the proposal, the Owner may determine, on the basis of information available, the amount, if any, due the Contractor because of the termination and shall pay the amount determined.

(d) Subject to paragraph (c) of this clause, the Contractor and Owner may agree on the whole or any part of the amount to be paid (including an allowance for Fee) because of the termination. This agreement will be amended, and the Contractor paid the agreed amount. If the Contractor and Owner fail to agree in whole or in part on the amount to be paid because of the termination, the parties agree to submit the matter to mediation, and if not resolved in mediation, the matter will be submitted for binding arbitration per section 15.0.

(e) If, after termination of the Contractor for default, it is determined by a court of competent jurisdiction or arbitrator that the Contractor was not in default, or that the delay was excusable, the rights, obligations, and remedies of the parties will be the same as if the termination had been issued for the Owner's convenience.

    16.5  **Obligations Arising Before Termination.** Even after termination, the provisions of this agreement will apply to any Work performed, payments made, events occurring, costs charged or incurred, or obligations arising before the termination date.

  17.0  **Miscellaneous.**

    17.1  **Entire Agreement.** This agreement represents the entire agreement between Owner and Contractor and supersedes any prior written or oral agreements, understandings, and representations made or dated before the date of this agreement. This agreement may be amended only by a written amendment signed by the parties.

    17.2  **Joint Drafting.** The parties hereby agree that this agreement was jointly drafted and that each had the opportunity to negotiate terms and to obtain assistance of counsel in reviewing terms prior to execution. This agreement will be construed in a neutral manner and neither against nor in favor of either party.

    17.3  **No Third-Party Beneficiary.** This agreement and the obligations of the parties are intended for the sole benefit of the parties and do not create any rights in any other person or entity whatsoever, except the Owner and Contractor.

Version 1.0 — 28 June 2018

EXHIBIT A - 000152



17.4     **Governing Law.** This agreement is governed by California law, or if outside California where the Project is located.

17.5     **Severability.** If any provision in this agreement is determined to be invalid, unenforceable or void, the remainder of the agreement will be fully binding with the same force and effect as though the invalid, unenforceable or void provision had been omitted.

17.6     **Photographs and Marketing.** Contractor may (a) make or issue any public announcement or statement with respect to the Work or the Project, (b) supply to the press or other news media any information, photographs, or data related to the Work or the Project, or (c) use images of the Work and Project in any Contractor materials, including without limitation, advertisements, websites, calendars, brochures or presentations with written approval from Owner; except that Contractor shall be prohibited from using Owner's name, trademark, or logo with Owner's prior written consent.

17.7     **Written Testimonial.** If the Work and Contractor's performance is satisfactory to the Owner, Owner agrees to provide Contractor with a written positive endorsement or testimonial that Contractor may use in its advertising, marketing, and promotional materials.

17.8     **Signage.** Contractor may erect signage at the site indicating its role on the Project and may maintain such signage until Final Acceptance or for a longer period as mutually agreed by the parties.

18.0     **List of Contract Documents.** The Contract Documents in existence at the time of the parties signing this agreement are as follows:

18.1     Exhibit A, Index of Plans and Specifications furnished by Owner.

18.2     Exhibit B, List of Exclusions and Assumptions and Qualifications.

18.3     Exhibit C, Estimated Budget.

18.4     Exhibit D, Schedule of the Work.

18.5     Exhibit E, List of Contractor Personnel and Hourly Rates.

18.6     Exhibit F, Contractor's Insurance.

18.7     Exhibit G, Sample Insurance Certificate.

18.8     Exhibit H, Form, Change Order.

18.9     Exhibit J, Form, Application and Certificate for Payment.

18.10    Exhibit K, Form, Schedule of Values.

18.11    Exhibit L, Form, Subcontractor Approval

*Signatures Follow on Next Page*

Version 1.0 — 28 June 2018

EXHIBIT A - 000153



The parties are signing this agreement on the date stated in the introductory clause.

FERRANTE KOBERLING CONSTRUCTION, INC.

Signed: _Michael Ferrante_

Print Name: Michael Ferrante

Title: PRESIDENT & CEO

OWNER'S FORMAL NAME IN UPPER CASE

Signed: _Sebastian Schoepe_

Print Name: SEBASTIAN SCHOEPE

Title: PRESIDENT

OWNER'S FORMAL NAME IN UPPER CASE

Signed: _____

Print Name: _____

Title: _____

Version 1.0 — 28 June 2018

EXHIBIT A - 000154

# EXHIBIT "E"

EXHIBIT A - 000155

**JOHN REED FITNESS LA, LLC,**
a Delaware limited liability company

**799 VAN NESS, LLC,**
a Delaware limited liability company

7000 Romaine Street, Suite 201
Los Angeles, CA  90038

March 20, 2020

**FERRANTE KOBERLING CONSTRUCTION INC. ,**
a California corporation
4700 W. Jefferson Blvd. #103
Los Angeles, CA  90016
Attention: Mr. Michael Ferrante

> Re:   Cost Plus Agreement Between Owner and Contractor (the **"SF Contract"**) Regarding 799 Van Ness, San Francisco (the **"San Francisco Project"**) and Cost Plus Agreement Between Owner and Contractor (the **"DTLA Contract"**) Regarding 150 S. 12th Street, Los Angeles, California (the **"DTLA Project"**).

Dear Michael:

This letter confirms our discussion and agreement regarding the San Francisco Project and the DTLA Project and the further agreement among 799 Van Ness, LLC (**"799 Van Ness"**), John Reed Fitness LA, LLC (**"John Reed Fitness"**) and Ferrante Koberling Construction, Inc. (**"Ferrante"**).  For the purpose of this letter, the SF Contract and the DTLA Contract shall be referred to herein collectively as the **"Contracts"**.

1. <u>Termination of Contracts</u>.  The Contracts have been terminated per section 16 of each of the Contracts provided that 799 Van Ness and John Reed Fitness make the payments in Sections 2 and 3, below, respectively.

2. <u>Transition Issues San Francisco Project</u>.  To create an orderly transition for the San Francisco Project, 799 Van Ness and Ferrante agree as follows:

> (i)   799 Van Ness shall pay all outstanding subcontractor/consultant invoices regarding the San Francisco Project, in the amount of $276,064.92.

> (ii)   799 Van Ness shall pay all outstanding Ferrante general conditions and Ferrante's earned Fee through February 29, 2020, in the amount of $163,961.91.

> (iii)   799 Van Ness shall pay Ferrante expenses incurred during the proposed "transition period" until March 31, 2020, in the amount of $38,764.20.

> (iv)   Ferrante shall reasonably facilitate 799 Van Ness during the "transition period" in regard to existing subcontracts, in particular the swimming pool, skylight, metal

and wood framing as well as the structural steel subcontractor. It is understood that it remains in each subcontractor's sole discretion to accept or decline the change in general contractor. However, Ferrante shall use commercially reasonable efforts to support 799 Van Ness in the process of handing over/adapting the existing subcontracts. Ferrante's obligation to assist 799 Van Ness automatically terminates at 11:59 PM on March 31, 2020.

      (v)     Ferrante shall deliver all statutory waivers and releases (that have not been delivered to date) from Ferrante and all subcontractors for any payments made by 799 Van Ness.

      (vi)     Ferrante shall deliver to 799 Van Ness the original permits and plans issued and stamped by the City of San Francisco.

      (vii)     Ferrante's delivery of the statutory waivers and releases and original permits and plans set forth in items (v) and (vi), above, is conditioned on the simultaneous payment by 799 Van Ness of all sums due under items (i)–(iv), above. Ferrante and 799 Van Ness agree that the simultaneous exchange described in this paragraph (vii) will occur no later than March 27, 2020 or on such later date as Ferrante and 799 Van Ness mutually agree.

      3.     <u>Transition Issues for the DTLA Project</u>. John Reed Fitness shall pay all costs and expenses for work and services ("**Transition Expenses**") performed by Ferrante in regard to the preparation of the DTLA Project, in the amount of $30,150.00. John Reed Fitness shall make payment for the Transition Expenses no later than March 27, 2020 or on such later date as Ferrante and John Reed Fitness mutually agree; simultaneously with such payment, Ferrante shall deliver a statutory waiver and release upon final payment with respect to the DTLA Project.

      4.     <u>Additional Issues Regarding Contracts, SF Project and DTLA Project</u>. 799 Van Ness, John Reed and Ferrante agree as follows:

      (i)     Immediately upon payments by 799 Van Ness and John Reed Fitness under Section 2 and 3, above, and Ferrante's satisfaction of all its obligations under this letter, 799 Van Ness and John Reed Fitness shall deliver to Ferrante a signed copy of the letter agreement attached as Exhibit "A".

      (ii)     Although 1Up Fitness Group North America LP and affiliated companies (collectively, "**1Up Fitness**") are identified in the SF Contract under the definition of "Owner", in reality the only "Owner" under the SF Contract is 799 Van Ness; and therefore 1Up Fitness never had any rights or obligations under the SF Contract.

      (iii)     Although RSG Group North America LP and affiliated companies (collectively, "**RSG**") are identified in the DTLA Contract under the definition of "Owner", in reality the only "Owner" under the DTLA Contract is John Reed Fitness; and therefore, RSG never had any rights or obligations under the DTLA Contract.

      (iv)     There shall be no termination fees due under the Contracts.

      (v)     Except as provided herein, 799 Van Ness and affiliated companies, John Reed Fitness and affiliated companies, and Ferrante shall have no further responsibility or liability under the Contracts. However, notwithstanding anything otherwise stated in this letter, Ferrante remains

legally responsible under the Contracts and otherwise for all work performed at, on, or for the SF Project and the DTLA Project.

      (vi)     If Owner fails to make payment of all sums noted above in sections 2 and 3, this letter agreement will automatically terminate and be rescinded immediately without further notice or action by Ferrante, and the parties will be restored to their same positions (and under the same terms as existed in the Contracts) prior to this letter agreement.

The parties (including their respective affiliated companies) agree (i) that this letter agreement does not establish any precedent respecting the La Brea Project and Dallas Project contracts and (ii) that both parties are prohibited from using or relying on this letter agreement as a basis to request or justify the same or similar treatment or termination of the La Brea Project and the Dallas Project contracts.

If this letter accurately reflects your understanding, please sign below to signify your agreement to the terms of this letter.

Sincerely,


SEBASTIAN SCHOEPE
President

ACCEPTED:

Ferrante Koberling Construction, Inc.

*Michael A Ferrante*         03.20.2020
By: _____
　　　　Michael Ferrante
　　　　President & CEO

EXHIBIT A - 000159

EXHIBIT "A"

**LETTER AGREEMENT**

EXHIBIT A - 000160

**JOHN REED FITNESS LA, LLC,**
a Delaware limited liability company

**799 VAN NESS, LLC,**
a Delaware limited liability company

7000 Romaine Street, Suite 201
Los Angeles, CA  90038

March 20, 2020

**FERRANTE KOBERLING CONSTRUCTION INC. ,**
a California corporation
4700 W. Jefferson Blvd. #103
Los Angeles, CA  90016

Re:     Cost Plus Agreements Between Owner and Contractor Regarding 799 Van Ness, San Francisco (the "**San Francisco Project**") and 150 S. 12th Street, Los Angeles, California (the "**DTLA Project**").

Dear Michael:

This letter confirms our discussions and agreement regarding the San Francisco Project and the DTLA Project.

As you know, the other projects that you are working on, the La Brea Project and the Dallas Project, are at critical stages; and we are under great pressure to complete construction on those projects as quickly as possible.  Therefore, to allow you to focus your uninterrupted attention on the La Brea Project and the Dallas Project, the contracts for the San Francisco Project and the DTLA Project have been terminated each termination conditioned on 799 Van Ness and John Reed Fitness each fully satisfying their respective obligations set forth in the letter to which this Exhibit A is attached.

We look forward to continuing to work with you on the La Brea Project and the Dallas Project so that those can be completed as soon as possible.

Sincerely,

SEBASTIAN SCHOEPE
President

ACCEPTED:

Ferrante Koberling Construction, Inc.

By:   *Michael A Ferrante*
          Michael Ferrante
          President & CEO

EXHIBIT A - 000161

# EXHIBIT "F"

Recording Requested By *and Return to:*
*Andrew. Menge, Esq.*

Name:
Ferrante Koberling Construction
c/o Mark Feldman, Esq.

Address:
11030 Santa Monica Blvd
Suite 109

City, State, Zip Code
Los Angeles, CA 90025



SPACE ABOVE THIS LINE FOR RECORDER'S USE

## Title of Document

Mechanics Lien

Recording Requested By and When Recorded Mail To:

Ferrante Koberling Construction, Inc.
C/O Mark A. Feldman, Esq.
Andrew A. Monge, Esq.
FELDMAN & ASSOCIATES, INC.
11030 Santa Monica Blvd., Suite 109
Los Angeles, California 90025
Telephone: (310) 312-5401

Space above this line for recorder's use only
(To be recorded in the county recorder's office
in the county in which the property is located.)

# MECHANICS LIEN

**NOTICE IS HEREBY GIVEN** that Claimant, Ferrante Koberling Construction, Inc., located at 4700 W. Jefferson Blvd. #103, Los Angeles, CA 90016, claims a lien for labor, service, equipment, or material under Section 8000 et. seq. of the Civil Code of the State of California, upon the premises hereinafter described, and upon every estate or interest in such structures, improvements and premises held by any party holding any estate therein. The work was furnished for the construction of those certain buildings, improvements, or structures, now upon that certain parcel of land situated in the County of Los Angeles, State of California, said land described as follows:

**STREET ADDRESS:**
    **960 N. La Brea Ave**
    **Los Angeles, CA 90038**

    The lien is claimed for the following labor, service, equipment or material furnished by the Claimant: construction of the building, pouring of the foundation for the building, construction and erection of the majority of the building. Claimant is owed $4,999,639.71 for work furnished to the work of improvement, after deducting all just credits and offsets, plus interest at the legal rate from the date of this lien. The name of the person or company by whom Claimant was employed, or to whom Claimant furnished the work is: 960 N. La Brea, LLC

    The name(s) and address(es) of the owner(s) or reputed owner(s) of the real property is/are:

960 N. La Brea, LLC
925 N. La Brea Ave, 4th Floor
Los Angeles CA, 90038

Name of Claimant: Ferrante Koberling Construction, Inc.

Date: August 28, 2020

By: _____
               Signature
           Andrew Monge, Esq.,
           Attorney and Agent

## Verification

I, the undersigned, declare: I am the authorized agent, for the Claimant named in the foregoing claim of mechanics lien: I am authorized to make this verification for the Claimant: I have read the foregoing claim of mechanics lien and know the contents thereof, and the same is true of my knowledge. I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on August 28, 2020 at Los Angeles, California. _____
                                                 Signature of Claimant or Authorized Agent

## <u>NOTICE OF MECHANICS LIEN</u>
## ATTENTION!
(Civil Code § 8416)

Upon the recording of the enclosed MECHANICS LIEN with the County Recorder's Office of the county where the property is located, your property is subject to the filing of a legal action seeking a court-ordered foreclosure sale of the real property on which the lien has been recorded.  That legal action must be filed with the court no later than 90 days after the date the mechanics lien is recorded.

The party identified in the mechanics lien may have provided labor or materials for improvements to your property and may not have been paid for these items.  You are receiving this notice because it is a required step in filing a mechanics lien foreclosure action against your property.  The foreclosure action will seek a sale of your property in order to pay for unpaid labor, materials, or improvements provided to your property.  This may affect your ability to borrow against, refinance, or sell the property until the mechanics lien is released.

BECAUSE THE LIEN AFFECTS YOUR PROPERTY, YOU MAY WISH TO SPEAK WITH YOUR CONTRACTOR IMMEDIATELY, OR CONTACT AN ATTORNEY, OR FOR MORE INFORMATION ON MECHANICS LIENS GO TO THE CONTRACTORS STATE LICENSE BOARD WEBSITE AT www.cslb.ca.gov.

# PROOF OF SERVICE AFFIDAVIT
## California Civil Code sections 8416

Failure to serve the Mechanics Lien and Notice of Mechanics Lien on the owner, or alternatively if the owner cannot be served on the lender or original contractor, shall cause the Mechanics Lien to be unenforceable as a matter of law (Civil Code Section 8416(e)). Service of the Mechanics Lien and Notice of Mechanics Lien must be by (1) registered mail, (2) certified mail, or (3) first-class mail evidenced by a certificate of mailing; postage prepaid, and to a residence or business address for the owner, lender or contractor. Further, a Proof of Service Affidavit (below) must be completed and signed by the person serving the Mechanics Lien and Notice of Mechanics Lien. This page should be completed (either one of the sections below) and recorded with the County Recorder along with the Mechanics Lien and Notice of Mechanics Lien.

**AFFIDAVIT FOR SERVICE ON THE OWNER**

California Civil Code Section 8416(a)(7) and (c)(1):

I, Andrew Monge, declare that I served a copy of this Mechanics Lien and Notice of Mechanics Lien by registered mail, certified mail, or first-class mail evidenced by a certificate of mailing, postage prepaid, addressed as follows to the owner(s) or reputed owner(s) of the property:

Company /Person served: 960 N. La Brea, LLC

Title or capacity of person or entity served: Owner

Service Address: 925 N. La Brea Ave, 4th Floor, Los Angeles CA, 90038.

Said service address is the owner's residence, place of business, or address shown by the building permit on file with the permitting authority for the work or the address identified on the construct trust deed.

Executed on August 28, 2020, at Los Angeles, California.

By: _____
(signature of person serving)

**ALTERNATE AFFIDAVIT FOR SERVICE ON THE CONSTRUCTION LENDER OR ORIGINAL CONTRACTOR**

California Civil Code Section 8416(a)(7) and (c)(2):

I, _____(name), declare that that the owner or reputed owner cannot be served with a copy of this Mechanics Lien and Notice of mechanics Lien by registered mail, certified mail, or first-class mail. Pursuant to California Civil Code section 8416, I served a copy of this Mechanics Lien and Notice of Mechanics Lien by registered mail, certified mail, or first-class mail evidenced by a certificate of mailing, postage prepaid, addressed as follows to the construction lender or original contractor as follows:

Company /Person served: _____.

Title or capacity of person served (if appropriate):_____.

Service Address: _____.

Executed on_____, 20__ (date), at _____(city), California.

By: _____
(signature of person serving)

C&B Forms - revised March 2012

Page Three

Español   Tiếng Việt   한국어   中文   հայերեն

THE SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

Search

| Home | Online Services | Forms, Filings & Files | Self-Help | Divisions | Jury | General Info |
|---|---|---|---|---|---|---|
| | Pay Fines, Search Records... | Forms, Filing Fees... | Self-Rep, Info, FAQs... | Civil, Criminal, Family... | Jury Duty Portal, Q&A... | Courthouses, ADA ... |

ONLINE SERVICES

# Case Access

 LANGUAGE ACCESS
English ▼

## CASE INFORMATION

PRINT    NEW SEARCH

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

**Case Number:** 20STCV32020
FERRANTE KOBERLING CONSTRUCTION, INC., A CALIFORNIA CORPORATION, ET AL. VS 960 N. LA BREA, LLC., A DELAWARE LIMITED LIABILITY COMPANY, ET AL.

**Filing Courthouse:** Stanley Mosk Courthouse

**Filing Date:** 08/21/2020
**Case Type:** Other Breach of Contract/Warranty (not fraud or negligence) (General Jurisdiction)
**Status:** Pending

Click here to access document images for this case
If this link fails, you may go to the Case Document Images site and search using the case number displayed on this page

## FUTURE HEARINGS

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

**02/18/2021** at 08:30 AM in Department 17 at 111 North Hill Street, Los Angeles, CA 90012
Case Management Conference

## PARTY INFORMATION

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

1UP FITNESS GROUP NORTH AMERICA L.P. - Defendant

703 MCKINNEY LLC - Defendant

799 VAN NESS LLC - Defendant

960 N. LA BREA LLC. - Defendant

BRESSI JESS - Attorney for Defendant

FERRANTE KOBERLING CONSTRUCTION INC. - Plaintiff

FERRANTE KOBERLING CONSTRUCTION TX INC. - Plaintiff

JOHN REED FITNESS LA LLC - Defendant

MONGE ANDREW A. - Attorney for Plaintiff

RSG GROUP NORTH AMERICA - Defendant

SCHOEPE SEBASTIAN - Defendant

## DOCUMENTS FILED

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

**Documents Filed (Filing dates listed in descending order)**
**11/09/2020** Answer
Filed by 960 N. La Brea, LLC. (Defendant); 1UP Fitness Group North America, L.P. (Defendant); 703 McKinney, LLC (Defendant) et al.

**10/13/2020** Summons (FIRST AMENDED)
Filed by Ferrante Koberling Construction, Inc. (Plaintiff); Ferrante Koberling Construction TX, Inc. (Plaintiff)

**10/13/2020** Amended Complaint ( (1st))
Filed by Ferrante Koberling Construction, Inc. (Plaintiff); Ferrante Koberling Construction TX, Inc. (Plaintiff)

**09/22/2020** Notice of Case Management Conference
Filed by Clerk

**08/21/2020** Notice of Case Assignment - Unlimited Civil Case
Filed by Clerk

EXHIBIT A - 000167

**08/21/2020** Civil Case Cover Sheet
Filed by Ferrante Koberling Construction, Inc. (Plaintiff); Ferrante Koberling Construction TX, Inc. (Plaintiff)

**08/21/2020** Summons (on Complaint)
Filed by Ferrante Koberling Construction, Inc. (Plaintiff); Ferrante Koberling Construction TX, Inc. (Plaintiff)

**08/21/2020** Complaint
Filed by Ferrante Koberling Construction, Inc. (Plaintiff); Ferrante Koberling Construction TX, Inc. (Plaintiff)

## PROCEEDINGS HELD

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

**Proceedings Held (Proceeding dates listed in descending order)**
None

## REGISTER OF ACTIONS

Case Information | Register Of Actions | FUTURE HEARINGS | PARTY INFORMATION | Documents Filed | Proceedings Held

**Register of Actions (Listed in descending order)**

**11/09/2020** Answer
Filed by 960 N. La Brea, LLC. (Defendant); 1UP Fitness Group North America, L.P. (Defendant); 703 McKinney, LLC (Defendant) et al.

**10/13/2020** Summons (FIRST AMENDED)
Filed by Ferrante Koberling Construction, Inc. (Plaintiff); Ferrante Koberling Construction TX, Inc. (Plaintiff)

**10/13/2020** Amended Complaint ( (1st))
Filed by Ferrante Koberling Construction, Inc. (Plaintiff); Ferrante Koberling Construction TX, Inc. (Plaintiff)

**09/22/2020** Notice of Case Management Conference
Filed by Clerk

**08/21/2020** Civil Case Cover Sheet
Filed by Ferrante Koberling Construction, Inc. (Plaintiff); Ferrante Koberling Construction TX, Inc. (Plaintiff)

**08/21/2020** Summons (on Complaint)
Filed by Ferrante Koberling Construction, Inc. (Plaintiff); Ferrante Koberling Construction TX, Inc. (Plaintiff)

**08/21/2020** Complaint
Filed by Ferrante Koberling Construction, Inc. (Plaintiff); Ferrante Koberling Construction TX, Inc. (Plaintiff)

**08/21/2020** Notice of Case Assignment - Unlimited Civil Case
Filed by Clerk

NEW SEARCH

EXHIBIT A - 000168

# EXHIBIT B



Electronically FILED by Superior Court of California, County of Los Angeles on 11/09/2020 05:46 PM Sherri R. Carter, Executive Officer/Clerk of Court, by X. Soto,Deputy Clerk

1  JESS R. BRESSI (Bar. No. 110264)
   jess.bressi@dentons.com
2  JAE K. PARK (Bar No. 234474)
   jae.park@dentons.com
3  DENTONS US LLP
   601 S. Figueroa Street, Suite 2500
4  Los Angeles, California 90017-5704
   Telephone:    (213) 623-9300
5  Facsimile:    (213) 623-9924
6
7  Attorneys for Defendants
   **960 N LA BREA, LLC, 703 MCKINNEY, LLC,**
8  **JOHN REED FITNESS LA, LLC, 799 VAN**
   **NESS, LLC, and RSG GROUP NORTH**
9  **AMERICA LP f/k/a 1UP FITNESS GROUP**
   **NORTH AMERICA LP**
10

11              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12       **LOS ANGELES COUNTY – STANLEY MOSK COURTHOUSE - UNLIMITED**

13  FERRANTE KOBERLING                    CASE NO. 20STCV32020
    CONSTRUCTION, INC., a California       Assigned to the Honorable Jon R. Takasugi
14  corporation, and FERRANTE KOBERLING    Department: 17
    CONSTRUCTION TX, INC., a Texas
15  corporation;                           **DEFENDANTS' ANSWER TO FIRST**
                                           **AMENDED COMPLAINT FOR:**
16              Plaintiff,
                                           **(1) BREACH OF CONTRACT;**
17       v.                                **(2) FORECLOSURE OF**
                                           **MECHANIC'S LIEN;**
18  960 N LA BREA, LLC, a Delaware limited **(3) STATUTORY PROMPT**
    liability company; 1UP FITNESS GROUP   **PAYMENT PENALTIES;**
19  NORTH AMERICA, L.P., a Delaware limited **(4) UNJUST ENRICHMENT;**
    partnership; 703 MCKINNEY, LLC, a      **(5) BREACH OF CONTRACT;**
20  Delaware limited liability company; JOHN **(6) STATUTORY PROMPT**
    REED FITNESS LA, LLC, a Delaware       **PAYMENT PENALTIES;**
21  limited liability company; 799 VAN NESS, **(7) UNJUST ENRICHMENT (ETC.)**
    LLC, a Delaware limited liability company;
22  RSG GROUP NORTH AMERICA, a             **Date filed:  August 21, 2020**
    Delaware limited partnership; and DOES 1
23  through 100, inclusive,                **Trial Date:   Not yet set**

24              Defendants.

25

26

27

28

EXHIBIT B - 000170

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

Defendants 960 N. La Brea, LLC, 1UP Fitness Group North America, L.P. (now known as RSG Group North America LP), 703 McKinney, LLC, John Reed Fitness LA, LLC, 799 Van Ness, LLC, and RSG Group North America L.P. (improperly named as RSG Group North America) (collectively "Defendants") answer the allegations set forth in plaintiffs Ferrante Koberling Construction, Inc. and Ferrante Koberling Construction TX, Inc. (collectively "Plaintiffs") unverified First Amended Complaint ("FAC") as follows:

## GENERAL DENIAL

Under California Code of Civil Procedure § 431.30(d), Defendants deny, generally and specifically, each and every allegation in the FAC that charges or relates to or purports to charge or relate to Defendants, and further expressly deny, generally and specifically, that Plaintiffs are entitled to relief or have been damaged in the sum(s) alleged, or any other sum(s) at all. Defendants further deny that Plaintiffs have sustained any damage or loss whatsoever by reason of any conduct, action, error, or omission on the part of Defendants.

This answer is without prejudice to Defendants' right to file a further amended answer or other responses after conducting discovery or obtaining additional evidence or information.

## AFFIRMATIVE AND ADDITIONAL DEFENSES

Without admitting any allegations contained in the FAC, Defendants set forth the following affirmative defenses applicable to all causes of action asserted against Defendants in the FAC. Defendants reserve the right to re-evaluate, restate or delete any of the enumerated defenses and/or to assert additional defenses. By listing any matter as an affirmative defense, Defendants do not assume the burden of proving any matter upon which Plaintiffs bear the burden of proof under applicable law. Moreover, by setting forth the following affirmative defenses, Defendants do not waive their rights to assert additional defenses as the facts of this action develop.

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

The FAC, and each of its purported causes of action asserted against Defendants, fail to state a claim against Defendants upon which relief can be granted.

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

**SECOND AFFIRMATIVE DEFENSE**

(Claims Barred by Contract Provisions)

Some or all of Plaintiffs' claims are barred by the express provisions of the contracts between the parties including conditions precedent.

**THIRD AFFIRMATIVE DEFENSE**

(No Further Obligations)

Plaintiffs' claims are barred, in whole or in part, because Defendants have fully discharged all of their obligations to Plaintiffs under the contracts at issue or otherwise.

**FOURTH AFFIRMATIVE DEFENSE**

(No Liability)

Plaintiffs have not been damaged in any way or in any manner as a result of any alleged act, conduct, or omission of Defendants.

**FIFTH AFFIRMATIVE DEFENSE**

(Superseding/Intervening Cause)

Plaintiffs' claims are barred in whole or in part by, or recovery is reduced, because none of the acts attributed to Defendants proximately caused the alleged damages, and any such causation was caused by the intervening and superseding actions of others, which intervening and superseding actions bar and/or diminish Plaintiffs' recovery, if any, against Defendants.

**SIXTH AFFIRMATIVE DEFENSE**

(No Standing)

Defendants deny that Plaintiff Ferrante Koberling Construction TX, Inc. has sustained any injury, damage or loss by reason of any act, error, or omission on the part of Defendants.  If, however, it is established that Plaintiff Ferrante Koberling Construction TX, Inc. has sustained any injury, Ferrante Koberling Construction TX, Inc., as a stranger to the relevant contract, has no standing to pursue any claim for damage or loss.

///

///

///

EXHIBIT B - 000172

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

## SEVENTH AFFIRMATIVE DEFENSE

(Failure to Mitigate Damages)

Plaintiffs' claims are barred in whole or in part because Plaintiffs have failed to mitigate their damages, if any, alleged or otherwise, and are therefore estopped from making or pursuing any claim thereon, either in this action or otherwise.

## EIGHTH AFFIRMATIVE DEFENSE

(Acts or Omissions of Others)

Plaintiffs' alleged injuries and damages, if any, were caused by the acts or omissions of persons or organizations other than Defendants, or by Plaintiffs' acts or omissions.

## THIRTEENTH AFFIRMATIVE DEFENSE

(Adequate Remedy at Law)

Plaintiffs' claims for equitable relief fails because Plaintiffs have not pled that they do not have an adequate remedy at law.

## FOURTEENTH AFFIRMATIVE DEFENSE

(Misrepresentation)

Plaintiffs' claims are barred to the extent Plaintiffs negligently or intentionally misrepresented, failed to disclose, or concealed any facts material to Defendants.

## FIFTEENTH AFFIRMATIVE DEFENSE

(Laches)

Plaintiffs' claims are barred in whole or in part by the doctrine of laches.

## SIXTEENTH AFFIRMATIVE DEFENSE

(Waiver)

Plaintiffs' claims are barred in whole or in part by the doctrine of waiver.

## SEVENTEENTH AFFIRMATIVE DEFENSE

(Estoppel)

Plaintiffs' claims are barred in whole or in part by the doctrine of estoppel.

///

///

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

### EIGHTEENTH AFFIRMATIVE DEFENSE

#### (Unclean Hands)

The FAC, and its purported causes of action, are barred by the doctrine of unclean hands. Defendants incorporate by this reference the allegations of Plaintiffs' wrongdoing (including misrepresentation) contained in the cross-complaint Defendants will be filing in a short period of time against Plaintiffs.

### NINETEENTH AFFIRMATIVE DEFENSE

#### (Unjust Enrichment)

Plaintiffs' claims are barred in whole or in part because Plaintiffs would be unjustly enriched were they to recover any sum of money.

### TWENTIETH AFFIRMATIVE DEFENSE

#### (No Damages)

Plaintiffs have not suffered any damages as a result of any action or inaction by Defendants.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

#### (Failure to Provide Work and Services)

The value of the work and services furnished by Plaintiffs at the subject properties was substantially less than the amount prayed for in the FAC.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

#### (Failure to Properly Foreclose Mechanic's Lien)

Plaintiffs have failed to properly and adequately comply with all the requirements for recording and foreclosing a mechanic's lien.

### TWENTY-THIRD AFFIRMATIVE DEFENSE

#### (Lack of License)

Plaintiffs were not duly licensed at all times material to the allegations in the FAC, thereby precluding the relief sought by the FAC.

///

///

DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT

EXHIBIT B - 000174

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

(No Improvement to Realty)

Some or all of the work performed or materials supplied by Plaintiffs did not result in a permanent improvement in the real property that is the subject of the FAC, thereby limiting or precluding the relief sought by the FAC.

### TWENTY-FIFTH AFFIRMATIVE DEFENSE

(Complainant's Breach)

Plaintiffs are barred from any recovery against Defendants due to Plaintiffs' own material breaches of contract and failure to perform its obligations, including, without limitation, Plaintiffs' defective and/or inadequate performance of work, construction, and/or related services and obligations.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE

(Lack of Priority)

Any lien or interest held by Plaintiffs in the real property that is the subject of the FAC, if any, is subject to and junior to liens, deeds of trust, and/or other interest held by other individuals and/or entities, including Defendants.

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE

(Failure to Satisfy Lien Content Requirements)

Plaintiffs failed to satisfy the requirements of code regarding the contents of a claim of lien, including without limitation California Civil Code section 8430 through 8434, thereby precluding the relief sought by the FAC.

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE

(Failure to Satisfy Timing Requirements)

Plaintiffs failed to satisfy the requirements of code regarding the timing of recording a lien and initiating legal action, including without limitation Civil Code sections 8410 through 8424, thereby precluding the relief sought by the FAC.

///

///

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

## TWENTY-NINTH AFFIRMATIVE DEFENSE

(Failure to Effect Service)

Plaintiffs failed to satisfy the service requirements set forth by code, including without limitation California Civil Code sections 8100 through 8118, thereby precluding the relief sought by the FAC.

## THIRTIETH AFFIRMATIVE DEFENSE

(Offset of Mechanic's Lien)

Some or all of the materials and/or labor provided by Plaintiffs on the subject properties were materially defective and/or not done in a workman like manner and, therefore, any amounts sought to be recovered by Plaintiffs in this action under their mechanic's lien or otherwise, must be offset, and/or is barred in whole or in part by the damages caused by Plaintiffs' defective material and/or workmanship.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

(Reasonable Value)

The amount of the claim of lien is limited to the reasonable value of the labor, services, equipment and materials used or consumed in the work of improvement.

## THIRTY-SECOND AFFIRMATIVE DEFENSE

(Consent)

Plaintiffs consented to and approved all of the acts and omissions about which they now complain. Accordingly, Plaintiffs are barred from pursuing this action.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

(Duplicative)

Some or all of the amounts sought by the FAC are duplicative and inclusive of amounts sought by other claimants, or listed in liens and/or stop notices served and recorded by other contractors, suppliers, constructors, and/or materialmen.

///

///

///

DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT

EXHIBIT B - 000176

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

### THIRTY-FOURTH AFFIRMATIVE DEFENSE

(Incorporation of Claims in Cross-Complaint)

Defendants will be filing a cross-complaint against Plaintiffs in a very short period of time.  Defendants' claims are incorporated by this reference and are reasserted as an affirmative defense to defeat, reduce or offset, in part or in full, any and all claims asserted by Plaintiffs against Defendants.

### THIRTY-FIFTH AFFIRMATIVE DEFENSE

(Fraud in the Inducement)

Defendants' consent to each of the contracts alleged in Plaintiffs' FAC to have been entered by Defendants, Exhibits "A" through "D" to the FAC, was induced by fraudulent representations by Plaintiffs to Defendants.  The fraudulent representations that are known of as of the present date that fraudulently induced Defendants' consent are to be alleged with great specificity in the cross-complaint against Plaintiffs by Defendants which is to be filed with the court in a very short period of time.  Defendants' counter claims of fraud are incorporated by this reference and are reasserted as an affirmative defense to negate Defendants' putative consent to the contracts and any and all claims asserted by Plaintiffs against Defendants.

### THIRTY-SIXTH AFFIRMATIVE DEFENSE

(Breaches of the Implied Covenant of Good Faith and Fair Dealing)

The FAC, and its purported causes of action, are barred by the Plaintiffs' Breaches of the Implied Covenant of Good Faith and Fair Dealing.  Defendants incorporate by this reference the allegations of Plaintiffs' Breaches of the Implied Covenant of Good Faith and Fair Dealing contained in the cross-complaint Defendants will be filing in a short period of time against Plaintiffs.

### ADDITIONAL DEFENSES

Defendants reserve the right to amend this general denial to assert such additional defenses as may become apparent during the continuing course of discovery in this action.

WHEREFORE, Defendants pray for judgment as follows:

EXHIBIT B - 000177

A.  That the Court dismiss Plaintiffs' causes of action against Defendants with prejudice;

B.  That the Court award Defendants all their attorney fees and costs incurred in connection with this action; and

C.  That the Court award Defendants such other and further relief as this Court deems just and proper.

Dated: November 9, 2020

Respectfully submitted,

DENTONS US LLP

By: */s/ Jess Bressi*

Jess Bressi

Attorney for Defendants 960 N. La Brea, LLC, 1UP Fitness Group North America, L.P. (now known as RSG Group North America LP), 703 McKinney, LLC, John Reed Fitness LA, LLC, 799 Van Ness, LLC, and RSG Group North America L.P.

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

8

EXHIBIT B - 000178

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

**PROOF OF SERVICE**

*Ferrante Koberling Construction, Inc., et al. v. 960 N. La Brea, LLC, et al.*

*Case No. 20STCV32020*

I am a resident of the State of California, County of Orange; I am over the age of eighteen years and not a party to the within action; my business address is 4675 MacArthur Court, Suite 1250, Newport Beach, California  92660.

On November 9, 2020, I caused to be served on the interested parties in this action through ACE Attorney Service, the within document(s) entitled:

**DEFENDANTS' ANSWER TO FIRST AMENDED COMPLAINT**

[   ]   **BY HAND DELIVERY:**  I enclosed the documents in a sealed envelope addressed to the persons at the address listed below and engaged **ACE Attorney Service** to deliver it to them by hand to the offices of the addressee.

[   ]   **BY FAX: -** by transmitting via electronic facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.; I also caused the fax machine to print such record(s) of the transmission.

[   ]   **BY MAIL:  -** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Newport Beach, California addressed as set forth below.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[   ]   **BY OVERNIGHT MAIL -** By **FEDEX**, following ordinary business practices for collection and processing of correspondence with said overnight mail service, and said envelope(s) will be deposited with said overnight mail service on said date in the ordinary course of business.

[   ]   **BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED** – By placing true copy(ies) thereof in sealed envelope(s) with Certified Mail, Return Receipt Requested, postage thereon fully prepaid and by causing such envelope(s) to be deposited in the mail at 4675 MacArthur Court, Suite 1250, Newport Beach, CA 92660.

EXHIBIT B - 000179



1  [   ]   **BY ELECTRONIC SERVICE** -  the parties listed below were served
2       electronically with the document(s) listed above by e-mailed PDF files on
3       November 9, 2020.  The transmission was reported as complete and without error.
       My electronic notification address is 4675 MacArthur Court, Suite 1250, Newport
4       Beach, California 92660.  My e-mail address is judy.padilla@dentons.com.

5  [ X ]   **BY ELECTRONIC SERVICE VIA COURT'S E-FILE**:  Pursuant to California
       Rules of Court Nos. 2.250, 2.253, 2.261 and the Code of Civil Procedure, and
6       pursuant to the Court's First Amended General Order of May 3, 2019, I uploaded
7       the document(s) without error to https://efile.acelegal.com/ selecting the proper
       functions to electronically serve the person(s) listed via the Court's e-file system.
8
9   Mark A. Feldman                    *Attorneys for Plaintiffs*
    Andrew A. Monge                    **FERRANTE KOBERLING**
10   11030 Santa Monica Blvd., Suite 109   **CONSTRUCTION, INC. and FERRANTE**
    Los Angeles, California 90025       **KOBERLING CONSTRUCTION TX,**
11   Tel:    (310) 312-5401              **INC.**
    Fax:    (310) 312-5409
12
13       [ X ]  **STATE:**  I declare under penalty of perjury, under the laws of the State of
14   California, that the above is true and correct.

15       [   ]  **FEDERAL:**  I declare that I am employed in the office of a member of the Bar of
16   this Court at whose direction this service was made.

17       Executed on November 9, 2020, at Newport Beach, California.

18                                    _Judy Padilla_
19                                    _____
                                     Judy Padilla
20
21
22
23
24
25
26
27
28

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

EXHIBIT B - 000180

## PROOF OF SERVICE

*Ferrante Koberling Construction, Inc., et al. v. 960 N. La Brea, LLC, et al.*

I am a resident of the State of California, County of Orange; I am over the age of eighteen years and not a party to the within action; my business address is 4675 MacArthur Court, Suite 1250, Newport Beach, California 92660.

On November 10, 2020, I caused to be served on the interested parties in this action through ACE Attorney Service, the within document(s) entitled:

**DEFENDANTS' NOTICE OF REMOVAL**

[    ]    **BY HAND DELIVERY:**  I enclosed the documents in a sealed envelope addressed to the persons at the address listed below and engaged **ACE Attorney Service** to deliver it to them by hand to the offices of the addressee.

[    ]    **BY FAX: -** by transmitting via electronic facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.; I also caused the fax machine to print such record(s) of the transmission.

[ X ]    **BY MAIL:  -** by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Newport Beach, California addressed as set forth below.  I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

PROOF OF SERVICE

US_Active\115901388\V-1

[   ]   **BY OVERNIGHT MAIL -** By **FEDEX**, following ordinary business practices for collection and processing of correspondence with said overnight mail service, and said envelope(s) will be deposited with said overnight mail service on said date in the ordinary course of business.

[   ]   **BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED** – By placing true copy(ies) thereof in sealed envelope(s) with Certified Mail, Return Receipt Requested, postage thereon fully prepaid and by causing such envelope(s) to be deposited in the mail at 4675 MacArthur Court, Suite 1250, Newport Beach, CA 92660.

[   ]   **BY ELECTRONIC SERVICE** -  the parties listed below were served electronically with the document(s) listed above by e-mailed PDF files on November 10, 2020.  The transmission was reported as complete and without error.  My electronic notification address is 4675 MacArthur Court, Suite 1250, Newport Beach, California 92660.  My e-mail address is judy.padilla@dentons.com.

[   ]   **BY ELECTRONIC SERVICE VIA COURT'S E-FILE**:  Pursuant to California Rules of Court Nos. 2.250, 2.253, 2.261 and the Code of Civil Procedure, and pursuant to the Court's First Amended General Order of May 3, 2019, I uploaded the document(s) without error to https://efile.acelegal.com/ selecting the proper functions to electronically serve the person(s) listed via the Court's e-file system.

Mark A. Feldman
Andrew A. Monge
11030 Santa Monica Blvd., Suite 109
Los Angeles, California 90025
Tel:    (310) 312-5401
Fax:   (310) 312-5409

*Attorneys for Plaintiffs*

**FERRANTE KOBERLING CONSTRUCTION, INC. and FERRANTE KOBERLING CONSTRUCTION TX, INC.**

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

PROOF OF SERVICE

US_Active\115901388\V-1

[   ] **STATE:**  I declare under penalty of perjury, under the laws of the State of California, that the above is true and correct.

[ X ] **FEDERAL:**  I declare that I am employed in the office of a member of the Bar of this Court at whose direction this service was made.

Executed on November 10, 2020, at Newport Beach, California.

*Judy Padilla*
_____

Judy Padilla

DENTONS US LLP
601 S. FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017
(213) 623-9300

PROOF OF SERVICE

US_Active\115901388\V-1